UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
JUN 20 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| WINSTON & STRAWN LLP<br>1700 K STREET NW<br>WASHINGTON, DC 20006<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE<br>CORPORATION<br>550 17TH STREET NW<br>WASHINGTON, DC 20429<br><br>Defendants. | CASE NUMBER 1:06CV01120<br>JUDGE: Emmet G. Sullivan<br>DECK TYPE: General Civil<br>DATE STAMP: 06/20/2006 |

## COMPLAINT FOR RELIEF

Plaintiff Winston & Strawn LLP ("the Plaintiff" or "W&S") for its Complaint for Relief against the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as Receiver for Benj. Franklin Federal Saving & Loan Association ("Benj. Franklin"), Portland, Oregon, hereby states as follows:

### Nature of the Case

1. Plaintiff W&S is a law firm that successfully represented Benj. Franklin and its shareholders in a breach of contract action against the United States in the United States Court of Federal Claims and a related tax action in the United States District Court for the District of Columbia. In the action in the Court of Federal Claims, then Chief Judge Smith awarded Benj. Franklin a judgment of $34,672,500 in June 2002. In the tax litigation before Judge Sullivan in this Court, W&S settled a $1.2 billion tax claim asserted by the Internal Revenue Service ("IRS") for $50 million. W&S agreed to accept greatly reduced professional rates for its representation

1

of Benj. Franklin in both matters in exchange for a promise that it would receive a success fee if the firm obtained a favorable outcome. The instant action relates solely to W&S's successful settlement of Benj. Franklin's tax litigation in this Court. Having obtained a favorable result in that litigation, W&S now seeks reimbursement for reasonable attorneys' fees, including a success fee equaling twice its standard billing rates, minus the amounts already paid W&S. The holders of over one-third of Benj. Franklin's shares have already approved payment of the specific fees sought and no shareholder has voiced opposition.

### Parties

2.  Plaintiff W&S is an Illinois limited liability partnership, with its principal place of business at 35 West Wacker Drive, Chicago, IL 60601.

3.  The FDIC was established under the Federal Deposit Insurance Act, as amended, for the purpose of, among other things, insuring the accounts of depositors of certain state and federal depository institutions. The agency also has been the primary federal regulator of state chartered savings banks. In the instant action, FDIC assumed the responsibility of Receiver for Benj. Franklin Savings & Loan Association as of December 31, 1995, when, by statute, the Resolution Trust Corporation ("RTC") succeeded to the rights and obligations of the RTC in connection with those institutions for which the RTC was then the receiver. The FDIC maintains its principal place of business in Washington, D.C.

### Jurisdiction and Venue

4.  This Court has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. § 1821(d)(6), in that W&S submitted a proof of claim seeking payment of the fees with the FDIC on November 18, 2005, that proof of claim was denied in part by the FDIC on May 17, 2006, and W&S filed this action with the Court within 60 days of the denial of its full claim.

The legislative history of 12 U.S.C. § 1821 confirms that W&S is entitled to a *de novo* review of its claim by this Court, rather than a simple review of the FDIC's prior disallowance of its claim. *See* H.R. Rep. No. 54, 101st Cong., 1st Sess., pt. 1 at 418-419, *reprinted in* U.S.C.C.A.N. 86, at 214-215.

5. W&S has complied with all of the relevant procedural mandates prescribed by 12 U.S.C. § 1821, including obtaining an initial determination of its claim by the FDIC. *See* Ex. 1.

6. This Court may properly exercise personal jurisdiction over the Defendant because the Defendant resides and maintains its primary place of business in the District of Columbia, and because its denial of W&S's claim took place in this judicial district.

7. Venue is proper in this District pursuant to 12 U.S.C. § 1821(d)(6), as well as 28 U.S.C. § 1391(b)(1)-(2), because the FDIC resides in this judicial district and a substantial portion of the events and/or omissions giving rise to W&S's claim occurred in this judicial district.

**Background**

8. Rising interest rates and a deregulated market caused many savings and loans in the 1970s to pay substantially more in interest for funds than they were receiving from borrowers of 30-year mortgages. This interest rate mismatch led many savings and loan associations to the brink of collapse in the early 1980's. As the insurer of these failing institutions, the FDIC and its then-sister agency, the Federal Savings and Loan Insurance Corporation ("FSLIC"), were faced with a potential payout of $20-30 billion to insured depositors of failing savings and loan associations.

9. To avoid this liability, the FDIC and the FSLIC offered substantial incentives to financially healthy thrifts that would agree to purchase failing institutions. Specifically, the

FDIC and the FSLIC induced mergers by offering assistance to healthy thrifts in the form of *supervisory goodwill* -- an intangible, non-earning asset that could be amortized on a straight line basis over a period of up to 40 years equal to the liabilities assumed marked to market less the assets assumed marked to market. In effect, this arrangement allowed purchasing thrifts to offset any net liabilities acquired with the intangible asset of supervisory goodwill, with the understanding that the supervisory goodwill would be amortized over an agreed number of years.

