```
00001
01  UNITED STATES DISTRICT COURT
02  FOR THE DISTRICT OF COLUMBIA
03  United States of America         Docket No. CA 02-1427 EGS
04          Plaintiff
05                                   Washington, D.C.
06       vs.                         Tuesday, May 2, 2006
07                                   2:00 p.m.
08  Federal Deposit Insurance
09   Corporation
10          Defendant
11  Transcript of Fairness Haring
12  Before the Honorable Emmitt G. Sullivan
13  United States District Judge
14  APPEARANCES:
15  For the Plaintiff:       Henry C. Darmstader, Esq.
16  For the Defendant:       Richard S. Gill, Esq.
17  Other Counsel:           Thomas M. Buchanan, Esq.
18                           Rosemary Stewart, Esq.
19  Reporter:                WILLIAM D. MC ALLISTER, CVR CM
20                           Official Court Reporter
21                           Room 4806 B
22                           333 Constitution Avenue, N.W.
23                           Washington, D.C. 20001 8306
24                           (202) 371 6446
25  Reported by Voice Writing and transcribed using SpeechCAT
26  Pages 1 through 58
00002
01  P R O C E E D I N G S
02          THE CLERK: This is the case in the matter of Civil
03  Action 02-1427. United States Versus Federal Deposit Insurance
04  Corporation, et al.
05          Will counsel please state your name of the record?
06          MR. GILL: Richard Gill, representing the Federal
07  Deposit Insurance Corporation and we filed the motion for the
08  fairness hearing.
09          MR. DARMSTADTER: Good afternoon, Your Honor. Henry
10  Darmstadter for the plaintiff, United States of America.
11          THE COURT: Who else is sitting at counsel table? It
12  is good to know who is sitting in the well of the court.
13          MR. WILLNER: Your Honor, I am Don Willner from
14  Portland. I represent shareholders.
15          THE COURT: Good afternoon. Welcome to court.
16          MS. STEWART: Rosemary Stewart. I also represent
17  shareholders.
18          MR. BUCHANAN: Thomas Buchanan of the first Winston
19  and Strawn. I represent shareholders, Your Honor.
20          THE COURT: We have some guests on the telephone, do
21  we not?
22          MR. WILLNER: Your Honor, the court will recall in
23  the court's order you allowed a hook up to the courtroom in
24  Portland, Oregon.
25          THE COURT: Yes.
00003
01          MR. WILLNER: On the screen are many shareholders
02  from Portland, Oregon, and the surrounding area participating
03  through the magic of video camera
```

```
19  several distributions that have been requested by the
20  shareholders and the shareholders' counsel that are going
21  through the FDIC's claim process.  In particular those relate
22  to there was a litigation trust fund created that has
23  approximately $3 million.  The FDIC has tentatively agreed and
24  will issue a formal determination to pay that particular
25  distribution to the shareholders that contributed that money,
00010
01  and in the next phase we have three sets of petitions.  I
02  truthfully wish that was before the court, but it's before the
03  FDIC so it's not on your plate which is on the attorney's fees
04  relating to this particular tax case.
05           So what I'm trying to say is the only thing that is
06  specifically before this court is the approval of the $50
07  million tax settlement.
08           THE COURT:  All right.  And approval of that
09  sentiment has nothing to do with the request for attorney's
10  fees, is that correct?
11           MR. GILL:  Yes, Your Honor.  It has nothing to do
12  with it.  That is coming through the FDIC's claim process.  But
13  I will say that in the event that the shareholders' counsel
14  contest the attorneys' fee determination, they can pick a
15  district court to go to but that's totally separate and it's
16  basically the appeals process from the FDIC claims
17  determination.
18           THE COURT:  That's fine.
19           MR. GILL:  What might be helpful, just obviously -- I
20  don't want to go through the nuances of the settlement --
21           THE COURT:  I don't want to belabor the point.  I
22  have received, as you can well imagine, scores of comments pro
23  and against the settlement, and there have been a fair number
24  of comments regarding the attorney's fees.
25           I just want the folks in Portland to know that this
00011
01  court has no jurisdiction at this time to address any issues
02  that impact attorney's fees because that is an issue of some
03  concern to shareholders.  I just want the record clear.  That
04  is still in the administrative proceeding.  It may well find
05  its way to a judicial tribunal at some point but it may well be
06  resolved at the administrative level, correct?
07           MR. GILL:  Yes, Your Honor.
08           THE COURT:  I just want the folks in Oregon to know
09  that.
