BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| WINSTON & STRAWN LLP, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLNER & ASSOCIATES, PC | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BLACKWELL SANDERS PEPER MARTIN | ) | Case No. 1:06CV01120 (EGS) |
| and | ) | |
| ERNEST FLEISCHER | ) | [Consolidated with |
| | ) | No. 06-01227 (EGS) |
| | ) | and No. 06-01273 (EGS)] |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION, as Receiver for the | ) | |
| Benj. Franklin Federal Savings and | ) | |
| Loan Association, Portland, Oregon, | ) | |
| | ) | |
| Defendant | ) | |

_____

## MOTION FOR SUMMARY JUDGMENT INCLUDING
## MEMORANDUM OF POINTS AND AUTHORITIES

| | |
|---|---|
| February 1, 2007 | DON S. WILLNER |
| | Don S. Willner & Associates, P.C. |
| | 630 Sunnyside Road |
| | Trout Lake, WA  98650 |
| Of Counsel: | Tel:    509-395-2000 |
| KELBY D. FLETCHER | Fax:    509-395-2939 |
| Peterson, Young, Putra, Fletcher, | |
|   Knopp & Wampold, P.S. | JEREMIAH A. COLLINS |
| 2800 Century Square | Bredhoff & Kaiser, P.L.L.C. |
| 1501 Fourth Avenue | 805 15th Street, N.W., Suite 1000 |
| Seattle, WA  98101-1609 | Washington, DC  20005 |
| Tel:    206-624-6800 | Tel:    202-842-2600 |
| Fax:    206-682-1415 | Fax:    202-842-1888 |
| | |
| | Counsel for Plaintiff |

## Table of Contents

**Page**

A. INTRODUCTION ................................................................................................... 2

B. STATEMENT OF FACTS ...................................................................................... 2

C. ARGUMENT ......................................................................................................... 13

   1. This Circuit compensates attorneys by a percentage of a common fund ............... 13

   2. This District evaluates common fund fee applications by seven factors. ............. 15

      a. The size of the fund created and the number of persons benefited. ................. 16

      b. The presence or absence of substantial objections by members of the Class to the
      settlement in terms of fees requested by counsel. ................................................ 16

      c. The skill and efficiency of the attorneys involved. .......................................... 16

      d. The complexity and duration of the litigation. ................................................ 24

      e. The risk of non-payment ................................................................................. 27

      f. The amount of time devoted to the case by plaintiffs' counsel. ....................... 27

      g. The awards in similar cases. ........................................................................... 27

   3. FDIC has not paid reasonable expenses. .......................................................... 28

D. CONCLUSION ...................................................................................................... 29

# Table of Authorities

**Cases**

Boeing Co. v. Van Gemert,
444 U.S. 472, 478 100 S. Ct. 745, 62 L.6d 2d 676 (1980) ........................................................ 13

Donnell v. United States,
682 F.2d 240 (D.C. Cir, 1982) ................................................................................................... 14

Freeport Partners, L.L.C. v. Allbritton,
2006 U.S. Dist Lexis (D.C. 2006) ........................................................................................ 15, 27

George v. Leavitt,
407 F.3d 405, 410 (D.C. Cir. 2005) ............................................................................................ 2

Gottlieb v. Barry,
43 F.3d 474, 491 (10th Cir., 1994). ........................................................................................... 14

Hensley v. Eckerhart,
461 U.S. 424, 437, 103 S. Ct. 1933, 76 L.Ed.2d 40 (1983) ...................................................... 15

In re Baan Company Securities Litigation,
288 F.Supp.2d 14 (D.C. 2003) ............................................................................................. 15, 27

In re Vitamins Antitrust Litigation,
2001 U.S. Dist. (Lexis 25067 (D.C. 2001); ......................................................................... 15, 27

Swedish Hospital Corp. v. Shalala,
1 F.3d 1261 (D.C. Cir 1998) .............................................................................................. passim

United States v. FDIC,
No. 1:02cvo1427 ........................................................................................................................ 2

United States v. Flora,
362 U.S. 145, 80 S.Ct. 630 (1960) ............................................................................................. 6

White v. Auerbach,
500 F.2d 822, 828 (2d Cir., 1976) ............................................................................................. 14

**Statutes**

12 U.S.C. § 1821(d)(g) ........................................................................................................... 1, 14

12 U.S.C. § 1984(d)(g) ............................................................................................................... 14

BEFORE THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

WINSTON & STRAWN LLP,                    )
                                         )
and                                      )
                                         )
WILLNER & ASSOCIATES, PC                 )
                                         )
and                                      )
                                         )
BLACKWELL SANDERS PEPER MARTIN           )        Case No. 1:06CV01120 (EGS)
and                                      )
ERNEST FLEISCHER                         )        [Consolidated with
                                         )        No. 06-01227 (EGS) and
                                         )        No. 06-01273 (EGS)]
            Consolidated Plaintiffs,     )
                                         )
                                         )
        v.                               )
                                         )
FEDERAL DEPOSIT INSURANCE                )
CORPORATION, as Receiver for the         )
Benj. Franklin Federal Savings and       )
Loan Association, Portland, Oregon,      )
                                         )
            Defendant                     )
---                                      )

# MOTION FOR SUMMARY JUDGMENT INCLUDING
# MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Don S. Willner and Associates P.C. ("Willner firm") moves for Summary

Judgment on its first Claim for Relief—Reasonable Attorneys' Fees and Expenses Under 12

U.S.C. § 1821(d)(g) in the amount of $782,110.24 plus reasonable expenses in the amount of

$1,264.14.

