I, Don S. Willner, declare under penalty of perjury under the laws of the United States and the State of Washington that the following is true and correct to the best of my knowledge and belief.

1. I am the principal of Don S. Willner and Associates, P.C. and also one of the attorneys in this case.

2. Benj. Franklin (founded in 1925), survived the great depression, then in 1982 acquired a failing savings and loan at the suggestion of the Federal Home Loan Bank of Seattle upon an agreement that the marked to market loss could be treated as the capital assets of goodwill. Then the government breached its contract by retroactively removing the goodwill which caused the seizure. Benj. Franklin was profitable before seizure, profitable in the conservatorship, and profitable in the receivership. There are no creditors, so the issue before a court if there was no settlement would have been whether this money should go to the government which breached its contract or to the 6500 shareholders (ex. 4).

3. I knew that action had to be taken to protect the shareholders. To prevent the FDIC from making tax payments, I filed on behalf of the shareholders a suit on June 17, 2002 against the FDIC in the United States District Court for the District of Oregon (the "Oregon Action"). I, who was sole counsel of record in the Oregon Action, was successful in obtaining a temporary restraining order ("TRO") prohibiting the FDIC, as Receiver of the Benj. Franklin, from making any tax

payment to the IRS. As a result, the FDIC then agreed not to make any such payment without advance notice to me. No taxes were paid by FDIC on behalf of Benj. Franklin Receivership until the current tax settlement was negotiated and approved.

4. In the negotiations, the FDIC did not advocate the lowest possible tax, stating that it was a "third party neutral" and an "honest broker" between the IRS and the shareholders. Consequently, the efforts of shareholder counsel were crucial in achieving a resolution that would produce the lowest possible tax payment from the assets of the receivership estate.

5. In addition to obtaining the TRO and filing the Motion to Intervene, I played a crucial role in the process that culminated in the tax settlement, serving as attorney of record on the motion to intervene, as lead counsel and principal spokesperson handling the lengthy correspondence with the Department of Justice and the FDIC, and coordinating the efforts of all counsel who were involved in that effort on behalf of the shareholders.

I personally have devoted approximately 8,000 hours to representing Benj. Franklin shareholders. As of the date of the Claim, 1031.1 hours my hours were devoted to the tax claim. This suit deals only with the work relating to the tax settlement and no compensation is sought here for unrelated work in the Claims Court Action.

The Willner firm charged the shareholders minimal fees for its work in resolving the tax issue. It received only $101,793.90 for four years of work on that issue, at rates that have never exceeded $125 per hour for my work. The

Willner firm's shareholder clients understood and agreed that these minimal fees would merely enable the small law firm to stay in operation, and that the firm would receive additional fees out of any assets of the receivership estate that were created or preserved through the firm's legal work.

6. I have practiced law for 55 years, and have been a member of the bar of this Court throughout that period. I also have admitted to practice in the States of Oregon and Washington. My practice has emphasized trial and appeals, including successful arguments in the United States Supreme Court, the Supreme Courts of Oregon and Washington, and the 9th and 10th Circuit Courts of Appeal. I have been lead counsel in numerous complex cases, including, in addition to the Benj. Franklin matters, major class action litigation in the areas of civil rights, labor, tenants' rights, and airplane travel. I have done extensive legal work in test cases for the Japanese American Citizens League, the NAACP, and Colegio Cesar Chavez, most of which has been *pro bono*.

In addition to my practice, for more than ten years I was an adjunct professor of law at Lewis and Clark Law School in Portland, Oregon, and I have served as a Circuit Court Judge pro tem in five Oregon counties by appointment of the Chief Justice of the Oregon Supreme Court. I am a graduate of Harvard College and Harvard Law School.

7. FDIC attorneys Robert Clark, Catherine Topping, Hugo Zia, and Richard Gill participated at various times in the settlement process, as did FDIC tax specialists. FDIC was helpful, but certainly not to the same extent as the shareholder attorneys because FDIC believed its role to be that of a "neutral third party" and

"honest broker" between the shareholders and the IRS, rather than as an advocate for the shareholders.

