I, Rosemary Stewart, declare under penalty of perjury under the laws of the United States and the District of Columbia that the following is true and correct to the best of my knowledge and belief.

1. I am a partner in the Washington, D.C. litigation law firm of Spriggs & Hollingsworth. I have been in private practice for 16 years and previously was in government service for 16 years at the Federal Home loan Bank Board (where I served as Director of Enforcement for the last five years of my government service).

2. In early 2002, at the request of Don S. Willner, my then partner Jerry Stouck and I began to assist Don S. Willner with the various lawsuits in which he was involved concerning Benj. Franklin Federal Savings & Loan Association, Portland, Oregon ("Benj. Franklin"). I gradually assumed most of the responsibility for the assistance that Spriggs & Hollingsworth provided to Mr. Willner.

3. One of the matters on which I worked directly with Mr. Willner was the coordinated effort to settle the IRS lawsuit filed in 2002 against the FDIC as Receiver for Benj. Franklin, which sought over a billion dollars of unpaid income taxes, interest, and penalties. My firm eventually billed for approximately 400 hours of attorney and paralegal time working on this matter, most of which reflected my own time.

4. The FDIC staff invited Mr. Willner to participate in the tax settlement discussions after Mr. Willner had taken the following steps:

   a. In early 2002, Mr. Willner filed an injunctive action against the FDIC in the U.S. District Court in Portland, Oregon, seeking to prevent the FDIC-Receiver from paying the tax demanded by the IRS. The Court issued a temporary restraining order, directing FDIC not to pay the disputed tax. The Court later declined to grant a preliminary injunction in light of FDIC's representation that the tax would not be paid without further notice to the shareholder plaintiffs who were Mr. Willner's clients.

      b.     When the United States filed its tax collection suit against the FDIC in the U.S. District Court for D.C. in 2002, Mr. Willner filed a motion to intervene and to transfer to the District of Oregon, arguing that the shareholders were the real parties in interest because the $1.2 billion tax claim threatened to eliminate the entire surplus that the Benj. Franklin shareholders were entitled to receive.

5.     Later in 2002, formal settlement meetings were initiated between and among the FDIC staff, the counsel and consultants for the Benj. Franklin shareholders, and representatives of the U.S. Department of Justice Tax Division ("DOJ"). Representatives of the IRS also attended some of the meetings. These meetings typically included, as the shareholders' representatives: Mr. Willner, Thomas Buchanan and Mitch Moetell from Winston & Strawn, Ernest Fleischer (Mr. Willner's tax consultant) and myself. Another accounting consultant for the shareholders, Ms. Randi Cohn, also participated in some of the meetings.

6.     Many meetings and conference calls among the shareholders' representatives also preceded and followed each of the meetings held with the FDIC, the DOJ, and/or the IRS.

7.     On behalf of the shareholders' team, Mr. Willner was responsible for scheduling and coordinating each of these meetings, which required many telephone calls and conferences and much correspondence between Mr. Willner and the DOJ, and Mr. Willner and the FDIC, as well as among the shareholder representatives. Mr. Willner also "chaired" the shareholder side of the settlement discussions at each of the face-to-face meetings with the FDIC, DOJ, and IRS.

8.     Mr. Willner and I also negotiated a separate letter agreement with the FDIC in 2004, which provided that in the event of a favorable tax settlement, FDIC would, *inter alia*, reimburse $3 million of shareholder contributions to the BFS Lit. Fund and pay reasonable attorneys fees for the shareholder attorneys' tax-related work (all to be paid from the Benj. Franklin receivership surplus).

9. As the settlement discussions proceeded, different roles emerged for the various shareholder representatives. Mr. Willner continued to contact the DOJ and FDIC staff to urge their consideration and action, and he continued to coordinate the meetings and discussions. Tax attorney Mitch Moetell took the lead on developing and arguing the tax positions that would minimize the tax liability of the Benj. Franklin receivership, with Mr. Fleischer's careful review of and collaboration on each tax argument. Mr. Buchanan assured the government representatives that the shareholders would vigorously litigate the disputed taxes. And I assumed increased responsibility to coordinate and communicate with the FDIC and later to research and prepare drafts of FDIC's motion for fairness hearing as well as drafting and coordinating the notice that would be sent to all Benj. Franklin shareholders.

10. At the fairness hearing held in May 2006, Mr. Willner spoke in favor of the proposed tax settlement on behalf of his shareholder clients, and Mr. Buchanan also advised the Court that the shareholders he represented were in favor of the proposed settlement.

11. I believe that every member of the shareholders' team provided important and effective input to the settlement process. I further believe that our team effort was key to developing a cooperative relationship with the FDIC and together convincing the DOJ that there were both equitable reasons and technical tax reasons not to litigate the disputed taxes but to settle the matter instead.

12. This concludes my Declaration.

Dated: January 26, 2007

*Rosemary Stewart*
Rosemary Stewart

451319v1