```
            UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
```

---------------------------------X
WINSTON & STRAWN, LLP, et al.,   :
                                 :
            Plaintiffs,           :
                                 :
      v.                          : No. 06-01120 (EGS)
                                 :    06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE         :    06-01273 (EGS)
CORPORATION,                      :
                                 :
            Defendant.            :
---------------------------------X

                                  Washington, D.C.

                         Wednesday, January 17, 2007

Deposition of

                     RICHARD GILL

a witness, called for examination by counsel for
Plaintiffs, pursuant to notice and agreement of
counsel, beginning at approximately 2:30 p.m., at
the law offices of Winston & Strawn, 1700 K Street,
NW., Washington, D.C., before Mary Ann Payonk of
Beta Court Reporting, notary public in and for the
District of Columbia, when were present on behalf
of the respective parties:

                                                      2

1    APPEARANCES:
2       On behalf of Winston & Strawn, LLP:

Page 1

11  we mean that in a good way. The goodwill
12  litigation on behalf of the FDIC.
13          And then from 2002, I think
14  approximately January-February 2002 to the
15  present, I've come back home and I now work
16  again for the professional liability group in
17  the FDIC.
18      Q   Have you ever been an attorney in
19  private practice?
20      A   No.
21      Q   Did you tell me or Kelly Fletcher
22  that a decision on my fee petition was being

1   made by FDIC in Texas?
2       A   No. I think I -- I mean, for
3   clarification, I think I told you that it was
4   being -- it -- that is the office that has to
5   send out the decisional material, but that --
6   and that's where the petition had to be
7   filed. But I never said that they were
8   making the decision.
9       Q   And you're confident of that?
10      A   Yes.
11      Q   Did you tell me or my attorney,
12  Kelly Fletcher, to send my fee petition and

Page 5

```
13    supplements to Glenn Glinsmann of
14    Texas?
15        A    Yes.
16        Q    Had we previously been sending them
17    to you?
18        A    Before the claim was officially
19    filed, you were sending to the -- the actual
20    claims to me in draft form, and so that was
21    being sent to me.
22        Q    You have been present during the
```

7

```
1     telephone deposition of Glenn Glinsmann?
2         A    Yes.
3         Q    Is he correct that you made the
4     decision on my fee petition?
5         A    Point of clarification. I was
6     certainly involved in the decisional process
7     on your fee application. The decision -- and
8     for all intents and purposes, I proposed the
9     recommended decision that was approved by
10    other people in the FDIC.
11        Q    Who else in FDIC approved the
12    decision?
13        A    Specifically, Richard Aboussie,
14    who's an associate general counsel. I think
15    he is now an acting deputy general counsel,
```

Page 6

16  but at the time, he was an associate general
17  counsel. And the general counsel of the
18  FDIC, who I believe now is in private
19  practice, William Kroener.
20     Q   Did you have discussions with Mr.
21  Aboussie or Mr. Kroener about my fee
22  petition?

1     A   Yes.
2     Q   Before -- and did you also make
3  the, as you phrase it, effective
4  recommendations on the fee petitions of
5  Spriggs & Hollingsworth and Winston & Strawn?
6     A   Yes. The same process occurred.
7     Q   Before evaluating these three fee
8  petitions -- mine, Winston & Strawn and
9  Spriggs & Hollingsworth -- how many fee
10  petitions, attorney fee petitions have you
11  evaluated?
12     A   I've never evaluated attorneys fee
13  petitions like this before. But in my let's
14  say over ten years in the professional
15  liability section, we hire outside counsel to
16  handle cases, and I have probably -- if you
17  count each month's bill as a fee petition or

19  handled hundreds.

20  Q  But just so we're clear, the only
21  other fee petitions you evaluated have been
22  those of contract attorneys who were doing

9

1   work for FDIC, is that correct?
2       A   That is correct.
3       Q   Does FDIC have any written or oral
4   guidelines for evaluation of attorney fee
5   petitions?
6       A   I am not aware of any.
7       Q   So we're clear, and no such
8   guidelines were utilized by you in reviewing
9   my fee petition?
10      A   No, I did not look at any -- any
11  FDIC policy on this matter.
12      Q   Were you given any oral
13  instructions by anyone in terms of how to
14  evaluate my fee petition?
15      A   Can -- that -- I'd have to say yes.
16      Q   All right.
17      A   I mean, but it -- as far as --
18      Q   Who gave you those instructions,
19  and what were they?
20      A   Robert Clark and Rick Aboussie.

