```
00001
 1      UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF COLUMBIA
 2   -------------------------------x
     WINSTON & STRAWN, LLP, et al., :
 3                                  :
            Plaintiffs,             :
 4                                  :
            v.              : No. 06-01120 (EGS)
 5                          :    06-01227 (EGS)

 6   FEDERAL DEPOSIT INSURANCE   :  06-01273 (EGS)

 7   CORPORATION,                :

 8                               :

 9          Defendant.           :

10   -------------------------------x

11                  Washington, D.C.

12               Thursday, January 18, 2007

13   Deposition of

14           DON S. WILLNER

15   a witness, called for examination by counsel for

16   Defendant, pursuant to notice and agreement of

17   counsel, beginning at approximately 8:40 a.m., at

18   the law offices of Winston & Strawn, 1700 K Street,

19   NW., Washington, D.C., before Mary Ann Payonk of

20   Beta Court Reporting, notary public in and for the

21   District of Columbia, when were present on behalf

22   of the respective parties:
```

```
00010
 1  matter. I'd been involved in the tax matter
 2  in the Claims Court case, and we all knew and
 3  there was a stipulation of counsel that there
 4  was this huge claimed tax liability. I knew
 5  there'd been some -- that Mike Duhl had a at
 6  that point Chicago attorney and I believe
 7  CPA, had talked to the FDIC, and then had
 8  gone with the FDIC to a meeting with the IRS.
 9         After the conclusion of our Claims
10  Court case, I became very concerned as to
11  what the IRS -- as to what the FDIC was going
12  to do in connection with this tax claim,
13  because I'd not heard anything other than the
14  meeting involving Mike Duhl. I'm trying to
15  think of the sequence.
16         I believe at that point I contacted
17  Mike Duhl. I believe I asked him was there
18  any conflict between his representing my
19  plaintiffs group and his former
20  representation with the FDIC. He said no.
21         Then there followed some
22  correspondence with you which we introduced
```

00011
1  in connection with your deposition. You're
2  familiar with those documents.
3    Q  Yes.
4    A  And after receiving your last
5  letter -- I'm paraphrasing now -- in which
6  you said: In view of the IRS's unwillingness
7  to make any concessions and my knowledge of
8  the interagency agreement which said that the
9  FDIC under certain circumstances would not
10 contest an IRS claim, I believe there was
11 extraordinary jeopardy there when you wrote
12 that a decision will be made soon about
13 paying the tax in view of the fact that the
14 IRS was not going to make any concessions and
15 the interagency agreement gave no remedy to
16 the FDIC.
17   Q  Some other witnesses have testified
18 that from information provided by you, they
19 understood that the FDIC was going to pay the
20 IRS the tax. Is your testimony that your
21 belief regarding the FDIC's possible payment
22 of the tax was based on the letter you

00012
1  received from me?
2    A  Yes, I did. I think a reasonable
3  person would draw that same inference.
4    Q  Okay. But otherwise, you didn't
5  speak with anybody from the FDIC who told you
6  that FDIC was going to pay the tax?
7    A  No. I thought a written letter
8  from you was sufficient.
9    Q  In the negotiations themselves
10 between the FDIC and the United States
11 through the Department of Justice on behalf
12 of the IRS and the ones where the FDIC
13 invited the attorneys in this room to
14 participate, what was your primary role?
15   A  Well, first thing I did was I filed
16 a motion to intervene and transfer to the
17 District of Oregon.
18   Q  Was that before or after the
19 negotiations began?
20   A  Before. That -- that triggered the
21 negotiations.
22   Q  How do you know it triggered the

```
00015
 1  course I was very worried that if the FDIC
 2  paid the taxes, as you gave every indication
 3  they would, there would have been nothing to
 4  fight about in the tax case because the money
 5  would have been gone.
 6        And at that point, I had received
 7  the advice of Mr. Fleischer that if the tax
 8  was paid by FDIC that the only way a claim
 9  could be made was by FDIC paying the entire
10  amount of the claim, which was a billion 2,
11  approximately, before they would have
12  standing.  And, of course, there was also the
13  issue of whether we, the shareholders, would
14  have standing.  So I considered my first
15  contribution was on saving the fund.
16        Do you want me to go on?
17    Q   I'm talking about the whole period
18  of the negotiations.
19    A   I'm talking about --
20    Q   I'd like to know what you consider
21  your major contribution to the process.
22    A   Well, I think I had several.  I
```

