# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WINSTON & STRAWN LLP,** ) <br> ) <br> and ) <br> ) <br> **DON S. WILLNER & ASSOCIATES, P.C.** ) <br> ) <br> and ) <br> ) <br> **BLACKWELL SANDERS PEPER MARTIN** ) <br> and ) <br> **ERNEST M. FLEISCHER** ) <br> ) <br> Consolidated Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> **FEDERAL DEPOSIT INSURANCE** ) <br> **CORPORATION, AS RECEIVER FOR** ) <br> **THE BENJ. FRANKLIN FS&LA,** ) <br> **PORTLAND, OREGON** ) <br> ) <br> Defendant. ) <br> ) | Civil Case No. 06-01120 (EGS) <br><br> [Consolidated with No. 06-01227 (EGS) and No. 06-01273 (EGS)] |

### FDIC-RECEIVER'S EXHIBITS TO ACCOMPANY ITS OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
### VOL. II

Bruce C. Taylor
Federal Deposit Insurance Corporation
550 17th Street, NW
Room VS-E7118
Washington, DC 20429
(703) 562-2436 (Telephone)
(703) 562-2478 (Facsimile)

Counsel for Federal Deposit Insurance Corporation,
as Receiver for The Benj. Franklin FS&LA

Date:   February 22, 2007

## INDEX TO FDIC-RECEIVER'S EXHIBITS
## (OPPOSITION AND CROSS MOTION)

**Document**                                                                      **Ex. No.**

### VOL I

Letter to Robert Suess from Don Willner (8/22/1990) .....................................1

Order, *Suess v. FDIC*, No. 02-807-HA (D.Ore.) (7/26/2002). .......................2

Joint Unopposed Motion, *United States v. FDIC*, No. 02-1427 (D.D.C.)
(4/22/2003).................................................................................................3

Email to Tom Buchanan from Rosemary Stewart (9/28/2005) .......................4

Notice to Shareholders, *United States v. FDIC*, No. 02-1427 (D.D.C.)
(2/3/2006)....................................................................................................5

Order, *United States v. FDIC*, No. 02-1427 (D.D.C.) (5/2/2006) ................6

Notice of Partial Disallowance of Claim to Rosemary Stewart from
Glenn Glinsmann (5/17/2006) .....................................................................7

Undated letter to FDIC from Robert Suess..................................................8

Letter to Richard Gill from Robert Suess (1/4/2007) ...................................9

### VOL. II

Buchanan Deposition (1/17/2007) ..............................................................10

Willner Deposition (1/18/2007)...................................................................11

### VOL. III

Fleischer Deposition (1/18/2007) ...............................................................12

Stewart Deposition (1/18/2007)..................................................................13

Gill Declaration (2/22/2007).......................................................................14

**Page 2**

APPEARANCES:
On behalf of Winston & Strawn, LLP:
    SCOTT PLUTA, ESQUIRE
    THOMAS M. BUCHANAN, ESQUIRE
    Winston & Strawn, LLP
    1700 K Street, NW.
    Washington, D.C. 20006
    (202) 282-5100

On behalf of Willner & Associates, PC:

    DON S. WILLNER, ESQUIRE
    Willner & Associates, PC
    630 Sunnyside Road
    Trout Lake, WA 98650
    (509) 395-2000

On behalf of Blackwell Sanders Peper Martin, LLP
    and Ernest Fleischer:
    JAMES BORTHWICK, ESQUIRE
    Blackwell Sanders Peper Martin, LLP
    4801 Main Street, Suite 100
    Kansas City, MO 64112
    (816) 983-8000
On behalf of Federal Deposit Insurance
    Corporation:

    BRUCE C. TAYLOR, ESQUIRE
    Federal Deposit Insurance Corporation
    550 17th Street, NW. Room VS-E7118
    Washington, D.C. 20429
    (703) 562-2436

    ROBERT J. DEHENZEL, ESQUIRE
    RICHARD GILL, ESQUIRE
    Federal Deposit Insurance Corporation
    3500 Fairfax Drive Virginia Square
    Arlington, Virginia 22226

**Page 3**

## CONTENTS

EXAMINATION BY:                              PAGE
    Counsel for FDIC              4
    Counsel for Blackwell         46

* * * * *

**Page 4**

P R O C E E D I N G S

Whereupon,

    THOMAS M. BUCHANAN

was called as a witness and, having been first
duly sworn, was examined and testified as follows:

    EXAMINATION BY COUNSEL FOR FDIC

    BY MR. TAYLOR:

    Q   Mr. Buchanan, at the outset, just a
couple of housekeeping matters.  If I refer
to the goodwill case, will you understand
that I'm referring to Seuss versus United
States, which is pending in the --

    A   Sure.

    Q   -- United States Court of Federal
Claims?  And if I refer to the tax case, will
you understand that I'm referring to U.S.
versus FDIC, which was pending in the
District of Columbia and was subject to the
fairness hearing in May of 2006?

    A   That's fine.

    Q   How did you get involved in the
goodwill case?

**Page 5**

    A   I was contacted by Don Willner in
1990 to assist him on the goodwill case.

        He advised me at the time that he
was representing Bob Seuss, and -- and he
approached me, interviewed our firm.  He may
have talked to some other firms.  And he
hired this firm and myself.

    Q   To your understanding, who were
your clients at that time?

    A   At that time, I believe that Bob
Seuss was the client, or the ultimate client.
And thereafter, there was some additional
plaintiff shareholders, if you will, who
contributed who were involved who, in effect,
were -- were clients.

        I guess until the case was actually
established as a derivative action, I think
there was probably some issue as to who
exactly were the clients because initially,
we were looking at a class action as well.
And that -- I don't know how long Don looked
at that, but I know there was a subsequent

**6**

1  sort of fee agreement that dealt with the
2  issue of whether it was a class or not.
3       So obviously, if we had a class and
4  it was certified, the class would have been
5  the client. But since it ultimately went as
6  a derivative action, it really would have
7  been the -- the institution that would be the
8  client. But since they were effectively
9  defunct, you know, we reported to a number of
10  named shareholders.
11       Q   Who do you report to now?
12       A   On -- on that case?
13       Q   On the goodwill case.
14       A   Well, I report to Bob Seuss. But
15  also, if there were other shareholders who
16  had questions who called me up, I would
17  respond to them.
18       In terms of who is the client, I
19  mean, I guess technically the lead plaintiff
20  is Bob Seuss. I spend my time on the case
21  talking to him primarily. And now that we
22  have been designated as the lead attorneys

**7**

1  and effectively that's made him the lead
2  plaintiff, I essentially speak with him.
3       But ultimately, you know, it's a
4  derivative action, again, so there's some
5  technical issues as to exactly who are the
6  client or clients. But the way -- again,
7  because it's a defunct entity, I basically
8  talk to Bob Seuss.
9       Q   Is that true of the time period
10  relevant to -- to your action and the other
11  attorneys' fees actions, that is, the -- the
12  period during the negotiations regarding the
13  IRS case or the tax case?
14       A   The tax case is different because,
15  you know, there's a period where I worked
16  with Don Willner in the tax case and then for
17  various reasons I then represented Bob Seuss
18  only. And then ultimately, Bob Seuss hired
19  me to represent his interests and other
20  shareholders that he felt were relying on him
21  with regard to the tax case. So ultimately
22  on the tax case I was hired by Bob Seuss and

**8**

1  he paid me.
2       Q   And when -- when did Mr. Seuss hire
3  you regarding the tax case?
4       A   I have a fee agreement which I
5  think we produced. I can't recall the date.
6  Maybe 2001.
7       Q   What did you do in the negotiations
8  related to the tax case, you personally?
9       A   Well, the -- what I initially did
10  was to take discovery both in the form of
11  document discovery and depositions back in
12  1990-2000 of certain officials at the FDIC.
13  And I took the lead on that with the
14  assistance of some associates and tax
15  partners, but mainly, I did that work. And
16  that began as a result of Mr. Willner and I
17  uncovering that there was this tax claim
18  based on the federal financial assistance
19  notion in 1999-2000. And we learned that
20  from a financial statement which indicated
21  the assets and liabilities of the
22  receivership, and it had this huge tax claim.

**9**

1       So I was here in Washington and we
2  had tax lawyers. Don said, you take the lead
3  on that. He was handling other aspects of
4  the Court of Federal Claims case. So that's
5  actually when the -- the tax claim sort of
6  arose.
7       So I handled all of that. I took
8  the depositions of the two FDIC officials. I
9  reviewed various documents, tax returns,
10  other issues, did research, had others help
11  me here at the firm. That's reflected in the
12  fee petition.
13       Ultimately, we were going to
14  present this tax claim as part of our claim
15  before the Court of Federal Claims. What we
16  hoped to do was say that but for the breach,
17  we wouldn't have to pay this tax, even though
18  we -- we hadn't paid it yet.
19       But Judge Smith ultimately decided
20  it was certainly not within his purview at
21  that time to be able to decide that. But I
22  did prepare witnesses for that. And we

10

1    actually sought out Michael Duhl to be an
2    expert. And Duhl was referred to me by a
3    former FDIC lawyer named Mike Touche. I
4    contacted Duhl. It turned out Duhl's lawyer
5    actually worked in our Chicago office.
6        Ultimately, Duhl determined that he
7    may have a conflict based on the position of
8    the FDIC so then I went to hire another
9    expert at PWC. I forget his name, but I then
10   utilized him, and he was going to be our
11   expert in the Court of Federal Claims case to
12   try to get the tax that might be paid
13   pursuant to the FAA claim of the IRS as part
14   of our but-for-the-breach damages.
15       As it turned out, Judge Smith
16   decided he did not want to or didn't allow
17   that to be pursued within the context of that
18   case.
19       And then when there was a -- a
20   lawsuit filed or threatened, actually, my
21   next involvement was Don Willner advised me
22   that he had been advised by the FDIC that

