# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WINSTON & STRAWN LLP, <br><br> and <br><br> DON S. WILLNER & ASSOCIATES, P.C. <br><br> and <br><br> BLACKWELL SANDERS PEPER MARTIN <br> and <br> ERNEST M. FLEISCHER <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> FEDERAL DEPOSIT INSURANCE <br> CORPORATION, AS RECEIVER FOR <br> THE BENJ. FRANKLIN FS&LA, <br> PORTLAND, OREGON <br><br> Defendant. | Civil Case No. 06-01120 (EGS) <br><br> [Consolidated with No. 06-01227 (EGS) and No. 06-01273 (EGS)] |

## FDIC-RECEIVER'S EXHIBITS TO ACCOMPANY ITS OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT
## VOL. III

Bruce C. Taylor
Federal Deposit Insurance Corporation
550 17th Street, NW
Room VS-E7118
Washington, DC 20429
(703) 562-2436 (Telephone)
(703) 562-2478 (Facsimile)

Counsel for Federal Deposit Insurance Corporation,
as Receiver for The Benj. Franklin FS&LA

Date:   February 22, 2007

# INDEX TO FDIC-RECEIVER'S EXHIBITS
# (OPPOSITION AND CROSS MOTION)

**Document**      **Ex. No.**

## VOL I

Letter to Robert Suess from Don Willner (8/22/1990) ................................................. 1

Order, *Suess v. FDIC*, No. 02-807-HA (D.Ore.) (7/26/2002). ..................................... 2

Joint Unopposed Motion, *United States v. FDIC*, No. 02-1427 (D.D.C.)
(4/22/2003) .................................................................................................................... 3

Email to Tom Buchanan from Rosemary Stewart (9/28/2005) ..................................... 4

Notice to Shareholders, *United States v. FDIC*, No. 02-1427 (D.D.C.)
(2/3/2006) ...................................................................................................................... 5

Order, *United States v. FDIC*, No. 02-1427 (D.D.C.) (5/2/2006) ............................... 6

Notice of Partial Disallowance of Claim to Rosemary Stewart from
Glenn Glinsmann (5/17/2006) ...................................................................................... 7

Undated letter to FDIC from Robert Suess ................................................................... 8

Letter to Richard Gill from Robert Suess (1/4/2007) ................................................... 9

## VOL. II

Buchanan Deposition (1/17/2007) .............................................................................. 10

Willner Deposition (1/18/2007) .................................................................................. 11

## VOL. III

Fleischer Deposition (1/18/2007) ............................................................................... 12

Stewart Deposition (1/18/2007) .................................................................................. 13

Gill Declaration (2/22/2007) ....................................................................................... 14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------x
WINSTON & STRAWN, LLP, et al., :
                               :
            Plaintiffs,        :
                               :
        v.                     : No. 06-01120 (EGS)
                               :    06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE      :    06-01273 (EGS)
CORPORATION,                   :
                               :
            Defendant.         :
------------------------------x

                                    Washington, D.C.

                                Thursday, January 18, 2007

Deposition of

    ERNEST M. FLEISCHER

a witness, called for examination by counsel for

Defendant, pursuant to notice and agreement of

counsel, beginning at approximately 8:00 a.m., at

the law offices of Winston & Strawn, 1700 K Street,

NW., Washington, D.C., before Mary Ann Payonk of

Beta Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:

**Page 2**

APPEARANCES:
On behalf of Winston & Strawn, LLP:
    SCOTT PLUTA, ESQUIRE
    THOMAS M. BUCHANAN, ESQUIRE
    Winston & Strawn, LLP
    1700 K Street, NW.
    Washington, D.C. 20006
    (202) 282-5100

On behalf of Willner & Associates, PC:

    DON S. WILLNER, ESQUIRE
    Willner & Associates, PC
    630 Sunnyside Road
    Trout Lake, WA 98650
    (509) 395-2000

    JEREMIAH A. COLLINS, ESQUIRE
    Bredhoff & Kaiser, PLLC
    805 15th Street, NW.
    Washington, D.C. 20005-2207
    (202) 842-2600

On behalf of Blackwell Sanders Peper Martin, LLP
    and Ernest Fleischer:
    JAMES BORTHWICK, ESQUIRE
    Blackwell Sanders Peper Martin, LLP
    4801 Main Street, Suite 100
    Kansas City, MO 64112
    (816) 983-8000

On behalf of Federal Deposit Insurance
    Corporation:

    BRUCE C. TAYLOR, ESQUIRE
    Federal Deposit Insurance Corporation
    550 17th Street, NW. Room VS-E7118
    Washington, D.C. 20429
    (703) 562-2436

**Page 3**

CONTENTS

EXAMINATION BY:                    PAGE
Counsel for FDIC                      4

\* \* \* \* \*

**Page 4**

PROCEEDINGS
Whereupon,
        ERNEST M. FLEISCHER
was called as a witness and, having been first
duly sworn, was examined and testified as follows:
        EXAMINATION BY COUNSEL FOR FDIC
        BY MR. TAYLOR:
    Q   Good morning, Mr. Fleischer.
    A   Good morning.
    Q   Based on comments made by Mr.
Borthwick prior to the deposition, I'm going
to shorten my deposition somewhat. I'm sure
everybody's happy about that.
        I'll start with: How did you get
involved in the settlement negotiations
relating to the case of United States versus
FDIC?
    A   I received a telephone call from
Don Willner in which Mr. Wilner introduced
himself to me, told me that he'd obtained my
name from Jerry Stock, that he understood I
was a tax lawyer, that I had familiarity with

