# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WINSTON & STRAWN LLP,** ) | |
| ) | |
| and ) | |
| ) | |
| **DON S. WILLNER & ASSOCIATES, P.C.** ) | |
| ) | |
| and ) | |
| ) | |
| **BLACKWELL SANDERS PEPER MARTIN** ) | |
| and ) | Civil Case No. 06-01120 (EGS) |
| **ERNEST M. FLEISCHER** ) | |
| ) | [Consolidated with No. 06-01227 |
| Consolidated Plaintiffs, ) | (EGS) and No. 06-01273 (EGS)] |
| ) | |
| v. ) | |
| ) | |
| **FEDERAL DEPOSIT INSURANCE** ) | |
| **CORPORATION, AS RECEIVER FOR** ) | |
| **THE BENJ. FRANKLIN FS&LA,** ) | |
| **PORTLAND, OREGON** ) | |
| ) | |
| Defendant. ) | |
| ) | |

## FDIC'S OPPOSITION AND CROSS MOTION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT, INCLUDING MEMORANDUM OF POINTS AND AUTHORITIES AND STATEMENT OF MATERIAL FACTS

Bruce C. Taylor
Federal Deposit Insurance Corporation
550 17th Street, NW
Room VS-E7118
Washington, DC 20429
(703) 562-2436 (Telephone)
(703) 562-2478 (Facsimile)

Counsel for Federal Deposit Insurance Corporation,
as Receiver for The Benj. Franklin FS&LA

Date:   February 22, 2007

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

ISSUE PRESENTED ................................................................................................................ 1

STANDARD OF REVIEW ....................................................................................................... 1

ARGUMENT ............................................................................................................................ 3

   I.    SUMMARY ................................................................................................................ 3

   II.   None Of The Plaintiff Law Firms Can Show They Were Responsible
        For A Reduction Of Taxes ........................................................................................ 6

        A. Winston & Strawn.............................................................................................. 6

        B. Willner & Associates ......................................................................................... 8

        C. Ernest Fleischer and Blackwell Sanders Peper Martin .............................. 14

   III.  The FDIC-Receiver Can Show That It Preserved Surplus Funds
        For Distribution To Shareholders ........................................................................ 17

   IV.  Ultimately, the Parties to the Tax Settlement Agreed to One of the
        Scenarios Presented by the IRS ........................................................................... 18

   V.   The "Will" of All the Shareholders Is Either Not Evident or
        In Fairness Does Not Support the Plaintiff Law Firms..................................... 19

   VI.  Viewed Objectively The Efforts of the Participants Resulted in the
        "Loss" of $50 Million ............................................................................................. 24

   VII. Receivership Principles Militate Against Awarding Additional Fees
        To The Plaintiff Law Firms .................................................................................. 24

CONCLUSION ........................................................................................................................ 25

STATEMENT OF MATERIAL FACTS ................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*First Hartford Corporate Pension Plan & Trust v. United States*,
   554 Fed. Cl. 298 (2002) ................................................................................ 22
*In re Activism Sec. Litig.*,
   723 F. Supp. 1373 (N.D.Cal. 1989) .............................................................. 24
*In re Gilbert*,
   276 US 294, 48 S.Ct. 309 (1928) ................................................................. 24
*In re Holocaust Victim Assets Litig.*,
   270 F.Supp.2d 313 (E.D.N.Y. 2002) ............................................................ 14
*Naito v. Naito*,
   35 P.3d 1068 (Ore. App. 2001) .................................................................... 22
*\*Swedish Hospital Corp. v. Shalala*,
   1 F.3d 1261 (D.C. Cir. 1993) ........................................................ 1, 2, 3, 25
*\*Veeder v. Public Service Holding Corp.*,
   51 A.2d 321 (Del Ch. 1947) ........................................................................ 24

**Statutes**

12 U.S.C. § 1441a(m)(1) ............................................................................... 17
12 U.S.C. §§ 1821(d)(2)(A), (d)(2)(B), and (d)(2)(E) ................................. 22
12 U.S.C. § 1821(d)(11) (1990) ................................................................... 21
12 U.S.C. § 1821(f) ....................................................................................... 17
12 U.S.C. § 1821(g)(1) .................................................................................. 17
12 U.S.C. § 1821(g)(2) .................................................................................. 17
12 U.S.C. § 1821(j) ....................................................................................... 10

**Rules**

Fed. R. Civ. P. 56 ............................................................................................ 1
LCvR 56.1 ....................................................................................................... 1

**Regulations**

12 C.F.R. § 360.3 (2006) ............................................................................... 21
12 C.F.R. § 360.3(a)(1) .................................................................................. 22
12 C.F.R. § 360.3(a)(10) ................................................................................ 22
12 C.F.R. § 360.3(a)(6) .................................................................................. 17
12 C.F.R. § 360.3(a)(7) .................................................................................. 17

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Fed. R. Civ. P. 56 and LCvR 56.1, the Federal Deposit Insurance Corporation, as Receiver for The Benj. Franklin FS&LA ("FDIC-Receiver"), files this opposition and cross motion for summary judgment to the motions for summary judgment filed in this consolidated action by the Plaintiff Law Firms on February 2, 2007.[1]  In support of its opposition and cross motion, the FDIC-Receiver submits that there is no genuine issue as to any material fact and that it is entitled to summary judgment as a matter of law, as set forth in the accompanying Memorandum of Points and Authorities and Statement of Material Facts.

## ISSUE PRESENTED

The FDIC-Receiver agreed to pay reasonable attorney's fees in connection with the settlement of tax litigation involving the Benj. Franklin receivership and estimated those fees at between $1 million to $2 million in a notice to shareholders of the failed thrift.  The FDIC-Receiver directly or indirectly paid over $1 million to the Plaintiff Law Firms and another firm that did not sue for additional fees.  Is it reasonable under the circumstances of this case to require the FDIC-Receiver to pay an additional $2.6 million to almost $4 million from the surplus to the Plaintiff Law Firms for their participation in settlement discussions?

## STANDARD OF REVIEW

The FDIC-Receiver agrees with Winston & Strawn that the standard of review is provided by Fed. R. Civ. P. 56(c).[2]  But the facts of this case do not warrant additional fees under *Swedish Hospital Corp. v. Shalala*[3] and similar cases cited by the Plaintiff Law Firms –

---

[1]  Collectively the plaintiffs are referred to as the "Plaintiff Law Firms."  Plaintiff Winston & Strawn LLP is referred to as "Winston & Strawn."  Plaintiff Don S. Willner & Associates P.C. is referred to as "Willner & Associates."  Plaintiff Ernest Fleischer is referred to as "Fleischer."  Plaintiff Blackwell Sanders Peper Martin is referred to as "Blackwell Sanders." And Fleischer and Blackwell Sanders are collectively referred to as the "Blackwell Plaintiffs."

[2]  *See* Winston & Strawn MSJ 5.  *See also* LCvR56.1.

[3]  *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993).

whether they are characterized as success multipliers, success fees, contingent fees, fee enhancements, or percentage fees.