10. Benj. Franklin merged with one failing institution, Equitable Savings and Loan, in September 1982, and purchased a second failing institution, Western Heritage, in July 1985. In return for its agreement to acquire the liabilities and assets of Equitable Savings and Loan, Benj. Franklin was permitted to treat the resulting supervisory goodwill of $342 million as a regulatory capital asset to be amortized over a period of 32 years. In return for its agreement to acquire the liabilities and assets of Western Heritage, Benj. Franklin was permitted to treat the resulting supervisory goodwill of $6.8 million as a regulatory capital asset to be amortized over a period of up to 25 years.

11. In response to further disruptions in the banking market in the late 1980's, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). Among other things, FIRREA drastically altered the federal regulatory structure which then applied to financial institutions.

12. Most relevant to the instant action, FIRREA prevented federal regulators from treating supervisory goodwill as regulatory capital (with exceedingly modest exceptions), notwithstanding the agreements made years earlier by federal officials. As a result, a number of financial institutions were unable to maintain minimum regulatory capital requirements and were ultimately seized by federal regulators.

4

13. Because Benj. Franklin could no longer treat its contracted-for supervisory goodwill as regulatory capital, Benj. Franklin -- for the first time in the institution's history -- was unable to satisfy its minimum regulatory capital requirements and, as a result, federal regulators seized the institution in February 1990.

14. Federal banking regulators appointed the RTC to serve as Benj. Franklin's Receiver during its wind down and liquidation. On September 14, 1990, W&S, together with Portland, Oregon counsel, Don S. Willner, filed a derivative and class action in the United States Court of Federal Claims, alleging takings and breach of contract claims. Because the RTC, as Receiver, elected not to bring the action, C. Robert Suess, a major Benj. Franklin shareholder, filed the action in his name for the benefit of Benj. Franklin and its shareholders.

15. The FDIC succeeded the RTC as Benj. Franklin's Receiver on December 31, 1995 when, by statute, the RTC ceased to exist. In April 1999, the FDIC joined the shareholders' derivative action as an involuntary plaintiff. By agreement, however, Mr. Willner and W&S took the lead at trial and the shareholders continued to manage the litigation, primarily through the leadership of their named plaintiff, C. Robert Suess.

16. On December 22, 1997, then Chief Judge Smith of the United States Court of Federal Claims granted Benj. Franklin's motion for summary judgment, finding the United States liable to Benj. Franklin for breach of contract. In addition, pursuant to a pre-existing Case Management Order, the court ordered a full trial on the issue of damages.

17. Shortly after the liability decision was rendered, and with discovery underway in connection with the damages portion of the case, in the course of their review of financial documents, counsel discovered that the IRS had asserted a claim against the Benj. Franklin receivership for $1.2 billion in alleged taxes and penalties. Because the IRS's claim exceeded the

total damages sought by Benj. Franklin, the shareholder plaintiffs immediately directed W&S to marshal all of its expert tax and litigation resources to analyze the legitimacy of the IRS's claim and either negotiate a settlement or prepare an effective defense.

18.    W&S agreed to provide the requested services under the pre-existing fee agreement, which provided for the payment of legal fees at a greatly reduced rate of $125 per hour, notwithstanding that the ordinary hourly rate for its principal lawyer on the case was about three times that amount at the time. This agreement was premised on the express understanding that W&S would be paid a success fee *in excess of the firm's normal standard rates* if the firm achieved a successful outcome, as judged by Benj. Franklin's shareholder plaintiffs. By this arrangement, Benj. Franklin and its shareholders significantly reduced their risk by paying in real time only a fraction of the amount W&S would ordinarily charge, while acknowledging that W&S would be entitled to an amount greater than its ordinary billable rates should its work yield a positive outcome.

19.    At all relevant times, W&S was eminently qualified to provide advice on complex issues of taxation and was also recognized as one of the nation's top litigation law firms. Consistent with its strong reputation in the legal community, W&S provided expert tax analysis and advice as well as expert skill in negotiating all of the receivership's tax issues with the IRS and the Department of Justice's Tax Division.

20.    On June 6, 2002, after a trial lasting more than six months, then Chief Judge Smith entered a judgment in the damages action on behalf of the Benj. Franklin receivership in the amount of $34,672,500.

21.    Shortly thereafter, the Department of Justice filed a motion for reconsideration on the issue of damages. On December 3, 2002, then Chief Judge Smith issued an order

6

withholding his decision on the Government's motion for reconsideration pending resolution of Benj. Franklin's tax dispute with the IRS.