10           MR. GILL:  It might be helpful and I'll try to be
11  brief, but just a brief walk through of the settlement process
12  so that you can feel comfortable.
13           THE COURT:  Oh, go right ahead.  Take your time.
14           MR. GILL:  I think that parties fought hard and long
15  and it's one of those kinds of things that I have learned that
16  maybe this is why we have a settlement.  It is the old adage
17  that when agencies with a reputation for excellence probably
18  take on a case with a reputation for mediocrity, I think we've
19  all learned that it's the reputation of the case that survives.
20  And so I think in this particular case it's why everybody, I
21  think, sat down and tried to be reasonable.
22           But initially when the government filed its complaint
23  in July of 2002, they were alleging IRS damages in excess of a
```

```
24  billion dollars.  That was composed of approximately 94 million
25  in taxes, an excess of 200 million in penalties and an excess
00012
01  of $770 million in interest.  That was in July of 2002.
02          Several months later, the Portland, Oregon case was
03  stayed and we all sat down, the Internal Revenue Service which
04  was ably represented by Mr. Darmstadter and others and at the
05  FDIC's request we invite shareholders' counsel because we
06  wanted their good wisdom on this particular matter, to sit down
07  and see if we could try to reach resolution.
08          And what we've got in this particular instance which
09  is pretty rare in the FDIC's scheme of things is a surplus
10  receivership.  We found, up until recently, that they're more
11  like Halley's comet.  They come by once in a generation so we
12  don't see these cases very often.
13          But what we have now is approximately $94 million in
14  surplus; and if the IRS were to prevail in litigation for the
15  billion dollars, obviously there will be no money to pour out
16  to the shareholders.
17          So we all sat down to see, because from the FDIC's
18  perspective what we were really trying to do was find the
19  correct tax.  So the principal issue that was in dispute, but
20  there was a bunch of others, was this vehicle called federal
21  financial assistance and what happened when this particular
22  institution was taken down in February of 1990, Bank of America
23  took over the deposits and assets of the institution.  But they
24  put back to the FDIC, or it was the Resolution Trust
25  Corporation, approximately a billion seven and certain types of
00013
01  mortgages that they didn't want.
02          Well, that under the IRS, this particular interim
03  regulation called 89(102) produced immediate tax consequences
04  because it was determined to be income in that particular year.
05          Now, the FDIC disagreed with that determination and
06  we fought hard with the shareholders' counsel; and what the IRS
07  has done for purposes of this settlement is actually allowed
08  the more lenient treatment of federal financial assistance
09  which basically allows it to, in effect, not to be taxable
10  because it is only taxable when it is put up against years in
11  which they have expenses that offset the income.  The net
12  effect of that was the IRS allowed us to use section 597.
13          The IRS also, just for purposes of the settlement,
14  obviously if we're back in the litigation arena, all bets are
15  bets are off and the IRS and the Department of Justice will
16  certainly pursue the maximum tax case possible.  They waived,
17  for these purpose the penalties which were in excess of $200
18  million dollars.  There was another deduction that the FDIC did
19  not take because it occurred in later years and the IRS allowed
20  us to actually roll it back into the year of failure which was
21  1990 which was 258 million dollars for something called
22  subrogated interest which was frankly interest paid on the
23  deposits that the FDIC picked up.
24          The bottom line on all of this is that we pushed a
25  tax liability that was in excess of a billion dollars with all
00014
01  the interest and penalties down to approximate 12 million in
02  tax and around 38 million in interest.  From the FDIC's
```

```
03  perspective we believe that that actually is the appropriate
04  tax consequences in this particular case.
05          Sort of the next thing I'd like to talk briefly
06  about, I know that lawyers never should do math in public, but
07  since the FDIC is the party that actually, you know, pushed for
08  the proxies, I just wanted -- you are getting the originals
09  obviously of the proxies, but just from, we've done an Excel
10  spreadsheet and what we have come up with but they are still
11  coming in, I mean, in other words hopefully we can stop
12  counting.  But we have actually received approximately two
13  million 900,000 in shareholder proxies representing -- there
14  were seven million, 705,000 shares at the time of failure.  So
15  we received two million nine of the shares voting which is
16  approximately 39 percent of the outstanding shares.  And of
17  those, we've got two million 668,000 that were affirmative
18  voting in favor of the settlement and we have 22,000 shares, a
19  little over 22,000 shares disagreeing with the settlement.