1

### A. INTRODUCTION

Don S. Willner, principal of the Willner firm, was lead counsel on behalf of the proposed shareholders intervenors in the case of *United States v. FDIC,* No. 1:02cvo1427 in this court which resulted in a settlement for $50 million of an IRS tax claim of $1.2 billion plus a favorable allocation of the settlement amount to interest rather than tax. This preserved in the FDIC Receivership of Benj. Franklin Federal Savings and Loan ("Benj. Franklin") a common fund of $44 million. The amount sought by Willner firm in this court for attorney fees is 1.78 % of the common fund. Adding the amounts which this court finds reasonable for the other shareholder attorneys would only constitute a small fraction of the common fund.

The governing law in this Circuit is *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir 1998), which holds that a proper fee should be 20% to 30% of the common fund. The Summary Judgment standard is set forth in *George v. Leavitt,* 407 F.3d 405, 410 (D.C. Cir. 2005).

The facts of the work done by Willner firm are not in dispute (see Willner firm's Statement of Material Facts) but rather only the proper interpretation of those material facts. The case is therefore ripe for summary judgment.


### B. STATEMENT OF FACTS

Benj. Franklin (founded in 1925), survived the great depression, then in 1982 acquired a failing savings and loan at the suggestion of the Federal Home Loan Bank of Seattle upon an agreement that the marked to market loss could be treated as the capital assets of goodwill. Then the government breached its contract by retroactively removing the goodwill which caused the seizure. Benj. Franklin was profitable before seizure, profitable in the conservatorship, and profitable in the receivership. There are no creditors, so the issue before a court if there was no

settlement would have been whether this money should go to the government which breached its contract or to the 6500 shareholders (ex. 4).

On February 21st, 1990, as a result of a retroactive change in the law, the United States government placed Benj. Franklin into receivership with the Resolution Trust Corporation (RTC), asserting that the institution was unable to satisfy its minimum regulatory capital requirements.

On September 14, 1990, a proposed shareholder derivative action was filed in the United States Court of Federal Claims by the Willner firm on behalf of Benj. Franklin and its shareholders against the United States (the "Claims Court Action"), alleging that Benj. Franklin's capital had been reduced by breaches of contract and by takings of property without just compensation on the part of the United States.

Plaintiff or its principal, Don S. Willner ("Willner"), or its predecessor law firms, are and have been the only attorneys of record in the Claims Court Action. [1]

In 1995, Willner obtained shareholder derivative status for the case and in 1998 Willner obtained summary judgment on liability. In 2002, Willner, with assistance of other attorneys he had hired, prevailed after trial on damages in the Claims Court Action, obtaining a judgment of approximately $35 million on behalf of Benj. Franklin and its shareholders. Upon reconsideration, the Court of Federal Claims recently increased the judgment amount to approximately $52 million.

On April 22, 2002, the Internal Revenue Service ("IRS") filed a proof of claim with the FDIC asserting that Benj. Franklin owed approximately $1.2 billion in federal income tax for events which occurred after Benj. Franklin had been placed in RTC and later FDIC receivership. [2]

---

[1] Other attorneys are now being brought in for the forthcoming appeal to the Federal Circuit in which Willner will participate as of counsel.

[2] The FDIC succeeded to the RTC for purposes of this matter.

3

The IRS tax claim, if upheld, would greatly exceed both the assets of the receivership estate and the judgment in the Claims Court Action. Consequently, if the alleged tax liability were paid, Benj. Franklin shareholders, who otherwise each would receive a portion of the receivership assets, would instead received nothing.

After receiving four letters from Willner concerning the tax situation on June 6, 2002, FDIC attorney Bruce Taylor wrote ex. 1 to Willner. This letter states in part:

> It appears unlikely that further efforts will be successful in lowering the IRS assessment of taxes, penalties, and interest below the projected assets of the receivership estate. In fact, the IRS has not given any indication that it will lower its assessments, at all….

> Finally, you expressed the hope that no payments would be made to the IRS without advance notice to you and without your consent. Although we agreed to keep you apprised of the status of negotiations with the IRS, we did not agree to notify you or obtain your consent before the FDIC takes any action it deem necessary or appropriate and have no duty to do so. We can tell you, however, that a decision may be made soon on how to handle the IRS's claim, in light of the IRS's latest indication that it doesn't not intend to abate any portion of the tax liability of the Ben Franklin receivership. Further, we will let you know if a payment is made to the IRS, so you can advise your clients accordingly.

At that time, there was in effect the Internal Revenue Service and Resolution Trust Corporation Inter-Agency Agreement (ex. 2) which was ratified by FDIC when it replaced RTC, which includes this language:

> The IRS and the RTC agree that it is in the best interest of the IRS, RTC, and the United States to resolve tax matters administratively between the IRS and the RTC in a manner that conserves government resources, carries out statutory responsibilities of the RTC, and promotes fair administration of the tax laws…

> The RTC will provide prompt written certification for each taxable year for each Thrift Under RTC Jurisdiction that meets the certification criteria. The certification shall state that (1) the assets of such thrift are insufficient to satisfy the claims of the thrift's depositors (or the RTC as successor for depositors' claims); (2) if the IRS were to collect taxes before all depositors (or the RTC as successor for depositors' claims) were paid in full, additional Treasury Funds would be used to satisfy deposit claims;…

> Each agreement will be specific in its findings and will not be made public by either party except as required by IRS information sharing agreements with the various states, or other provisions of law….
>
> The RTC will not litigate federal income tax issues against the United States involving a Thrift Under RTC Jurisdiction or its Consolidated Subsidiaries in any court to the extent that the IRS would forego collection pursuant to this Agreement….
>
> This Agreement and all of its provisions are for the sole benefit of the IRS, the RTC, and any successor, and any Thrift Under RTC Jurisdiction. No third party may rely on the terms of this Agreement.
>
> *(The entire Inter-Agency Agreement is set forth in ex. 2.)*

In other words, pursuant to a confidential agreement made for the benefit of the IRS and the RTC/FDIC without mention of persons situated like the 6500 shareholders of Benj. Franklin, if certain certifications were made (which were made in the Benj. Franklin case) RTC/FDIC agreed not to contest in Court any IRS tax claim, regardless of merit.