8. My work on the tax matter started in 1999 at the Claims Court trial of damages. I prepared and presented the testimony of expert witness Dr. Paul Horvitz. Almost all of the tax claim resulted from the IRS deciding that the 1990 federal financial assistance to the receivership which was called a loan to the Receiver and fully repaid plus $258 million of interest should be treated as taxable income. Dr. Horvitz testified that but for the seizure of Benj. Franklin there would not have been any later federal financial assistance, so therefore any tax paid should be added to restitution damages. Claims Court Judge Smith allowed the testimony, but he did not decide this issue, which is therefore preserved for appeal to the Federal Circuit.

I coordinated the work of all team members, chaired the shareholder side of the three-way discussions, handled almost all of the contact with government attorneys, primarily negotiated and signed the important agreement with FDIC (Ex. 11), and held the discussions with Richard Gill of FDIC concerning the actual settlement proposals. At the Fairness Hearing before this Court, I had the major role of describing and defending the settlement. In addition, my 16 years of knowledge of the case became important when FDIC or the Department of Justice requested documents or information from Benj. Franklin. This earlier gained knowledge has not been billed for in this petition fee.

9. The issue presented by the IRS claim of income tax was whether federal financial assistance provided to a receivership after the institution has been seized can be

taxable income on transactions that are called loans (and in this case, repaid plus interest) has never been decided by any court. In almost all other receiverships, the federal financial assistance is provided with no real expectation of repayment, even though it is called a loan. The Internal Revenue Service regulations were written considering the usual scenario of no repayment. But Benj. Franklin Receivership is one of a tiny few which has a surplus, and therefore can and did repay the $1.5 billion loan with interest. This case would have been one of first impression if it was not settled.

10. This was not the case for IRS to use as its test case. It was the job of the shareholder attorneys to persuade the government of the importance of this equitable argument. I best knew the Benj. Franklin history which was the basis of the equitable argument.

I had the responsibility as lead counsel of coordinating the work of four law firms who often had different views of how to proceed, and keeping everything harmonious. Dealing with FDIC and IRS was difficult.

The FDIC, instead of being a close ally, was claiming that it was a "third party neutral" and "an honest broker" and did not agree with the shareholder argument that there should be no federal financial assistance tax. FDIC was however helpful in discussions with Department of Justice. But it also had its own problems, most notably its predecessor, RTC, never claiming in its tax returns that the $258 million paid in interest on the federal financial assistance loan was a deductible offset, and the shareholders then pending suit against FDIC for breach of fiduciary duty initially due to the imminent threat to pay the tax.

The Department of Justice also had its problems. It was apparent during the negotiations that its client, the IRS wanted to take a less compromising position. At one three-way meeting, there were over a half a dozen IRS people present who strongly disagreed with all of the shareholder arguments. It is frequently difficult to negotiate with a government agency which often has difficulty in getting someone to commit to a decision, plus the layers of government review.

Then the whole compromise almost unraveled by the Department of Justice review board wanting a last minute additional $3 million after its trial department had recommended the $47 million settlement. Ultimately, the shareholder clients agreed, but it was not easy.

11. The Willner firm was paid $125 an hour by the shareholders for my work as lead counsel, with the understanding that I would apply for additional contingent compensation out of the common fund, if successful. If no common fund had been preserved in the Receivership, the risk of not achieving reasonable compensation was clear.

12. The FDIC however, disallowed $1,204.14, which was part of the cost of bringing Dr. G. Dale Weight, former CFO of Benj. Franklin and Donald McIntyre, former executive vice-president of Benj. Franklin to the Fairness Hearing. It was my belief that I needed the two former executives of Benj. Franklin with me at the hearing. If they had stayed in Portland and were present at the federal courthouse in Portland, Oregon they could have testified in favor of the settlement, but I would be deprived of the opportunity of consulting with them if factual issues

arose at the Fairness Hearing. This was a reasonable strategic judgment and
should not be second guessed by the FDIC attorney.

Date February 1, 2007

*[signature: Don S. Willner]*

Don S. Willner