21    Q    And what instructions were you
22  given in evaluating my fee petition?

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

10

1         MR. TAYLOR:  Let me stop the
2   witness here for a second.
3         MR. WILLNER:  Sure.
4         MR. TAYLOR:  I'm going to object
5   initially insofar as it calls for information
6   that's protected by the work product
7   privilege and instruct the witness not to
8   answer if it does.  Otherwise, if your
9   question calls for whether he was provided
10  with the standards of review, that's fine.
11        BY MR. WILLNER:
12    Q    Were you provided standards of
13  review by any superior in connection with my
14  fee petition?
15    A    No.
16    Q    All right.  Do not answer this
17  question, to give your attorney a chance to
18  object.  Were you provided any guidance in
19  writing or orally by any of your superiors in
20  dealing with my fee petition?
21        MR. TAYLOR:  Again, to the extent
22  it calls for information that's protected by

Page 9

1  the work product provision I object and I
2  instruct the witness not to answer. If it's
3  just talking about policies, procedures,
4  specific instructions about how to go about
5  it, that's fine.
6        MR. WILLNER: I think you're
7  premature. I just asked him if he provided
8  any.
9      A    The answer is yes, but it's in
10 response to your November 2004 letter
11 agreement that you had with the FDIC.
12       BY MR. WILLNER:
13     Q    All right. Well, what
14 instructions, guidelines, were you given in
15 connection with the letter agreement between
16 Bob Clark and myself?
17     A    The November agreement, the letter
18 agreement which Bob Clark memorialized with I
19 believe a one-sentence concurrence, says that
20 the FDIC will support reasonable attorneys'
21 fees and that the -- and that the fees, you
22 know, will be run through the receivership

1  claims process. At the time, we all believed
2  that those fees were going to go through the
3  court process and then, after the Court
4  approved them, they would be run for payment
5  through the receivership claims process.
6      Subsequently, after Mr. Clark left
7  the FDIC, in discussions with Rick Aboussie,
8  it was determined that it might jeopardize
9  the underlying settlement by allowing both
10 the attorneys' fees and blessing the
11 settlement amount to be run through the
12 fairness hearing. So I believe it was
13 mutually agreed to that the attorneys' fees
14 would be run up through the receivership
15 claims process.
16     And at all times, both, you know,
17 on the reasonable attorneys' fees, it was the
18 FDIC's assumption that what we were to pay
19 was your reasonable hourly rates.
20     So to the extent that I was
21 provided guidance, it was to try to determine
22 what was fair as far as the reasonable -- the

1   hourly rates of the law firms. And I was
2   given instructions I think both by Bob Clark,
3   who -- and Richard Aboussie on the -- that --
4   that's what, you know, the basic parameters
5   were as far as looking at these attorney's
6   fee petitions.
7       Q    Isn't it fair to say that Mr.
8   Aboussie was taking a position inconsistent
9   with the agreement that Bob Clark and I
10  reached?
11      A    It was different than the
12  agreement. I mean, it was -- in the sense
13  that Mr. Aboussie felt that the Court -- that
14  the Court may have a problem approving
15  attorneys' fees and so his position was that
16  they should come through the -- the
17  receivership claims process.
18      Q    Was the document of two pages
19  prepared by me and concurred in by Bob Clark
20  a binding agreement on the FDIC?
21      A    I think what it was was it was a
22  general outline of what the -- the broad

14

1   parameters of the settlement would be.  In
                        Page 12

2  other words, the -- the post and -- you know,
3  settlement agreement.
4         MR. TAYLOR: Excuse me, do you have
5  a copy of the letter that you're referring
6  to?
7         MR. WILLNER: I don't think I do.
8  The witness and I know it by heart, but I
9  don't think I do. I'm sorry.
10    A    It was November of 2004 or
11 something, but I don't -- I can't remember
12 the date.
13         MR. WILLNER: Off the record.
14             (Discussion off the record.)
15         MR. TAYLOR: If the witness
16 recalls, he can answer, but with -- I'd like
17 it understood that he doesn't have the
18 document in front of him. So, with that
19 qualification, whatever answers he gives, it
20 may be contradicted by the document itself.
21 I would ask for some allowance for that.
22         MR. WILLNER: Why don't we ask at