00021
1  there -- so were others.
2  Q   What about Mr. Fleischer's major
3  contribution to the process?
4  A   Well, I agree with him that he had
5  two contributions. His first one was giving
6  me advice which caused me to get the TRO,
7  which I believe saved the possibility of
8  money being available in the fund.
9      And secondly, he was my tax
10 consultant during this entire period. He --
11 he became involved significantly before Mr.
12 Moetel did.
13 Q   Okay. You were in the room earlier
14 when Mr. Fleischer testified. I just want to
15 get your recollection of how and why you
16 hired Mr. Fleischer. Could you briefly
17 describe why you hired Mr. Fleischer?
18 A   Yes. I'm no tax lawyer, and I knew
19 I needed one. And at that point, Winston &
20 Strawn was not participating in our -- in our
21 -- in the Claims Court case. I'm sorry, they
22 were participated in the Claims Court case,

00022
1  but they were not participating after the end
2  of the trial in 1999. I don't remember the
3  date, but at some date, there was a period in
4  which -- after which they were no longer
5  participating.
6      I needed new tax advice. I asked
7  Jerry Stock, who I'd retained. He's a
8  Washington, D.C. Attorney. I'd retained him
9  to help me after Winston & Strawn was no
10 longer involved, told him I needed a tax
11 attorney. He recommended Ernie Fleischer.
12   Q   What --
13   A   Is that the -- the answer you want?
14   Q   Yeah. And what -- did you discuss
15 the terms of Mr. Fleischer's engagement?
16   A   Very little. All I said to him was
17 I needed a tax consultant, Terry Stock had
18 recommended him, but we didn't have any money
19 and that he would have to work on this case
20 on a contingency.
21   Q   And did you discuss what the
22 contingency might be?

```
00041
 1    A   Probably.
 2    Q   And as it turned out, Mr. Fleischer
 3  began work sometime in the summer of 2002 and
 4  received no payment of any kind until the
 5  summer of 2006, is that right?
 6    A   I don't know the dates, but yes.
 7    Q   Okay.  Now, when you told Mr.
 8  Fleischer the situation, what did he tell you
 9  with regard to whether it was a good idea to
10  pay the money to the IRS and then seek a
11  refund?
12    A   Mr. Fleischer provided me with a
13  U.S. Supreme Court case.  He may have
14  provided me with -- he testified to statutes.
15  I don't specifically remember statutes, but I
16  certainly remember that U.S. Supreme Court
17  case, which I read and was very clear to me
18  that I had to go to court in Portland to get
19  a TRO.
20    Q   And so that's what you did?
21    A   Yes.
22    Q   And in summary, what did the TIR --
```

```
00042
 1  I'm sorry, TRO provide?
 2     A   Well, again, there's a document,
 3  but basically, it provided that the FDIC was
 4  restrained from paying any money to the IRS.
 5     Q   Until something happened?  Or it
 6  was simply a restrained endeavor?
 7     A   No.  A TRO under procedure in
 8  Federal District Court in Oregon, and I don't
 9  know if it's the same elsewhere, essentially
10  remains in effect until there's a preliminary
11  injunction hearing.  This one remained in
12  effect until the preliminary injunction
13  hearing.
14         But during the argument to the
15  judge in Portland, the FDIC offered me
16  advance notice of -- before I paid the tax.
17  They said they were a stakeholder.  They said
18  they were considering interpleading the
19  money.  And even though I did not get the
20  preliminary injunction, I felt that I had the
21  protection I needed.
22     Q   In fact, you received the assurance
```

00044

1  Oregon.

2  Q  And after that point, then what did

3  you do to try to defeat the IRS claim?

4  A  Well, I've testified at some length

5  to Mr. Taylor's questions, but that's

6  basically what I did. And in terms of your

7  client, he was my tax consultant. I didn't

8  make a move in connection with that case

9  without consulting with Ernie Fleischer, and

10  -- and I asked that Ernie review anything

11  that Mitch Moetel did and that Mitch Moetel

12  review anything that Ernie did. And I

13  thought they were working together very

14  closely.

15  Q  And that's what -- you started --

16  initially, immediately after the TRO lapsed,

17  you began working with Mr. Fleischer on

18  determining the issues and legal research and

19  so forth, and then a few months later, Mr.

20  Moetel became involved in addition, is that

21  right?

22  A  Yes.