11

1    they may well go ahead and pay the tax claim,
2    basically take all the money in the
3    receivership and pay it to the IRS based on
4    the IRS's claim. The IRS was apparently
5    threatening a suit but hadn't filed it.
6        So Don said we need to take action
7    here, and he decided to proceed by the way of
8    seeking injunctive relief out of Oregon.
9        I then worked with him on that
10   matter. He took the lead but I had to
11   prepare an affidavit based on various
12   discussions I had with the FDIC about how
13   they would proceed and work with us on the
14   tax claim and not actually pay it but work
15   with us and work with Mr. Duhl.
16   Q    This was all before the United
17   States filed the tax case against the FDIC in
18   the District of Columbia?
19   A    Right. And so I worked with him on
20   that, so that was part of the tax case. And
21   then I think there was another hearing on the
22   preliminary injunction and then we discussed

12

1    it, the intervention, and -- and Don filed
2    that.
3        So then when that heated up, that
4    suit, I guess it was filed. It was stayed by
5    agreement of the parties. I think I was
6    involved in some of the discussions there. I
7    think Bob Seuss had hired me to handle that.
8    Then we got into the substantive
9    negotiations, and so --
10   Q    Involving other members of the
11   firm, of your firm?
12   A    Yes. So we went forward. So I
13   went and then obviously gathered everything I
14   had done, all the memos we had issued. I
15   reviewed this, I put together a team to
16   assist us involving, you know, Mitch Moetel,
17   some associates, and we went forward.
18       And Mitch was assigned to handle
19   the substantive tax analysis, and I worked
20   with him on that. He took the lead. I
21   worked with Bob Seuss, responded to his
22   questions, dealt with Rosemary Stewart, Don

13

1    Willner about strategy and about talking to
2    the IRS. I attended all the meetings.
3        I had, you know, comments and
4    discussions there and just talked about, you
5    know, if the litigation went forward the
6    risks on both sides, essentially
7    representing, you know, Bob and his interests
8    and what I believe to be the interests of all
9    the shareholders. So I attended all those
10   negotiations.
11       I was in all the conference calls
12   with the Department of Justice, and I -- I
13   dealt with Mitch Moetel regularly about our
14   strategy and how to present things and, you
15   know, just generally involved in the
16   day-to-day negotiations or the month-to-month
17   negotiations with the IRS and the FDIC and
18   Department of Justice, and I talked regularly
19   with your people and attended meetings with
20   them as well.
21   Q    What do you consider the firm's
22   major contribution to the settlement of the

14

1  **tax case?**
2  A  Well, I think first of all that by
3  the fact that we were involved, Winston &
4  Strawn, a firm of 850 lawyers and recognized
5  as, you know, one of the -- the top-rated
6  litigation firms in the country, I think that
7  brought some leverage to the table in that
8  the Department of Justice knew we had the
9  power to litigate it.
10  Obviously recognized Don was there
11  and also Rosemary Stewart, but we also had a
12  major law firm. Then also, we brought
13  litigators to the table. But, in addition,
14  we brought the substantive tax analysis,
15  which I think was key to the resolution of
16  the case.
17  I think in all -- as I recall,
18  almost every meeting where there was a
19  substantive tax issue discussed that Mitch
20  Moetel took the lead and handled it, not only
21  for the shareholders but vis-a-vis the FDIC,
22  which also were representing. We were all

15

1  on the same side arguing together. He
2  clearly was the foremost authority in the
3  room on the tax issues and was the most
4  persuasive individual with regard to the
5  federal financial issue over everybody, the
6  Department of Justice, the IRS and all the
7  other lawyers.
8  **Q  Did anyone from the IRS express**
9  **that opinion to you?**
10  A  IRS people didn't say much, but the
11  FDIC did. Richard Gill told me on numerous
12  occasion that he saw Mitch as the -- the key
13  performer in terms of the negotiations, the
14  substantive -- the most substantive
15  individual. And he said that he believed
16  that -- that Mitch Moetel's knowledge of the
17  FFA issue and the tax code was such that to
18  have an intimidating effect on the Department
19  of Justice, that their lawyers -- if there's
20  anybody they were concerned about in terms of
21  going forward and arguing before the Federal
22  District Court, it was Mitch Moetel because

16

1  of how -- how knowledgeable he was, how
2  persuasive he was.
3  In fact, Mr. Gill often stated when
4  we came into the room that here's Mitch
5  Moetel, he's a walking encyclopedia of the
6  IRS code, has the whole code in his head.
7  Everybody contributed, but if there
8  was something that we did in particular, it's
9  because we're a big firm and we had that
10  asset. It was, you know, the contributions
11  of Mitch Moetel. I mean, I think I
12  contributed as well in negotiations, but a
13  lot of it was really focused on the details
14  and the analysis of the tax issues,
15  precedent, history, legislative history. And
16  he knew that. That was his bailiwick. And
17  he's a tremendous tax lawyer. And he really
18  was the only tax lawyer on behalf of the
19  shareholders.
20  In fact, I don't know that there
21  was -- any of those other people were
22  actually tax lawyers that represented the

17

1  FDIC. So on our half of the table, the brain
2  power in terms of tax was Mitch Moetel.
3  **Q  Just to clarify, but no one from**
4  **the IRS ever expressed to you or anyone else**
5  **on the -- on the team to your knowledge that**
6  **they were particularly impressed by the work**
7  **of Mr. Moetel or anybody else on the opposite**
8  **side of the table?**
9  A  Well, no. No one from the IRS said
10  that, but most of the people in the IRS, they
11  -- you know, they talked issues. They came
12  and talked issues and they left. I mean, if
13  you -- are you including the Department of
14  Justice in that?
15  **Q  Anybody -- I'm including the**
16  **Department of Justice, IRS attorneys and the**
17  **staff attorneys, anyone who may have**
18  **participated on the opposite side of the V.**
19  A  I think Hank Darmstadter in -- at
20  least implicitly if not explicitly,
21  acknowledged to me and to everybody, and in
22  those meetings, that he recognized Mitch's

18

1   argument very persuasive and he was an
2   excellent lawyer. No one said as a result of
3   Mitch Moetel, we're settling for this amount.
4       Q   That leads me to my next line of
5   questions. Are you claiming that the
6   contributions of your firm created the
7   surplus, the receivership surplus? By that I
8   mean the surplus that -- the $94 million that
9   was in the receivership coffers when these
10  negotiations began, or as they ended.
11      A   No. I'm not asserting that.
12      Q   Can you tell me specifically how
13  you think your contributions preserved the
14  surplus for distribution to the shareholders?
15      A   Well, I think that absent a
16  settlement, there would have been litigation.
17  And the position of the IRS and their counsel
18  at the Department of Justice was that they
19  had a 1.2 billion dollar claim, and that they
20  were asserting that claim, and absent their
21  agreeing to settle for the 50 million that
22  they did, they were going to pursue a claim

19

1   that would have swallowed not only the
2   surplus of 94 million but the $35 million
3   judgment that had been awarded some years
4   before, assuming that was held up on appeal
5   and then, you know, placed into the
6   receivership.
7       So I think -- I think that all --
8   all the firms contributed. Don Willner's
9   firm, Rosemary Stewart's firm. I think the
10  FDIC contributed. What I said is I think in
11  terms of the issues at hand, which were the
12  substantive tax issues, I mean, absent our
13  tax people, I don't believe the IRS would
14  have been convinced to settle this case.
15  Absent the arguments based on the analysis
16  that Winston & Strawn did, I don't believe
17  that they would have agreed to settle.
18      Now, this is not to say that the
19  other lawyers weren't good, and I include
20  myself. I think if we didn't come in with
21  somebody as substantive as Mitch Moetel and
22  people that supported him to make these

20

1   arguments, I don't believe the other lawyers
2   had the wherewithal to make the arguments as
3   persuasively as he did.
4       But I think everybody contributed
5   in various ways, so I do think our firm
6   played a significant role in getting the
7   settlement.
8       Q   And the settlement involved paying
9   the IRS $50 million from the existing
10  receivership surplus, correct?
11      A   That's right.
12      Q   Do you know how your contribution
13  convinced the IRS to settle for $50 million?
14      A   When you say "your," you mean
15  Winston & Strawn?
16      Q   Winston & Strawn.
17      A   As I said, I -- I think that they
18  had a claim of 1.2 billion. And the IRS is
19  typically very aggressive in pursuing their
20  claims. And if we go back in time, there
21  were numerous negotiations before the IRS
22  filed its lawsuit years before in which the

21

1   FDIC took the lead in which I believe they
2   used Michael Duhl, a former FDIC official and
3   lawyer.
4       And they went to the IRS, and I
5   believe they talked to a man named Mr.
6   Weinstein, and they -- they made the
7   arguments at that time, and the IRS rejected
8   them and said, we do not agree. We're going
9   to pursue the FAA claim to the fullest and we
10  believe we have a right to not only the 94
11  million but the amount that -- any judgment
12  that's out there and that we don't feel we
13  need to compromise it at all.
14      So again, the FDIC, a sister agency
15  with -- in this informal or formal agency
16  agreement, went in and -- and represented the
17  shareholders, if you will, and -- and got
18  nowhere.
19      I think they were correct in their
20  position, but they just didn't get nowhere,
21  so it just showed the stubbornness of the
22  IRS. And their position, and their adamancy

22

1  that they were going to go forward. And they
2  did sue.
3      Then there's a point before Don
4  Willner filed his lawsuit that Don advised me
5  that the FDIC was going go ahead and pay all
6  the money to the IRS. So essentially, they
7  had reached a decision apparently based on
8  the negotiations that the IRS wasn't going to
9  negotiate and that the IRS had a good claim.
10     Then there's Don's lawsuit that
11 stayed the payment of the money by the FDIC
12 to the FDIC. And then there was the -- the
13 lawsuit that was filed that was stayed when
14 the negotiations started.
15     So if you take that history, you
16 have a situation where you're on the precipe
17 of basically wiping out the judgment in the
18 Court of Federal Claims and the surplus, a
19 decision that was being made by the FDIC in
20 conjunction with the IRS. Then you have Mr.
21 Willner's firm and our firm and Rosemary
22 Stewart's firm and our firm coming in and

23

1  that being the only distinction, thing that's
2  different, between what was decided before.
3  Then we go to negotiations, we do our work
4  and we get a settlement of 50 million.
5      So but for the intervention of the
6  plaintiff's lawyers, the shareholders'
7  lawyers and the negotiations that followed in
8  their work, the FDIC would have paid off the
9  -- would have paid all the money to the -- in
10 the surplus to the IRS.
11     Q   Well, you make that statement --
12 and correct me if I'm wrong, but are you
13 basing that on the information that Mr.
14 Willner gave you that the FDIC was going to
15 pay the IRS?
16     A   Yes.
17     Q   And did Mr. Willner give you any
18 details as to why he thought that?
19     A   I believe my recollection is he
20 said that he was advised that by the FDIC.
21     Q   And that's -- but that's about the
22 extent of it?