**Page 5**

the taxation of thrifts, and he wanted to
share with me the factual information about
Benjamin Franklin, which was in receivership
with the FDIC, as the receiver, sought then
to obtain my views as to whether or not I
would be willing to serve as tax counsel, and
further explained to me that there truly was
no client with whom to negotiate anything and
that no source of funds was readily available
with which to pay a normal hourly rate.
    Q   Do you recall when you got the
phone call from Mr. Willner, approximately?
    A   My recollection is that it was in
approximately the middle of 2002.
    Q   During that phone call, did you
discuss the terms of your employment?
    A   The terms, as I recall, were that
the fee was going to be a contingent fee
based upon the results obtained because there
was no fund out of which to pay normal hourly
rates.
        Mr. Willner at that time told me

Page 6

1  that funds had been contributed by some of
2  the Benjamin Franklin shareholders for the
3  purpose of paying the costs involved in the
4  claim against the United States for breach of
5  contract and that the tax case was a case
6  that was a derivative of that claim, that it
7  was important to prevail in the tax matter in
8  order to make certain that the recovery,
9  whatever it was going to be, from the breach
10 of contract would be available for the
11 shareholders.
12    Q  **When Mr. Willner told you that**
13 **there were no funds available to --**
14 **immediately available to pay you, did he**
15 **provide any specific information about how**
16 **you would be paid?**
17    A  I have a general understanding as a
18 lawyer of a class action lawsuit in that when
19 there is a class action, there is usually no
20 client with whom a fee can be negotiated,
21 that after the matter is either litigated or
22 settled, a judge then makes a determination

Page 7

1  setting a fair fee based upon the results
2  obtained.
3     Q  **Were you aware when you were**
4  **discussing your services with Mr. Willner**
5  **that the tax case was not a class action?**
6     A  No, I was not.
7     Q  **Are you aware of that now?**
8     A  I believe that in my view, the tax
9  case does qualify as a class action because
10 there's a fund that is available for a class
11 of people and that, in my view, a judge is
12 going to be the one who is going to finally
13 determine what is a fair and reasonable fee.
14    Q  **After speaking with Mr. Willner,**
15 **what services did you provide related to the**
16 **tax case?**
17    A  Mr. Willner explained to me that
18 the most urgent matter involved the proposed
19 payment by the FDIC of the entire fund to
20 satisfy a very large assessment made by the
21 Internal Revenue Service against the FDIC in
22 its role as receiver. He then told me that

Page 8

1  he had been advised by others -- and my
2  recollection is the others involved the
3  Winston & Strawn law firm -- to allow the
4  FDIC to make that payment and then bring a
5  refund claim and eventual litigation with
6  respect to that refund claim against the
7  Internal Revenue Service, against the United
8  States, to recover the amount of the payment
9  to the extent that it exceeded the tax that,
10 in fact, was owing.
11       Mr. Willner explained to me that he
12 was not a tax lawyer, that that just didn't
13 seem to him to be the right course of action,
14 and he wanted my views on if I thought that
15 that was a reasonable way in which to handle
16 the tax controversy.
17    Q  **Before I go further, other than**
18 **what Mr. Willner told you or what the Winston**
19 **& Strawn firm told you or what Mr. Willner**
20 **told you based on what others may have said,**
21 **do you have any personal knowledge of anyone**
22 **within the FDIC stating that they intended to**

Page 9

1  **take the type of action you described, that**
2  **is, to pay the taxes and then challenge it?**
3     A  I do not.
4     Q  **After your initial discussions with**
5  **Mr. Willner and when you actually started**
6  **providing services, what -- what did you do?**
7     A  Initially, I provided Mr. Willner
8  with the case law and statutory authority
9  that required a payment of the entire tax
10 with respect to any one year in order to
11 prosecute a refund claim with the Internal
12 Revenue Service.
13    Q  **Now, did you provide any other**
14 **services?**
15    A  On a continuing basis, once it
16 became clear that there would be negotiations
17 with the Internal Revenue Service concerning
18 the correct amount of tax, I reviewed income
19 tax returns which Mr. Willner had sent to me,
20 I reviewed corporate documents involving the
21 mergers that led to the goodwill, I
22 researched the specific dates involved in the

Page 10

1  controversy between the Internal Revenue
2  Service and taxpayers over the way in which
3  the acquisition of a stock association by a
4  mutual was to be taxed under the code.
5      I then looked at the steps that had
6  been taken when Benj., as a mutual, acquired
7  a stock thrift in a merger. All of that was
8  for the purpose of determining whether the
9  tax basis of the assets had been correctly
10 reflected on the income tax return filed by
11 the FDIC in the year in which the first of
12 the loans from the government to Benj. was
13 received, which was 190.
14     Q  Did you come up with a particular
15 theory or proposal to present to the IRS in
16 the hopes of getting the taxes reduced?
17     A  I did. There were two major issues
18 that I saw involved in the case. The first
19 involved the tax basis of the goodwill. The
20 second involved whether a loan could ever be
21 taxable under the code and the implementing
22 amendment to our constitution that allowed