*Swedish Hospital* states that the common fund doctrine "allows a party who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees."[4]  But the Plaintiff Law Firms did not create or increase the fund at issue in this case – the Benj. Franklin receivership surplus.  And in a very real sense, they did not preserve the fund, because the fund decreased from over $90 million to a little over $40 million.

The D.C. Circuit also noted that "special problems exist in assessing the reasonableness of fees in a class action suit since class members with low individual stakes in the outcome often do not file objections, and the defendant who contributed the fund will usually have no interest in how the fund is divided between the plaintiffs and class counsel."[5]  This is not a class action.  But it is worth mentioning that (i) the shareholders as a whole have not been given a real opportunity to object to the range of success fees being requested by the Plaintiff Law Firms, and (ii) at least one major shareholder has voiced his objection to additional fees for one of the plaintiff law firms.  Further, in this case the FDIC-Receiver – the defendant in the underlying Tax Case and the custodian of the receivership surplus – has an interest in ensuring that the receivership surplus is distributed in accordance with applicable law, with due regard to the interests of all shareholders, not just the few who are on record as supporting additional fees to one of the plaintiff firms.

---

[4] *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993).  (Emphasis added.)
[5] *Id.*.

Moreover, *Swedish Hospital* holds that the district court "was within its discretion in basing its fee calculation *only on that part of the fund for which counsel was responsible*."[6]  The Plaintiff Law Firms cannot show that they are responsible for the fund.

Finally, it is clear that regardless of the method used to determine fees, "When awarding attorneys' fees, federal courts have a duty to ensure that claims for attorneys' fees are reasonable."[7]  The FDIC-Receiver submits that reasonable fees have already been paid to the Plaintiff Law Firms under the circumstances presented.

## ARGUMENT

### I.     SUMMARY

As part of the settlement of the Tax Case, the FDIC-Receiver agreed to pay reasonable fees to law firms that participated in the settlement discussions.[8]  Several months before the terms of the settlement were submitted to the Court and the shareholders, the FDIC-Receiver indicated that it would not pay a success fee to any law firm.[9]  In the notice to shareholders, the FDIC-Receiver indicated that it would pay $3 million to the Benj. Franklin Shareholders Litigation Fund and agreed to pay reasonable fees – estimated at between $1 million to $2 million – to the attorneys who participated in the settlement discussions.[10]  Based on the FDIC-Receiver's earlier indication that the FDIC-Receiver would not approve success fees and the estimated fee range of $1 million to $2 million in the notice to shareholders, the Plaintiff Law Firms knew or should have known that the FDIC-Receiver intended to pay only standard hourly rates.

---

[6] *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1272 (D.C. Cir. 1993).  (Emphasis added).

[7] *Id*. at 1265.

[8] Notice to Shareholders 7, *United States v. FDIC*, No. 02-1427 (D.D.C.)  FDIC Ex.5.

[9] Email dated Sept. 28, 2005, to Tom Buchanan from Rosemary Stewart.  FDIC Ex. 4.

[10]  Notice to Shareholders 7 ¶ 3, *United States v. FDIC*, No. 02-1427 (D.D.C.).  FDIC Ex. 5.

The FDIC-Receiver paid Winston & Strawn $400,812.75.[11]  The Benj. Franklin

Shareholders Litigation Fund paid Winston & Strawn $189,456.76.[12]  Winston & Strawn

received a total of $590,270.

The FDIC-Receiver paid Willner & Associates $108,793.60.[13]  The Benj. Franklin

Shareholders Litigation Fund paid Willner & Associates $122,731.44.[14]  Willner & Associates

received a total of $231,525.

The FDIC –Receiver paid the Blackwell Plaintiffs $89,465.34.[15]  This represents the total

received by the Blackwell Plaintiffs.

In addition, the FDIC-Receiver paid two other consultants to Willner & Associates – the

Siegfried Group LLP and Jerry Young, CPA - $21,803.93 and $4,357.47, respectively.

Further, the FDIC-Receiver paid the Washington D.C. firm of Spriggs & Hollingsworth

$131,968.24.[16]  Spriggs & Hollingsworth did not file suit for additional fees.

The FDIC-Receiver paid the Benj. Franklin Shareholders Litigation Fund $3 million,

which reimbursed the fund for amounts previously paid by the fund to Winston & Strawn and

Willner & Associates related to the Tax Case, as noted below, as well as for work related to other

matters.

---

[11]  Winston & Strawn Compl. 13.

[12]  Winston & Strawn Comp. 13.

[13]  Notice of Partial Disallowance of Claim dated May 19, 2006, second ¶; Willner Compl. Ex. 2.

[14]  Willner Compl. 7 ¶ 24.

[15]  Blackwell Compl. 6 ¶ 20.

[16]  Notice of Partial Disallowance of Claim for Reasonable Attorney's Fees dated May 17, 2006.  FDIC Ex. 7.

Following is a summary of amounts received by the Plaintiff Law Firms and others directly related to the Tax Case:

| Firm or Consultant | Amount Received |
|---|---|
| Winston & Strawn | 590,270 |
| Willner & Associates | 231,525 |
| Fleischer/Blackwell | 89,465 |
| Siegfried Group | 21,804 |
| Jerry Young | 4,357 |
| Spriggs & Hollingsworth | 131,968 |
| Total | 1,069,389 |

The FDIC-Receiver also currently is considering an additional claim of almost $217,000 from Winston & Strawn on behalf of Robert Suess that apparently slipped through the cracks during the reimbursement process related to the Benj. Franklin Shareholders Litigation Fund.[17]

The Plaintiff Law Firms do not have valid claims for additional compensation under the circumstances presented. The Tax case was not a class action. Only the FDIC-Receiver and the United States/IRS were parties to the Tax Case. The Plaintiff Law Firms did not represent the IRS or the FDIC-Receiver in the Tax Case. The FDIC-Receiver invited the Plaintiff Law Firms to participate in settlement discussions. Winston & Strawn and Willner & Associates had been representing shareholders of the failed Benj. Franklin FS & LA since 1990 and first began reviewing tax issues in 1998. Given their longstanding involvement with the shareholders and examination of tax issues several years before the United States filed the Tax Case, it cannot be fairly said that the firms undertook "new and risky" representation when the FDIC-Receiver invited the firms to participate in discussions with the IRS. On the other hand, Fleischer was retained as a consultant by Don Willner.

---

[17] Gill Dec. 5 ¶ 15. FDIC Ex. 14.

Perhaps most importantly, the Plaintiff Law Firms cannot show that they were responsible for the ultimate outcome of the tax settlement discussions.  The two entities responsible for settling the IRS tax claim against the receivership were the FDIC-Receiver and the IRS, the only parties to the Tax Case.  And ultimately, the IRS agreed to settle the Tax Case for $50 million, which nearly matched the outcome of one of its own scenarios.

In connection with the settlement of the Tax Case, the FDIC-Receiver paid a total of nearly $4 million to the Benj. Franklin Shareholders Litigation Fund and various attorneys and consultants.

The Plaintiff Law Firms received fair and reasonable compensation for the services they rendered related to the settlement of the Tax Case.  They are not entitled to further payment for such services.  Rather, the funds that Plaintiff Law Firms seek as additional fees should be distributed to the shareholders of The Benj. Franklin FS&LA.