22. In the course of analyzing the IRS's tax claim and developing a defense against it, W&S conducted multiple depositions, researched and prepared numerous memoranda analyzing complex and novel tax issues, and subpoenaed and reviewed thousands of pages of tax returns and other tax related documents. W&S utilized the considerable work product generated by these activities in the course of its extensive, and ultimately successful, negotiations with the IRS and the Department of Justice's Tax Division. W&S also prepared numerous complex tax shelters, reviewed the IRS's analyses and schedules and took the lead in negotiating the two cases with the FDIC and the IRS.

23. W&S exposed itself to substantial financial risk by agreeing to charge discounted rates in return for only the possibility of recovering a success fee. The billable rate of $125 per hour was substantially lower than the rates W&S customarily received for professional services and, if W&S had been unable to achieve a successful outcome in the IRS tax dispute, it would never have been able to recover the difference between the substantially reduced rate and its customary fees.

24. The novel and complex nature of the issues presented by Benj. Franklin's breach of contract and takings action and its dispute with the IRS increased the uncertainty of the outcome of these actions, which in turn increased the level of W&S's risk in undertaking these matters on a contingency basis. The IRS based its tax claim on the assertion that Federal Financial Assistance ("FFA") paid to the Benj. Franklin receivership should be treated as taxable income. Because very few FDIC receiverships have ever maintained a positive balance sheet after receiving FFA, as the Benj. Franklin receivership did, the application of a federal income

tax to FFA created a novel issue of law. In fact, no reported decision or published scholarly article had ever addressed this issue.

25. In addition to the financial risks assumed by W&S, the contingent nature of the fee agreement at issue dictated that W&S would not be paid more than $125 per hour (if at all) *until a successful outcome had been achieved*. In other words, the fee agreement required W&S to abdicate any right to immediate payment. To date, W&S has been compensated $189,456.76 for efforts and work product that, under a customary fee agreement, would have yielded the immediate payment of $582,603.75 in professional fees.

26. On November 18, 2005, W&S filed a proof of claim with the FDIC requesting the same relief sought in the instant action.

27. On May 17, 2006, the FDIC allowed W&S's recover of attorney's fees equivalent to their standard hourly rates, but denied W&S's request for the success fees sought herein.

28. Under 12 U.S.C. § 1821(d)(6)(A)(ii), the FDIC's denial of W&S's full claim entitles W&S to seek a *de novo* determination of its claim before this Court.

**FIRST CLAIM FOR RELIEF**
**Determination of Claim for Reasonable Attorneys' Fees under 12 U.S.C. § 1821(d)(6)**

29. W&S hereby incorporates by reference the factual allegations contained in paragraphs 1 - 28 of this Complaint as if fully restated herein.

30. W&S has complied with all of the relevant procedural mandates prescribed by 12 U.S.C. § 1821, including obtaining an administrative determination of its claim in the first instance. *See* Ex. 1. Accordingly, W&S is now entitled to a *de novo* judicial determination of its claim.

8

31.    By all applicable standards, the fees sought by W&S are both reasonable and fair. Thus, awarding the requested relief will not create a windfall for W&S.

32.    While being compensated at approximately one-third its standard billing rates, and with no assurance it would ever recover more, W&S expended vast resources, applied unique expertise to evaluate novel and unusually technical issues of law and fact, and ultimately helped to settle a $1.2 billion tax claim for $50 million -- thereby preserving a $42 million receivership surplus.

33.    As a direct result of W&S's efforts, after the remaining administrative expenses and claims are paid by the FDIC-Receiver, tens of millions of dollars will be available for distribution to the shareholders of Benj. Franklin.

34.    W&S's standard hourly rates were at all relevant times consistent with the prevailing rates for attorneys in Washington D.C. offering services of a similar type and quality. As such, the success fee sought by W&S constitutes no more than the amount of compensation that was adequate to attract competent counsel to accept the cases at issue.

35.    The FDIC spent six months reviewing W&S's fee petition and invoices before rendering its recent determination. The FDIC ultimately concluded that W&S's standard hourly rates were acceptable, and thus determined that the Benj. Franklin receivership should compensate W&S for all but 15.5 hours (the equivalent of only $6,638.75 in fees) of the claimed attorney billing time that accrued over the past nine years. *See* Ex. 1.

36.    If W&S were to recover the portion of its proof of claim denied by the FDIC, i.e., the success fee sought in this action, the total fees recovered by W&S would constitute only 2.75 percent of the $42 million dollars retained for the receivership as a direct result of the firm's

9

efforts. This percentage is substantially lower than percentage-based contingency awards routinely sustained as reasonable by courts in this and other jurisdictions.