20          Just to push the percentages a little bit, if my math
21  is correct, we have approximately 99.3 percent of the shares
22  that voted, represented voting in favor of the settlement and
23  we have 0.7 percent of the shares disagreeing with the
24  settlement.
25          For all of these reasons we believe that, you know,
00015
01  that this settlement should be approved.  We believe that it's
02  a fair and reasonable settlement and it will result in
03  distributions back to the shareholders, the total surplus that
04  would be left after the IRS received the 50 million would be
05  $44 million dollars
06          Your Honor, that's all that I have to say, but I
07  would like, obviously with your permission, to turn it over to
08  Don Willner who is the lead counsel for the shareholders at
09  least in the good will litigation case.
10          THE COURT:  Let me ask a question.  I'm just curious
11  as to whether or not there was any criminal responsibility
12  assigned to anyone for what happened in this case?
13          MR. GILL:  Not that I'm aware of, Your Honor,
14          THE COURT:  That in and of itself is fairly amazing
15  in this day and age.  No one was prosecuted for what happened?
16  It was just flagrant disregard of the tax laws.
17          MR. GILL:  I think that --
18          THE COURT:  This wasn't just simple negligence.  It
19  was gross negligence.
20          MR. GILL:  Actually, Your Honor, it's far more
21  complicated than that.  What actually happened is is that
22  Congress passed, probably during the height of the thrift
23  crisis, they passed legislation that because during the 1980s
24  federal financial assistance was abused and people were not
25  only getting -- they were getting kind of a doubled tax benefit
00016
01  for it.  Congress sort of swung the other way and said that
02  federal financial assistance was to be taxed.  The IRS issued
03  89(102) which if that particular tax regulation which actually
04  applies in this case were to be applied, the tax liability
05  would be approximately $94 million dollars.  Then the penalties
06  and interest would flow.
07          THE COURT:  So there would be nothing to turn over
```

```
08  the shareholders at all then.
09         MR. GILL:  Exactly.  But what happened is the IRS,
10  upon rethinking and recogitating, determined that 597 was the
11  more appropriate regulation, but that was not enacted until
12  1992 and it was not applied to this particular receivership
13  because this receivership failed in 1990.
14         So in fairness to the IRS, in other words, a literal
15  application of 89(102) actually produces the tax liability; but
16  for purposes of this compromise, the IRS has agreed that we
17  will be allowed to apply on section 597.
18         THE COURT:  All right.  Thank you, counsel.
19         MR. WILLNER:  May it please the court, I am Don
20  Willner from Portland, Oregon.
21         THE COURT:  Good afternoon, counsel.  Welcome to the
22  court.
23         MR. WILLNER:  Thank you.  I would like to welcome all
24  the people from Oregon and Washington who are sitting in the
25  courtroom out there listening to us.  I should also tell the
00017
01  court that I became a member of the bar of this court in 1951.
02  The court may remember the Jonah Crowelly Bar Review court.
03         THE COURT:  Absolutely.  Absolutely.
04         MR. WILLNER:  I'm a happy graduate of that.
05         THE COURT:  Absolutely.  That's the mark of a true
06  Washingtonian that you remember the Jonah Crowelly Bar Review.
07         MR. WILLNER:  If I may take 30 more seconds of random
08  comment that you and I remember, sir.  Jonah Crowelly for $30
09  in my day, at least that is what I paid for the bar review and
10  I paid for three things.
11         One, for the course.  Two, he spotted about 50
12  percent of the questions.
13         THE COURT:  That's right.  He was an amazing spotter,
14  wasn't he?
15         MR. WILLNER:  Yes.  And the third was he moved our
16  admission to the United States Court of Appeals for the
17  District of Columbia Circuit.
18         He would stand there with about 50 of us there, and
19  the court may remember this, and read off our names, and one at
20  a time say, I vouch for his character.  I always wondered what
21  would happen if the judge would have asked him what does he
22  know about the character of each of these.
23         THE COURT:  And of course, he was never asked.
24         MR. WILLNER:  He was never asked.  All he knew was
25  our $30 check had not bounce.  He knew that.
00018
01         Your Honor, previously the court introduced, asked
02  the people to introduce themselves at home in Portland but let
03  me also introduced in this courtroom some people.
04         THE COURT:  By all means.
05         MR. WILLNER:  First, I'm going to ask two of them,
06  when I'm done, very briefly to comment.