Based upon the working of the Inter-Agency Agreement and Taylor's letter, Willner contends that there is no real doubt that FDIC was going to pay the tax and the 6500 Benj. Franklin shareholders would be out of luck.

In his deposition, Taylor was asked

> Q: Do you remember a clause in the interagency agreement which says that the FDIC under certain circumstances surrendered its right to protest any tax levied by the IRS?
>
> A: I don't remember that provision specifically but I have no reason to doubt that it is in the agreement.
>
> …
>
> Q: But the decision was being made in light of the IRS's latest indication that it does not intend to abate any portion of the tax liability of the Benj. Franklin receivership, is that correct?
>
> A: That's what my letter says, yes.
>
> …

Q: And it's clear, isn't it, that you meant you would give me that notification after you made the payment?

A: That is what my letter indicates, yes.

…

Q: Were you authorized to write Exhibit 7?

A: Yes.

Q: Before writing Exhibit 7, did you research the impact of paying any portion of the tax upon the rights of the FDIC receiver or the shareholders of Benj. Franklin?

A: I did not.

*(The Taylor Deposition is ex. 15.)*

Willner knew that action had to be taken to protect the shareholders.

To prevent the FDIC from making tax payments, Willner filed on behalf of the shareholders a suit on June 17, 2002 against the FDIC in the United States District Court for the District of Oregon (the "Oregon Action").

Willner, who was sole counsel of record in the Oregon Action, was successful in obtaining a temporary restraining order ("TRO") prohibiting the FDIC, as Receiver of the Benj. Franklin, from making any tax payment to the IRS. As a result, the FDIC then agreed not to make any such payment without advance notice to Willner. No taxes were paid by FDIC on behalf of Benj. Franklin Receivership until the current tax settlement was negotiated and approved.

The case of *United States v. Flora,* 362 U.S. 145, 80 S.Ct. 630 (1960) holds that if any portion of a tax is paid the taxpayer (here FDIC) could not sue for a refund without paying the entire tax. (Here $1.2 billion.) The shareholders are not the taxpayer, nor did the shareholders have $1.2 billion available for this purpose. Furthermore, any theoretical attempt to pay the $1.2

billion by the shareholders and then sue for a refund would have been opposed by the IRS on the ground of lack of standing.

By obtaining the TRO and the later agreement of advance notice before paying any tax, Willner prevented all of the claims of the shareholders from becoming moot.

On July 17, 2002, the IRS sued the FDIC in this Court seeking the approximately $1.2 billion in taxes from the Benj. Franklin receivership. The shareholders, again with Willner as sole counsel of record, moved to intervene in that action and transfer the case to the District of Oregon. The result of filing the motion was that the motion was stayed and Willner and his team were allowed to participate in a three-way process of discussion with the United States Department of Justice (D.O.J.), its client, the IRS and the FDIC, which ultimately produced a settlement of the tax issue.

In the negotiations, the FDIC did not advocate the lowest possible tax, stating that it was a "third party neutral" and an "honest broker" between the IRS and the shareholders. Consequently, the efforts of shareholder counsel were crucial in achieving a resolution that would produce the lowest possible tax payment from the assets of the receivership estate.

The discussions resulted in a settlement in which the IRS agreed to a tax payment of only $50 million, as compared to the approximately $1.2 billion it had claimed It did so with a favorable allocation of 75% interest and 25% to the principal amount of the tax. The Benj. Franklin Receivership could later use that interest payment as an offset to future taxes on the $52 million Claims Court judgment if the forthcoming appeal to the Federal Circuit retains that amount or any other positive judgment. As a result, the receivership estate retained a surplus of $44 million. This $44 million surplus will be increased by the amount if any that is recovered on the Claims Court $52 million judgment filed by the derivative plaintiffs represented by Willner

on behalf of the Benj. Franklin Receivership  That judgment would have been wiped out if any tax had been paid by FDIC.

To date, FDIC has paid $3 million to the contributors to the Benj. Franklin Shareholders Litigation Fund, $31 million distribution to the shareholders and further payments are expected. These payments come from the common fund which the efforts of the shareholder attorneys preserved.

In addition to obtaining the TRO and filing the Motion to Intervene, Willner played a crucial role in the process that culminated in the tax settlement, serving as attorney of record on the motion to intervene, as lead counsel and principal spokesperson handling the lengthy correspondence with the Department of Justice and the FDIC, and coordinating the efforts of all counsel who were involved in that effort on behalf of the shareholders.

Don Willner personally has devoted approximately 8,000 hours to representing Benj. Franklin shareholders.  As of the date of the Claim, 1031.1 hours Willner hours were devoted to the tax claim. Copies of the fee petition which include the actual time and expense records are included as ex. 3. This suit deals only with the work relating to the tax settlement and no compensation is sought here for unrelated work in the Claims Court Action.

The Willner firm charged the shareholders minimal fees for its work in resolving the tax issue.  It received only $101,793.90 for four years of work on that issue, at rates that have never exceeded $125 per hour for Willner's work. The Willner firm's shareholder clients understood and agreed that these minimal fees would merely enable the small law firm to stay in operation, and that the firm would receive additional fees out of any assets of the receivership estate that were created or preserved through the firm's legal work.

In its Claim to the FDIC, the Willner firm requested attorneys' fees in the amount of $541,327.50, plus a reasonable enhancement (multiplier), minus the $101,793.90 previously paid by the shareholders.

The Willner firm's Claim also requested payment for the work of consultants and certain expenses which are set forth in the Willner Declaration (ex. 4).