1  the time the witness reviews and signs his
2  deposition to have him state whether he has
3  any different view at that point?

```
 6    statistical analysis saying, you know, a
 7    partner with 20 or 30 or 40 or 50 years'
 8    experience, what that partner would be worth.
 9    What I looked at specifically was what the
10    high rate for a partner that the FDIC was
11    paying. And to the extent that that was
12    embedded in the data, that -- I picked it up.
13       Q    Are you aware of any Pacific
14    Northwest attorney other than me who was lead
15    counsel in a Washington, D.C. major complex
16    litigation in the group of attorneys that you
17    hired?
18       A    I'm not -- I'm not aware of any --
19    the case was filed in Washington, but I think
20    most of the work probably was performed in
21    the Pacific Northwest. But no, I'm not aware
22    of any other. In answer to your question,
```

29

```
 1    no.
 2       Q    All right. In evaluating a
 3    reasonable fee in this case, did you consider
 4    that the original suit of the IRS sought 1.2
 5    billion and that through the efforts of the
 6    attorneys, a $50 million settlement was made?
 7       A    Yes, we certainly looked at the
```
Page 26

8    amount of the original lawsuit. But, more
9    important, in the determination that
10   reasonable hourly rates should be the
11   standard hourly rates was the fact that this
12   was a combined effort by the FDIC, private
13   attorneys that we invited to participate on
14   behalf of the shareholders. And in all
15   fairness, I thought the attorney that we drew
16   from the Department of Justice was very
17   receptive to try to work that you to see if
18   we could resolve the case.
19        Q    Did you tell me in the course of
20   these discussions that the role of FDIC was
21   being a stakeholder?
22        A    I think that I -- I told you that

30

1    the role of the FDIC was to try to see what
2    we believed the correct tax should be and
3    that, you know, as far as -- as far as the --
4    the dollar flow, I mean, we were performing
5    more as a third-party neutral because the
6    dollars were going to flow either to you,
7    your shareholders, or to the Internal Revenue
8    Service.
9         Q    My question was: Did you tell me

10  during the course of those
11  number of occasions that FDIC was a
12  stakeholder in the matter?
13      A    I -- I don't remember using those
14  words. I remember saying we were functioning
15  more as a third-party neutral, because I -- I
16  just don't -- I don't remember -- I don't
17  understand a stakeholder. I -- I don't think
18  I said that. I just -- it -- it just doesn't
19  -- doesn't ring like --
20      Q    Are you confident of your
21  testimony?
22      A    I -- as confident as I can be. I

31

1   mean, I -- I'm trying to be genuine and
2   candid here and I just don't remember using
3   the word "stakeholder," because we really
4   weren't a stakeholder in these proceedings.
5   We were -- the money was going to flow either
6   to the shareholders or to the Internal
7   Revenue Service. The FDIC had been paid in
8   full, even -- I think it was 350 million in
9   post-insolvency interest, so we really
10  weren't a stakeholder.
11      Q    That you were not a stakeholder?
12      A    Were not. That -- that's why --

13  that's why I just don't believe I used those
14  words.
15      Q   Do you know whether or not FDIC
16  used those words, called its position that of
17  a stakeholder in legal pleadings filed in the
18  Portland case?
19      A   No, I do not.  I -- that was filed
20  in, I think, June of 2002, and I came into
21  this case in probably early to mid 2004.
22      Q   All right.

1       A   I mean, the FDIC may have, but I
2   just specifically -- I mean, I don't remember
3   using those words.
4       Q   Do you recall using the -- telling
5   me that FDIC's role was that of an honest
6   broker --
7       A   Yes.
8       Q   -- between the IRS and the
9   shareholders?
10      A   Yes, I do remember that, saying
11  that to you on a number of occasions.
12      Q   During the discussions, were you
13  aware of the interagency agreement that had
14  been signed years before between first RTC

```
15    and then EDUCATOR'S?
16      A    Yes. At some point during the
17   discussions, I was made aware of it.
18      Q    And were you aware that the
19   agreement provided that if certain
20   prerequisites are met that the FDIC would
21   accept the IRS's determination of the proper
22   tax?
```