24

1      A   Right. And then I -- I read his
2  pleadings and I filed an affidavit and the
3  affidavit went to the issue, you know, of --
4  of my negotiations and discussions with Mr.
5  Eigo and others at the FDIC in terms of the
6  position they were going to take.
7      So I do recall discussions, many of
8  them with Mr. Wilmer, in which he represented
9  what the FDIC had decided. And therefore, he
10 asked me to prepare this lengthy affidavit
11 about all my discussions with Jim Eigo,
12 another at the FDIC, about what they -- their
13 position as to the FAA and how they would
14 stand with us and fight this.
15     So I don't recall any discussions
16 with the FDIC at the time where they said to
17 me, Mr. Buchanan, we're going to pay on
18 Monday the money out of the surplus. My --
19 my knowledge of the situation came from Mr.
20 Willner.
21     Q   Okay. So am I correct in -- in
22 saying that you have no personal knowledge as

25

1  to whether the FDIC intended to pay the IRS
2  or not?
3      A   I don't have any knowledge directly
4  from the FDIC, but I have it from Mr.
5  Willner.
6      Q   Okay.
7      A   So I consider that to be personal
8  knowledge.
9      Q   Regarding the contributions of the
10 -- the other parties, that being Mr.
11 Fleischer and his law firm, and Mr. Willner,
12 his law firm, you're familiar with their
13 contributions, are you not?
14     A   Yes.
15     Q   Can you point to any contribution
16 Mr. Fleischer made, for instance, that
17 resulted in a reduction of the taxes?
18     A   Well, as I said, I -- I think it
19 was an overall effort and I think in that
20 sense consistent with the representative of
21 the FDIC, Richard Gill, that there were
22 people in the FDIC contributed and Mr.

26

1  Willner's firm, Spriggs & Hollingsworth, and
2  Mr. Fleischer.
3       I know Mr. Fleischer advocated
4  aggressively various tax positions at the
5  meetings. He was very knowledgeable of the
6  tax issues and also the positions that Mitch
7  Moetel was taking. I know he corresponded
8  with Mitch Moetel and worked with him.
9       I know he advised Mr. Willner. I
10 talked with him, and he was at all the
11 meetings. So, I mean, I can't say that --
12 that on such and such day, Mr. Fleischer made
13 an argument about goodwill being a deduction
14 and that thereby caused them to settle
15 because I don't know what was in the mind of
16 the -- of the IRS or the Department of
17 Justice as to what actually caused them to
18 settle. But clearly, based on all the
19 negotiations and all the parties being there,
20 you could see that we went over various
21 scenarios and various analyses.
22      Mr. Darmstadter, while he was very

27

1  sort of tight-lipped and close-mouthed, but
2  he did knowledge that, yes, that's a scenario
3  we knowledge you could be correct on,
4  something we could work with, and that's one
5  and that's not one we could work with.
6  Through the joint effort, including Mr.
7  Fleischer, you know, we -- we reduced sort of
8  the -- the resistance of the IRS and the
9  Department of Justice and got them to move to
10 a reasonable position which was a significant
11 compromise.
12      So again, it's like any case. I
13 mean, if I bring any case and somebody
14 settles, I can say, well, why did they
15 settle? You know, maybe it was fear of what
16 -- what the jury would do or the judge would
17 do. Maybe it was the public exposure of the
18 case. Maybe they thought we were better
19 lawyers than their lawyers. Maybe they just
20 wanted to get rid of it. I mean, I think
21 there's any number of reasons.
22      I think certainly that the

28

1  Department of Justice probably thought we had
2  a very sympathetic position in that we were
3  representing these shareholders and a Court
4  already found they had been seized, their
5  institution, and wiped out the value of the
6  stock. And now that the surplus is left, the
7  IRS is going to come in and take it. I'm
8  sure that was a factor. I don't know they
9  have admitted that.
10      But, you know, it was -- everybody
11 was contributing and working together so I --
12 I think everybody obviously contributed to
13 the end result.
14 **Q    And this is somewhat similar to a**
15 **question I asked you previously, but I just**
16 **want to confirm that no one from the IRS told**
17 **you or any other party to your knowledge that**
18 **they settled for any particular reason or**
19 **based on any particular contribution made by**
20 **any of the parties?**
21 A    No. I -- in terms of the answer to
22 the last part, I don't remember anybody from

29

1  the Department of Justice or the IRS saying
2  that it was any particular lawyer's work that
3  caused them to settle.
4       But again, if you start from where
5  they were at the beginning of the
6  negotiations and then some 18 months later
7  where they were and the only thing that was
8  happening to keep them from pursuing their
9  lawsuit was the lawyers, meaning Rosemary
10 Stewart, Don Willner, Ernie Fleischer,
11 myself, Mitch Moetel and others, the only
12 thing that was preventing them from pursuing
13 their $1.2 billion claim was our positions
14 that we were articulating, our research
15 analysis, you have to say that the proximate
16 cause of the settlement was the positions
17 that were taken by the lawyers and their
18 ability to back up those positions.
19 **Q    Speaking of others, do you think**
20 **the FDIC's contribution helped lead to a**
21 **settlement?**
22 A    Yeah, I think they did help. I

30

1  think the fact that you had a government
2  agency on the same side of us, you know,
3  probably caused some consternation within the
4  Department of Justice that we're, you know,
5  sort of suing a sister agency.
6       In fact, they looked at the FDIC as
7  the owner of the claim. You know, they --
8  they looked at the -- and said that the
9  receivership and that the FDIC, it's not
10 these shareholders. You know, in certain
11 respects, they allowed us to negotiate but I
12 think they're also taking the position it was
13 really FDIC's claim.
14      So, I mean, Mr. Gill contributed.
15 He was constantly working. Hank Darmstadter,
16 and trying to get him to compromise. He had
17 his own knowledge of the case and his ability
18 to articulate the positions, persuasiveness.
19 He also had the FDIC as a client, so I think
20 that helped.
21      Q  To move on beyond the -- the -- the
22 settlement, at least the discussions leading

31

1  to the settlement and go to the fairness
2  hearing on May 2nd of 2006, which I believe
3  you testified you're familiar with --
4       A  Yes.
5       Q  Or are you familiar with that?
6       A  Yes.
7       Q  Do you recall that in the notice to
8  shareholders, one of the terms of the
9  settlement which were announced to the Court
10 was that the FDIC agreed to pay reasonable
11 attorneys' fees to the firms that had
12 assisted in the settlement discussions with
13 the IRS or Department of Justice?
14      A  Yeah, I -- I believe that that term
15 was maybe used in the notice in reference to
16 the hearing. But it was -- it was made clear
17 it wasn't part of the hearing.
18      Q  Did you discuss with anyone the
19 meaning of the term "reasonable attorneys'
20 fees" in that context?
21      A  No, I don't believe I ever recall
22 discussing reasonable attorneys' fees with

32

1  anyone at that point in time.
2       Q  Did you form an opinion as to what
3  the term "reasonable attorneys' fees" meant
4  in that context?
5       A  You know, I -- I don't recall being
6  focused on those words. I'm trying to recall
7  if, in fact, at that time -- and, in fact, my
8  recollection is is that the FDIC knew that at
9  least Winston & Strawn was going to seek --
10 and I can't recall the timing, but I believe
11 they knew that Winston & Strawn was seeking
12 not only their hourly rates, but twice that,
13 and so I had no reason to believe that that
14 statement was somehow ruling out our ability
15 to get that. Because otherwise, if they were
16 to put in there we're willing to pay
17 reasonable attorneys' fees based on hourly
18 rates only, or something to that effect -- so
19 while I didn't see it as a concession that
20 they were going to pay success fee, I didn't
21 see it as an obstacle or a position by the
22 FDIC that they were not going to do it.

33

1       Now, I don't recall the timing of
2  when we submitted it, my conversations with
3  Richard Gill and -- and that hearing. But
4  certainly, I told Mr. Gill before the
5  submission we were going to seek a success
6  fee in the form of double our rates.
7       I don't think he took a position
8  early on when we talked about it, but
9  ultimately, he did take a position even
10 before we got the letter of disallowance in
11 which he said, you know, our position is you
12 just get, you know, your -- your hourly
13 rates. And we had various conversations and
14 even talked about compromising, things like
15 that.
16      But -- so that -- to answer your
17 question, no, I never thought that those
18 words meant that we could not get a success
19 fee.
20      Q  After the FDIC receiver paid you at
21 your standard hourly rates except for the
22 small amount of time that was disallowed,

34

1    **when did you determine to file your lawsuit?**
2        A    I had planned to file the lawsuit
3    the moment I was advised that we were not
4    going to get a success fee. And if we'd got
5    the success fee, I wasn't going to file it.
6    But, you know, as soon as the FDIC conveyed
7    to me -- just I think Mr. Gill over the phone
8    said, you know, you can always go to court,
9    but we're not going to probably do this.
10        And I had some conversations with
11    Glinsmann and always had a hope that they
12    would compromise, give us, you know, some
13    success fee. But I was -- my intent was if
14    we didn't get a success fee that -- to file a
15    lawsuit.
16        So as soon as I got the denial, we
17    were planning to do it and went ahead and did
18    it very quickly, I think.
19        **Q    Did you discuss filing your lawsuit**
20    **or ask any of the other parties whether they**
21    **intended to file a similar lawsuit for a**
22    **success fee or fee enhancement?**