Page 11

1  the imposition of an income tax.
2      Q  And were these -- was that position
3  presented to the IRS?
4      A  It was, yes.
5      Q  Do you know how the IRS -- what the
6  IRS thought of that position?
7      A  The IRS, of course, rejected both
8  arguments initially, but it was those two
9  arguments, those two issues that I believe
10 persuaded the Internal Revenue Service that
11 it ran a significant chance that very little
12 relative to the amount of funds held by the
13 FDIC, in fact, could be collected in the
14 event of litigation.
15     Q  Do you have any objective evidence
16 to support that belief?
17     A  The only objective evidence I have
18 is that in my dealings with the Internal
19 Revenue Service, they're generally
20 represented by highly competent, trained
21 people who have great specialties in various
22 areas of the tax law, that they will evaluate

Page 12

1  their trial risks.
2      But they understand the law of
3  averages quite well and recognize that with
4  respect to the taxpayer, the taxpayer either
5  has a zero chance of prevailing or a 100
6  percent chance of prevailing with respect to
7  issues.
8      The Internal Revenue Service, of
9  course, can spread its risk over many cases
10 so that in a settlement that is achievable
11 short of litigation, the Internal Revenue
12 Service usually insists upon a settlement
13 that gives it something better than the
14 ordinary odds of winning or losing.
15     Q  Did you actually speak with anybody
16 at the Department of Justice or the Internal
17 Revenue Service about why they settled the
18 case?
19     A  I have not.
20     Q  Okay. What do you consider the --
21 your major contribution to the settlement
22 process?

Page 13

1      A  My major contribution was providing
2  the theory under which the temporary
3  restraining order was obtained by Mr. Willner
4  and the supporting law to support that
5  theory.
6      Secondly, providing the two grounds
7  that I believe were the most persuasive on
8  legal analysis as to determining the correct
9  amount of tax that should have been owing,
10 which I believe was significantly less than
11 -- and in a settlement, it has to be
12 significantly less than -- the amount of tax
13 that actually was paid.
14     Q  And do you -- do you know how any
15 contributions you made to the settlement
16 process may have actually resulted in a
17 reduction of taxes in the amount?
18     A  I do not.
19     Q  Okay.
20     MR. TAYLOR: Do you have a copy of
21 your complaint handy?
22     MR. BORTHWICK: Yes.

Page 14

1  BY MR. TAYLOR:
2  Q  Mr. Fleischer, I'm going to ask you
3  maybe a couple of questions about your
4  complaint and then I believe we'll be
5  through.
6      At paragraph 37, Roman numeral IV
7  on page 9, the provision or the statement
8  says over one-third of Benj. Franklin's
9  shareholders have already approved a success
10 fee. Do you see that?
11 A  I do.
12 Q  Can you identify the shareholders
13 who you refer to in that subparagraph?
14 A  My recollection is that the Winston
15 & Strawn firm in its complaint set forth a
16 statement that shareholders representing a
17 percent of the total number of shares had
18 approved a success fee with respect to
19 Winston & Strawn. That is the basis for that
20 statement.
21 Q  Am I correct in stating that you
22 can't identify any shareholders who have

Page 15

1  specifically approved your request for a
2  success fee?
3  A  I cannot.
4  Q  Okay.
5      MR. TAYLOR: That's all I have.
6      MR. WILLNER: I have no questions.
7      MR. PLUTA: No questions.
8      THE REPORTER: Sir, will he read
9  and sign?
10     MR. BORTHWICK: Yes.
11         (Whereupon, at 8:28 a.m., the
12         deposition of ERNEST M. FLEISCHER
13         was adjourned.)
14            * * * * *
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------x
WINSTON & STRAWN, LLP, et al.,   :
                                 :
         Plaintiffs,             :
                                 :
    v.                           : No. 06-01120 (EGS)
                                 :     06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE        :     06-01273 (EGS)
CORPORATION,                     :
                                 :
         Defendant.              :
---------------------------------x

                                    Washington, D.C.

                                    Thursday, January 18, 2007

Deposition of

ROSEMARY STEWART

a witness, called for examination by counsel for

Defendant, pursuant to notice and agreement of

counsel, beginning at approximately 8:30 a.m., at

the law offices of Winston & Strawn, 1700 K Street,

NW., Washington, D.C., before Mary Ann Payonk of

Beta Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:

**Page 2**

APPEARANCES:
On behalf of Winston & Strawn, LLP:
    SCOTT PLUTA, ESQUIRE
    THOMAS M. BUCHANAN, ESQUIRE
    Winston & Strawn, LLP
    1700 K Street, NW.
    Washington, D.C. 20006
    (202) 282-5100

On behalf of Willner & Associates, PC:
    DON S. WILLNER, ESQUIRE
    Willner & Associates, PC
    630 Sunnyside Road
    Trout Lake, WA 98650
    (509) 395-2000

On behalf of Blackwell Sanders Peper Martin, LLP and Ernest Fleischer:
    JAMES BORTHWICK, ESQUIRE
    Blackwell Sanders Peper Martin, LLP
    4801 Main Street, Suite 100
    Kansas City, MO 64112
    (816) 983-8000

On behalf of Federal Deposit Insurance Corporation:
    BRUCE C. TAYLOR, ESQUIRE
    Federal Deposit Insurance Corporation
    550 17th Street, NW. Room VS-E7118
    Washington, D.C. 20429
    (703) 562-2436

    ROBERT J. DEHENZEL, ESQUIRE
    Federal Deposit Insurance Corporation
    3500 Fairfax Drive Virginia Square
    Arlington, Virginia 22226

**Page 3**

CONTENTS

| EXAMINATION BY: | PAGE |
|---|---|
| Counsel for FDIC | 4 |
| Counsel for Blackwell | 26 |