## II.    None Of The Plaintiff Law Firms Can Show They Were Responsible For A Reduction Of Taxes

Under *Swedish Hospital* the Plaintiff Law Firms must show that they were responsible for the fund from which they seek additional compensation.  But none of the firms can show objectively do so.  When asked how their contributions resulted in a reduction in taxes – and thus preservation of a portion of the existing receivership surplus – the representatives for the firms testified that they could not point to any such specific contribution.

### A.    Winston & Strawn

Of all the Plaintiff Law Firms, Winston & Strawn probably has the most reasonable case, but even it does not rise to the level justifying additional fees.  Like the other law firms, Winston & Strawn cannot point to any specific contribution it made that resulted in the reduction of taxes.

Tom Buchanan testified on behalf of Winston & Strawn:

**Q** – What do you consider the firm's major contribution to the settlement of the tax case?

**A** – . . .[W]e brought the substantive tax analysis, which I think was key to the resolution of the case.

      I think in all – as I recall, almost every meeting where there was a substantive tax issue discussed that [Winston & Strawn attorney] Mitch Moetel took the lead and handled it . . . . [18]

* * *

      Everybody contributed, but if there was something that we did in particular, it's because we're a big firm and we had that asset. It was, you know, the contributions of Mitch Moetel . . . . [19]

* * *

**A** – I think [IRS attorney] Hank Darmstadter in – at least implicitly if not explicitly, acknowledged to me and to everybody, and in those meetings, that he recognized Mitch's argument [was] very persuasive and he was an excellent lawyer.  [But] *No one said as a result of Mitch Moetel, we're settling for this amount.* [20]

In addition, when asked to confirm whether the IRS told him or any other

party that the IRS settled for any particular reason or based on any particular

contribution by any of the parties, Mr. Buchanan responded:

**A** – No.  I mean – in terms of the answer to the last part, I don't remember anybody from the Department of Justice or the IRS saying that it was any particular lawyer's work that caused them to settle. [21]

Further, much of the work performed by Winston & Strawn occurred well before the Tax

Case was filed. [22]  The fee agreement entered into between Winston & Strawn and Robert Suess

---

[18]  Buchanan Dep. 13:21-22, 14:14-20 (Jan. 17, 2007).  FDIC Ex. 10.

[19]  Buchanan Dep. 16:7-11 (Jan. 17, 2007).  FDIC Ex. 10.

[20]  Buchanan Dep. 17:19-22, 118:1-3 (Jan. 17, 2007).  FDIC Ex. 10.  (Emphasis added).

[21]  Buchanan Dep. 28:21-22, 29:1-3 (Jan. 17, 2007).  FDIC Ex. 10.

[22]  Winston & Strawn Compl. 5-6 ¶¶ 16-18; Buchanan Dep. 8:7:22, 9:1-6 (Jan. 17, 2007), FDIC Ex. 10; Suess Dec. second ¶.

was executed in May 2003, after much of the work had been performed.  The FDIC-Receiver is not a party to the agreement.

Winston & Strawn already represented the shareholders' interests when the Tax Case was filed and had already performed a substantial amount of work on the tax issues.[23]  The firm's work related to the Tax Case essentially was a continuation of its longstanding representation in the Goodwill Case going back to 1990.[24]  It is unclear how the firm took on additional risk by continuing the representation it had undertaken years before.

### B.    Willner & Associates

Like Winston & Strawn, Willner & Associates had been representing the shareholders' interests since 1990.[25]  It is unclear what additional risk the firm took on by continuing that representation during settlement discussions in the Tax Case.

In addition, Don Willner, the principal in Willner & Associates is not a tax lawyer and felt the need to hire a tax consultant.[26]

At his deposition, Mr. Willner described his major contributions in the following exchange:

> **Q** – Okay.  Now, after you were invited to participate, what – what do you consider the major contribution to the settlement process?
>
> * * *
>
> **A** – Well, I think the first was getting the TRO [in Oregon district court] and an agreement from the FDIC that they would give me advance notice of any attempt to pay the tax . . . . And basically, I received sufficient reassurance that there would still be money left

---

[23]  Winston & Strawn Compl. 5-6 ¶¶ 16-18; Buchanan Dep. 8:7:22, 9:1-6 (Jan. 17, 2007), FDIC Ex. 10.

[24]  *See* Winston & Strawn Facts 4 ¶ 15; Buchanan Dep. 41:19-22 (Jan. 17, 2007), FDIC Ex. 10.

[25]  Willner Compl. 3 ¶¶ 9-11.

[26]  Willner Dep. 21:13-19 (Jan. 18, 2007).  FDIC Ex. 11.

in the receivership. . . . So I considered my first contribution was on saving the fund.[27]

* * *

**Q** – I'd like to know what you consider your major contribution to the process.

**A** – Well, I think I had several.  I don't think I had just one.

**Q** – Well, what do you consider to be – if you can write them [sic] [read "rate them"], if not, what do consider the top three major contributions?

**A** – All right.  I think the first contribution I've discussed.
        The second contribution was filing the motion to intervene and transfer to Oregon, which was the trigger for getting us into settlement discussions.
        And the third was being lead counsel, organizing a team, coordinating the work of the group over a three-year period, handling all the correspondence with . . .[IRS and FDIC attorneys] . . .coordinating our group's effort, initiating all the telephone calls . . . .Chairing our side of the negotiations, calling on others to speak.
        I thought my third major contribution was being lead counsel for the shareholders during this entire period of time.[28]

Mr. Willner's first self-described major contribution occurred before the United States filed the Tax Case and before settlement discussions began.  Mr. Willner's assertion that he saved the fund is overly dramatic and overstated.  He asserts that he filed the injunctive action in Oregon based on a letter from FDIC counsel.  Using Mr. Willner's "but for" analysis, the FDIC should be given credit for "saving the fund," because absent the letter from FDIC counsel Mr. Willner would not have filed the injunctive action.  Moreover, there is nothing in the record that proves that the FDIC would have paid the fund to the IRS "but for" the injunctive action.  In fact, the FDIC had a window of opportunity to pay the surplus to the IRS in the period from the date

---

[27] Willner Dep. 14:6-9, 12-15, 15:14-15 (Jan. 18, 2007).  FDIC Ex. 11.
[28] Willner Dep. 15:20 to 17:8 (Jan. 18, 2007).  FDIC Ex. 11.

of FDIC counsel's letter of June 6, 2002, until the district court issued the TRO on June 17, 2002. But it did not do so.

Further, the letter from FDIC counsel stated "that a decision *may be made soon on how to handle* the IRS's claim . . . ."[29]  This shows nothing more than the unremarkable fact that FDIC personnel were discussing what to do, *not that a decision had been made to pay* the IRS.

In addition, the FDIC moved to dissolve the TRO based on 12 U.S.C. § 1821(j).  At a hearing held on July 2, 2002, the Court dissolved the TRO and denied the Shareholder Plaintiffs' request for a hearing on the preliminary injunction.[30]  Mr. Willner asked the district court to re-issue the TRO, but the district court denied the request for lack of jurisdiction under 12 U.S.C. § 1821(j).[31]  The district court's order of July 26, 2002, belies Mr. Willner's contention that the injunctive action "saved the fund."  The TRO was dissolved and the district court did not issue a preliminary injunction.  But the FDIC did not pay the receivership surplus to the IRS.