37. The fee agreement between W&S and the Benj. Franklin shareholder plaintiffs was expressly premised on the understanding that W&S would be paid a success fee if the firm achieved a successful outcome in the IRS dispute, as determined by Benj. Franklin's shareholder plaintiffs.

38. W&S was in fact successful in achieving such an outcome, as evidenced by, among other things, the fact that over one-third of Benj. Franklin's shareholders have already approved the success fee sought by W&S in the instant action. Attached as Exhibit 2 are declarations of support from individuals holding over one-third of the outstanding shares of Benj. Franklin stock. In addition, in one of these attached declarations, C. Robert Suess, the named plaintiff in Benj. Franklin's underlying derivative action against the United States, states that he has spoken with individuals who hold over half of the shares of Benj. Franklin stock, and that these individuals fully support W&S's recovery of the success fee requested herein.

39. A substantial portion of the work performed by W&S was completed in the years 1998 and 1999. Applying a standard interest rate to W&S's hourly fees from this period forward would result in an amount equal to at least twice W&S's current hourly rates. Accordingly, in actuality, W&S will not recover any success fee for the work performed during these years even if it succeeds in the instant action. Similarly, applying the same standard interest rate to fees not yet recovered from the years 2000 to 2006 would demonstrate that W&S is actually seeking far less than a doubling of its fees for the work completed during the entire period in question.

40. W&S would not have undertaken matters as complicated and demanding as those described above in return for greatly reduced billable rates if it were only offered a success incentive equivalent to the substantially delayed payment of its standard professional fees.

41. To date, W&S has not been compensated in any way for the risk it assumed by representing Benj. Franklin at substantially reduced rates.

### SECOND CLAIM FOR RELIEF
### Quantum Meruit

42. W&S hereby incorporates by reference the allegations contained in paragraphs 1 - 41 of this Complaint as if fully restated herein.

43. All of the relevant facts, taken together, demonstrate that W&S deserves to recover the full recovery requested in this action.

44. W&S rendered valuable services to Benj. Franklin's shareholders and the Benj. Franklin receivership. W&S committed extensive resources, applied its unique expertise to evaluating novel and technical issues of law and fact and settled a $1.2 billion tax claim for $50 million -- thereby preserving a $42 million receivership surplus. As a result of W&S's efforts, tens of millions of dollars will be distributed to Benj. Franklin's shareholders that otherwise would likely have been paid to the IRS.

45. The FDIC, as Receiver, has benefited from W&S's services. Accordingly, W&S seeks payment in this action from the very party on whose behalf it has rendered valuable services.

46. Benj. Franklin's shareholder plaintiffs and the Benj. Franklin receivership accepted, used and enjoyed W&S's services to effectuate a favorable resolution of their tax dispute with the IRS.

47.  Benj. Franklin's shareholder plaintiffs and the Benj. Franklin receivership were provided reasonable notice, both actual and constructive, that W&S expected to be paid for the valuable services it rendered.

    (i) The fee agreement between W&S and the Benj. Franklin shareholder plaintiffs called for the payment of reduced hourly professional fees, but was expressly premised on the understanding that W&S would be paid a success-contingent fee if the firm achieved a successful outcome, as determined by Benj. Franklin's shareholder plaintiffs.

    (ii) W&S would not reasonably have undertaken complicated and demanding matters, involving novel legal issues, in return for substantially reduced billable rates if, under the best case scenario, it stood to receive only the substantially delayed payment of its standard professional fees.

    (iii) The total fees sought by W&S in this action, including the success fee, constitute only 2.75 percent of the $42 million dollars retained for the receivership as a direct result of W&S's efforts. This percentage is substantially lower than percentage-based contingency awards routinely sustained as reasonable by courts in this jurisdiction.

    (iv) Over one-third of Benj. Franklin's shareholders have already approved the success fee sought by W&S.

WHEREFORE, for the reasons stated, W&S requests that this Court grant the award of a success fee compensating W&S at a rate of twice its standard billing rates for the work performed during the relevant period, minus the amount already paid by Benj. Franklin shareholders at the reduced rate of $125 per hour and the amount paid by the FDIC Receiver. Accordingly, W&S requests judgment in the amount of $574,937.99 (two times its total fees of $582,603.75 at the standard hourly rate, less $189,456.76, which has already been paid by Benj. Franklin shareholders, and less $400,812.75, which has already been paid by the FDIC Receiver) from the Benj. Franklin receivership, and any such further relief as the Court deems just and proper.

Respectfully submitted,

Winston & Strawn LLP

By: _____
Thomas M. Buchanan
Eric W. Bloom
Edwin H. Caldie
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5000 (office)
(202) 282-5100 (fax)

DATE: June 20, 2006

DC:465697.1

13