07         First of all, I would like to introduce Dr. Dale
08  Weight, the chairman of the board, CEO and president of Benj.
09  Franklin at the time of seizure.
10         THE COURT:  All right.  Good afternoon.
11         MR. WEIGHT:  Good afternoon, Your Honor.
12         MR. WILLNER:  Sitting next to him is Richard Green, a
```

```
13  shareholder and a plaintiff in this case.  Mr. Green works for
14  and has worked for NIH in this area.
15          Next to him is Donald McIntyre who was the executive
16  vice president of Benj. Franklin at the time of seizure.
17          THE COURT:  Good afternoon.
18          MR. McINTYRE:  Good afternoon, Your Honor.
19          MR. WILLNER:  Next to him is Peter Baker who
20  represents presents the group who were the larger shareholders
21  of Benj. Franklin at the time of seizure.
22          THE COURT:  Good afternoon.
23          MR. BAKER:  Good afternoon, Your Honor.
24          MR. WILLNER:  Next to him is Bob Suess, who started
25  this lawsuit and is a plaintiff.
00019
01          THE COURT:  Good afternoon, welcome.
02          MR. SUESS:  Good afternoon, Your Honor.
03          MR. WILLNER:  As the court possibly knows from the
04  papers that have been filed, I have been working on this case
05  for 16 years and I have a thousand hours and I am lead counsel
06  in all of the three cases.  The three cases  being first the
07  Claims Court case where I represent the shareholders derivative
08  action pending there which is I represented in that way all of
09  the shareholders.
10          Then in the case in Portland, Oregon, the breach of
11  fiduciary duty case.  And when this tax claim was filed on
12  behalf of shareholders, I filed a motion to intervene and
13  transferred to Oregon, to the District of Oregon.
14          The result of this, I believe, this may have had some
15  impact on getting some of the discussions going and FDIC
16  graciously allowed us to participate and the government thought
17  that was all right.  The government strongly opposing our right
18  to interview, but allowing us to participate in the matter.
19          We had many many many discussions and negotiations.
20  One of the issues before this court was was this arms length,
21  were the parties well represented, and were issues raised and
22  discussed; and the answer is very much so.  This went on for
23  three and a half years.  There were many meetings that I recall
24  coming to Washington and being lead counsel for the
25  shareholders.  One we had, I think over 20 people present
00020
01  including IRS folks, Department of Justice people.
02          THE COURT:  You do this without the benefit of a
03  third party, of neutral evaluator or arbitrator or mediator,
04  didn't you?
05          MR. WILLNER:  Of course, we had no neutral there.  I
06  thought we did very well.
07          THE COURT:  I did, I applaud your efforts, I mean
08  when I say you, I applaud the efforts of everyone who
09  participated in this, but it just struck me as quite unusual
10  that this was accomplished without the assistance of a mediator
11  or a retired judge or an arbitrator.  The parties literally
12  rolled their sleeves up and made this thing happen.  It took a
13  lot of time.
14          MR. WILLNER:  In retrospect that might have been a
15  good idea but I thought we worked well together.
16          THE COURT:  I'm sure, because of that working
17  relationship, no one thought about upsetting the apple cart at
```

```
18  that point and asking for the involvement of a third party
19  mediator which sometimes will alter the chemistry that exists
20  among the participants.  I applaud your efforts.  It is quite
21  unusual that a settlement of this magnitude is achievable
22  without the intervention or the assistance of someone who is
23  completely detached from the proceedings.  I really applaud the
24  efforts of everyone who worked so hard over the years.
25            I recognize this case was on a docket for quite a
00021
01  while, but the parties were quiet.  You weren't bothering me so
02  I didn't bother you.  I kept track of it every six months.  I
03  had to report open which is fine.  The parties were
04  negotiating.  Periodic progress reports.  I've learned that
05  when the parties are actively working and trying to resolve
06  their differences, let them work.  If they need me, they'll ask
07  me.
08            MR. WILLNER:  Your Honor, I too have read all of the
09  comments that have been coming in.
10            Let me briefly state from my point of view what the
11  tax issue was.
12            THE COURT:  Sure.
13            MR. WILLNER:  The question was raised in many
14  comments why was anything paid.
15            THE COURT:  That's right.  That has been a recurring
16  question.