By letter date May 19, 2006, the FDIC approved the Willner firm's Claim in part and disallowed the Claim in part. (See Exhibit 5.) This appeal followed.

The Notice of Partial Disallowance of Claim for Reasonable Attorney's Fees (ex. 5 to this memorandum) is signed by Glenn Glinsmann of the Claims Department who testified this way at his deposition:

> Q: But what I'm – all right. Are there any written or even oral policies which say – which guide you in evaluating an attorney fee petition?
>
> A: I believe there's an oral policy that we would refer to our legal in-house staff any fee bills, things like that, that would be presented for a claim.
> …
>
> Q: Can you think of any other situations where you evaluated attorney fee petitions other that attorneys who worked for the institution before – before they were seized?
>
> A: No, I don't believe so.
>
> …
>
> Q: Did you personally read my fee petition?
>
> A: I looked at – I guess. I did as far as reviewing it, I didn't review every line item, no.
>
> Q: Did anyone on your staff in Texas read through my entire fee petition?
>
> A: I don't believe so.
>
> …

9

Q: Do you know if my fee petition was evaluated in any way different from the way you evaluated the fee petitions of attorneys you had under contract?

A: No, I'm not – not aware of that, no.

…

Q: Did you write that document? *(Ex. 5 in this memorandum)*

A: I did not actually write the document, no.

Q: did you write any part of that document?

A: The final version, no.

…

Q: I think what you're telling me – Richard Gill made the decision on the contents of Exhibit Number 1. Is that correct?

A: Yes.

…

Q: You didn't perform any substantive analysis of the individual line items?

A: No, I did not.

Q: So is it fair to say that you relied wholly on Mr. Gill's recommendation for the claim?

A: Yes.

*[The Glinsmann Deposition is e.x 16 in this memorandum.]*


Richard Gill in his deposition testified:

Q: Have you ever been an attorney in private practice?
A: No.

…

Q: Is he [Glinsmann] correct that you made the decision on my fee petition?

A: Point of clarification. I was certain involved in the decisional process on your fee application. The decision – and for all intents and purposes, I proposed the recommended decision that was approved by other people in the FDIC.

10

Q: Who else in the FDIC approved the decision?

A: Specifically, Richard Aboussie, who's an associate general counsel…And the general counsel of the FDIC, who I believe now is in private practice, William Kroener.

…

Q: Before evaluating these three fee petitions – mine, Winston & Strawn and Spriggs & Hollingsworth – how many fee petitions, attorney fee petitions have you evaluated?

A: I've never evaluated attorneys fee petitions like this before.

…

Q: Does FDIC have any written or oral guidelines for evaluation of attorney fee petitions?

A: I am not aware of any.

Q: So we're clear, and no such guidelines were utilized by you in reviewing my fee petition?

A: No, I did not look at any – any FDIC policy on this matter.

…

Q: Were you provided standards of review by any superior in connection with my fee petition?

A: No.

…

A: And at all times, both, you know, on the reasonable attorneys' fees, it was the FDIC's assumption that what we were to pay was your reasonable hourly rates.

…

Q: Are you aware of any Pacific Northwest attorney other than me who was lead counsel in a Washington, D.C. major complex litigation in the group of attorneys that you hired?

A: I'm not – I'm not aware of any – the case was filed in Washington but I think most of the work probably was performed in the Pacific Northwest. But no, I'm not aware of any other. In answer to your question.

11

…

A: We tried to canvass the material out – out there in the public domain, which was interesting but not particularly dispositive, because the rates were all over the place, so we fell back to what we knew, which was what we paid our outside counsel.

*[The Gill Deposition is ex. 17 of this memorandum.]*

In other words, no one at FDIC admits that they made the decision and Richard Gill based his recommendation on hourly rates paid to FDIC contract attorneys in the Pacific Northwest for work done in that area. There was no consideration of contingent rates, and no evaluation of the magnitude and complexity of the lead counsel role of Willner in the Benj. Franklin tax settlement or of Willner's skills and fine reputation in the Oregon legal community.

Don Willner has practiced law for 55 years, and has been a member of the bar of this Court throughout that period. He also is admitted to practice in the States of Oregon and Washington. His practice has emphasized trial and appeals, including successful arguments in the United States Supreme Court, the Supreme Courts of Oregon and Washington, and the 9th and 10th Circuit Courts of Appeal. Willner has been lead counsel in numerous complex cases, including, in addition to the Benj. Franklin matters, major class action litigation in the areas of civil rights, labor, tenants' rights, and airplane travel. He has done extensive legal work in test cases for the Japanese American Citizens League, the NAACP, and Colegio Cesar Chavez, most of which has been *pro bono*.

In addition to his practice, for more than ten years Willner was an adjunct professor of law at Lewis and Clark Law School in Portland, Oregon, and he has served as a Circuit Court Judge pro tem in five Oregon counties by appointment of the Chief Justice of the Oregon Supreme Court. He is a graduate of Harvard College and Harvard Law School.

Laird C. Kirkpatrick, former Dean of the University of Oregon Law School and currently a visiting professor at the George Washington University Law School and the University of Maryland Law School has stated in a Declaration that Willner is "one of the most highly regarded trial attorneys in the state [of Oregon], particularly for complex litigation," and that "[Willner's] ability and skill match that of lawyers handling similar legal matters in Washington, D.C. or any other large urban area." (See ex. 6).

Attached are the Declarations of former Chief Judge James M. Burns of the United States District Court for the District of Oregon (ex. 7) and former Chief Justice of the Oregon Supreme Court Berkeley Lent (ex 8) concerning the high status and reputation of Willner. Also (ex. 9) is the Declaration of Dr. G. Dale Weight, former CEO of Benj. Franklin, concerning the ability of Willner, and ex. 10 is the Declaration of Portland attorney David Markowitz concerning Willner's high status and reputation in Oregon, and the results of an attorney fee survey.