33

```
1       A    Yes.
2       Q    In addition to the factors you
3    previously mentioned about --
4       A    Oh, can I clarify? What I'm aware
5    of is that the FDIC -- if the IRS made a
6    final determination, I think the agreement
7    read we could -- we would not contest their
8    determination.
9       Q    Right.
10      A    Just a point of clarification.
11      Q    Sure.
12      A    If it was in court.
13      Q    You said something about court?
14   I'm sorry.
15      A    If the case went to court.
16      Q    Yes, all right. In addition to the
17   matters you've mentioned -- well, have you
```

18  covered all matters that you considered in
19  fixing my fee?
20      A    I think that's reasonably
21  dispositive. We tried to canvass the
22  material out -- out there in the public

34

1   domain, which was interesting but not
2   particularly dispositive, because the rates
3   were all over the place, and so we fell back
4   to what we knew, which was what we paid our
5   outside counsel.
6           MR. WILLNER: All right. Off the
7   record.
8               (Discussion off the record.)
9           BY MR. WILLNER:
10      Q    You told us you've never been in
11  private practice. As an attorney in any
12  government agency, have you kept time
13  records?
14      A    Yes, I have. I mean, in the -- the
15  government isn't as time matter-sensitive as
16  the private practice but yes, we keep time
17  sheets. But it's much less specific. It's
18  just like how much time you've worked on a --
19  like, for example, in the FDIC, how much time

```
 5   approximately?
 6      A      The best of my recollection, I --
 7   I'm thinking it was either the first or
 8   second quarter of 2004.
 9      Q      All right. And were your
10   predecessors Catherine Topping and Hugo Zia?
11      A      Yes. They functioned as line
12   attorneys like I did. Catherine got a
13   promotion and moved out.
14      Q      And when you came into the matter,
15   did you have discussions with them about what
16   had taken place before you became involved?
17      A      Yes, I did.
18      Q      Are you aware of the fact that I
19   filed the motion to intervene and along with
20   the motion to transfer to Oregon?
21      A      Yes.
22      Q      Are you aware of the fact that
```

54

```
1   starting way before you came in and
2   continuing until not too long ago there was
3   an enormous amount of correspondence between
4   Henry Darmstadter on behalf of the
5   government, Catherine or Hugo or yourself on
6   behalf of the FDIC, and myself as lead
```

Page 49

```
 8       A    Yes.
 9       Q    That just saved you going through
10   chunks of paper.
11            Isn't it a fact that there were
12   numerous discussions between you and me
13   concerning what settlement would be
14   acceptable to the shareholders?
15       A    Yes, yes.
16       Q    Isn't it true that at the meetings
17   held in Washington, D.C., around that long
18   table that I chaired the shareholders' side
19   of those meetings?
20       A    Yes. As best I can recall, I think
21   that you were the -- you were the counsel for
22   the shareholders that -- yes.
```

55

```
 1       Q    And that I would -- during the
 2   discussions, I would call on others in our
 3   group to respond to questions?
 4       A    Yes. I mean, you know, I remember
 5   that Winston & Strawn was at the meetings. I
 6   think Tom Buchanan and Rosemary Stewart,
 7   which was from Spriggs & Hollingsworth, was
 8   also counsel at the meeting.
 9       Q    Yeah.
```

10  A   But I think you were the lead
11  counsel for the shareholders at that time.
12  Q   When you say "at that time," wasn't
13  I lead counsel for the shareholders through
14  the time of the fairness hearing?
15  A   Yes. And I just was -- I didn't
16  know if you were still lead counsel. That
17  was the only -- I -- that's --
18  Q   I'm not lead counsel for the
19  appeal.
20  A   Yeah, that's -- I didn't mean to --
21  Q   I'm of counsel for the appeal.
22  A   I was trying to be complete in my

1   answer. Yes, you were lead counsel at the
2   time of the fairness hearing.
3   Q   Right. And was I the only attorney
4   of the shareholders who participated in the
5   fairness hearing?
6   A   Well, in -- I think Mr. Buchanan --
7   in other words, Bob Seuss had a group of
8   shareholders -- I mean, you were representing
9   -- I can't be -- I don't know the full
10  answer. You know more than I do. But you
11  were representing some of the shareholders,