35

1        A    I decided to pursue our suit
2    independent of anything that they decided.
3        I did discuss filing a lawsuit with
4    Rosemary Stewart and with Don Willner. I
5    believe, you know, we talked about it
6    generally. I don't think I had many
7    conversations with Don about it, but it
8    wasn't like, you know, do you agree that I
9    should do that? It was just like, I intend
10    to do this, you know, here's how I intend to
11    proceed. How do you-all intend to proceed?
12        Rosemary told me she wasn't going
13    to proceed with a -- a lawsuit. And then I
14    heard either from Don or -- or from Don
15    indirectly through Rosemary that he was going
16    to file a claim.
17        And I -- I had no discussions with
18    Ernie Fleischer or about his potential claim
19    with anyone before he filed the lawsuit.
20        **Q    Did Ms. Stewart tell you why she**
21    **chose not to file a lawsuit for a fee**
22    **enhancement or success fee?**

36

1        A    Yes. She -- she told me that she
2    just didn't want to pursue it. You know, she
3    just -- just -- that was basically it.
4        **Q    But in your discussions, the -- the**
5    **meaning or interpretation of the term**
6    **"reasonable attorneys' fees" related to the**
7    **settlement didn't come up?**
8        A    No. I -- I never had any
9    discussions with anyone about that term. You
10    know, I -- I just never was focused on it. I
11    do remember, now that you mention it, that
12    Mr. Gill brought up the attorneys' fees issue
13    and said, you know, this is not part of this
14    hearing but, you know, we've agreed to do
15    this. And I had looked at the notice at some
16    point. But it -- it never struck me as -- as
17    meaning that was going to rule out our
18    ability to get them.
19        And she never said, look, I'm not
20    going to pursue it because I think they're
21    right. Her position was they're wrong, she
22    did deserve a success fee, but she just

37

1    didn't want to pursue it.
2        **Q    I'm just going to ask you a few**
3    **questions about specific portions of your**
4    **complaint then I think we'll be through.**
5        A    Okay.
6        MR. WILLNER:  Under 30 minutes? Go
7    ahead.
8        BY MR. TAYLOR:
9        **Q    Do you have a copy of your**
10    **complaint handy, by the way?**
11        A    Did I take it with me?
12        **Q    Yeah, I think so. I don't have it**
13    **anymore. Do you want me to get it? If I**
14    **just refer to something, then I can hand it**
15    **to you?**
16        A    Okay, yeah.
17        **Q    If you want.**
18        A    You can ask me and if I need to see
19    it, I'll let you know.
20        **Q    At paragraph 22 of your complaint,**
21    **you go through a recitation of talking about**
22    **analyzing the IRS's tax claim and developing**

38

1  a defense and you also reference a number of
2  the services that you provided or that the
3  firm provided, some of which you've already
4  testified to.
5      Among those, you make this
6  statement: W&S, meaning Winston & Strawn,
7  also prepared numerous complex tax shelters,
8  reviewed the IRS's analyses and schedules and
9  took the lead in negotiating the two cases
10  with the FDIC and the IRS.
11      I'm just curious. What --
12  A  Does that say "tax shelters"?
13  Q  It says "tax shelters," and I'm
14  just curious.
15  A  It should have said -- meant
16  schedules. That's a mistake.
17  Q  As you can see, I'm somewhat
18  interested in how the tax shelters entered
19  into the negotiations.
20  A  Brown & Wood did those.
21  Q  All right. And on -- on various
22  occasions, some of the other parties, in

39

1  fact, all the parties I think referred to
2  having undertaken substantial risk related to
3  the representation in the tax case. I -- if
4  you -- if you could, can you just give me a
5  little bit of a specific explanation of what
6  type risk you undertook related to the tax
7  negotiations?
8  A  Well, yeah. It's basically this:
9  Winston & Strawn agreed to -- to represent
10  Bob Seuss and ultimately others for $125 an
11  hour when our rates at the time were over 400
12  for most of the lawyers. And they went up
13  every year probably 6 or 7 percent. And that
14  $125 an hour would stay in place the entire
15  negotiations. And only if a settlement was
16  achieved that was considered favorable to the
17  shareholders by Mr. Seuss and others that he
18  would consult with could we achieve a great
19  result in terms of our fees, both in terms of
20  the hourly rate and the success fee.
21      It was like any contingency fee.
22  We took risk in the sense that instead of

40

1  having Mitch Moetel, one of the most valued
2  lawyers in the firm, myself, and others work
3  at our full rates for other clients, we
4  agreed to work for $125 an hour on this
5  matter. And we spent a huge amount of hours
6  over a number of years on this case. And had
7  the settlement not been achieved and had the
8  IRS gone forward, all that time, you know,
9  would have been -- essentially, we would have
10  been paid at $125 an hour. And so we'd have
11  lost 3 -- $300 an hour on average of time
12  that we could have achieved from somebody
13  else.
14      So that was the risk, moving
15  attorneys under this case to work at a much
16  reduced hourly rate on the chance we would
17  never recoup anything beyond that, and a
18  significant chance, particularly considering
19  the position of the IRS at the time.
20  Q  Did you work exclusively on this
21  case during -- in the period 2002 to 2004?
22  A  No, but, you know, in other words,

41

1  if we hadn't been working on this case, we
2  would have been working on other cases.
3  Q  In some of your other cases do you
4  work at a discounted hourly rate?
5  A  Nothing like that. I meant, you
6  know, well, the Slattery case, you know,
7  there's a discounted rate there. That's
8  another goodwill case. But typically, I work
9  at full rates, and then some clients require
10  a discount. You know, and then often --
11  sometimes you negotiate a certain volume of
12  business, you get a discount.
13      You know, I mean, I don't want to
14  get into all that. But we have some huge
15  clients that pay us over $10 million a year.
16  If you pay us over $5 million a year in fees,
17  you know, we'll give you a discount of this
18  amount but it's -- it's nothing like that.
19  Q  Well, was the discounted rate you
20  charged for the tax case a continuation of
21  the rate structure you had in place for the
22  goodwill case?

FDIC Exhibit 10

42

1    A   In fact, it was because it was
2  negotiated by Bob Seuss and that's what we
3  were doing there so we just said, why don't
4  we continue with that? So it was two
5  different matters. But in his mind, you
6  know, it was -- he wanted to continue with
7  that rate.
8    Q   And you're asking -- in your claim
9  for relief, you're asking for over $500,000,
10  maybe close to $600,000, somewhere around
11  that range, is that -- is that correct?
12    A   It's stated in the claim we're
13  basically asking for twice our hourly rates
14  we have been paid, the hourly rate, so it's
15  the other half.
16    Q   Right. In relation to your firm's
17  contribution and the contribution of Mr.
18  Fleischer, for instance, do you think Mr.
19  Fleischer's claim for relief for 5 percent of
20  the remaining surplus, which comes out to
21  about $2 million, is fair and reasonable?
22    A   No, I -- I don't think. I think

43

1  he's asking for a $2 million success fee.
2  No, I think he probably deserves a multiple,
3  but I don't think he deserves that.
4         But my understanding is that is
5  just sort of an opening salvo. He's suing
6  for that but ultimately, he's not going to
7  seek that, or -- I'm not really sure, you
8  know, but I -- I think he's requesting that.
9  But the extent he's requesting $2 million on
10  $89,000 worth of work, no, I think that's --
11  that is excessive. But I do think he
12  deserves more than 89,000. I think twice
13  would be -- I would be supportive if he got
14  twice of that.
15    Q   Why do you think it's merely an
16  opening salvo as opposed to something he --
17  since he claimed it in his complaint?
18    A   I don't know, I just -- maybe just
19  talking with the lawyers, maybe they said
20  this is what they're pursuing, but I -- I
21  just -- it was in the back of my head.
22    Q   So there's nothing -- you don't

44

1  recall anything specific that someone may
2  have said that -- along the lines that this
3  is merely an opening salvo, we don't really
4  mean it?
5    A   No, I think it was more that this
6  would be sort of the -- the outer limit, you
7  know, we -- we would go but we're willing to
8  -- to compromise that. So I think it's the
9  position they've taken. I guess they believe
10  in it.
11         But in -- in -- in -- I just --
12  it's my recollection that discussions along
13  the way about, you know, trying to resolve
14  things that people would, you know, would --
15  would work to resolve it in a certain amount.
16  Maybe I overstated it.
17    Q   And in relation to your firm's work
18  compared to Mr. Willner's contribution to the
19  tax settlement do you think it's fair he's
20  asking for $800,000 and you're asking for a
21  little bit under 600,000?
22    A   I -- I think that we -- we have

45

1  been paid more, I -- I think, than he has so
2  far. I mean, I -- I -- my view is is that
3  Don deserves a multiple of a certain hourly
4  rate and so I think that I would have no
5  problem with him getting twice whatever
6  hourly rate was legitimate for him.
7    Q   Do you think, given Mr. Willner's
8  involvement in this case and the geographic
9  area where he normally practices, do you
10  think an hourly rate of over $500 an hour is
11  reasonable for him?
12    A   No. I -- I don't think 525 is --
13  is a reasonable rate, but I do think that --
14  the way I view it is I think that whether
15  it's 250 or $300 an hour, and maybe more
16  would be reasonable, but I think he deserves
17  a multiple of that, like twice.
18         So the way I view it is -- and my
19  position would be that if Don were to say,
20  okay, I want $250 an hour but I want a
21  multiple so it comes out to 500, I'd say
22  that's reasonable.

46

1    MR. TAYLOR: Thank you, Mr.
2 Buchanan. That's all I have.
3    THE WITNESS: Okay.
4    MR. WILLNER: I have no questions.
5    MR. BORTHWICK: I only have one
6 question.
7    EXAMINATION BY COUNSEL FOR BLACKWELL
8    SANDERS PEPER MARTIN
9    BY MR. BORTHWICK:
10    Q  Mr. Moetel's work in the case began
11 in mid November 2002, isn't that right, his
12 involvement in the tax case?
13    A  It's in the billing records. It
14 would reveal that. I think that's true. If
15 you want to show me something --
16    Q  Yes. The first time that we've
17 seen it appear is November 15, and I'm just
18 wondering, is that when his involvement
19 began?
20    A  It would be -- it would be
21 consistent with the -- the billing sheet, so
22 if that's what that indicates, he would be

47

1 billing his time. So if that's the first
2 time he billed time then that's when he would
3 have started.
4    I would add, though, there were tax
5 lawyers that worked back in the case I think
6 in 1999 or 2000 when we first got involved
7 and started reviewing it. We had -- Mitch, I
8 don't know if he was at the firm at that
9 time, but the head of the tax department, Bob
10 Denver, and a guy named Jim Fishman worked
11 the case then.
12    MR. BORTHWICK: No further
13 questions.
14    THE WITNESS: Okay.
15    MR. WILLNER: Nobody left.
16    MR. TAYLOR: Do we want to try to
17 take Ernie, or wait?
18    MR. BORTHWICK: I don't want to.
19    MR. WILLNER: I'm pretty tired.
20    (Whereupon, at 5:40 p.m., the
21    deposition of THOMAS M. BUCHANAN
22    was adjourned.)