DEPOSITION EXHIBITS:
No. 9 - September 28, 2005, E-mail    9

\* \* \* \* \*

**Page 4**

PROCEEDINGS
Whereupon,
    ROSEMARY STEWART
was called as a witness and, having been first duly sworn, was examined and testified as follows:
    EXAMINATION BY COUNSEL FOR FDIC
    BY MR. TAYLOR:
    Q  Ms. Stewart, in an earlier deposition we went through kind of a shorthand where I asked the witnesses whether they would understand what I was talking about and whatnot, saying "the tax case," meaning the United States versus FDIC case that was pending in the District Court for the District of Columbia and which kind of precipitated all of the attorney fee petitions. Will you understand what I mean if I just say "tax case"?
    A  Yes.
    Q  Okay. Are you familiar with the discussions among the various attorneys who filed complaints and the FDIC and the

**Page 5**

Department of Justice and the Internal Revenue Service regarding the tax claim against the Benj. Franklin receivership in the tax case?
    A  I am familiar with them from the time those discussions began until the time that FDIC approved my own firm's fee petition.
    Q  Okay.
    A  I then had no further discussions with any of the litigants in the fee claim cases.
    Q  Okay. During those discussions, what was your role?
    MR. PLUTA: At this point, I'd just like to object to the extent that your question attempts to get any answers that would reveal conversations in and among Don Willner and Thomas Buchanan related to their claims, at least. To the extent that there was a waiver previously, I would argue that it would be compartmentalized to Ms.

Page 6

1  Stewart's claims. Any discussions related
2  specifically to her claim, but any waiver
3  that may have occurred, would not moot the
4  privilege associated with Mr. Willner's
5  claim, Mr. Fleischer's claim or Mr.
6  Buchanan's claim.
7         MR. WILLNER: And I join in that.
8         MR. BORTHWICK: I join in that
9  also.
10        BY MR. TAYLOR::
11   Q   Ms. Stewart, you just heard the
12 objection. Let me ask you some background
13 questions. In your role in the settlement
14 discussions, who was your client?
15   A   Now you're referring to the tax
16 settlement agreement?
17   Q   Yes.
18   A   I was co-counsel with Mr. Willner
19 for his shareholder clients.
20   Q   And when you submitted the proof of
21 claim to the FDIC, on whose on behalf was
22 that made?

Page 7

1   A   I prepared the claim that was
2  submitted jointly by Spriggs & Hollingsworth
3  and Winston & Strawn.
4    Q   In the final stages of the
5  settlement discussions, do you recall that
6  the parties or the Court was presented with a
7  -- with the terms of the proposed settlement,
8  including a notice to shareholders?
9    A   Yes.
10   Q   Do you recall in the notice to
11 shareholders that there was a provision that
12 said that the FDIC had agreed to pay
13 reasonable attorney's fees to the attorneys
14 who had participated in the settlement
15 discussions?
16   A   Yes.
17   Q   Did you have any opinion as to what
18 the term "reasonable attorney's fees" meant
19 in that context?
20   A   Yes.
21   Q   And what was that?
22   A   I believed that the fee petition

Page 8

1  that I was at that point preparing was
2  reasonable in its request for the normal
3  hourly rates of the attorneys who worked on
4  the matter times two.
5    Q   And ultimately, what did you
6  receive from the FDIC as -- in the terms of
7  fees?
8    A   The FDIC approved my submission for
9  the regular hourly fees as opposed to the
10 much smaller fee that we were collecting from
11 the clients but did not approve the doubling
12 that we had requested.
13   Q   Okay. Did your firm sue for the
14 additional fees that it had requested?
15   A   No.
16   Q   Why?
17   A   It was my opinion based on the
18 many, many discussions that had been held
19 between all the parties and the FDIC that we
20 were striving to arrive at fees that all of
21 us could recommend to a court as reasonable.
22        I believed when I submitted the fee

Page 9

1  petition that the joint petition of Spriggs &
2  Hollingsworth and Winston & Strawn did that.
3  But when the FDIC determined otherwise, my
4  thinking was it was still to me a debatable
5  issue about what "reasonable" meant. But for
6  me to recommend a lawsuit, I was going to
7  have to argue that it was unreasonable for me
8  to get regular hourly rates, which FDIC had
9  approved. And I concluded that I couldn't do
10 that. I couldn't reach that conclusion. I
11 was satisfied with the payment I received.
12   Q   Did you express that to any of the
13 attorneys who have sued the FDIC for
14 additional fees?
15        MR. PLUTA: I renew my objection.
16        MR. BORTHWICK: Join in the
17 objection.
18        MR. WILLNER: Join in the
19 objection.
20   A   Yes, I did.
21        BY MR. TAYLOR::
22   Q   What did you say to the other

**Page 10**

1  participants or any of the participants you
2  discussed it with?
3      MR. PLUTA: At this point, I'd ask
4  for a standing objection on any of the
5  questions along this line.
6      MR. TAYLOR: Objection noted.
7      A  Well, I believe I had different
8  discussions with different people.
9      BY MR. TAYLOR::
10     Q  Did you have a discussion with Mr.
11 Willner?
12     A  Yes.
13     Q  Do you recall the major terms of
14 that discussion?
15     MR. WILLNER: I believe we're
16 getting into issues of work product, of
17 attorney-client privilege. Ms. Stewart was
18 and is my co-counsel and I think that any
19 discussions about -- certainly about my fee
20 would be totally privileged.
21     BY MR. TAYLOR::
22     Q  Ms. Stewart, do -- do you represent