In any event, the injunctive action certainly did not prevent the United States from filing the Tax Case on behalf of the IRS.  And the injunctive action did not reduce or eliminate the federal tax claim against the Benj. Franklin receivership.

The motion to intervene filed by Mr. Willner in the Tax Case was stayed by agreement of the parties after the FDIC-Receiver invited Willner & Associates and others to participate in the settlement discussions with the IRS.  The IRS intended to oppose the motion to intervene, if necessary.[32]  The FDIC-Receiver, on its own initiative, invited the shareholders' attorneys to

---

[29]  Willner Compl. Ex. 1.  (Emphasis added).

[30]  *See* Order, *Suess v. FDIC*, No. 02-807 (D.Ore. July 26, 2002).  FDIC Ex. 2.

[31]  Order, *Suess v. FDIC*, No. 02-807 (D.Ore. July 26, 2002).  FDIC Ex. 2.

[32]  Joint Unopposed Motion by Plaintiff United States and Defendant FDIC for a Stay of all Proceedings in Action Pending Resolution of Income Tax Examination by the Internal Revenue Service and Settlement Negotiations by the Parties 8, *United States v. FDIC*, No. 02-1427 (D.D.C. April 22, 2003) ("Joint Mot., *United States v. FDIC*").  FDIC Ex. 3.

participate in the settlement discussions.[33]  The parties agreed to stay the Tax Case during

settlement discussions.[34]  The motion to intervene did not reduce or eliminate the federal tax

claim against the Benj. Franklin receivership.

Finally, Mr. Willner's third contribution consisted of organizational duties which simply

have no bearing on the reduction of taxes against the Benj. Franklin receivership.

In fact, Mr. Willner could not point to any contribution that resulted in a reduction of

taxes.

> **Q** – Do you know how any of your contributions resulted in a
> reduction of tax to the receivership?
>
> **A** – Not in terms of my individual contributions.  I – we all worked
> together as a team and I think it was clear that our efforts as a team
> resulted in a settlement.[35]
>
> * * *
>
> **Q**. – Do you know why the Department of Justice and the IRS
> ultimately decided to accept $50 million in settlement of the billion
> dollar tax claim?
>
> **A** – Are you asking my knowledge or my belief?
>
> **Q** – Well, I'll ask you your knowledge first.
>
> **A** – No.[36]
>
> **Q** – What about your belief?
>
> **A** – My belief is that we had developed a very strong case,
> particularly a strong case that there should be no federal financial
> assistance tax, which, incidentally, was not a position the FDIC
> agreed with. . . . [Mr. Darmstadter] felt we had made a persuasive
> case.  He – *he did not agree with our interpretation*.[37]

---

[33]  Gill Dec. 1-2 ¶ 2.  FDIC Ex.14.

[34]  Joint Mot., *United States v. FDIC* 8.  FDIC Ex. 3.

[35]  Willner Dep. 17:17-22 (Jan. 18, 2007).  FDIC Ex. 11.

[36]  Willner Dep. 18:8:16 (Jan. 18, 2007).  FDIC Ex 11.

[37]  Willner Dep. 18:17-22, 19:7-9  (Jan. 18, 2007).  FDIC Ex. 11.  (Emphasis added).

* * *

> **Q** – Did anyone on behalf of the Department of Justice or the IRS
> ever indicate to you that they accepted that any of the theories or
> positions presented by the plaintiff attorneys and the FDIC would
> result in no taxes being due to the receivership?
>
> **A** – They *never* agreed with our arguments, no.[38]

Mr. Buchanan testified that Mr. Willner's claim for over $500 per hour was unreasonable.

> **Q** – Do you think, given Mr. Willner's involvement in this case
> and the geographic area where he normally practices, do you think
> an hourly rate of over $500 an hour is reasonable for him?
>
> **A** – No.  I - - I don't think 525 is – is a reasonable rate, but I do
> think . . .if Don were to say, okay, I want $250 an hour but I want a
> multiple so it comes out to 500, I'd say that's reasonable.[39]

Mr. Buchanan's statement is gracious given Mr. Willner's inability to identify how

his contributions resulted in a reduction of taxes.  C. Robert Suess, Mr. Buchanan's client and a

major shareholder, is not so willing to concede the point.[40]

Willner & Associates also relies on several declarations that are presented as

expert opinions in support of its request for a success fee.  But they fail several prerequisites for

admissible expert opinion.  Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge *will assist
> the trier of fact to understand evidence or determine a fact in issue*,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion
> or otherwise, it (1) the *testimony is based upon sufficient facts or
> data*, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and
> methods reliably *to the facts of the case*.[41]

---

[38] Willner Dep. 19:17-22, 20:1-2 (Jan. 18, 2007).  FDIC Ex. 11.  (Emphasis added).
[39] Buchanan Dep. 45:7-13, 19-22 (Jan. 17, 2007).  FDIC Ex. 10.
[40] *See* pp. 22-23 n. 81 and n. 82, herein.
[41] Fed. R. Evid. 702.  (Emphasis added).

The declarations of Laird Kirkpatrick, Judge James Burns, Judge Berkeley Lent, Dr. Dale Wright, do not begin to satisfy the requirements of Rule 702.  The affiants do not have any knowledge of the underlying facts or circumstances of the Tax Case, the settlement discussions, or Mr. Willner's contributions to the settlement discussions.  They are not based on any facts, much less sufficient facts.  They do not apply any principles or methods to the facts of the Tax Case.  The declarations cannot possibly assist the Court to understand the evidence or determine a fact at issue.  The declarations simply recite Mr. Willner's professional history and his reputation in the legal community in Oregon and conclude – without support – that Mr. Willner is entitled to additional fees.

The declaration of David Markowitz opines that $400 per hour is "the prevailing average rate for top litigators who handle complex civil litigation" in Portland, Oregon, and that "if Mr. Willner's rate is to be set based upon Portland's standards, his rate should be set at $400 per hour."[42]  Mr. Markowitz, however, does not profess to be familiar with the work that Mr. Willner performed in the Tax Case.  Mr. Markowitz states that he assisted "discreet matters" in "this case," but he clearly means the Goodwill Case filed in 1990 not the Tax Case, because at the beginning of the same paragraph he says that he referred the "class representative in this case to Mr. Willner because of my belief that he was the most qualified plaintiff's class action litigator in the city of Portland who would be willing to undertake the Benj. Franklin Savings & Loan litigation."[43]  Mr. Markowitz does not have sufficient familiarity with Mr. Willner's work related to the Tax Case to conclude that Mr. Willner is entitled to $400 per hour Portland rate for "tip litigators who handle complex civil litigation."

---

[42]  Markowitz Dec. 2.  Willner Ex. 10.
[43]  Markowitz Dec. 2.  Willner Ex. 10.

In addition, Winston & Strawn attorney Tom Buchanan and shareholder Robert Suess –
both of whom are more intimately familiar with Mr. Willner's work – do not believe that Mr.
Willner is entitled to a substantially higher standard hourly rate, if at all.