17            MR. WILLNER:  Most of the assets and liabilities of
18  Benj were sold to Bank of America as counsel has mentioned.
19  What they were really interested in was the deposit base.  Bank
20  of America being a California corporation primarily they wanted
21  an entry into Oregon.  Benj. Franklin was the largest savings
22  and loan in Oregon and a very clean and honorable well thought
23  of savings and loan formed in 1925.
24            Bank of America also purchased on all of the loan
25  portfolio.  And they decided -- and they had a put option in,
00022
01  and they decided they would put it back and it was worth a
02  billion seven and all of a sudden the FDI, then the RTC it's
03  predecessor, had to come up the money.
04            There was another part of RTC called RTC Corporate,
05  not RTC receiver which had money, and paid the money to Bank of
06  America.  And charging interest.  The receiver got back the
07  loans and did very well with them.  That is part of the reason
08  why there is a big balance in the receivership now.
09            After paying the money and getting back the loans,
10  the receiver repaid all of the money that was loaned by RTC
11  Corporate with $258 million dollars worth of interest in
12  addition paid to RTC Corporate.
13            We, on behalf of the shareholders, thought that was a
14  classic loan situation which should not be taxed.  The
15  government took the position that this was a taxable
16  transaction and there was a good deal of congressional
17  legislative history from which they could draw some support.
18  We went into these discussions taking the position which is
19  there was no federal financial assistance tax owed because we
20  thought under the 16th Amendment it was a loan.  The government
21  had some, I ultimately realized, some arguments that I didn't
22  have here when I started.
```

```
21  will be more than happy to fax a copy of this out so they can
22  take a few minutes to look at this and I'll invite any comments
23  they may have about this order.
24          MR. GILL:  Thank you, Your Honor, that sounds like
25  very good wisdom.
00045
01          THE COURT:  See if we can get a fax number.
02          MR. BULLES:  Your Honor, our fax number here is
03  (xxxx).
04          THE COURT:  All right.  It's on the way.  We'll give
05  you a few minutes to look at it.
06          MR. GILL:  Thank you.
07          THE COURT:  Sure.
08    (Pause.).
09          THE COURT:  It will take a few minutes.  It's only
10  fair to give the folks out there a copy of it and let them make
11  any comments they would like to make.
12          To the folks in Oregon, it's on the way.  It will be
13  there in a few minutes and we'll talk again in about 15 minutes
14  or so and maybe the deputy clerk who is assisting can make a
15  few copies so that you can read it and I'll be happy to answer
16  any questions, I can answer.  I have not approved it, I have
17  not signed it.  I'm just seeing it for the first time now, but
18  I'm going to take a very short recess and read it.  If you have
19  questions about it, I would be more than happy to answer the
20  questions or if I can't I'll refer the questions to the
21  attorneys for an appropriate comment.
22          We'll take a very short recess and make sure you get
23  a copy in a few minutes.  There is no need to stand.
24     (Recess from 3:33 p.m. to 3:55 p.m.)
25          THE COURT:  Any comment folks, regarding the proposed
00046
01  order?
02    (No response.)
03          Does anyone have any comments regarding the proposed
04  order that's been submitted?
05          All right.  I take it from your silence the answer is
06  no.
07          I've had a chance to review the order and I'm going
08  to sign the order and put the court's approval on this order.
09  I am going to read into the record so there is a record of this
10  in case anyone who's not present wishes to obtain a copy of the
11  transcript with the order, and I'll just read it verbatim as it
12  appears.
13          On May 2nd, 2006, the court presided at a fairness
14  hearing to consider a proposed settlement of the tax claim made
15  against the Federal Deposit Insurance Corporation as the
16  receiver for the Benj. Franklin Federal Savings and Loan
17  Association Portland, Oregon.  Because the amount of any tax
18  settlement payment will directly affect the amount of money
19  remaining in the Benj. Franklin receivership to be distributed
20  to approximately 6500 shareholders of Benj. Franklin, the court
21  previously approved a notice to shareholders and directed that
22  it be sent by the FDIC to all known shareholders to advise them
23  of the hearing about the fairness of the proposed tax
24  settlement and to invite such shareholders to advise the court
25  of their views on the proposed settlement.
```

```
00047
01              Both parties to this action, United States
02   represented by the United States Department of Justice tax
03   division and the FDIC, have agreed to a proposed settlement
04   that would require the FDIC receiver to pay $50 million dollars
05   for the federal income taxes allegedly due for calendar years
06   1990 through 2002 which will resolve and close each of those
07   disputed tax years.