## C. ARGUMENT

### 1. This Circuit compensates attorneys by a percentage of a common fund.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 100 S. Ct. 745, 62 L.6d 2d 676 (1980) holds, "A litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his clients is entitled to a reasonable attorney's fee from the fund as a whole."

The decision in *Swedish Hospital Corp v. Shalala,* 1 F.3d at 1265, discussed at length the three alternative methods of compensation which are based on a percentage of common fund, "lodestar" (adjusted hourly rate) and "cross check" (comparing percentage with lodestar), and then holds, "In sum, we join the Third Circuit task force and the Eleventh Circuit, among others

in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fee award in common fund cases." *Swedish Hospital,* 1 F.3d at 1271.

The *Swedish Hospital* case also held that the common fund "doctrine allows [payment] to a party who creates, *preserves* or increases the value of a fund" 1 F.3d at 156) [emphasis added].

The District of Columbia Circuit has held that intervenors were entitled to a fee award if they contributed substantially to the result. *Donnell v. United States* 682 F.2d 240 (D.C. Cir, 1982). Here, the shareholders were proposed intervenors, who by consent of the parties (Department of Justice and the FDIC) participated fully in the settlement discussions (see ex. 15). Indeed, even objectors can receive a fee from a common fund if the settlement was improved as a result of their efforts. *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir., 1976); *Gottlieb v. Barry*, 43 F.3d 474, 491 (10th Cir., 1994).

In addition, FDIC and the shareholders have agreed that there should be:

> "A distribution of the reasonable fees and expenses of shareholders' counsel and consultants as approved by the court and as determined through the receivership process in connection with such persons' work to reduce the $1.2 billion tax liability alleged by the IRS against the Benj. Franklin receivership (Ex. 11)"

Pursuant to this agreement between FDIC and Willner and 12 U.S.C. § 1984(d)(g), the FDIC has paid fees and expenses to Willner's firm but Willner's firm has appealed to this court as provided by 12 U.S.C. § 1821(d)(g) claiming that the fees to Willner authorized by FDIC are unreasonably low.

This case is a *de novo* review of the FDIC determination although the FDIC/Willner agreement, now repudiated by FDIC provided for the court fixing the fee first. (ex. 11). Also see testimony of Richard Gill (p. 11, 12, 13 of Gill Dep., ex 17) The Willner firm fee petition originally sought a fee of $525 per hour plus a multiplier, but now believes that the <u>*Swedish Hospital*</u> case percentage of the common fund rule controls in a case in this Court. The need for

14

this approach, as discussed in *Swedish Hospital* case 1 F.3d at pages 126 and 127 is to avoid an unnecessary full trial on the facts, which is also discouraged by the Court in *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S. Ct. 1933, 76 L.Ed.2d 40 (1983).

**2. This District evaluates common fund fee applications by seven factors.**

The *Swedish Hospital* ruling that a percentage of common fund is the only method for this Circuit is discussed at length and followed in three recent District of Columbia District court cases: *In re Vitamins Antitrust Litigation,* 2001 U.S. Dist. (Lexis 25067 (D.C. 2001); *In re Baan Company Securities Litigation,*288 F.Supp.2d 14 (D.C. 2003); and *Freeport Partners, L.L.C. v. Allbritton,* 2006 U.S. Dist Lexis (D.C. 2006).

In the *In re Vitamins* case, Chief Judge Hogan, wrote that the lodestar approach is still used. "in instances in which the amount of the common fund is difficult to ascertain." (p. 11). But in this case the amount of the common fund is clearly $44 million, the amount remaining in the Benj. Franklin Receivership after payment of the tax. Indeed, the common fund could later increase if there is an affirmance or increase in the Claims Court judgment but for purposes of this fee application $44 million is sufficient.

In the *In re Baan* case, Judge Huvelle wrote, "Courts have looked to several factors in assessing the reasonableness of a fee request, including:

> (1) the size of the fund created and the number of persons benefited; (2) the presence of absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases."

And in *Freeport Partners, L.L.C. v. Allbritton*, Judge Kessler applied the same seven factors applied by Judge Huvelle in the *In re Baan* cases.

15

Although the use of these seven factors is not mandated by *Swedish Hospital*, the Willner firm will analyze the facts of its claim applying the seven factors.

### a. The size of the fund created and the number of persons benefited.

There were about 6500 shareholders of Benj. Franklin at the time of seizure in 1990. There has been no stock transfer agent since 1990 but there has been a substantial over-the-counter market. No one knows how many shareholders will benefit from the 2006 settlement because most of the money was distributed through stockbrokers who keep confidential records, but it is probably still in the thousands (See Willner Declaration, Ex 4). $44 million is a very substantial common fund.

### b. The presence or absence of substantial objections by members of the Class to the settlement in terms of fees requested by counsel.

There was no significant objection to the tax settlement before and at the Fairness Hearing before this Court. FDIC, which is not a shareholder, objects to the fees requested by all shareholder counsel. The shareholder have not been asked to indicate approval or disapproval of the amount of fees sought in this court. Thomas Buchanan, attorney for Suess, has testified in his deposition that he favors a 100% multiplier for Willner. See Buchanan Deposition (ex. 18). This would be substantially more than FDIC paid Willner.

### c. The skill and efficiency of the attorneys involved.

Obtaining this settlement was a team effort. The other members of the team consisted of:

16

Rosemary Stewart, trial and appellate attorney in the Washington, D.C. law firm of Spriggs and Hollingsworth and formerly Director of Enforcement for the Federal Home Loan Bank Board. She was hired by Willner in this case starting in early 2002. Stewart has not appealed her FDIC fee award.

Earnest Fleischer, tax counsel to the Kansas City law firm of Blackwell, Sanders, Peper & Martin LLP and listed in Best Tax Lawyers in the United States, was hired by Willner in mid-2002.