48

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------x
WINSTON & STRAWN, LLP, et al., :
                               :
            Plaintiffs,        :
                               :
      v.                       : No. 06-01120 (EGS)
                               :     06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE      :     06-01273 (EGS)
CORPORATION,                   :
                               :
            Defendant.         :
------------------------------x

                                    Washington, D.C.

                           Thursday, January 18, 2007

Deposition of

            DON S. WILLNER

a witness, called for examination by counsel for

Defendant, pursuant to notice and agreement of

counsel, beginning at approximately 8:40 a.m., at

the law offices of Winston & Strawn, 1700 K Street,

NW., Washington, D.C., before Mary Ann Payonk of

Beta Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:

**2**

1  APPEARANCES:
2    On behalf of Winston & Strawn. LLP:
3      SCOTT PLUTA. ESQUIRE
       THOMAS M. BUCHANAN. ESQUIRE
4      Winston & Strawn. LLP
       1700 K Street. NW.
5      Washington. D.C. 20006
       (202) 282-5100
6
     On behalf of Willner & Associates. PC:
7
       DON S. WILLNER. ESQUIRE
8      Willner & Associates, PC
       630 Sunnyside Road
9      Trout Lake. WA 98650
       (509) 395-2000
10
       JEREMIAH A. COLLINS. ESQUIRE
11     Bredhoff & Kaiser, PLLC
       805 15th Street. NW.
12     Washington. D.C. 20005-2207
       (202) 842-2600
13
     On behalf of Blackwell Sanders Peper Martin. LLP
14     and Ernest Fleischer:
15     JAMES BORTHWICK. ESQUIRE
       Blackwell Sanders Peper Martin. LLP
16     4801 Main Street. Suite 100
       Kansas City, MO 64112
17     (816) 983-8000
18   On behalf of Federal Deposit Insurance
       Corporation:
19
       BRUCE C. TAYLOR. ESQUIRE
20     Federal Deposit Insurance Corporation
       550 17th Street. NW.  Room VS-E7118
21     Washington, D.C. 20429
       (703) 562-2436
22

**3**

1    APPEARANCES (CONT'D):
2      ROBERT J. DEHENZEL, ESQUIRE
       Federal Deposit Insurance Corporation
3      3500 Fairfax Drive Virginia Square
       Arlington, Virginia 22226
4
5
6
7          C O N T E N T S
8  EXAMINATION BY:                    PAGE
9    Counsel for FDIC              4
10   Counsel for Blackwell        33
11
12
13
14
15            * * * * *
16
17
18
19
20
21
22

**4**

1          P R O C E E D I N G S
2  Whereupon,
3              DON S. WILLNER
4  was called as a witness and, having been first
5  duly sworn, was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR FDIC
7      BY MR. TAYLOR:
8      Q   Mr. Willner, I believe you were in
9  the room when I began Mr. Buchanan's
10 deposition.  If not, we went through a little
11 housekeeping where I said if I refer to "the
12 goodwill case," will you understand that I'm
13 referring to Seuss versus United States
14 that's pending in the United States Court of
15 Federal Claims and about to go up on appeal,
16 I suppose.  And if I say "the tax case,"
17 you'll understand I'm referring to United
18 States versus FDIC, which was pending in the
19 United States District Court for the District
20 of Columbia in the case where all the parties
21 participated in the settlement with the IRS
22 and resulted in the attorney fee complaints?

**5**

1      A   Yes.
2      Q   Okay.
3          MR. COLLINS:  Let me identify
4  myself for the record.  I'm Jeremiah Collins,
5  counsel for Don S. Willner and Associates.
6      BY MR. TAYLOR:
7      Q   Briefly, how did you get involved
8  in the goodwill case initially?
9      A   I was retained by Bob Seuss.
10     Q   Was he your only client?
11     A   No.
12     Q   Who were your clients?
13     A   Oh, I had many clients.  I don't
14 know what information you want.  I had many
15 clients at the time.
16     Q   Did you have any conversations with
17 any individuals other than Mr. Seuss?
18     A   I did later.
19     Q   With whom?
20     A   First, Mr. Seuss retained me and I
21 told him if we were seeking a -- either a
22 shareholders derivative action or a class

**6**

1  action that it would be advisable to have a
2  few other plaintiffs and so we added, I
3  think, four or five other plaintiffs.
4      Q   Do you recall who those other four
5  or five were?
6      A   Sure.  Foster Baker and Parcel,
7  which was a Seattle brokerage firm and the
8  largest shareholder of Benj. Franklin.  Leo
9  Sherry, who was a Portland, Oregon, attorney
10 and CPA.  Richard Green, who was a
11 shareholder of Benj. Franklin known to Mr.
12 Seuss who was, incidentally, the son of
13 former Congresswoman Edith Green who was a
14 long-time board member of Benj. Franklin.
15 Dr. Irving Roberts, I believe, a veterinarian
16 physician who Mr. Seuss knew.  How many am I
17 up to?
18     Q   Other than the individuals you just
19 named --
20     A   I -- I -- I think that's a full
21 list.  I'm not sure.  I think that is full.
22 I'm not positive.

**7**

1      Q   During the course of your
2  representation, did you have discussions with
3  one shareholder or two shareholders more than
4  any of the other shareholders?
5      A   Well, there are approximately 6500
6  shareholders.  I had frequent conversations
7  with my -- with my clients, who were five or
8  six people.  The largest number of
9  conversations in the early days were with Bob
10 Seuss.
11     Q   Did that change over time?
12     A   Yes.
13     Q   How so?
14     A   I'm guessing at the date.  I
15 believe it was 2001, my other clients became
16 unhappy with action that Bob Seuss was taking
17 and was -- and some of the instructions he
18 was giving me.  I advised each of them to
19 seek independent counsel, which they did.
20 Then there was a meeting at which the other
21 plaintiffs each revoked Bob Seuss' management
22 authority which they had delegated to him.

**8**

1  My recollection was Irving Roberts was not
2  present at that meeting.
3      Q   Who was present?
4      A   Bob Seuss, William Sherry, Peter
5  Baker, Mike Foster, Don McIntyre.
6      Q   Among the shareholders who you
7  advised to seek independent counsel, do you
8  recall their names?
9          MR. BUCHANAN:  I'm going to note an
10 objection to relevance of all these questions
11 to Mr. Willner's fee petition.
12         MR. WILLNER:  I agree, but I'm just
13 the witness.
14         BY MR. TAYLOR:
15     Q   You can answer.
16     A   I'm sorry, what was your question,
17 please?
18     Q   Who were the shareholders who you
19 advised to seek independent counsel?
20     A   The plaintiffs.  The plaintiffs I
21 just named.
22     Q   Okay.  Who did you represent during

**9**

1  the negotiations regarding the tax case?
2      A   I filed the case on behalf of the
3  same group of individuals except by that
4  point, Mike Foster had died and -- I believe
5  Mike Foster had died by that point and the
6  Court had substituted McIntyre as a plaintiff
7  in his stead, but it was the same --
8  basically, the same group of individuals.
9      Q   When you say -- did you say you
10 filed a case or claim?  I may have
11 misunderstood your answer.  You did something
12 on behalf of the same group of individuals?
13     A   Yes.
14     Q   And what was -- what did you do?
15     A   Well, in connection with -- there
16 were two cases.  You're talking about the tax
17 case now?
18     Q   You tell me.  What action did you
19 take on behalf of these individuals, whether
20 in the tax case or the case in Oregon?
21     A   Well, the first thing I did was I
22 had been corresponding with you about the tax

10

1  matter. I'd been involved in the tax matter
2  in the Claims Court case, and we all knew and
3  there was a stipulation of counsel that there
4  was this huge claimed tax liability. I knew
5  there'd been some -- that Mike Duhl had a at
6  that point Chicago attorney and I believe
7  CPA, had talked to the FDIC, and then had
8  gone with the FDIC to a meeting with the IRS.
9      After the conclusion of our Claims
10  Court case, I became very concerned as to
11  what the IRS -- as to what the FDIC was going
12  to do in connection with this tax claim,
13  because I'd not heard anything other than the
14  meeting involving Mike Duhl. I'm trying to
15  think of the sequence.
16      I believe at that point I contacted
17  Mike Duhl. I believe I asked him was there
18  any conflict between his representing my
19  plaintiffs group and his former
20  representation with the FDIC. He said no.
21      Then there followed some
22  correspondence with you which we introduced

11

1  in connection with your deposition. You're
2  familiar with those documents.
3      Q  Yes.
4      A  And after receiving your last
5  letter -- I'm paraphrasing now -- in which
6  you said: In view of the IRS's unwillingness
7  to make any concessions and my knowledge of
8  the interagency agreement which said that the
9  FDIC under certain circumstances would not
10  contest an IRS claim, I believe there was
11  extraordinary jeopardy there when you wrote
12  that a decision will be made soon about
13  paying the tax in view of the fact that the
14  IRS was not going to make any concessions and
15  the interagency agreement gave no remedy to
16  the FDIC.
17      **Q  Some other witnesses have testified**
18  **that from information provided by you, they**
19  **understood that the FDIC was going to pay the**
20  **IRS the tax. Is your testimony that your**
21  **belief regarding the FDIC's possible payment**
22  **of the tax was based on the letter you**