**Page 11**

1  Mr. Willner on his fee petition?
2      A  No, I do not.
3      Q  Did you ever represent Mr. Willner
4  on his fee petition?
5      A  In the very beginning, I drafted a
6  fee petition that would have been submitted
7  by all three lawyers, all three firms, that
8  is, Mr. Willner's firm, Spriggs &
9  Hollingsworth and Winston & Strawn. I had
10 one or two drafts of that before Mr. Willner
11 opted out and said that he wanted to file his
12 own separate claim. So at that point, you
13 know, I -- I think probably the relationship
14 changed.
15     Q  After Mr. Willner opted out, did
16 you have any discussions with him regarding
17 success fees and/or what the term "reasonable
18 attorney's fees" may have meant in the
19 context of the notice to the shareholders?
20     MR. WILLNER: I have a standing
21 objection.
22     MR. TAYLOR: Understood.

**Page 12**

1      A  Yes, we discussed it a number of
2  times.
3      BY MR. TAYLOR::
4      Q  And what was the gist of those
5  discussions?
6      A  I -- I've lost track of the
7  sequence. Are you asking me the gist of them
8  after?
9      Q  After.
10     A  After Mr. Willner opted out of a
11 joint petition, he still gave me at my
12 request comments to the petition that I had
13 drafted for Spriggs & Hollingsworth and
14 Winston & Strawn.
15     And I reviewed his declaration that
16 he intended to submit, because I had seen an
17 earlier iteration that was going to be part
18 of the joint submission, and provided
19 comments to him.
20     We discussed whether his clients,
21 the shareholder representatives in the
22 derivative case, were in favor of the

**Page 13**

1  doubling of the legal fees that Winston &
2  Strawn and my firm had requested. And Mr.
3  Willner was unclear whether they had approved
4  that or not.
5      At some point, he told me that his
6  clients had approved the higher hourly rate
7  that he wanted to seek but had not approved a
8  multiplier for Mr. Willner's fees, so we
9  discussed that.
10     I encouraged Mr. Willner to join
11 Mr. Buchanan and I in the claim that we had
12 made for a reasonable hourly rate doubled.
13 He declined, and we prepared the petitions
14 separately.
15     Q  Did you have similar discussions
16 with Mr. Fleischer?
17     A  My discussions with Mr. Fleischer
18 began with my -- on the fee petition. We had
19 worked closely on the tax settlement, but on
20 the fee petition, it began with my
21 encouraging him to prepare a bill that had
22 his hourly time and fees. I think I have a

Page 14

1  couple of -- two or three e-mails encouraging
2  him to do that.
3      Q   And let me -- let me confirm, first
4  of all, do you represent Mr. Fleischer or the
5  Blackwell firm on their fee petition?
6      A   No, I do not.
7      Q   Did you ever represent Mr.
8  Fleischer or the Blackwell firm regarding
9  their fee petition?
10     A   No.
11     Q   Okay. You just mentioned an
12 e-mail. Do you mind if I take a look? Or do
13 you have more than one?
14     A   I have e-mails that I collected in
15 response to your subpoena that went to either
16 Mr. Willner, Mr. Buchanan or Mr. Fleischer
17 discussing fee petitions.
18     Q   All right.
19     A   I did not attach to those e-mails
20 the drafts of the claims as I was preparing
21 them. I did not know whether you had any
22 agreement about drafts of things, but you

Page 15

1  will see several references to "attached is
2  my first draft," or attached is the chart of
3  the fees that Spriggs & Hollingsworth or
4  Winston & Strawn expects to claim. I did not
5  attach any of those. I only attached my text
6  of discussions with those three lawyers.
7      MR. WILLNER: Could you make us
8  copies after the session?
9      MR. TAYLOR: Oh, sure, sure.
10         (Deposition Exhibit No. 9 was
11         marked for identification.)
12     BY MR. TAYLOR::
13     Q   I'm handing you what's been marked
14 Exhibit 9, and it's from the documents that
15 you provided to me. Could you identify it
16 for the record, please?
17     A   This is an e-mail that I sent to
18 Tom Buchanan on September 28, 2005.
19     Q   Could you read the last paragraph?
20     MR. WILLNER: We'd like to see
21 these.
22     MR. BUCHANAN: I don't know if

Page 16

1  these are privileged or not.
2      MR. TAYLOR: Objections have been
3  noted for the record.
4      MR. BUCHANAN: There's more than an
5  objection. I mean, people can direct him not
6  to answer. If there's a joint defense
7  privilege with regard to documents, that's
8  not -- you know, you can't testify about
9  that. Once you do, you waive it.
10     MR. TAYLOR: Ms. Stewart has been
11 testifying about it, so --
12     MR. BUCHANAN: Well, I'd like to
13 take a look at those before she testifies
14 about it.
15     MR. TAYLOR: You'll have to make
16 copies. They aren't my documents.
17     MR. BUCHANAN: All right. Well,
18 I'll go over there.
19     MR. WILLNER: I want to see them
20 too. How hard is it to make copies of them?
21     MR. BUCHANAN: How hard? Put them
22 in a machine.