Moreover, in 1990, when Mr. Willner undertook his representation in the Goodwill Case,
he advised Mr. Suess that "a fair hourly rate would be more than double" the rate of "62.50 per
hour for my time."[44]  Assuming an hourly rate of $125 for Mr. Willner in 1990 and factoring in a
5% increase for each year from 1991 to 2004, Mr. Willner's hourly rate would have been
$247.53, slightly less than the $250 per hour that the FDIC-Receiver paid Mr. Willner.

In a recent high-profile case in the Eastern District of New York, the court's recitation of
the qualifications of a witness to provide evidence helpful to the court on the issue of attorney's
fees is illustrative of how lacking the affidavits submitted by Mr. Willner are:

> Professor Neuborne's extraordinary experience, *his familiarity with*
> the attorneys in this case, the *nature of the work performed*, and the
> *insights he possesses from his integral role in the litigation* from
> its inception make his opinion as to the *importance of each*
> *attorney's contribution* particularly helpful.[45]

The declarations submitted by Mr. Willner are either testimonials or conclusory
statements that are not informed by the facts and circumstances of the underlying Tax Case.
They do not qualify as admissible expert opinions.

### C.    Ernest Fleischer and Blackwell Sanders Peper Martin

Don Willner retained Fleischer as a consultant.[46]  Mr. Buchanan, whose firm is seeking a
multiplier of twice its standard hourly rates in this action, testified that he could only support a
doubling of the $89,000 paid by the FDIC-Receiver to Mr. Fleischer.  Rosemary Stewart, an

---

[44] Letter dated August 22, 1990, to Robert Suess from Don Willner 2 ¶ 2.a.  FDIC Ex. 1.

[45] *In re Holocaust Victim Assets Litig.*, 270 F.Supp.2d 313, 319 (E.D.N.Y. 2002).  (Emphasis added).

[46] Willner Dep. 21:13-19 (Jan. 18, 2007).  FDIC Ex. 11.

attorney for Spriggs & Hollingsworth – the only firm that participated in the settlement

discussions that did not seek a fee enhancement – testified that the FDIC-Receiver had paid Mr.

Fleischer everything he was entitled to.

> Mr. Buchanan, testifying the day before the Blackwell Plaintiffs indicated that

they might revise their original claim for $2 million, indicated that the $2 million claim was

"excessive" for "$89,000 worth of work."

> **Q** - . . . Right.  In relation to your firm's contribution and the
> contribution of Mr. Fleischer, for instance, do you think Mr.
> Fleischer's claim for relief for 5 percent of the remaining surplus,
> which comes out to about $2 million, is fair and reasonable?
>
> **A** - . . . [T]o the extent he's requesting $2 million on $89,000 worth
> of work, no, I think that's – that is excessive.  But I do think he
> deserves more than 89,000.  I think twice would be – I would be
> supportive if he got twice of that.[47]

> Ms. Stewart, on the other hand, testified that Mr. Fleischer was not entitled to any

further compensation.

> **Q** – [W]hat do you think about Mr. Fleischer's request for relief in
> his complaint for 5 percent of the remaining surplus of $40
> million.[48]

> * * *

> **A** – I do not agree with Mr. Fleischer's claim.

> **Q** – Why?

> **A** – Mr. Fleischer was a consultant to Mr. Willner from the
> beginning of his work on this matter.  Mr. Willner submitted Mr.
> Fleischer's fees and expenses as part of his claim, and they were
> approved in full.  As a result of that, *I do not accept that Mr.*
> *Fleischer did not get everything that he was entitled to get, and I*
> *would not support any enhancement.  I would certainly not support*

---

[47]  Buchanan Dep. 42:16-21, 43:9-14 (Jan. 17, 2007).  FDIC Ex. 10.

[48]  Stewart Dep. 24:16-19 (Jan. 18, 2007).  FDIC Ex. 13.

*any contingency share of any savings*, which I guess is how this is being characterized for the contingency portion of the request.[49]

Counsel for the Blackwell Plaintiffs then pressed Ms. Stewart further on the issue of contingency fees.

> **Q** – And if the matter had proceeded and no refund or, I'm sorry, no amount had been saved for the shareholders, then there would have been no way for Mr. Fleischer to receive any payment, to your knowledge?
>
> **A** – I don't believe that was ever clarified. Mr. Willner told me that he had told Mr. Fleischer that he had no money at the beginning of our tax settlement discussions but that if he ever was – got money and was able to pay, Mr. Fleischer would be, you know, treated the way the rest of the lawyers were treated. I never understood that to mean that it would come from tax savings.
> *You know, this entire litigation, until the date of the tax settlement, was always looking forward to a successful result in the U.S. Court of Federal Claims. And when and if that successful result occurs, it has always been understood that attorneys will ask for fees. So it was not clear to me that there was ever an understanding that fees were to be based on the tax savings.* That opportunity arose, thankfully, and we were able to file fee claims, but I don't think it arose at the beginning.[50]

And as with the other firms, Fleischer and the Blackwell Firm cannot identify a specific contribution that resulted in the reduction of taxes. The following exchange occurred at Fleischer's deposition:

> **Q** – And do you – do you know how any contributions you made to the settlement process may have actually resulted in a reduction of taxes in [any] amount?
>
> **A** – I do not.[51]

In this case it is not enough for the Plaintiff Law Firms to simply posit that they are entitled to additional fees because they were part of a team and the result speaks for itself.

---

[49] Stewart Dep. 25:20-22, 26:1-12 (Jan. 18, 2007). FDIC Ex. 13. (Emphasis added).

[50] Stewart Dep. 27:2-22, 28:1-6 (Jan. 18, 2007). FDIC Ex. 13. (Emphasis added).

[51] Fleischer Dep. 13:14-18 (Jan. 18, 2007). FDIC Ex. 12.

**III.     The FDIC-Receiver Can Show That It Preserved Surplus Funds For Distribution To Shareholders**

On the other hand, the FDIC-Receiver can identify one important contribution it made without the assistance from the private law firms that resulted in the preservation of surplus funds for distribution to the shareholders.

The Resolution Trust Corporation ("RTC") covered about $2.6 billion in insured deposit liabilities when Benj. Franklin failed.[52]  The RTC had a claim against the receivership for the amount of the insured deposits.[53]  When the RTC ceased to exist on December 31, 1995, the FDIC in its corporate capacity ("FDIC-Corporate") succeeded to the RTC's subrogated insured deposit claim against the receivership.[54]  The subrogated insured deposit claim is entitled to interest.[55]  The FDIC-Receiver paid almost $258 million in post-insolvency interest to the FDIC-Corporate on the subrogated insured deposit claim.[56]

None of the interest paid to FDIC-Corporate was deducted on the receivership's tax forms.  While all or almost all of the subrogated interest was paid after the tax returns for earlier years were "final," the FDIC-Receiver, without assistance from counsel for the shareholders, convinced the IRS's Tax Division to permit the receivership to reopen the tax returns and receive full credit for the post-insolvency interest payments.  *If this $258 million deduction had not been allowed, the entire receivership surplus would have been consumed*.[57]

Assuming any one participant can lay claim to playing a crucial role, it is the FDIC-Receiver's contribution that ensured that there would be a receivership surplus available for

---

[52]  Gill Dec. 4 ¶ 11.  FDIC Ex. 14.