08              The remaining terms of the settlement are set out in
09   the attached letter agreement between the Department of Justice
10   and the FDIC which is made a part of this order.  That
11   agreement was conditioned on the approval of this court after
12   the conduct of a fairness hearing.
13              At the May 2nd, 2006 fairness hearing, the court
14   heard from counsel for the plaintiff, the United States and for
15   the defendant, FDIC and also heard statements by several Benj.
16   Franklin shareholders and by counsel from other Benj. Franklin
17   shareholders all of whom except one, spoken in favor of the
18   proposed settlement.
19              Prior to the hearing, the court also received the
20   votes of approximately 446 shareholders representing the
21   ownership of approximately 3 million shares of Benj. Franklin's
22   stock.  Most of the shareholders who sent written views to the
23   court expressed agreement with the proposed settlement.
24              Of the total number of shares owned by these
25   responding share owners, 99.3 percent of the shares agreed with
00048
01   the settlement and 0.7 percent of the shares disagreed with the
02   proposed settlement.
03              Most of the shareholders who voted and disagreed, do
04   not believe that any taxes should be paid by the Benj. Franklin
05   receivership because of the way in which the institution was
06   seized back in 1990.
07              In a notice previously approved by this court and
08   sent Benj. Franklin shareholders, they were advised that if
09   they did not send their response form back to the court, the
10   court would assume that such non-responding shareholders did
11   not object to the proposed settlement described in the notice.
12              Accordingly, 7,682,958 of the 7,705,000, shares of
13   common stock of Benj. Franklin voted in favor of the
14   settlement.
15              Based on all of the views expressed at the hearing as
16   set out in the form submitted by Benj. Franklin shareholders,
17   the court finds that the settlement reached between the United
18   States and the FDIC with various counsel for Benj. Franklin
19   shareholders also participating actively in the settlement
20   discussions was the product of arms-length negotiations.
21              The court further finds that the settlement is a fair
22   adequate reasonable way to resolve the tax controversy between
23   the parties particularly considering the early stage of
24   litigation proceeding and the opinions expressed by the
25   experienced counsel to the parties and to the shareholders.
00049
01   And I will add, and based on this court's own experience.
02              More over the issues related to the bank's seizure in
03   1990 are not before this court and thus would not have been
04   resolved in this forum even if this tax case had been litigated
```

```
05  to conclusion.
06          Accordingly, the terms of settlement set out in the
07  attached letter agreement between the Department of Justice and
08  the FDIC -- and that's the letter dated November the 16th, 2005
09  -- are approved by this court and the parties are directed to
10  carry out the settlement in the manner set out in that
11  agreement.
12          And let me just say and I'll depart from the order.
13  Let me say that there's no such thing as a perfect settlement.
14  I've not seen a perfect settlement in the 22 years I've been a
15  judge in the more than 30 years I've been an attorney and it
16  just strikes me as eminently reasonable that this settlement
17  has been reached as a result of significant arms-length
18  negotiations and, as counsel readily admit and concede, a give
19  and take process.  It is not the perfect settlement.  I've not
20  seen anyone leaping with joy to their feet, but it's a
21  settlement that the parties can live with and often times
22  that's the best settlement and it's going to bring about some
23  finality.
24          And I felt the emotion of the woman who testified and
25  her husband who testified.  I feel your pain.  I've seen this
00050
01  all too often in these cases in which litigation and the
02  prospect of litigation and the prospect of future litigation
03  has been spread out over years and the prospect for continued
04  litigation exists and undoubtedly this case would have dragged
05  on for years and years.  There is no doubt in my mind about it.
06  There would not have been a speedy resolution of this issue.
07          Even if there was a speedy resolution of the issues
08  before this court, in this court, without a doubt there
09  would've been an appeal.  It would have been an expensive
10  appeal.  It would have been an protracted appeal and it would
11  not have brought about finality in the foreseeable future, I
12  can assure you, based on my experiences over the past 30 plus
13  years.
14          So I think that the settlement is a fair one.  It's a
15  reasonable one, and of utmost importance, that the settlement
16  that's been reached is a result of arms-length negotiations,
17  and I have nothing but applause for the attorneys in this case
18  and the shareholders who participated in this agreement.
19          Indeed, it's a very historic agreement for many
20  reasons.  Many of the reasons have been alluded to by counsel
21  for the parties.  But it is also an important settlement
22  because it came about as a result of the hard work and efforts
23  of the attorneys and shareholders without the participation by
24  disinterested third parties, and we don't see that too often
25  especially in cases that are either class actions or analogous
00051
01  to class actions.