Delaware CPA Randi Cohn (who is not involved in the pending fee petitions) also started work on the tax matter in mid-2002.

Thomas Buchanan, now head of the Washington, D.C. trial department of the national law firm of Winston and Strawn, became involved in this tax law suit in late 2002, but had worked on similar tax aspects of the related Court of Federal Claims case in 1999.

Mitchel Moettel, a Washington, D.C. tax partner of Winston and Strawn also became involved in late 2002. All of the attorneys participated in all of the three way meetings with the Department of Justice and FDIC.

FDIC attorneys Robert Clark, Catherine Topping, Hugo Zia, and Richard Gill participated at various times in the settlement process, as did FDIC tax specialists. FDIC was helpful, but certainly not to the same extent as the shareholder attorneys because FDIC believed its role to be that of a "neutral third party" and "honest broker" between the shareholders and the IRS, rather than as an advocate for the shareholders. Gill Deposition, p. 27, 29 (ex 17).

Winston and Strawn, L.L.C. and Ernest Fleischer have filed lawsuits in this consolidated case and will undoubtedly discuss their own substantial contributions.

17

There follows a discussion of the specific contribution of the Willner firm to the tax settlement process.

Willner's work on the tax matter started in 1999 at the Claims Court trial of damages. Willner prepared and presented the testimony of expert witness Dr. Paul Horvitz. Almost all of the tax claim resulted from the IRS deciding that the 1990 federal financial assistance to the receivership which was called a loan to the Receiver and fully repaid plus $258 million of interest should be treated as taxable income. Dr. Horvitz testified that but for the seizure of Benj. Franklin there would not have been any later federal financial assistance, so therefore any tax paid should be added to restitution damages. Claims Court Judge Smith allowed the testimony, but he did not decide this issue, which is therefore preserved for appeal to the Federal Circuit. (Willner Declaration, ex. 4.)

Willner's role and the role of the other attorneys and consultants in the tax settlement process are discussed in Willner's Declaration (Ex. 4) and the Declaration of Rosemary Stewart (Ex 13). They both stress the important role of all of the team members in the final settlement. Willner coordinated the work of all team members, chaired the shareholder side of the three-way discussions, handled almost all of the contact with government attorneys, ,primarily negotiated and signed the important agreement with FDIC (Ex. 11), and held the discussions with Richard Gill of FDIC concerning the actual settlement proposals. At the Fairness Hearing before this Court, Willner had the major role of describing and defending the settlement. In addition, Willner's 16 years of knowledge of the case became important when FDIC or the Department of Justice requested documents or information from Benj. Franklin. This earlier gained knowledge has not been billed for in this petition fee.

18

Richard Gill, FDIC attorney in the tax settlement matter from mid-2004 through 2006 testified this way in his deposition:

> Q: Are you aware of the fact that I filed the motion to intervene and along with the motion to transfer to Oregon?
>
> A: Yes.
>
> Q: Are you aware of the fact that starting way before you came in and continuing until not too long ago there was an enormous amount of correspondence between Henry Darmstadter on behalf of the government, Catherine or Hugo or yourself on behalf of the FDIC, and myself as lead counsel for the shareholders?
>
> A: Yes.
>
> Q: That just saved you going through chunks of paper. Isn't it a fact that there were numerous discussions between you and me concerning what settlement would be acceptable to the shareholders?
>
> A: Yes, yes.
>
> Q: Isn't it true that at the meetings held in Washington, D.C. around that long table that I chaired the shareholders' side of those meetings?
>
> A: Yes. As best I can recall, I think that you were the – you were the counsel for the shareholders that – yes.
>
> Q: And that I would – during the discussions, I would call on others in our group to respond to questions?
>
> A: Yes.
>
> …
>
> A: Yes, you were lead counsel at the time of the Fairness Hearing.
>
> *(Gill Deposition, ex. 17)*

The best way of demonstrating Don Willner's  work as lead counsel in the complex settlement process is through the 3 ½ years of correspondence between Willner on behalf of the shareholder team, the Department of Justice and the FDIC

(Ex 14, omitting the many lengthy enclosures to those letters and numerous informal emails). Here is a summary of the 43 letters:

1. <u>November 1, 2002.</u> Darmstadter (lead Department of Justice attorney) to Willner, copies to Rohall (Department of Justice attorney in Sacramento) and Topping (FDIC) enclosing schedules showing alternate preliminary calculations of income tax liability.

2. <u>November 1, 2002.</u> Topping to Darmstadter and Willner enclosing schedules and explaining the failure of RTC (predecessor of FDIC) to claim a $258 million deduction, and a $195 million overstatement of a repayment.

3. <u>November 4, 2002.</u> Willner to Topping, Darmstadter and other FDIC and Department of Justice attorneys enclosing shareholder statement of position.

4. <u>February 7, 2003.</u> Topping letter to Willner and Moettel responding to letter of factual inquiry from Moettel.

5. <u>February 13, 2004.</u> Darmstadter to shareholder and FDIC attorneys enclosing background supporting documents calculating interest amounts.

6. <u>March 17, 2003.</u> Willner to FDIC attorneys enclosing memoranda explaining why loans from RTC and Benj. Franklin Receivership should not be treated as taxable income and requesting a meeting to develop a common position.

7. <u>April 9, 2003.</u> Topping to Willner responding to Willner's letter of March 17, 2003, providing information.

8. <u>May 2, 2003.</u> Willner to FDIC enclosing spreadsheets and legal citation.

9. <u>July 30, 2003.</u> Topping to Darmstadter copy to Willner summarizing FDIC position on alternate minimum tax. ("ATM").

10. <u>August 14, 2003.</u> Willner to Darmstadter and Topping providing shareholder position on alternate minimum tax and requesting early three-way conference.