12

1  received from me?
2      A  Yes, I did. I think a reasonable
3  person would draw that same inference.
4      **Q  Okay. But otherwise, you didn't**
5  **speak with anybody from the FDIC who told you**
6  **that FDIC was going to pay the tax?**
7      A  No. I thought a written letter
8  from you was sufficient.
9      **Q  In the negotiations themselves**
10  **between the FDIC and the United States**
11  **through the Department of Justice on behalf**
12  **of the IRS and the ones where the FDIC**
13  **invited the attorneys in this room to**
14  **participate, what was your primary role?**
15      A  Well, first thing I did was I filed
16  a motion to intervene and transfer to the
17  District of Oregon.
18      **Q  Was that before or after the**
19  **negotiations began?**
20      A  Before. That -- that triggered the
21  negotiations.
22      **Q  How do you know it triggered the**

13

1  **negotiations?**
2      A  I -- I was told so by Mr.
3  Darmstadter, the Department of Justice
4  attorney. I had talked to him and possibly
5  corresponded with him before filing the
6  motion. And he -- and I told him my concerns
7  that FDIC would not aggressively represent
8  the interests of the shareholders in view of
9  some matters we talked about and other
10  matters. And I told him I was considering
11  filing a motion to intervene to transfer to
12  Oregon. And he said do not do that. If you
13  do that, that will put everything in a
14  litigating mode and we will oppose your
15  motion to intervene, transfer to Oregon.
16      I did not follow his advice and I
17  filed the motion to intervene and transfer to
18  Oregon and wrote, I thought, a good brief and
19  supporting documents.
20      At that point, Mr. Darmstadter said
21  to me, well, we do not recognize you as a
22  party but maybe we should have some

| | 14 |
|---|---|
| 1 | discussions if FDIC is willing to invite you |
| 2 | and your group to participate. |
| 3 | **Q    All right. And the FDIC, in fact,** |
| 4 | **did invite you and others to participate?** |
| 5 | A    Yes. |
| 6 | **Q    Okay. Now, after you were invited** |
| 7 | **to participate, what -- what do you consider** |
| 8 | **the major contribution to the settlement** |
| 9 | **process?** |
| 10 | A    That I made, you're asking me? |
| 11 | **Q    That you made.** |
| 12 | A    Well, I think the first was getting |
| 13 | the TRO and an agreement from the FDIC that |
| 14 | they would give me advance notice of any |
| 15 | attempt to pay the tax and their statements |
| 16 | to the judge that they would consider |
| 17 | themselves stakeholders, FDIC considered |
| 18 | itself a stakeholder and was considering an |
| 19 | interpleader. |
| 20 | And basically, I received |
| 21 | sufficient reassurance that there would still |
| 22 | be money left in the receivership. And of |

| | 15 |
|---|---|
| 1 | course I was very worried that if the FDIC |
| 2 | paid the taxes, as you gave every indication |
| 3 | they would, there would have been nothing to |
| 4 | fight about in the tax case because the money |
| 5 | would have been gone. |
| 6 | And at that point, I had received |
| 7 | the advice of Mr. Fleischer that if the tax |
| 8 | was paid by FDIC that the only way a claim |
| 9 | could be made was by FDIC paying the entire |
| 10 | amount of the claim, which was a billion 2, |
| 11 | approximately, before they would have |
| 12 | standing. And, of course, there was also the |
| 13 | issue of whether we, the shareholders, would |
| 14 | have standing. So I considered my first |
| 15 | contribution was on saving the fund. |
| 16 | Do you want me to go on? |
| 17 | **Q    I'm talking about the whole period** |
| 18 | **of the negotiations.** |
| 19 | A    I'm talking about -- |
| 20 | **Q    I'd like to know what you consider** |
| 21 | **your major contribution to the process.** |
| 22 | A    Well, I think I had several. I |

| | 16 |
|---|---|
| 1 | don't think I had just one. |
| 2 | **Q    Well, what do you consider to be --** |
| 3 | **if you can write them, if not, what do you** |
| 4 | **consider the top three major contributions?** |
| 5 | A    All right. I think the first |
| 6 | contribution was as I've discussed. |
| 7 | The second contribution was filing |
| 8 | the motion to intervene and transfer to |
| 9 | Oregon, which was the trigger for getting us |
| 10 | into the settlement discussions. |
| 11 | And the third was being lead |
| 12 | counsel, organizing a team, coordinating the |
| 13 | work of the group over a three-year period, |
| 14 | handling all the correspondence with Mr. |
| 15 | Darmstadter, who was attorney for the |
| 16 | Department of Justice, and first Catherine |
| 17 | Topping and Hugo Zia and then Richard Gill as |
| 18 | attorneys for the FDIC, coordinating our |
| 19 | group's effort, initiating all the telephone |
| 20 | calls with our group, having I think all or |
| 21 | almost all the telephone calls with Mr. |
| 22 | Darmstadter, sharing with Rosemary Stewart, |

| | 17 |
|---|---|
| 1 | who was assisting me, the phone calls with |
| 2 | the FDIC attorneys. All of these. Chairing |
| 3 | our side of the negotiations, calling on |
| 4 | others to speak. |
| 5 | I thought that my third major |
| 6 | contribution was being lead counsel for the |
| 7 | shareholders during this entire period of |
| 8 | time. |
| 9 | I would add that initially, Winston |
| 10 | & Strawn was not involved. I filed the |
| 11 | original suit before their involvement and |
| 12 | they became involved toward the end of the |
| 13 | year, and then at the point Winston & Strawn |
| 14 | became involved, I also coordinated all of |
| 15 | the efforts of all of us in support of the |
| 16 | common goal. |
| 17 | **Q    Do you know how any of your** |
| 18 | **contributions resulted in a reduction of tax** |
| 19 | **to the receivership?** |
| 20 | A    Not in terms of my individual |
| 21 | contributions. I -- we all worked together |
| 22 | as a team and I think it was clear that our |

18

1    efforts as a team resulted in a settlement.
2        Q    Did you have any discussions with
3    anyone at the Department of Justice or the
4    IRS about how the contributions of you or any
5    of the team members may have resulted in
6    reduction of the tax?
7        A    Not our individual contributions.
8        Q    Do you know why the Department of
9    Justice and the IRS ultimately decided to
10   accept $50 million in settlement of the
11   billion dollar tax claim?
12       A    Are you asking my knowledge or my
13   belief?
14       Q    Well, I'll ask you your knowledge
15   first.
16       A    No.
17       Q    How about your belief?
18       A    My belief is that we had developed
19   a very strong case, particularly a strong
20   case that there should be no federal
21   financial assistance tax which, incidentally,
22   was not a position the FDIC agreed with.

19

1            And I had conversations with Mr.
2    Darmstadter in which he said that he agreed
3    that our argument was initially persuasive to
4    any judge, but he felt that upon careful
5    consideration of an opposing argument by the
6    IRS, they -- by him on behalf of the IRS that
7    he might be able to overcome that.  But he
8    felt that we had made a persuasive case.  He
9    -- he did not agree with our interpretation.
10       Q    Did anyone on behalf of the
11   Department of Justice or the IRS ever
12   indicate that they believed that any of the
13   theories presented by you or Winston & Strawn
14   or any of the other participants would reduce
15   [sic] in zero taxes?
16       A    Say it again, please.
17       Q    Did anyone on behalf of the
18   Department of Justice or the IRS ever
19   indicate to you that they accepted that any
20   of the theories or positions presented by the
21   plaintiff attorneys and the FDIC would result
22   in no taxes being due to the receivership?

20

1        A    They never agreed with our
2    arguments, no.
3        Q    Okay.  You've alluded to this
4    earlier, but let me ask you specific
5    questions about the contributions of the
6    other participants which you're familiar
7    with.  Correct?
8        A    Yes.
9        Q    All right.  What do you believe
10   Winston & Strawn's major contribution was to
11   the process?
12       A    I think their major contribution
13   was bringing Mitchell Moetel into the
14   discussions.  He was a good tax lawyer, and I
15   thought he contributed significantly.
16       Q    Do you know whether Mr. Moetel's
17   contribution convinced the IRS to reduce any
18   taxes?
19       A    No.  I -- I mean, I don't think
20   anybody can differentiate what each of us --
21   each of us did.  I thought Mr. Moetel was a
22   good tax attorney, and effective, but I --

21

1    there -- so were others.
2        Q    What about Mr. Fleischer's major
3    contribution to the process?
4        A    Well, I agree with him that he had
5    two contributions.  His first one was giving
6    me advice which caused me to get the TRO,
7    which I believe saved the possibility of
8    money being available in the fund.
9            And secondly, he was my tax
10   consultant during this entire period.  He --
11   he became involved significantly before Mr.
12   Moetel did.
13       Q    Okay.  You were in the room earlier
14   when Mr. Fleischer testified.  I just want to
15   get your recollection of how and why you
16   hired Mr. Fleischer.  Could you briefly
17   describe why you hired Mr. Fleischer?
18       A    Yes.  I'm no tax lawyer, and I knew
19   I needed one.  And at that point, Winston &
20   Strawn was not participating in our -- in our
21   -- in the Claims Court case.  I'm sorry, they
22   were participated in the Claims Court case,

22

1  but they were not participating after the end
2  of the trial in 1999. I don't remember the
3  date, but at some date, there was a period in
4  which -- after which they were no longer
5  participating.
6      I needed new tax advice. I asked
7  Jerry Stock, who I'd retained. He's a
8  Washington, D.C. Attorney. I'd retained him
9  to help me after Winston & Strawn was no
10 longer involved, told him I needed a tax
11 attorney. He recommended Ernie Fleischer.
12     Q   What --
13     A   Is that the -- the answer you want?
14     Q   Yeah. And what -- did you discuss
15 the terms of Mr. Fleischer's engagement?
16     A   Very little. All I said to him was
17 I needed a tax consultant, Terry Stock had
18 recommended him, but we didn't have any money
19 and that he would have to work on this case
20 on a contingency.
21     Q   And did you discuss what the
22 contingency might be?