Page 17

1      MR. WILLNER: No, no.
2      MR. BUCHANAN: You know, let's see.
3  I would object and say that this is part of a
4  joint defense, all those documents, and I
5  think they should be returned. I don't know
6  about the rest.
7      MR. TAYLOR: I'm not going to use
8  the rest.
9      MR. BUCHANAN: Okay. I think this
10 is a communication between two lawyers who
11 have a joint defense agreement regarding
12 various matters, all of which are privilege.
13     MR. WILLNER: Can I see it?
14     MR. BUCHANAN: Yeah.
15     MR. TAYLOR: This is not the place
16 to debate the issue, but certainly the last
17 paragraph indicates what Richard Gill told
18 Ms. Stewart. I don't see how that can
19 possibly be privileged.
20     MR. WILLNER: Could I have a
21 moment?
22     MR. BUCHANAN: It's her

18

1  communication with me about communication
2  she's had. In other words, that is
3  privileged, okay?
4         Mr. Gill can testify about his
5      conversation with Ms. Stewart, and she
6      can testify about her conversation with
7      Mr. Gill. But to the extent that when
8      she's communicating with me and we have
9      a joint defense privilege, it's not a
10     debate. You either assert the privilege
11     and direct the person not to answer,
12     because if they testify, it's waived.
13     It's not something you testify about it
14     and reserve until later. You can't
15     reserve the privilege.
16         MR. TAYLOR: Well, as I said, Ms.
17 Stewart just testified along this subject
18 matter already, so to the extent the
19 privilege exists, I think it is waived.
20         MR. BUCHANAN: I disagree.
21         MR. TAYLOR: The only question is
22 how do you -- I mean, I don't know how you

19

1  want to handle this exhibit. I would propose
2  we go forward, but subject to your objection.
3  If we have to take it up with the judge
4  later, fine, if that becomes an issue.
5  Insofar as I'm concerned, we can redact all
6  of it except for the last paragraph or
7  anything that doesn't mention Richard Gill or
8  what Richard Gill said.
9         MR. BUCHANAN: John, what's your
10 view?
11         MR. WILLNER: I previously made the
12 same objection as your co-counsel did.
13         MR. BUCHANAN: Right, but -- okay.
14 I can't force Ms. Stewart not to testify, but
15 I think these are all communications among
16 attorneys as part of a joint defense
17 privilege that are reflected in this and I
18 would direct that she not answer any
19 questions about it. But I'm not her lawyer.
20         BY MR. TAYLOR::
21     Q  Ms. Stewart, given that, I believe
22 you can testify.

20

1      A  The last paragraph says, quote:
2  With respect to attorney's fees, Richard Gill
3  said that people in the FDIC's receivership
4  claims division have been very negative in
5  their comments back to him about any payment
6  to counsel beyond regular hourly rates. And
7  with respect to Don's claim, they have been
8  expressing unhappiness that he has not
9  identified his actual hourly rate or a proxy
10 for that by reference to another Portland,
11 Oregon, or Trout Lake, Washington, attorney's
12 fees. Don argued briefly for his submitted
13 rate and asked for an opportunity to speak
14 with the, quote, real decision-makers,
15 unquote, on the fee claims before they make a
16 final decision. Richard will pass along this
17 request, but I doubt that it will happen.
18 Richard kept repeating that he doesn't make
19 the decisions about receivership claims, but
20 it was clear that he was trying to prepare us
21 for not getting the full amount of the claims
22 as we filed them. The whole meeting was less

21

1  than an hour.
2      Q  I believe that's all I have.
3      A  I was not done answering your
4  question about Mr. Fleischer.
5      Q  Okay.
6      A  I don't want the record to be
7  unclear.
8      Q  You're right.
9      A  You took my documents.
10     Q  Sorry.
11     A  I said that my discussions with Mr.
12 Fleischer began with encouraging him to
13 submit a fee claim.
14         We then had a discussion after the
15 FDIC had approved and paid his portion of Mr.
16 Willner's fee claim about whether Mr.
17 Fleischer should file a suit. And we had a
18 telephone discussion about that.
19     Q  What did you tell Mr. Fleischer?
20         MR. BORTHWICK: I make the same
21 objection here. It's within the privilege
22 that has already been asserted by co-counsel,

**22**

1  and I would suggest that the witness should
2  not answer the question about the substance
3  of the conversation because of privilege.
4      MR. TAYLOR: Again, given that
5  that's a suggestion, I'd suggest that you can
6  answer it.
7      MR. BORTHWICK: Objection.
8      MR. BUCHANAN: If she believes it's
9  privileged, she cannot answer. That --
10 that's the law. You know, if she doesn't
11 think it's privileged conversation, she can
12 answer, but --
13     BY MR. TAYLOR::
14 Q  Ms. Stewart, do you believe that
15 was a privileged conversation?
16 A  I am appearing here as a fact
17 witness pursuant to subpoena. I don't
18 believe it's -- it's within my prerogative to
19 make those decisions.
20     If the Court tells me I cannot
21 answer, or strikes my answer, I would accept
22 that. But I have not in any way considered

**23**

1  the privileges relevant to this litigation in
2  which I'm not involved at all. I don't even
3  know if there are privileges, so I would
4  answer the question.
5  Q  Please.
6     MR. BORTHWICK: I would suggest
7  that we ask the Court to consider the matter
8  before she does answer to determine whether
9  or not a privilege exists.
10    MR. BUCHANAN: An attorney -- you
11 have to make a determination, Ms. Stewart,
12 whether it was privileged or not. You can't
13 just say I don't know or I'm not thinking
14 about that or I haven't focused on that
15 because I'm not involved in litigation in
16 testifying. But you have to make a
17 determination as a lawyer whether that was
18 part of a joint defense privilege. And if it
19 was, you can't answer. You can't say that
20 you're not going to consider that and leave
21 it up to someone else because then, you're
22 waiving the privilege on behalf of yourself