[53]  12 U.S.C. § 1821(f); 12 U.S.C. § 1821(g)(1); 12 C.F.R. § 360.3(a)(6).

[54]  12 U.S.C. § 1441a(m)(1).

[55]  12 U.S.C. § 1821(g)(2); 12 C.F.R. § 360.3(a)(7).

[56]  Gill Dec. 4 ¶ 11.  FDIC Ex. 14.

[57]  Gill Dec. 4 ¶12.  FDIC Ex. 14.

distribution to the shareholders. Yet, the FDIC-Receiver is not asking for additional compensation in addition to its ordinary operational expenses. It the FDIC-Receiver applied the theories advanced by the Plaintiff Law Firms, however, the FDIC-Receiver could ask for an additional $574,000 to $1.5 million. But such a request would be no more reasonable than those made by the Plaintiff Law Firms under the circumstances.

In any event, the truth is that the IRS may deserve more credit than the Plaintiff Law Firms or the FDIC-Receiver for the outcome of settlement discussions in the Tax Case.

## IV.    Ultimately, the Parties to the Tax Settlement Agreed to One of the Scenarios Presented by the IRS

During negotiations, the Plaintiff Law Firms argued that the receivership owed significantly less taxes than seemed reasonably supportable, and this approach was a non-starter for the IRS.[58] Mr. Willner testified that the IRS *never accepted* the arguments presented by the Plaintiff Law Firms.[59] The FDIC-Receiver, on the other hand, took the position that some tax was owed and tried to get the IRS to agree to a minimum tax scenario, while attempting to ensure that there would be surplus funds for distribution to the shareholders, as noted above.[60] Ultimately, however, none of the participants on the FDIC-Receiver side of the negotiations can take too much credit for the result, because the *IRS essentially agreed to settle the Tax Case based on one of its own scenarios*.

The IRS began an extensive review of Benj. Franklin's tax liabilities as a result of a request by the FDIC-Receiver for a significant reduction in the receivership's tax liability.[61] The

---

[58] Gill Dec.2 ¶ 5. FDIC Ex. 14.

[59] Willner Dep. 19:17-22, 20:1-2 (Jan. 18, 2007). FDIC Ex. 11. (Emphasis added); *see* p. 12 n. 38, herein.

[60] Gill Dec. 2 ¶ 5. FDIC Ex. 14.

[61] Joint Mot., *United States v. FDIC* 5. FDIC Ex. 3.

IRS ultimately prepared 11 scenarios in connection with the settlement negotiations.[62]  None of the scenarios comported with the tax positions advocated by the Plaintiff Law Firms that were rejected by the IRS.[63]  The IRS scenarios resulted in a range of taxes – without interest or penalties – from $11 million to $97 million.[64]

The IRS eventually agreed to accept $50 million, an amount conforming to its Scenario #10.[65]  The Plaintiff Law Firms can hardly take credit for a result that was presented by the IRS itself.

**V.     The "Will" of All the Shareholders Is Either Not Evident or In Fairness
        Does Not Support the Plaintiff Law Firms**

The Plaintiff Law Firms in one form or another invoke the "will" of the shareholders to support their claims for additional fees.  The record reflects only that a handful of identifiable shareholders support the Plaintiff Law Firms' request for additional fees or is devoid of evidence of such support.

Winston & Strawn presents the declarations of Robert Suess, Gary Hindes, and Abe Siemens.  Winston & Strawn represents Mr. Suess.[66]  Winston & Strawn represents Mr. Hindes's interests in a multi-million case pending in the U.S. Court of Federal Claims.  It is unclear whether Mr. Siemens is affiliated with Winston & Strawn.  These are only three individuals, even though they own a substantial number of shares.

---

[62]  Gill Dec. 2 ¶ 3.  FDIC Ex. 14.

[63]  Gill Dec. 2 ¶ 5.  FDIC Ex. 14.  Willner Dep. 19:17-22, 20:1-2 (Jan. 18, 2007).  FDIC Ex. 11

[64]  Gill Dec. 2 ¶ 3.  FDIC Ex. 14.

[65]  Gill Dec. 2 ¶ 6.  FDIC Ex. 14.

[66]  Buchanan Dep. 7:21-11, 8:1 (Jan. 17, 2007).  FDIC Ex. 10.

Willner & Associates does not offer a single shareholder declaration.  Instead it relies on the lack of significant objection to the tax settlement.[67]  As noted herein, however, Mr. Suess opposes additional fees for Willner & Associates.[68]

The Blackwell Plaintiffs asserted in their complaint that "[o]ver one-third of Benj. Franklin's shareholders have already approved a success fee."[69]  At depositions, however, Mr. Fleischer testified that he did not have any personal knowledge that any shareholders supported the Blackwell Plaintiffs' request for a percentage fee.

> **Q** – . . . At paragraph 37, Roman numeral IV [sic] on page 9 [of your Complaint], the provision or the statement says over one-third of Benj. Franklin's shareholders have already approved a success fee.  Do you see that?
>
> **A** – I do.
>
> **Q** – Can you identify the shareholders who you refer to in that subparagraph?
>
> **A** – My recollection is that the Winston & Strawn firm in its complaint set forth a statement that shareholders representing a percent of the total number of shares had approved a success fee with respect to Winston & Strawn.  That is the basis for that statement.
>
> **Q** – *Am I correct in stating that you can't identify any shareholders who have specifically approved your request for a success fee?*
>
> **A** – *I cannot.*[70]

In their complaint the Blackwell Plaintiffs' ask for "at least 5%" of the remaining receivership surplus of $42 million – or over $2 million.[71]  That claim alone would equal the maximum estimated fees set forth by the FDIC-Receiver in the notice to shareholders.  The

---

[67]  Willner MSJ 16 ¶ b.

[68]  Pp. 22-23 n. 82 and n. 83, herein.

[69]  Blackwell Plaintiffs' Compl. 9 ¶ 37(iv).

[70]  Fleischer Dep. 14:6-22, 15:1-2 (Jan. 18, 2007).  FDIC Ex. 12.  (Emphasis added).

[71]  Blackwell Plaintiffs' Compl. 10.  *See* p. 4 ¶ 13.

Blackwell Plaintiffs have since revised their request and now seek 3% of the remaining surplus – or $1.5 million.[72]  They also have softened the claim made in their complaint that one-third of the shareholders "have *already approved* a success fee"[73] to "It is Plaintiffs' *understanding* that over one-third of the shareholders have approved the award of a success fee."[74]  At the same time, however, they admit that "*It is unknown at this time whether any of the shareholders have substantial objections to a percentage fee award . . . .*"[75]

It is clear that the "will" of the entire shareholder class is not being asserted by the Plaintiff Law Firms.  At most it appears that a few major shareholders have expressed support for their own attorneys.  Although commendable, this hardly proves the support of the shareholder class.