02          Normally it takes the experience and hard work of a
03  disinterested third party to achieve finality.  The parties
04  were able to achieve finality themselves.  It took a lot of
05  time.  It took a lot of effort, but it does show that the
06  process can work.  So the parties have something to be
07  thankful.  The shareholders have something to be thankful for.
08          You're not getting 100 percent return on your
09  investment, but you know, there's an old expression, half of a
```

```
10  loaf is better than none and you're getting some return on your
11  investment and hopefully this court's approval of this
12  settlement today and bringing about finality to this one
13  chapter of the proceeding will encourage the parties to attempt
14  to speedily resolve the remaining litigation in the two other
15  forums.
16          So, I will sign this order.  We will give Xerox
17  copies of this order to the attorneys in the well of the court
18  and it will be scanned into our electronic case filing system
19  this evening and be a part of the electronic records of the
20  court, but I will approve it today and will be dated today's
21  date.
22          I didn't inquire whether counsel for the government
23  had anything else to say in response to any of these statements
24  made by the other attorneys for or the shareholders.  It was
25  just an oversight on my part.
00052
01          Counsel.
02          MR. DARMSTADTER:  Thank you, Your Honor.  I really
03  don't have anything to add.
04          I do appreciate that the shareholders who have come
05  down and I didn't feel that it was the government's role to
06  justify whether it was in the interest of the shareholders to
07  accept the settlement or not.  I felt that was a process they
08  had go through with their attorneys.
09          But I would be remiss as well in not thanking the
10  court for permitting us to go through a very lengthy and drawn
11  out settlement process.  I think the court has had some flavor
12  of complicated tax issues were involved, some of which were
13  very novel.
14          But even under the best case scenario I believe for
15  the shareholders, there were still millions of dollars that
16  would have been owed in tax from basic interest income.  So I
17  share the court in that I hope that this matter puts out this
18  issue to rest.
19          Thank you.
20          THE COURT:  Let me just inquire.  The court will sign
21  this order and approve this settlement today.  What's next?
22  You are expecting a payment of $50 million dollars soon?
23          MR. DARMSTADTER:  That's correct, Your Honor, and
24  I've already had discussions with the FDIC in the hopes that
25  the court would approve the settlement in transferring those
00053
01  funds.
02          THE COURT:  The check is in the mail, right?
03          MR. DARMSTADTER:  Hopefully.
04          THE COURT:  Then what?
05          MR. DARMSTADTER:  Then, Your Honor, we can dismiss
06  this case with prejudice and hopefully the court can take it
07  off of its docket.
08          THE COURT:  What about the issue of attorneys' fees?
09  Now, let me just inquire about the shareholders first.  When
10  will they receive the benefit of their investment?
11          MR. DARMSTADTER:  Well, Your Honor, I don't want to
12  speak out of school, so I may have to defer to the attorney for
13  the FDIC for that.  They will be handling the remainder, as I
14  understand it, the remainder of the receivership process and
```

```
15  any remaining claims I guess need to be paid out and then they
16  would pay the shareholders the final amounts.
17          THE COURT:  I'm sure the next question that the
18  shareholders have out in Oregon, what's next?
19          MR. GILL:  Your Honor, do you want me to address
20  that?
21          THE COURT:  Yes.  And for the record I have just
22  signed the order and we can make some Xerox copies for those
23  attorneys in the well of the court.
24          MR. GILL:  Your Honor, just before I get into that.
25  Mr. Suess reminded me that I'm certainly going to buy a book
00054
01  but evidently there is being about written on, called,
02  "Remember the Benj." and I think he said the first edition will
03  have 5000 copies.  So I certainly plan to get one since, you
04  know, this has been part of my life for the last three years.
05          In direct answer to your question what the FDIC plans
06  to do is to figure out how much of the attorneys' fees need to
07  be paid.  We have to do that in the next couple of weeks.  Then
08  if there is a challenge, what we are going to do is pay the
09  distribution to the shareholders with a hold back for any
10  amount that's been challenged, if they say, we didn't give them
11  enough.            But I would say a distribution probably
12  somewhere between 30 and $39 million will be coming, you know,
13  to the shareholders hopefully in the next couple of months and
14  then we anticipate --
15          THE COURT:  Be careful of what you say now, because
16  people are listening very carefully and they're going to be
17  expecting those receive those checks.