11. <u>September 25, 2003.</u> Willner to Darmstadter and Topping again requesting an early three-way meeting and saying that shareholders may move to reinstate the Motion to Intervene if there is no such meeting.

12. <u>November 12, 2005.</u> Topping to Darmstadter, Willner, Moettel. Request for update financial information.

13. <u>December 19, 2003.</u> Darmstadter to FDIC attorneys responding to FDIC request to reduce the amount of the claim.

14. <u>December 30, 2003.</u> Willner letter to Darmstadter and Topping suggesting sending copies of letters directly to other shareholder attorneys.

21

15. <u>December 30, 2003.</u> Willner to Department of Justice attorneys requesting expediting computation of interest under various scenarios.

16. <u>February 5, 2004.</u> Topping to Darmstadter, copy to Willner requesting abatement of penalties assessed for late filing (by RTC).

17. <u>February 23, 2004.</u> Willner to Darmstadter requesting speed in providing interest calculations for scenario number 1 (FFA excluded).

18. <u>February 27, 2004.</u> Darmstadter to FDIC attorneys, copies to shareholder attorneys, enclosing documents pertaining to interest computations.

19. <u>April 14, 2004.</u> Willner to Darmstadter enclosing statement of shareholder position on the $258 million deducation which RTC failed to claim, and seeking an early next three-way meeting.

20. <u>April 26, 2004.</u> Willner to Darmstadter and Gill urging speed in setting the next three-way meeting (Richard Gill is the new FDIC attorney assigned to the case).

21. <u>May 6, 2004.</u> Willner to Gill listing priority material for Gill to read before the next settlement discussion.

22. <u>May 10, 2004.</u> Darmstadter to Gill responding to FDIC omitting post-insolvency interest from Benj. Franklin Receivership tax returns.

22

23. <u>May 12, 2004.</u> Willner to Darmstadter and Gill submitting proposed agenda for May 18, 2004 three-way meeting.

24. <u>May 12, 2004.</u> Willner to Darmstadter and Gill enclosing corrected agenda for three-way meeting.

25. <u>May 15, 2004.</u> Willner to Darmstadter and Gill enclosing spreadsheet showing effects of changes in scenarios 10.

26. <u>July 29, 2004.</u> Willner to Darmstadter and Gill enclosing a new legal citation dealing with the issue of taxation of loans.

27. <u>August 13, 2004.</u> Willner to Darmstadter, copy to Gill dealing with attempts to tax loans as income.

28. <u>September 7, 2004.</u> Willner to Gill requesting that FDIC make a settlement offer of $40 million.

29. <u>November 18, 2004.</u> Clark (FDIC) to Darmstadter. Copy to Willner, making a settlement offer of $47,017,650 with 75% allocated to interest and 25% allocated to taxes.

30. <u>December 2, 2004.</u> Watkins to Clark. Copy to Willner.

31. <u>December 10, 2004.</u> Willner to Clark.

32. <u>February 17, 2005.</u> Willner to Clark encouraging communication with Darmstadter.

33. <u>February 21, 2005.</u> Willner to Darmstadter requesting speed in responding to offer.

34. <u>July 8, 2005.</u> Willner to Gill agreeing to increase the offer to $48 million.

23

35. <u>July 13, 2005.</u> Willner to Gill re: Fairness Hearing.

36. <u>July 22, 2005.</u> Willner to Gill saying no client approval for $50 million.

37. <u>July 22, 2005.</u> Aboussie (of FDIC) to Darmstadter. Copy to Willner offering $50 million.

38. <u>September 5, 2005.</u> Willner to Aboussie and Gill asking for help in getting Department of Justice to sign off on the settlement.

39. <u>November 18, 2005.</u> Willner to Aboussie and Gill asking for quick action on setting the Fairness Hearing.

40. <u>December 30, 2005.</u> Willner to Gill requesting cooperation in getting an early Fairness Hearing.

41. <u>January 23, 2006.</u> Willner to Aboussie and Gill concerning notification for the Fairness Hearing.

42. <u>January 25, 2006.</u> Gill to Willner re: FDIC's attempt to locate shareholders.

43. <u>January 30, 2006.</u> Willner to Darmstadter and Gill requesting the earliest possible Fairness Hearing.

**d. The complexity and duration of the litigation.**

      Work started in the IRS tax claim in 1999. The IRS filed its proof claim with FDIC on April 22, 2002 and the Fairness Hearing, approving the tax settlement, occurred in this court on April 3, 2006. This is a long time.

24

The IRS sought $1.2 billion and settled for $50 million, of which 75% was allocated to interest and 25% was allocated to the tax.

The issue presented by the IRS claim of income tax was whether federal financial assistance provided to a receivership after the institution has been seized can be taxable income on transactions that are called loans (and in this case, repaid plus interest) has never been decided by any court. In almost all other receiverships, the federal financial assistance is provided with no real expectation of repayment, even though it is called a loan. The Internal Revenue Service regulations were written considering the usual scenario of no repayment. But Benj. Franklin Receivership is one of a tiny few which has a surplus, and therefore can and did repay the $1.5 billion loan with interest.

This case would have been one of first impression if it was not settled. There were also other important tax issues unresolved which also contributed to the settlement. They included

> "how the Alternate Minimum Tax should have been applied, how the 1990 taxes should have been calculated, whether the bad debt reserve was handled correctly, which statute of limitations would apply, and whether interest and penalties would be appropriate. Any one of these legal issues might have formed the basis of a lengthy lawsuit, but in this case, all of these issues are present in the one pending suit." *Quoted from page 4 of FDIC's Motion for a Fairness Hearing.*

This was not the case for IRS to use as its test case. It was the job of the shareholder attorneys to persuade the government of the importance of this equitable argument. Willner best knew the Benj. Franklin history which was the basis of the equitable argument.