23

1      A   No, not to the best of my
2  knowledge.
3      Q   In the course of your legal career
4  have you hired consultants in other cases?
5      A   I've hired a variety of expert
6  witnesses and experts who have -- I've
7  consulted with, yes. Not in tax matters.
8      Q   Generally, how were they
9  compensated?
10     A   On an hourly rate.
11     Q   Before you discussed hiring --
12 before you hired Mr. Fleischer and discussed
13 his terms of employment, did you discuss that
14 with any of the shareholders?
15     A   I'm sure I did, because it would be
16 my practice to discuss those things with
17 plaintiffs. Six plaintiffs, 6500
18 shareholders. The shareholders were not my
19 clients. I owed them a fiduciary duty. I'm
20 confident I discussed it with plaintiffs.
21     Q   But you don't recall -- did you
22 discuss it with all of the -- what I'll say

24

1      the named plaintiffs, or maybe just two or
2  three?
3      A   I have no specific memory, but it
4  would have been my practice to discuss that
5  kind of a step with -- with -- with my
6  clients.
7      Q   Okay. Moving on to the actual
8  settlement itself and the fairness hearing on
9  May 2, 2006, which was held in the United
10 States Court of Federal Claims before Judge
11 Sullivan in which you participated, do you
12 recall that one of the terms that was
13 provided to the shareholders for their
14 approval was that the FDIC agreed to pay
15 reasonable fees to the attorneys who had
16 participated in the negotiations?
17     A   The issue of determination of fees
18 was removed from the motion that FDIC filed
19 with -- with the Court.
20     Q   All right. But do you recall that
21 the -- the provision where we were talking
22 about what was going to be paid to the IRS

25

1  and then there was a discussion of other
2  disbursements, including the $3 million to be
3  paid to the shareholders litigation fund and
4  then there was also a provision indicating to
5  the shareholders that the FDIC agreed to pay
6  reasonable fees? Do you recall that?
7      A   Yes. That was there, but what was
8  removed during the creation of the motion for
9  the fairness hearing was a request that the
10 judge at that point fix the fees.
11     Q   With respect to the -- the term
12 "reasonable attorney's fees" in the notice
13 that went out to the shareholders, did you
14 have an opinion as to what that meant?
15     A   Oh, it could mean -- my opinion, it
16 could mean any reasonable fee which could be
17 hourly or could be contingent or could be any
18 other basis of payment that was reasonable.
19     Q   Did you discuss that opinion with
20 anyone else?
21     A   I don't think so. I thought the
22 word "reasonable attorney's fees" was a -- a

26

1  very all-inclusive word.
2      Q   So you had no concerns that the
3  FDIC meant by "reasonable fees" standard
4  hourly rates?
5      A   I never heard that before Mr. Gill
6  raised the matter yesterday. I think that
7  would be a very strained interpretation of
8  the word "reasonable fees."
9      Q   You just testified it could mean
10  any number of things. Couldn't "reasonable
11  fees" mean standard hourly rates?
12      A   No. What I hope I said was that I
13  thought reasonable fees could include any of
14  these ways of reaching the ultimate result.
15  They could be a percentage of the amount
16  preserved for the fund. It could be a -- a
17  multiplier, could be hourly rates. All of
18  these could be -- I thought were clearly
19  included in the umbrella of reasonable fees.
20      Q   Did any other of the participating
21  attorneys talk to you about what "reasonable
22  fees" might mean in that context?

27

1      A   I think some later discussions. I
2  don't recall any discussions at that time.
3      Q   Afterwards, who did you discuss it
4  with?
5      A   Well, as I said, there were
6  certainly none at that time. I thought it
7  was a completely all-inclusive word. Later
8  on, there were some discussions with -- well,
9  primarily, discussions were with -- between
10  Rosemary Stewart on my behalf, who was in
11  Washington, D.C. and Tom Buchanan. Rosemary
12  would report to me that --
13      MR. COLLINS: Object to the extent
14  you're getting into the substance of the
15  conversations. It would be work product,
16  subsequent discussions of the basis for
17  claims for fees.
18      MR. WILLNER: Counsel, are you
19  objecting or instructing me not to answer?
20      MR. COLLINS: I'll advising you not
21  to answer to the extent that the question
22  asks you to divulge conversations among

28

1  co-counsel concerning legal theories.
2      THE WITNESS: All right. I will
3  follow my counsel's advice.
4      BY MR. TAYLOR:
5      Q   Is Rosemary Stewart your client?
6      A   No, she's my co-counsel.
7      Q   Is Tom Buchanan your client?
8      A   No.
9      MR. COLLINS: My objection was work
10  product.
11      MR. BUCHANAN: Joint defense
12  privilege.
13      MR. WILLNER: Yes.
14      BY MR. TAYLOR:
15      Q   Did you discuss the meaning of
16  "reasonable fees" with anybody at the FDIC?
17      A   No.
18      Q   Ever?
19      A   I've had discussions with the FDIC
20  concerning the fees that I was applying for,
21  not in the context of defining that word.
22  But I've certainly had discussions with Mr.

29

1  Gill about what he and I thought was -- were
2  reasonable.
3      Q   What did you tell him?
4      A   At the time, I was proceeding on
5  the basis that I should receive an hourly
6  rate that was equivalent to the highest rate
7  that was paid by any of the other members of
8  the team, of which I was lead counsel. And
9  Mr. Gill was basically saying that they were
10  Washington, D.C. attorneys and they had
11  higher overhead, they are in big firms and
12  they should be paid more. I mean, that's a
13  quick summary of a number of discussions.
14      Q   And as for the FDIC's position
15  regarding the standard hourly rate for you,
16  Mr. Gill testified that you and he had had
17  some communication as to what your hourly
18  rate was so he could calculate your fees
19  based on your fee petition. Do you recall
20  the specifics of any of those discussions?
21      A   Well, I recall one particular time
22  when Mr. Gill said to me, Howard, would you

---

**30**

1  accept a fee of $400 an hour? I said no, I
2  think I ought to be paid, since I'm lead
3  counsel, at the highest rate sought by any of
4  the other attorneys.
5      Is that responsive to your
6  question? I'm sorry.
7      Q   Well, how did -- how did you come
8  up with the rate that you wanted, the hourly
9  rate that you wanted?
10     A   When I found out what -- two ways.
11  I found out what other attorneys were seeking
12  in this case, particularly Winston & Strawn,
13  and also, I discussed reasonable fees with
14  other Washington, D.C. Attorneys who had
15  other similar complex litigation cases.
16     Q   In addition to your firm and
17  Winston & Strawn and Mr. Fleischer, was there
18  any other law firm involved in the settlement
19  discussions with the IRS?
20     A   Spriggs & Hollingsworth.
21     Q   Was that Rosemary Stewart's firm?
22     A   Yes.

---

**31**

1      Q   Do you know why Spriggs &
2  Hollingsworth didn't file suit against the
3  FDIC for success fees?
4      A   Yes. I -- well, I believe they
5  were satisfied with the fee that FDIC
6  provided to them.
7      Q   Do you understand that that was at
8  their standard hourly rate?
9      A   Yes. I might say -- I guess I can
10  volunteer once against the advice of my
11  attorney -- that I urged Rosemary Stewart to
12  seek more money.
13     MR. BUCHANAN: You just waived the
14  privilege by doing that.
15     MR. COLLINS: Three strikes and
16  you're going to be out.
17     THE WITNESS: Oh, my. You're
18  right. You're absolutely right. I always
19  tell witnesses not to volunteer anything.
20     (Discussion off the record.)
21     BY MR. TAYLOR:
22     Q   In light of your last response, did

---

**32**

1  Rosemary Stewart advise you one way or
2  another whether you should seek a success
3  fee?
4      A   No.
5      Q   Did you ask her whether you thought
6  it was a good idea to seek a success fee?
7      MR. COLLINS: Objection and advise
8  you not to answer. You're trying to disclose
9  work product.
10     MR. TAYLOR: I think he's already
11  waived the privilege.
12     MR. COLLINS: Talking about work
13  product, not attorney-client is my objection
14  at this point. He doesn't have to answer in
15  ways that would reveal his legal analysis of
16  his claims.
17     MR. TAYLOR: All right.
18     THE WITNESS: My own claim. I'll
19  follow the advice of my attorney.
20     MR. TAYLOR: None of that applies
21  in this case, but objection noted. I believe
22  that's all I have. Thank you. Mr. Willner.

---

**33**

1      MR. PLUTA: No questions.
2      MR. BORTHWICK: I have some. I'm
3  going to come around.
4      EXAMINATION BY COUNSEL FOR BLACKWELL
5      SANDERS PEPER MARTIN
6      BY MR. BORTHWICK:
7      Q   Mr. Willner, as I understand it,
8  the FDIC filed its proof of claim for $1.2
9  billion in April of 2002. Is that right?
10     A   The IRS did.
11     Q   What'd I say?
12     A   FDIC.
13     Q   I meant IRS. Sorry.
14     A   Yes.
15     Q   The IRS filed its claim --
16     A   Yes.
17     Q   -- in April. True?
18     A   I don't recall the date.
19     Q   That's what your petition says, and
20  I think that's accurate, your complaint.
21     A   I'm not questioning it, I just
22  don't recall.