**24**

1  and your firm.
2     THE WITNESS: I have not until this
3  morning heard the term "joint defense
4  privilege" as it applies to me so I have no
5  basis on which to even understand that
6  objection. I know what it means in the legal
7  sense, but I don't know how it's been applied
8  in this case or why it should apply to me.
9     MR. TAYLOR: I won't press any
10 further for that answer, and if I want it
11 later then we can go to the Court.
12    BY MR. TAYLOR::
13 Q  I'll ask you this: What -- in
14 light of your familiarity with the
15 contributions of all the participants in the
16 settlement process, what do you think about
17 Mr. Fleischer's request for relief in his
18 complaint for 5 percent of the remaining
19 surplus of $40 million.
20     (The reporter read the record as
21     requested.)
22    MR. BORTHWICK: Before she answers,

**25**

1  I will state on the record what I have stated
2  to counsel earlier this morning, which is
3  that the amount stated in our complaint of 5
4  percent is a maximum, and it is within that 5
5  percent that we are asking the Court to award
6  a fair contingent fee and that we are not
7  stating that our claim is for the 5 percent.
8     What I have also stated is that by
9  July -- January 26th, we will advise
10 counsel whether the -- we are claiming a
11 specific percentage, a specific dollar
12 amount, or whether we are simply going
13 to leave it up to the Court to determine
14 what Mr. Fleischer's contingent fee
15 should be, anywhere between zero and 5
16 percent.
17    BY MR. TAYLOR::
18 Q  You may answer, Ms. Stewart. If
19 you need the question read back --
20 A  I do not agree with Mr. Fleischer's
21 claim.
22 Q  Why?

Page 26

1  A  Mr. Fleischer was a consultant to
2  Mr. Willner from the beginning of his work on
3  this matter. Mr. Willner submitted Mr.
4  Fleischer's fees and expenses as part of his
5  claim, and they were approved in full. As a
6  result of that, I do not accept that Mr.
7  Fleischer did not get everything that he was
8  entitled to get, and I would not support any
9  enhancement. I would certainly not support
10  any contingency share of any savings, which I
11  guess is how this is being characterized for
12  the contingency portion of the request.
13      MR. TAYLOR: Thank you again.
14  That's all I have.
15      MR. WILLNER: No questions.
16      EXAMINATION BY COUNSEL FOR BLACKWELL
17      SANDERS PEPER MARTIN
18      BY MR. BORTHWICK:
19  Q  I just have a couple. Ms. Stewart,
20  Mr. Fleischer did not receive any payment
21  during the pendency of the tax litigation,
22  did he?

Page 27

1  A  I do not believe he did.
2  Q  And if the matter had proceeded and
3  no refund or, I'm sorry, no amount had been
4  saved for the shareholders, then there would
5  have been no way for Mr. Fleischer to receive
6  any payment, to your knowledge?
7  A  I don't believe that was ever
8  clarified. Mr. Willner told me that he had
9  told Mr. Fleischer that he had no money at
10  the beginning of our tax settlement
11  discussions but that if he ever was -- got
12  money and was able to pay, Mr. Fleischer
13  would be, you know, treated the way the rest
14  of the lawyers were treated. I never
15  understood that to mean that it would come
16  from tax savings.
17      You know, this entire litigation,
18  until the date of the tax settlement, was
19  always looking forward to a successful result
20  in the U.S. Court of Federal Claims. And
21  when and if that successful result occurs, it
22  has always been understood that attorneys

Page 28

1  will ask for fees. So it was not clear to me
2  that there was ever an understanding that
3  fees were to be based on the tax savings.
4  That opportunity arose, thankfully, and we
5  were all able to file fee claims, but I don't
6  think it arose in the beginning.
7  Q  In any event, Mr. Fleischer's work
8  was certainly contingent from the outset, was
9  it not? He might or might not get paid at
10  the conclusion of the litigation, is that
11  correct?
12  A  Yes.
13      MR. BORTHWICK: I believe that's
14  all I have.
15      MR. WILLNER: Nothing further.
16      MR. TAYLOR: Thank you. We're all
17  reading and signing our depositions.
18      THE WITNESS: Yes, I will.
19      MR. TAYLOR: Would you like to
20  preserve that right?
21      THE WITNESS: I will.
22      MR. TAYLOR: Okay.

Page 29

1      (Whereupon, at 10:14 a.m., the
2      deposition of ROSEMARY STEWART
3      was adjourned.)
4          * * * * *

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**WINSTON & STRAWN LLP,**

and

**DON S. WILLNER & ASSOCIATES, P.C.**

and

**BLACKWELL SANDERS PEPER MARTIN**
and
**ERNEST M. FLEISCHER**

        Consolidated Plaintiffs,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR THE BENJ. FRANKLIN FS&LA, PORTLAND, OREGON**

        Defendant.

Civil Case No. 06-01120 (EGS)

[Consolidated with No. 06-01227 (EGS) and No. 06-01273 (EGS)]

## DECLARATION OF RICHARD S. GILL

I, Richard S. Gill, hereby make this declaration and state as follows:

1. I am an attorney employed by the Federal Deposit Insurance Corporation. My current title is Counsel.

2. During November 2002, the FDIC-Receiver began an extensive exchange of correspondence and memoranda and convened multiple meetings with the Department of Justice in the course of settlement negotiations concerning *United States v. FDIC*, No. 02-1427 (D.D.C.) (the "Tax Case"). On it own initiative, the FDIC-Receiver invited attorney representatives of the shareholders of the former Benj. Franklin FS&LA to

1

FDIC Exhibit 14

participate in the settlement discussions in an attempt to resolve the Tax Case. During this same time period, the IRS undertook an "audit" of the receivership tax returns for the thirteen year period from 1990 to the end of 2002, which the assigned revenue agent completed in October 2003.