Gary Hindes stated in his declaration in support of Winston & Strawn's claim:  "FDIC's role in this matter is to maximize the benefit and minimize the losses to the shareholders . . . ."[76]  This misstates the FDIC-Receiver's statutory responsibilities.  The FDIC-Receiver does not owe a duty to the shareholders aside from that owed to all parties entitled to share in the distribution of available receivership assets.[77]  FDIC as receiver has the statutory authority to take over the assets of a failed institution, collect all obligations due, perform all functions of the institution, preserve and conserve the assets and property of the institution, and ultimately liquidate the

---

[72]  Blackwell Plaintiffs' MSJ 15.

[73]  Blackwell Plaintiffs' Compl. 9 ¶ 37(iv).  (Emphasis added).

[74]  Blackwell Plaintiffs' MSJ 21.  (Emphasis added).

[75]  Blackwell Plaintiffs' MSJ 21.  (Emphasis added).

[76]  Winston & Strawn MSJ 15.

[77]  *See* 12 U.S.C. § 1821(d)(11) (1990); 12 C.F.R. § 360.3 (2006) (applicable to receiverships established before August 10, 1993).

assets of the institution.[78]  The shareholders are last in line for payment under the receivership distribution system.[79]

Because, however, the Benj. Franklin receivership resulted in a surplus, as a practical matter the FDIC-Receiver's stewardship ultimately redounds to the benefit of the shareholders. To be sure, in this case the FDIC-Receiver in effect is protecting the interests of *all shareholders* by resisting the efforts of the Plaintiff Law Firms – with the support of a few shareholders who happen to own a large percentage of outstanding shares – from obtaining additional funds from the receivership surplus that the FDIC-Receiver believes should be distributed to all the shareholders *pro rata* in accordance with 12 C.F.R. § 360.3(a)(1).  Even Mr. Suess recognizes that the FDIC-Receiver is "trying to do the right thing by trying to control fees in this case."[80] And in fact, the majority shareholders may have a duty to the minority shareholders to ensure that the Plaintiff Law Firms do not recover additional fees and further reduce the surplus available for distribution to all the shareholders.[81]

And even the few shareholders on record as supporting additional fees are not universal in that support.  For instance, Mr. Suess, has written the FDIC-Receiver at least twice regarding the fees of Willner & Associates.  In one letter, Mr. Suess states that "FDIC allowance [for Willner] was most generous @ $250 based on Portland rates."[82]  In the second letter, Mr. Suess states:  "In closing, allow me to reemphasize, I personally, as well as Benj. owners representing

---

[78]  12 U.S.C. §§ 1821(d)(2)(A), (d)(2)(B), and (d)(2)(E).

[79]  12 C.F.R. § 360.3(a)(10).

[80]  Gill Dec. 5 ¶14.  FDIC Ex. 14.

[81]  *First Hartford Corporate Pension Plan & Trust v. United States*, 554 Fed. Cl. 298, 304 (2002) (a derivative plaintiff has a fiduciary duty to both the corporation and similarly situated shareholders) citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549, 64 S.Ct. 1221 (1949); *Naito v. Naito*, 35 P.3d 1068, 1079 (Ore. App. 2001) (majority shareholders have a fiduciary duty to minority shareholders).

[82]  Undated handwritten letter to FDIC/Richard Gill from C. Robert Suess.  FDIC Ex.8.

over four million shares oppose Mr. Willner's request for additional hourly fees.  We all feel
FDIC was very generous in paying him $250.00 per hour."[83]

Any shareholder who feels strongly that their attorneys are entitled to additional fees may
show their support by paying their attorneys from their share of the receivership surplus or
otherwise as their financial situation permits.  But for purposes of the receivership, the Plaintiff
Law Firms have been paid reasonable fees for their participation in the tax settlement.  And the
remaining receivership surplus should not be reduced further for additional attorney's fees.

Finally, although the shareholders' consent to the tax settlement was not legally required,
the FDIC-Receiver sought the input of *all the shareholders* given the substantial overall stakes
involved.  The notice to shareholders elicited the votes of approximately 446 shareholders
representing about 3,000,000 shares of Benj. Franklin stock, 99.3% of which agreed with the
proposed settlement.[84]  The statements submitted by the Plaintiff Law Firms in support of
additional fees – even if they represent more than 50% of the shares of Benj. Franklin – hardly
carry the same weight.

In addition, included in the notice to shareholders was the FDIC-Receiver's agreement to
pay reasonable attorney's fees to the participant law firms – estimated at *between $1 million and
$2 million*.  It can hardly be said now that the entire class of shareholders – as opposed to a few
shareholders with direct ties to the Plaintiff Law Firms – showed a willingness to pay additional
fees totaling $2.6 million to almost $4 million.  The Court should deny the Plaintiff Law Firms'
requests for additional fees.

---

[83]  Letter dated January 4, 2007, to Richard Gill from C. Robert Suess.  FDIC Ex. 9.

[84]  Order at 2, *United States v. FDIC*, No. 02-1427 (D.D.C. May 2, 2006), FDIC Ex. 6; Winston & Strawn MSJ Ex. 13.

VI.    **Viewed Objectively The Efforts of the Participants Resulted  in the "Loss" of $50 Million**

When settlement negotiations began, the receivership surplus totaled about $92 million. When negotiations ended, the receivership surplus totaled about $42 million.  Although the tax settlement preserved a substantial amount for distribution to the shareholders, measured by the starting and ending amounts, the participants' best efforts actually resulted in a loss of $50 million to the receivership surplus.  All in all, additional fees seem inappropriate under the circumstances of this case.[85]

VII.    **Receivership Principles Militate Against Awarding Additional Fees To The Plaintiff Law Firms**

Finally, the involvement of a receivership in this case should not be ignored in deciding whether it is reasonable to award additional fees to the Plaintiff Law Firms.

The Supreme Court has cautioned courts to refrain from being overly generous in awarding fees in circumstances involving protected funds.

> [T]he judges of the courts, in fixing allowances for services to court officers, should be most careful, and that vicarious generosity in such a matter could receive no countenance.[86]

In addition, rendering voluntary services that duplicate the efforts of duly authorized receivers are seldom compensable from receivership funds, but if the supplemental efforts of shareholders' representative results in the augmentation or preservation of a common fund "reasonable compensation may be allowed."[87]  In this case, of course, the FDIC-Receiver invited several law firms to participate in the settlement discussions.  Thus, consistent with the *Veeder*

---

[85]  *Cf. In re Activism Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D.Cal. 1989) (extraordinary circumstances may suggest reasons to increase or *lower* a percentage fee).

[86]  *In re Gilbert*, 276 US 294, 296, 48 S.Ct. 309, 310 (1928).

[87]  *Veeder v. Public Service Holding Corp.*, 51 A.2d 321, 325 (1947).

decision, the FDIC-Receiver paid each firm for their documented and justifiable time at standard hourly rates, without regard to whether the services duplicated the work of other firms or the FDIC-Receiver. The FDIC-Receiver directly or indirectly paid a total of over $1 million to all participants.