18          MR. GILL:  Well, I'm hoping.  I mean, the only thing
19  that may mess us up is that we are trying to locate a lot of
20  the shareholders and anything that the shareholders can do,
21  because a lot of the letters that we sent out to the
22  shareholders, I mean, there were I think there were 6500 at the
23  time of the takedown.  We sent out 8500 letters.  I said to the
24  folks that I would rather be over-inclusive than under-
25  inclusive and what I'm hoping is that the shareholders can
00055
01  spread the word among their friends and people that may have
02  bought shares so that we can try to get to as many shareholders
03  as we can because what we are going to do is divide through by
04  the number of shares and make that a per share distribution.
05  So I don't see any major reason why we can't get checks out in
06  the next couple of months.
07          THE COURT:  I see no reason either.  You know there's
08  a finite number of shares of stock that's outstanding.
09          MR. GILL:  Yes.
10          THE COURT:  We know that a certain number people have
11  responded to notices.  So it would seem to me that it shouldn't
12  be a problem whatsoever to get checks in the hands of those
13  shareholders who have responded and maybe even just escrow the
14  remaining balances or the remaining sums of money for those
15  shareholders who have not responded or for those shares of
16  stock.
17          MR. GILL:  The good news is we're in essence doing
18  that.  I know that's of no comfort to the shareholders, but the
19  receivership is earning interest, so they're getting paid while
```

```
20  they wait even though the interest rate --
21          THE COURT:  Well, they've got to have the money in
22  hand, I'm sure.
23          MR. GILL:  I'm sure.  But at least the last month it
24  was 4.52 percent per month so that's not too bad.
25          THE COURT:  Right.  Tell that to someone who has been
00056
01  waited 16 years, so they would rather have that money in hand
02  to do as they please, I'm sure.
03          MR. GILL:  Yes, I agree with you, Your Honor.
04          THE COURT:  Yes, counsel.
05          MR. WILLNER:  I don't want to add anything further to
06  the technical questions.  On behalf of the shareholders, I want
07  to thank Your Honor very much for taking the time, for giving
08  us the opportunity for participating on behalf of, I guess I
09  speak for all of them when I say we appreciate it.
10          THE COURT:  The question came up every six months.
11  You know, we have to report to the world about pending cases
12  every six months or so which is fine.  I think judges should
13  have an obligation to resolve cases in a timely manner and
14  that's not an issue with me.  The question came up every four
15  or five months or so, I wonder what's going on that case?  Is
16  it time to bring them in and -- nah, nah, I haven't heard them,
17  so no news is good news.  Let's just let them wait a while.
18  I'm sure they're working hard and they get periodic progress
19  reports and I accepted in the good faith attached to those
20  progress  reports.
21          We kept reporting the case is open and will remain
22  open until it's either settled or will resolved by further
23  proceedings.  That's fine and I got the sense that the parties
24  were hard at work and I accepted the representation that
25  everyone was working hard.  I had no reason to doubt that and
00057
01  it's truly amazing though that you were able to accomplish this
02  without the intervention of the third party because that's
03  really atypical these days.  The cases are so complex.  It's
04  very difficult to get the parties to sit down at the table
05  without a third party knocking heads and bring people together,
06  but, you know, you have something to be proud of.  Everyone
07  worked very hard.
08          MR. WILLNER:  Thank you for signing the order.
09          THE COURT:  Sure, it's my pleasure.
10          Anything else?
11          To the folks in Oregon, you were able to participate
12  because we're in the electronic age and it's been a pleasure to
13  have you here in my court and I wish you well.
14          All right.  Thank you, counsel.
15          We'll give you copies.  We have some copies of the
16  signed order.  There's no need to stand.  We have some copies
17  of the signed order and we'll scan in the original order today,
18  but it's a done deal.
19          Do want this case dismissed with prejudice now?
20          MR. DARMSTADTER:  Well, Your Honor, I --
21          THE COURT:  You want to get your money first.  How
22  long is it going to take to write a check for $50 million
23  dollars, unh?
24          MR. GILL:  I think we're actually going to wire
```

```
25  transfer it.
00058
01            THE COURT:  You're going to wire transfer it, all
02  right.
03            It's good to see everyone.  Good luck.
04        (Proceedings concluded at 4:12 p.m.)
05  CERTIFICATE OF REPORTER
06            I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
07  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.
08  WILLIAM D. MCALLISTER
09  OFFICIAL COURT REPORTER
10
```