Don Willner had the responsibility as lead counsel of coordinating the work of four law firms who often had different views of how to proceed, and keeping everything harmonious. Dealing with FDIC and IRS was difficult.

The FDIC, instead of being a close ally, was claiming that it was a "third party neutral" and "an honest broker" and did not agree with the shareholder argument that there should be no federal financial assistance tax. FDIC was however helpful in discussions with Department of Justice . But it also had its own problems, most notably its predecessor, RTC, never claiming in its tax returns that the $258 million paid in interest on the federal financial assistance loan was a deductible offset, and the shareholders then pending suit against FDIC for breach of fiduciary duty initially due to the imminent threat to pay the tax.

The Department of Justice also had its problems. It was apparent during the negotiations that its client, the IRS wanted to take a less compromising position. At one three-way meeting, there were over a half a dozen IRS people present who strongly disagreed with all of the shareholder arguments. It is frequently difficult to negotiate with a government agency which often has difficulty in getting someone to commit to a decision, plus the layers of government review.

Then the whole compromise almost unraveled by the Department of Justice review board wanting a last minute additional $3 million after its trial department had recommended the $47 million settlement. Ultimately, the shareholder clients agreed, but it was not easy. (Willner Declaration, Ex. 4)

Reducing a $1.2 billion claim to $50 million plus a favorable allocation of principal and interest was a superb job.

**e. The risk of non-payment.**

The Willner firm was paid $125 an hour by the shareholders for Don Willner's work as lead counsel, with the understanding that he would apply for additional contingent compensation out of the common fund, if successful. If no common fund had been preserved in the Receivership, the risk of not achieving reasonable compensation was clear.

**f. The amount of time devoted to the case by plaintiffs' counsel.**

The Willner firm has devoted 1031 hours of attorney time to the tax matter. On this first cause of action which is the subject of the claim, attorneys and paralegal hours work in the fee petition of which 49 hours of Willner involved in preparation of the fee petition.

**g. The awards in similar cases.**

The percentage allowed in *Swedish Hospital,* was 20%; *In re Vitamins,* 33%, *In re Baan*, 28% and *Freeport Partners*, 22%.

In the *Freeport Partners* case, supra, Judge Kessler wrote that "*Swedish Hospital* suggests that attorney's fees in most cases will fall between 20% and 30% of the [common] fund (page 9).

In those cases, however, far more attorney work was done because the settlements or judgments came at a later stage of the proceedings. An argument could be made that the Benj. Franklin shareholder attorneys achieved the desired result by early settlement rather than trial and should not be penalized for their efficiency, but this is not an argument which Willner firm wishes to make here as being unfair to the

shareholders. Furthermore, the fee was not entirely contingent, as it was in those other cases, since $125 per hour was paid.

Willner firm has been paid $108,793.60 and seeks an additional fee of $782,110.24 which would be 1.78% of the common fund. The court should also consider what fee will be awarded to the other law firms: Winston and Strawn L.L.P., and Blackwell, Sanders, Peper and Martin, as well as the $130,228.50 paid to Spriggs and Hollingsworth, which has not been appealed. Since the common fund awards in this District have been at least 20%, the award sought by Willner even when added to amounts that might reasonably be awarded to other counsel, will result in a fee total which will not exceed a reasonable percentage of the common fund. Willner firm believes its own requested fee is modest and reasonable by any measure. It takes no position on the fee requests of the other attorneys but believes that all contributed to the most successful result, and all should be reasonably compensated.

## 3. FDIC has not paid reasonable expenses.

The seven factors do not deal with expenses. The FDIC allowed expenses to be reimbursed to the Willner firm in the amount of $13,937.86, which are reasonable considering the need for airplane travel to and from Washington, D.C. and hotel and restaurant meals in Washington, D.C.

The FDIC however, disallowed $1,204.14, which was part of the cost of bringing Dr. G. Dale Weight, former CFO of Benj. Franklin and Donald McIntyre, former executive vice-president of Benj. Franklin to the Fairness Hearing. It was Willner's belief that he needed the two former executives of Benj. Franklin with him at the hearing. If they had stayed in Portland and were present at the federal courthouse in Portland, Oregon they could have testified in favor

of the settlement, but Willner would be deprived of the opportunity of consulting with them if factual issues arose at the Fairness Hearing. This was a reasonable strategic judgment by Willner and should not be second guessed by the FDIC attorney.

## D. CONCLUSION

Don Willner did exemplary work as lead counsel in coordinating the effort to reduce a $1.2 billion IRS claim to $50 million plus obtaining a favorable allocation of interest and tax, which preserved a common fund in the Receivership of $44 million. The amount sought by the Willner firm of $782,110.24 plus $1206.14 in unpaid expenses is reasonable. Indeed, it is most modest in relationship to the *Swedish Hospital* standard. It should be allowed in full.

February 2, 2007                                    Respectfully submitted,

Of Counsel:                                         __/s/Don S. Willner_____
KELBY D. FLETCHER                                   DON S. WILLNER
Peterson, Young, Putra, Fletcher,                   Don S. Willner & Associates, P.C.
  Knopp & Wampold, P.S.                             630 Sunnyside Road
2800 Century Square                                 Trout Lake, WA  98650
1501 Fourth Avenue                                  Tel:     509-395-2000
Seattle, WA  98101-1609                             Fax:    509-395-2939
Tel:     206-624-6800
Fax:    206-682-1415                                __/s/Jeremiah Collins_____
                                                    JEREMIAH A. COLLINS
                                                    Bredhoff & Kaiser, P.L.L.C.
                                                    805 15th Street, N.W., Suite 1000
                                                    Washington, DC  20005
                                                    Tel:     202-842-2600
                                                    Fax:    202-842-1888

                                                    Counsel for Plaintiff