---

34

1    Q   And thereafter, you became
2  concerned that the FDIC might pay that money
3  to the IRS without contesting the IRS claim.
4  Is that a fair statement?
5    A   Yes.
6    Q   And the reasons why you had that
7  concern were what? I think you've said them.
8  One was Mr. Taylor's letter, but another --
9  were there other reasons that you became
10  concerned?
11    A   Yes. I was aware of the
12  interagency agreement.
13    Q   Yes.
14    A   Which Mr. Taylor had kindly
15  furnished to me, and the interagency
16  agreement basically said that -- well, it's a
17  detailed document. Of course, it speaks for
18  itself, but basically, it says that under
19  certain circumstances, if certain reports
20  were filed that the FDIC would not contest
21  the tax assessment. And the document also
22  says this was in the best interest of the

35

1  United States, FDIC and IRS would make no --
2  no mention of people like my 6500
3  shareholders. And I was aware of that
4  document.
5    I knew of no other meeting between
6  the FDIC and the IRS other than meeting with
7  -- at which Mr. Duhl was present, which was
8  sometime previously. There was this period
9  of time when I could not get a response out
10  of Mr. Taylor. I wrote him a series of
11  letters. And then finally, the letter I
12  received says -- I'm paraphrasing, of course
13  -- IRS is not going to change its mind. And
14  I knew that the interagency agreement said
15  that FDIC couldn't contest it.
16    And then he says, in view of the
17  fact that they're not going to change their
18  mind, we're soon going to consider paying the
19  tax and we won't let you know until after
20  we've done it.
21    I wasn't born yesterday and I can
22  understand what those words mean, and I

36

1  promptly upon receiving that letter went to
2  work to prepare the TRO papers.
3    Q   Your time records indicate that you
4  started looking for a tax attorney in June
5  2002. Do you believe that's approximately
6  when you started looking for a tax attorney?
7  That's the first indication in your time
8  records and I'm just wondering if you started
9  --
10    A   I have no independent recollection
11  other than the time records.
12    Q   Okay.
13    A   I mean, I may -- I may have asked
14  Jerry before that, but I -- I don't remember.
15    Q   Did you have any understanding
16  whether the FDIC was going to pay all of the
17  funds to the IRS and then seek a refund, or
18  whether it was going to simply pay the funds
19  as demanded by the IRS?
20    A   Well, the letter I received from
21  Mr. Taylor made no -- did not talk about
22  filing any lawsuits for refunds, and the

37

1  interagency agreement said they couldn't.
2    Q   Okay. Now, did you receive any
3  information or advice from any other source
4  as to whether it would be appropriate to pay
5  the funds to the IRS and then seek a refund?
6    A   Well, earlier I had received --
7  when Tom Buchanan was still associated on the
8  case, I'd received a letter from Tom Buchanan
9  in which he basically said that the -- it was
10  appropriate to seek a refund after the tax
11  was paid. And he differentiated that from
12  the tax court alternative which apparently by
13  this point had been waived.
14    Q   And I assume you still have a copy
15  of that letter.
16    A   I do somewhere.
17    Q   I would ask you to produce that
18  letter to us, if you would, before the end of
19  discovery.
20    A   Yes.
21    Q   And so because -- and, of course,
22  the answer may seem obvious, but what would

38

1  have been the result for the shareholders of
2  Benj. Franklin if the FDIC had paid the
3  money, had paid the funds to the IRS?
4      A   They would have lost all interest
5  in recovering money from the Benj. Franklin
6  receivership.  Well, the basic reason, as
7  Richard Gill said yesterday, was that if --
8  if any amount was paid, then a billion -- the
9  full amount of the claim, a billion 2, would
10  have to be paid before a refund claim could
11  be made.  And nobody had a billion 2.
12         And it was also the issue as to
13  whether we, the shareholders, had standing
14  since at that point, FDIC had entered into an
15  agreement saying it wouldn't contest the --
16  the amount of the assessment.
17      Q   And -- and if that had been done,
18  there would have been nothing left for
19  shareholders, is that right?
20      A   Right.
21      Q   And so you began looking for tax
22  counsel, and you were given the name of

39

1  Ernest Fleischer, is that right?
2      A   I was looking for a tax consultant.
3      Q   Okay.
4      A   Mr. Fleischer was not going to be
5  an attorney of record in the matter.
6      Q   Right.
7      A   But I was told that he was an
8  excellent tax attorney and I was looking for
9  -- I didn't know anything about taxes and I
10  was looking for a skilled consultant.
11      Q   Mr. Fleischer's records indicate
12  that it was early July when you first
13  contacted him.  Do you have any memory of
14  when it was?
15      A   I have no independent memory.
16      Q   Does that sound about right?
17      A   What's in my mind is I'm not sure
18  when I filed the -- for the TRO.  I would
19  certainly have talked to Mr. Fleischer before
20  I filed for the TRO.
21      Q   Very good.  Now, when you first
22  contacted Mr. Fleischer, you told him

40

1  generally the circumstances of the matter and
2  the IRS claim, is that right?
3      A   Yes.  I think I wrote him a letter
4  thereafter.  I'm not sure.
5      Q   And you also told him that there
6  were no funds available with which to pay his
7  hourly rates.
8      A   Yes.
9      Q   And you told him he would have to
10  work on a contingency?
11      A   Yes.
12      Q   And you told him that -- well, I'm
13  sorry.  You were unable to tell him any
14  amount of contingent fee that he could
15  receive, were you?
16      A   I -- I -- I had no discussion with
17  him concerning amounts.
18      Q   Well, right.  And was there -- was
19  there a discussion that the amount of the
20  fee, the amount of the contingency, would be
21  determined at the end of the proceedings by
22  the judge?

41

1      A   Probably.
2      Q   And as it turned out, Mr. Fleischer
3  began work sometime in the summer of 2002 and
4  received no payment of any kind until the
5  summer of 2006, is that right?
6      A   I don't know the dates, but yes.
7      Q   Okay.  Now, when you told Mr.
8  Fleischer the situation, what did he tell you
9  with regard to whether it was a good idea to
10  pay the money to the IRS and then seek a
11  refund?
12      A   Mr. Fleischer provided me with a
13  U.S. Supreme Court case.  He may have
14  provided me with -- he testified to statutes.
15  I don't specifically remember statutes, but I
16  certainly remember that U.S. Supreme Court
17  case, which I read and was very clear to me
18  that I had to go to court in Portland to get
19  a TRO.
20      Q   And so that's what you did?
21      A   Yes.
22      Q   And in summary, what did the TIR --

42

1  I'm sorry, TRO provide?
2      A    Well, again, there's a document,
3  but basically, it provided that the FDIC was
4  restrained from paying any money to the IRS.
5      Q    Until something happened?  Or it
6  was simply a restrained endeavor?
7      A    No.  A TRO under procedure in
8  Federal District Court in Oregon, and I don't
9  know if it's the same elsewhere, essentially
10  remains in effect until there's a preliminary
11  injunction hearing.  This one remained in
12  effect until the preliminary injunction
13  hearing.
14          But during the argument to the
15  judge in Portland, the FDIC offered me
16  advance notice of when I paid the tax.
17  They said they were a stakeholder.  They said
18  they were considering interpleading the
19  money.  And even though I did not get the
20  preliminary injunction, I felt that I had the
21  protection I needed.
22      Q    In fact, you received the assurance

43

1  of the FDIC that it would advise you before
2  it made any payment to the IRS?
3      A    They said that in open court.
4      Q    Yes.  And -- and at that point, the
5  TRO proceeding became inactive?
6      A    Well, a TRO lapses.
7      Q    Right.
8      A    Yes.
9      Q    And it was no preliminary
10  injunction issued?
11      A    There was no preliminary
12  injunction.  And my -- I felt comfortable.
13      Q    And --
14      A    I mean, not because of good
15  intentions, but I knew that I'd asked for, as
16  part of the relief in the case, that if FDIC
17  breached its fiduciary duty to me that we
18  reserve the right to seek money damages.
19      Q    Sure.
20      A    And I didn't think FDIC wanted to
21  be sued for -- in the amounts we then thought
22  we could win in the Federal District Court in

44

1  Oregon.
2      Q    And after that point, then what did
3  you do to try to defeat the IRS claim?
4      A    Well, I've testified at some length
5  to Mr. Taylor's questions, but that's
6  basically what I did.  And in terms of your
7  client, he was my tax consultant.  I didn't
8  make a move in connection with that case
9  without consulting with Ernie Fleischer, and
10  -- and I asked that Ernie review anything
11  that Mitch Moetel did and that Mitch Moetel
12  review anything that Ernie did.  And I
13  thought they were working together very
14  closely.
15      Q    And that's what -- you started --
16  initially, immediately after the TRO lapsed,
17  you began working with Mr. Fleischer on
18  determining the issues and legal research and
19  so forth, and then a few months later, Mr.
20  Moetel became involved in addition, is that
21  right?
22      A    Yes.

45

1      Q    And after the two of them were both
2  there, the three of you worked together to
3  decide on strategy, to determine how the
4  issues -- what the issues were and how they
5  would be presented, is that right?
6      A    Well, more than the three of us.
7  Tom Buchanan was involved.  He was helpful.
8  He was Mr. Moetel's partner.  Rosemary
9  Stewart, my co-counsel, was involved.  We had
10  an independent CPA named Randi Cohen.  She
11  was involved.  We worked together as a group.
12      Q    And -- and a part of that team that
13  you've just described was -- was, of course,
14  Mr. Fleischer, and he was involved in not
15  only determining issues in the strategy but
16  in the negotiations with the IRS, was he not?
17      A    Yes.  I hesitated for a second.  He
18  was not involved in the -- the phone calls I
19  had with Richard Gill or Henry Darmstadter.
20      Q    Sure, sure.
21      A    But yes, he sat at the table and
22  was in the meetings and gave me lots of

46

1    advice and wrote lots of memos. Seemed like
2    he had done a lot of research.
3        MR. BORTHWICK: That's all the
4    questions I have. Thank you very much.
5        MR. COLLINS: No questions.
6        MR. TAYLOR: One more point, Mr.
7    Willner. Mr. Borthwick raised some discovery
8    points. I'd like -- I know that the
9    Blackwell and Fleischer plaintiffs served a
10   document request upon you and Winston &
11   Strawn, and I would just like to have copies
12   of any documents produced to them.
13       THE WITNESS: Could I request that
14   you obtain them from Mr. Borthwick? There
15   are a thousand pages worth.
16       MR. TAYLOR: Other than your fee
17   petition. I'm not interested in your fee
18   petition.
19       THE WITNESS: No, no. I responded
20   completely to their request and I would
21   request that Jim Borthwick give him a copy of
22   them, if he would.

47

1        MR. BORTHWICK: We will be happy to
2    provide you with any documents that Mr.
3    Willner has provided us, most of which was
4    the fee petition and his billing records.
5    But we'll give you a list of everything that
6    we received and you may have a copy of
7    whatever you like.
8        MR. TAYLOR: Thanks.
9        THE WITNESS: I wasn't reluctant to
10   do it, but just my staff prepared an enormous
11   amount of time in preparing these materials.
12       MR. TAYLOR: As long as I get it.
13   Scott, do you have any questions?
14       MR. PLUTA: No.
15       THE WITNESS: Does my attorney
16   advise me to read and sign?
17       MR. COLLINS: Yeah, you should.
18       THE WITNESS: All right.
19           (Whereupon, at 9:25 a.m., the
20           deposition of DON S. WILLNER was
21           adjourned.)
22           * * * * *