3. In a letter dated December 16, 2003, FDIC received schedules from the Tax Division of the Department of Justice reflecting the government's conclusions as to the proper amount of income tax liability (without any penalties) owed by the receivership under 11 different assumed tax scenarios. The different scenarios computed taxes based on various assumptions, resulting in a cumulative tax liability, without interest and penalties, ranging from approximately $11 million to $97 million.

4. Tax Scenario #10 set forth the tax positions taken by the FDIC-Receiver, which the FDIC-Receiver believed accurately calculated the correct amount of tax applicable for the Benj. Franklin receivership.

5. The attorneys for the shareholders advocated positions that resulted in significantly less tax being owed by the receivership than Scenario #10. These positions were non-starters for the Department of Justice and the IRS and were never accepted as the basis for a settlement. The FDIC-Receiver searched for a compromise that the IRS would accept and would still save substantial funds in the receivership surplus for distribution to the shareholders.

6. The IRS agreed for settlement purposes to accept Scenario #10 for resolving the disputed tax issues. Scenario #10 included a tax liability of approximately $12 million and interest of approximately $38 million, if run to the date of settlement.

FDIC Exhibit 14

7. The tax treatment of approximately $1.7 billion in Federal Financial Assistance ("FFA") given to Benj. Franklin at the time of its failure in September 1990 was one of the primary tax issues for resolution. As alleged in the Complaint in the Tax Case, if the FFA were considered taxable income at the time of failure, the tax assessment for 1990 would have consisted of past due taxes of $94 million, penalties of $210 million, and accrued interest on the tax and penalties of $774 million.

8. IRC § 597 addresses the tax treatment of FFA. In October of 1989, shortly after the enactment of the current § 597 (enacted as part of FIRREA), the IRS had published Notice 89-102 in the Federal Register. Notice 89-102 provided preliminary guidance with regard to the tax treatment of FFA until regulations could be promulgated. The Notice provided that in a Purchase and Assumption type transaction – the type used in the Benj. Franklin failure – FFA is taken into income in the year of closing. Notice 89-102 governed the tax treatment of FFA until proposed regulations were promulgated in April of 1992. Because Benj. Franklin was closed in 1990, the IRS insisted that the Benj. Franklin amended tax return for tax year 1990, though filed on November 19, 1993, be prepared in accordance with Notice 89-102.

9. As a result, under Notice 89-102 tax was calculated on the FFA, creating the bulk of the tax liability that was in dispute. The FDIC-Receiver disputed the appropriateness of Notice 89-102 on the grounds that Congress did not intend for federal income tax to be assessed or collected on FFA.

10. The FDIC considered Scenario #10 to be a favorable compromise because it provided the appropriate tax liability. Scenario #10 reduced the amount of FFA income that would be taxed in a given year, because it was matched in each year against deductible losses,

3

FDIC Exhibit 14

consistent with the final IRC § 597 regulations. In effect, Scenario #10 resulted in the non-taxability of FFA. In addition, Scenario #10 allowed the FDIC to take a deduction for post-insolvency interest expense (explained below), among other things, and waived tax penalties. As a result, the total tax liability for the thirteen year period from 1990 through 2002 was reduced to approximately $12 million, with an additional $38 million assessed as interest.

11. In 1990 the Resolution Trust Corporation ("RTC") paid about $2.6 billion in insured deposit liabilities when Benj. Franklin failed. The RTC then had a subrogated insured deposit claim against the Benj. Franklin receivership. By operation of law the FDIC in its corporate capacity ("FDIC-Corporate") succeeded to the rights of the RTC when the RTC ceased to exist on December 31, 1995. The subrogated insured deposit claim is entitled to interest, and the FDIC-Receiver paid almost $258 million in post-insolvency interest on the subrogated insured deposit claim.

12. None of the interest paid to FDIC-Corporate was deducted on the receivership's tax forms. While all or almost all of the subrogated interest was paid after the tax returns for earlier years were "final," the FDIC-Receiver, without assistance from counsel for the shareholders, convinced the IRS's Tax Division to permit the receivership to reopen the tax returns and receive full credit for the post-insolvency interest payments. *If this $258 million deduction had not been allowed, the entire receivership surplus would have been consumed.*

13. Before the FDIC-Receiver asked this Court to send a notice to the shareholders of Benj. Franklin FS&LA with respect to the settlement of the Tax Case, including the FDIC-Receiver's agreement to pay reasonable attorneys' fees, I advised the participating law

4

FDIC Exhibit 14

firms that the FDIC-Receiver would pay standard hourly rates for the work they performed related to the settlement.

14. During a telephone conversation in October 2006, Robert Suess told me that he knew the FDIC-Receiver was trying to do the right thing by trying to control fees in this case.

15. The FDIC-Receiver currently is reviewing an additional claim submitted by Winston & Strawn on behalf of Robert Suess for almost $217,000 that was not included in earlier submissions.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 22, 2007.

*Richard S. Gill*
Richard S. Gill
Counsel
3501 Fairfax Drive, Room VS-E7028
Arlington, VA 22226
703-562-2425 (office)

5

FDIC Exhibit 14