*Swedish Hospital* and its kin do not address the circumstances presented by the Tax Case. In the context of how the Plaintiff Law Firms became involved in the Tax Case and the involvement of a receivership and its receiver, the Plaintiff Law Firms have received reasonable compensation for their services.

## CONCLUSION

The Plaintiff Law Firms were invited to participate in settlement discussions between the FDIC-Receiver and the IRS. The Plaintiff Law Firms contributed to the settlement process in one degree or another, but none of the Plaintiff Law Firms can show that its contributions resulted in the reduction of taxes. On the other hand, the FDIC-Receiver helped ensure the preservation of surplus funds for distribution to the shareholders by convincing the IRS to re-open the receivership's tax returns and allow the deduction of $258 million in post-insolvency interest. But the FDIC-Receiver is not seeking additional compensation. Nor is the firm of Spriggs & Hollingsworth, which also participated in the settlement discussions.

Ultimately, the IRS agreed to settle for $50 million, which nearly matched the outcome of one of its own scenarios.

Before the terms of the settlement were presented to the Court and the shareholders, the FDIC-Receiver indicated that it would not pay success fees. In the notice to shareholders, the FDIC-Receiver agreed to pay the Plaintiff Law Firms reasonable fees for their services and estimated those fees at between $1 million and $2 million.

25

The FDIC-Receiver directly or indirectly paid the Plaintiff Law Firms and other participants over $1 million.  In all, in connection with the settlement of the Tax Case, the FDIC-Receiver paid about $4 million from the receivership surplus for legal fees and expenses related to the Tax Case and other shareholder-related matters.  And the FDIC-Receiver is reviewing an additional claim for about $217,000 that was not included in earlier submissions.

The Plaintiff Law Firms are asking for an additional $2.6 million to nearly $4 million, depending on the theory presented.  Their requests are unreasonable under the facts of this case.

The material facts are not in dispute.  As a matter of law, the Court should deny the motions for summary judgment filed by the Plaintiff Law Firms and grant the cross-motion for summary judgment filed by the FDIC-Receiver and dismiss the consolidated cases with prejudice.  A proposed order accompanies this opposition and cross-motion.

Respectfully submitted,

Date:  February 22, 2007

/s/ Bruce C. Taylor
Bruce C. Taylor
Federal Deposit Insurance Corporation
550 17th Street, NW
Room VS-E7118
Washington, DC 20429
(703) 562-2436 (Telephone)
(703) 562-2478 (Facsimile)

Counsel for Federal Deposit Insurance Corporation,
as Receiver for The Benj. Franklin FS&LA

## STATEMENT OF MATERIAL FACTS

The FDIC-Receiver submits the following statement of facts to accompany its opposition and cross motion to the Plaintiff Law Firms' motions for summary judgment.

1. The IRS prepared 11 tax scenarios for use in the settlement discussions in the Tax Case that resulted in a cumulative tax liability, without interest and penalties, ranging from approximately $11 million to $97 million.  Gill Dec. 2 ¶ 3.  FDIC Ex. 14.

2. The IRS ultimately agreed to settle the Tax Case on terms nearly matching the results of its Scenario #10, which included a tax liability of approximately $12 million and interest of approximately $38 million, if run to the date of settlement.  Gill Dec. 2 ¶ 6.  FDIC Ex. 14.

3. The FDIC-Receiver, without assistance from counsel for the shareholders, convinced the IRS's Tax Division to permit the receivership to reopen the tax returns and receive full credit for the post-insolvency interest payments.  If this $258 million deduction had not been allowed, the entire receivership surplus would have been consumed.  Gill Dec. 4 ¶ 12.  FDIC Ex. 14.

4. On September 29, 2005, Don Willner and Rosemary Stewart, an attorney for Spriggs & Hollingsworth met with Richard Gill, an attorney for the FDIC-Receiver, and discussed, among other things, the issue of attorney's fees.  Mr. Gill advised Mr. Willner and Ms. Stewart that the FDIC's receivership claims division had been very negative regarding paying fees beyond regular hourly rates.  The same day, Ms. Stewart sent an email to Tom Buchanan, counsel for Winston & Strawn, that recounted the meeting and specifically said that "it was clear that [Richard] is trying to prepare us for not getting the

27

full amount of the claims as we filed them."  Email to Tom Buchanan from Rosemary

Stewart (9/28/2005).  FDIC Ex. 4.  See Gill Dec. 4-5 ¶ 13.  FDIC Ex. 14.

5.  The Notice to Shareholders in *United States v. FDIC*, No. 02-1427 (D.D.C.) provided

that after payment of $50 million to the IRS, the remaining receivership surplus funds of

about $42 million would be distribution *pro rata* to all Benj. Franklin shareholders who

could demonstrate their ownership of Benj. Franklin common stock, after other claims

and expenses are paid.  Notice to Shareholders 8.  FDIC Ex.  5.

6.  The Notice to Shareholders also provided for the creation of a reserve for future

years' receivership and administrative expenses and other legal contingencies.  At

the time the FDIC-Receiver estimated that this reserve would be about $1 million.

Notice to Shareholders 6.  FDIC Ex. 5.

7.  The Notice to Shareholders also provided for the distribution of approximately $3

million to the Benj. Franklin Shareholders Litigation Fund to reimburse.  Notice

to Shareholders 7.  FDIC Ex. 5.

8.  The Notice to Shareholders also stated that the FDIC-Receiver agreed to

distribute an amount representing the reasonable fees and expenses of the

shareholders' attorneys and consultants in connection with such persons' work to

reduce the $1.2 billion tax liability alleged by the IRS down to the $50 million

settlement amount.  The FDIC-Receiver estimated that the amount of reasonable

fees and expenses would be between $1 million and $2 million.  Notice to

Shareholders 7-8.  FDIC Ex. 5.

9.  The Notice to Shareholders elicited a response from about 446 of Benj. Franklin's

estimated 6500 shareholders.  The respondents represented about 3,000,000

shares of Benj. Franklin stock, 99.3% of which agreed with the proposed settlement. Order at 2, *United States v. FDIC*, No. 02-1427 (D.D.C.) (5/2/2006). FDIC Ex. 6.

10. Rosemary Stewart testified that she believed that the FDIC-Receiver's payment of about $89,000 to Ernest Fleischer was reasonable compensation for his contribution to the settlement process. Stewart Dep. 26:6-12. FDIC Ex. 13.

11. C. Robert Suess, a major shareholder and organizer of the Goodwill Litigation, has stated that the FDIC-Receiver was generous to Willner & Associates by paying that firm $250 per hour and urged the FDIC-Receiver not to pay Willner & Associates any more. Undated letter to FDIC, FDIC Ex. 8; Letter to Richard Gill (1/4/2007), FDIC Ex. 9.

12. During a telephone conversation in October 2006, Robert Suess told FDIC attorney Richard Gill that he knew the FDIC-Receiver was trying to do the right thing by trying to keep control of the legal fees in this case. Gill Dec. 5 ¶ 14, FDIC Ex. 14.

13. The FDIC-Receiver currently is reviewing an additional claim submitted by Winston & Strawn on behalf of Robert Suess for $217,000 that was not included in earlier submissions. Gill Dec. 5 ¶ 15. FDIC Ex. 14.