BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| WINSTON & STRAWN LLP, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLNER & ASSOCIATES, PC | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BLACKWELL SANDERS PEPER MARTIN | ) | Case No. 1:06CV01120 |
| (EGS) | ) | |
| and | ) | |
| ERNEST FLEISCHER | ) | [Consolidated with |
| | ) | No. 06-01227 (EGS) |
| | ) | and No. 06-01273 (EGS)] |
| Consolidated Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION, as Receiver for the | ) | |
| Benj. Franklin Federal Savings and | ) | |
| Loan Association, Portland, Oregon, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

---

**WILLNER FIRM MEMORANDUM IN REPLY TO
FDIC ANSWERING MEMORANDUM
AND REQUEST FOR ORAL ARGUMENT (if helpful to the Court)**

| | |
|---|---|
| March 15, 2007 | DON S. WILLNER |
| | Don S. Willner & Associates, P.C. |
| | 630 Sunnyside Road |
| | Trout Lake, WA 98650 |
| Of Counsel: | Tel:    509-395-2000 |
| KELBY D. FLETCHER | Fax:    509-395-2939 |
| Peterson, Young, Putra, Fletcher, | |
|   Knopp & Wampold, P.S. | JEREMIAH A. COLLINS |
| 2800 Century Square | Bredhoff & Kaiser, P.L.L.C. |
| 1501 Fourth Avenue | 805 15th Street, N.W., Suite 1000 |
| Seattle, WA 98101-1609 | Washington, DC 20005 |
| Tel:    206-624-6800 | Tel:    202-842-2600 |
| Fax:    206-682-1415 | Fax:    202-842-1888 |
| | |
| | Counsel for Plaintiff |

# Table of Contents

TABLE OF AUTHORITIES ........................................................................................III

A. INTRODUCTION ...................................................................................................... 1

B. STANDARD OF REVIEW .......................................................................................... 4

C. STATEMENT OF ADDITIONAL FACTS ...................................................................... 5

    1.   THE 2002 IMMINENT THREAT BY FDIC TO PAY THE TAX. ................................................... 5
    2.   THE IMPORTANCE OF THE ROLE OF DON WILLNER AS LEAD COUNSEL IS RECOGNIZED BY FDIC. ......................................................................................... 8

D. ARGUMENT ............................................................................................................ 9

    A)   THE SIZE OF THE FUND CREATED AND THE NUMBER OF PERSONS BENEFITED. ................ 9
    B)   THE PRESENCE OR ABSENCE OF SUBSTANTIAL OBJECTIONS BY MEMBERS OF THE CLASS TO THE SETTLEMENT IN TERMS OF FEES REQUESTED BY COUNSEL. ............................ 9
    C)   THE SKILL AND EFFICIENCY OF THE ATTORNEYS INVOLVED. ....................................... 11
    D)   THE COMPLEXITY AND DURATION OF THE LITIGATION. ................................................ 14
    E)   THE RISK OF NON-PAYMENT. ..................................................................................... 14
    F)   THE AMOUNT OF TIME DEVOTED TO THE CASE BY PLAINTIFFS' COUNSEL. .................... 14
    G)   AWARD IN SIMILAR CASES .......................................................................................... 15

E. CONCLUSION ...................................................................................................... 23

# Table of Authorities

## Cases

*Freeman v. FDIC,*
*56 f.3d, 1394, 1400 (D.C. Cir, 1995)*..........................................................4

*Freeport Partners, L.L.C. v. Albritton,*
2006 U.S. Dist Lexis (D.C. 2006) ............................................................9

*In re Baan Company Securities Litigation,*
288 F. Supp. 2d 14, (DD.C. 2003) ...........................................................9

*In re: Vitamin Anti-Trust Litigation case,*
398 F.Supp.2d 209 (D.D.C., 2005 ........................................................22

*Salazar v. District of Columbia,*
123 F.Supp 2d 8, 15 (D.C., 2000).........................................................13

*Sharpe v. FDIC*
*126* F.3d 1147 (9th Cir. 1997) ..............................................................18

*Swedish Hospital Corp. v. Shalala,*
1 F.2d 3d 1261 (D.C. Cir 1998)............................................................15

*U.S. v. Flora,*
362 U.S. 145, 80 S. Ct. 630 (1960).......................................................17

## Rules

Fed.R.Civ.P. 56 (c).............................................................................4, 9
Fed.R.Ev. 701 ....................................................................................13
Fed.R.Ev. 702 ....................................................................................12

## Other Authorities

H.R. Rep No 101-54 (1) 101st Cong., 1st Sess.,
reprinted in 1989 U.S. Code Cong........................................................4

## A. INTRODUCTION

The parties agree that there are no material facts in dispute and the Willner firm case can be decided by Summary Judgment. (FDIC Memorandum, p.1)

LCvR 56.1 says that "in determining a Motion for Summary Judgment, the Court may assume that facts identified by the moving part in its Statement of Material Facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." FDIC has filed its own Statement of Material Facts to which Willner firm has filed admissions and denials but FDIC has not controverted the Willner firm Statement of Material Facts.

In its Response and Cross Motion for Summary Judgment the FDIC totally ignores the seven factors for evaluating common fund applications established by courts in this District. Instead, FDIC argues three fallacies which have no support in fact or law.

Its argument that it alone preserved the $44 million remaining in the Receivership (FDIC Memorandum, p. 17-18) is totally refuted by these material, undisputed facts:

1. FDIC had agreed in writing with IRS in a secret agreement that it would not oppose an IRS tax claim law suit. (Ex. 2 to Willner firm's Original Memorandum.)

2. FDIC threatened to pay the tax until restrained by the United States District Court for Oregon. Without the TRO and the agreement to provide future advance notice before paying any tax which came with dissolution of the TRO, all of the shareholder money probably would have been lost in order to pay the tax. (Discussed at length later infra.)

3. Even though it was a co-plaintiff in the Claims Court suit for damages, FDIC took the position in both the District of Oregon case and during

1

the tax settlement discussions that it was only a "neutral third party" and a "stakeholder" rather than an advocate. (Citations in Opening Brief.) Contrary to what FDIC's position was, it had the fiduciary duty of being an advocate for its client, here Benj. Franklin and its shareholders. (It was a co-counsel with the attorneys for the shareholder derivative plaintiffs in the Claims Court case.)

4. The $258 million interest deduction which FDIC claims it preserved came about only because its predecessor in interest, RTC ,negligently, and in breach of fiduciary duty, "overlooked" including in earlier tax returns filed on behalf of Benj. (Discussed at length later *infra.* )

By paying attorneys fees from the common fund the FDIC concedes that the shareholder attorneys rendered valuable service. The issue before this court is, what are reasonable attorney fees?

The FDIC argument that "none of the plaintiff law firms can show they were responsible for a reduction of taxes" is sophistry. (FDIC Memorandum, p. 6) If that were the case, FDIC would be in breach of its duties to shareholders by paying any legal fees to counsel for the shareholders.

All of the plaintiff law firms have produced evidence that it was a team effort which reduced the $1.2 billion tax claim to $50 million rather than the effort of any one individual or one law firm. Indeed, without minimizing the substantial contributions of others, if any attorney or firm should be singled out for its individual efforts, it is the Willner firm. It alone obtained the Temporary Restraining in the District of Oregon in 2002 and the FDIC agreement to provide advance notice before paying any tax. Also, the Willner firm alone filed in this Court the Motion

to Intervene and Transfer to the District of Oregon which brought the shareholders into the tax settlement discussions. (Willner firm Statement of Material Facts, number 7, page 2.)

Finally the FDIC argument that shareholder efforts which reduced the tax from $1.2 billion to $50 million, thereby preserving $44 million in the Receivership, was a "loss" to the Receivership is a play on words without substance. (FDIC Memorandum, p.24)

Let us look at the situation of the 6500 shareholders.

Benj. Franklin was seized by the government on February 21, 1990. It was founded in 1925, survived the Great Depression, became the largest savings and loan in Oregon, and was profitable for 16 consecutive calendar quarters before Congress breached the government contract with Benj. Franklin and hundreds of other institutions by retroactively removing a huge capital asset from the books of the institutions. Claims Court Judge Loren Smith has found that Benj. (as it was affectionately called in Oregon) would have survived adverse economic conditions but for the government's breach of contract. Most of the assets of what FDIC in its brief disparagingly calls a "failed thrift," were sold to Bank of America in 1990 for a record high premium. Benj. was profitable in the conservatorship and profitable in the receivership and is one of the very few FDIC receiverships with a surplus. It is almost unique in the savings and loan debacle and the later litigation arising from the government seizures of savings and loans. (Willner's Second Declaration, ex. 8 to this Reply Memorandum.)

While the quasi-governmental RTC and FDIC, with some significant exceptions, were frequently acting ineptly, at best, or breaching their fiduciary duty to the shareholders of Benj., at worst, the Department of Justice was prolonging the Claims Court suit. The Department of Justice also argued in the case filed in this Court that a $1.5 billion loan to the Benj. receiver, which was repaid in full plus $258 million in interest, was taxable income rather than a loan.

If ever there was a "David v. Goliath" case or a "cause" against unlawful government conduct, this was it.

Don Willner was the attorney who started the litigation on behalf of these 6500 shareholders in 1990. The Willner firm has never received more than $62.50, and later $125, per hour for its successful efforts for the past almost 17 years. (Willner Second Declaration, ex. 8)

Big Washington, D.C. and Kansas City law firms can spread the risk among many law partners, and do good work. But now there is a partial opportunity for just compensation to a small firm practitioner for being lead counsel in reducing a $1.2 billion IRS claim to $50 million. The Complaint of the Willner firm has merit, and the claimed fees for legal services and costs should be paid in full from the common fund which the Willner firm played a major role in preserving.

## B. STANDARD OF REVIEW

FDIC says on page one of its Memorandum that "the standard of review is provided by Fed.R.Civ.P. 56 (c)." This Rule, however, merely says that Summary Judgment should be granted if "there is no genuine issue of material fact," and there is none in connection with the Willner firm's motion. This standard of review, however, as set forth in the Willner firm opening memorandum is *de novo* with respect to the agency action in determining the claim for attorney fees and other claims made with the FDIC-Receiver. *Freeman v. FDIC, 56 f.3d, 1394, 1400 (D.C. Cir, 1995);* See H.R. Rep No 101-54 (1) 101st Cong., 1st Sess., reprinted in 1989 U.S. Code Cong, and Ad News 86, 214-15.

## C. STATEMENT OF ADDITIONAL FACTS

1. **The 2002 imminent threat by FDIC to pay the tax.**

   May 3, 2002. Don Willner wrote Bruce Taylor, Esq., of FDIC, the letter attached as Exhibit 1 to this Reply Memorandum suggesting that the shareholders and FDIC work together on the tax issue. Taylor did not respond. (Taylor's lack of response to this and succeeding letters appears in his deposition, ex. 7 to this Memorandum.)

   May 10, 2002. Don Willner again wrote to Mr. Taylor, referring, among other matters, to the two previous agreements between the shareholders and FDIC (exhibit 2 to Reply Memorandum) and to the Inter-Agency Agreement between FDIC and the IRS (exhibit 2 to Original Memorandum). One of the agreements between the shareholders and FDIC "says, in part, that FDIC has duties to the shareholders and intends to make a good faith effort to minimize the IRS tax claim against the receivership." The Inter-Agency Agreement between FDIC and IRS says in part, however:

   > **The RTC will not challenge, in any forum, the amount [of tax] finally determined by the IRS**.  (Emphasis supplied).

   The IRS had had delayed collection of the tax pursuant to this Agreement and FDIC, as the successor to RTC, accepted the terms of the Inter-Agency Agreement. (See Willner's Second Declaration, ex. 8.)

   The Inter-Agency Agreement further provided that,

   > **Each agreement will be specific in its findings and will not be made public by either party** except as required by IRS

5

information sharing agreements with the various states, or other provisions of law. (Emphasis supplied.)

In his May 10, 2002 letter, Willner argued that the Inter-Agency Agreement should not apply to the Benj.

Taylor never responded to the May 10, 2002 letter, although there was a telephone discussion.

<u>May 20, 2002.</u> Willner sent Taylor another follow-up letter, attached as Exhibit 3 to this Reply Memorandum. Taylor does not respond to this letter, either.

<u>June 6, 2002.</u> Willner sent a yet another follow-up letter to Taylor. (Exhibit 4 to this Reply Memorandum.)

<u>June 6, 2002.</u> Taylor finally writes Willner (Exhibit 1 to Willner firm's Original Memorandum) which Willner firm date stamps as received on June 11, 2002. This letter includes the following language.

It appears unlikely that further efforts will be successful in lowering the IRS assessment of taxes, penalties, and interest below the projected assets of the receivership estate. In fact, the IRS has not given any indication that it will lower its assessments at all….

Finally, you expressed the hope that no payments would be made to the IRS without advance notice to you and without your consent. Although we agreed to keep you apprised of the status of negotiations with the IRS, **we did not agree to notify you or obtain your consent before the FDIC takes any action it deems necessary or appropriate and have no duty to do so. We can tell you, however, that a decision may be made soon on how to handle the IRS's claim, in light of the IRS's latest indication that it does not intend to abate any portion of the tax liability of the Ben Franklin receivership. Further, we will let you know if a payment is made to the IRS, so you can advise your clients accordingly.** (Emphases supplied.)

(The Taylor Deposition is quoted at length on pages 5 and 6 of Willner firm's Original Memorandum but is also included here for continuity.)

Q: Do you remember a clause in the interagency agreement which says that the FDIC under certain circumstances surrendered its right to protest any tax levied by the IRS?

A: I don't remember that provision specifically but I have no reason to doubt that it is in the agreement.

Q: But the decision was being made in light of the IRS's latest indication that it does not intend to abate any portion of the tax liability of the Benj. Franklin receivership, is that correct?

A: That's what my letter says, yes.

Q: And it's clear, isn't it, that **you meant you would give me that notification after you made the payment?**

A: **That is what my letter indicates, yes.**

Q: Were you authorized to write Exhibit 7?

A: Yes.

Q: Before writing Exhibit 7, **did you research the impact of paying any portion of the tax upon the rights of the FDIC receiver or the shareholders of Benj. Franklin?**

A: **I did not.** (Emphases supplied.)

(Taylor Deposition excerpt, ex. 7 to this Reply Memorandum.)

June 17, 2002. Six days after receiving the Taylor response Willner filed the Oregon action and obtained the TRO. Only then did FDIC agree to give Willner advance notice before paying any tax to IRS.

7

2.  **The importance of the role of Don Willner as lead counsel is recognized by**

**FDIC.**

In the joint unopposed motion for a stay filed in this Court in the tax case, after

analyzing the arguments of the shareholders, FDIC and the Department of Justice

stated,

> 108(m) Statement
>
> "In accordance with LCvR 7.1(m), on April 10, 2003, the attorneys
> for the FDIC met in Washington, D.C. with the attorney for the six
> shareholders, Don S. Willner. Mr. Willner has been advised of the
> ongoing discussions between the FDIC and the United States with
> respect to the proper amount of the tax liabilities of Benj. Franklin
> and has stated that he does not oppose and is in agreement with the
> relief sought by this joint motion for a stay of all proceedings
> pending the full examination of the income tax liabilities of Benj.
> Franklin." (ex. 3 to FDIC Memorandum.)

Then three years later in the Notice to Shareholders submitted by

FDIC to the Court, the FDIC stated:

> **"Don S. Willner** is the Portland, Oregon attorney who **represents
> shareholders of Benj. Franklin in the above-described CFC**
> [Court of Federal Claims] **litigation,** which is a shareholders'
> derivative action. **Mr. Willner also filed a motion to intervene in
> the tax litigation pending before Judge Sullivan in the U.S.
> District Court (D.C.) in order to argue that the Benj. Franklin
> shareholders were the real parties in interest because the
> claimed tax would have eliminated any hope of the
> shareholders' receiving a cash distribution from the Benj.
> Franklin receivership estate.** Mr. Willner also filed a still-
> pending suit against the FDIC-Receiver in the U.S. District Court
> in Portland, Oregon, seeking to enjoin FDIC from making the
> disputed tax payment to the IRS.  **After these actions were filed
> by Mr. Willner and recognizing the interest of the Benj.
> Franklin shareholders, the FDIC invited Mr. Willner and
> other attorneys representing Benj. Franklin shareholders to
> meet with the FDIC and representatives of the IRS and the
> Department of Justice Tax Division to discuss the possible
> compromise or settlement of the tax dispute. Mr. Willner** and
> the other shareholders' counsel and consultants participated
> actively in these discussions over many months, and Mr. Willner

and other shareholders counsel now support the proposed tax
settlement described herein and will speak in favor of the proposed
tax settlement at the Fairness Hearing....

For all the reasons discussed above, the FDIC as receiver of Benj.
Franklin and shareholders' counsel, including Mr. Willner,
recommend that the proposed tax settlement be found to be fair,
adequate, and reasonable."

(Notice to Shareholders, ex. 5 to FDIC Memorandum)

## D. ARGUMENT

Rather than following the diversionary trails of the FDIC in its Response and Cross

Motion, Willner firm will follow the decisions of this Court in *In re Baan Company Securities*

*Litigation*, 288 F. Supp. 2d 14, (DD.C. 2003) and *Freeport Partners, L.L.C. v. Albritton*, 2006

U.S. Dist Lexis (D.C. 2006) and will continue to use the seven criteria set forth therein.

a) <u>The size of the fund created and the number of persons benefited.</u>

FDIC raises no new facts or arguments.

b) <u>The presence or absence of substantial objections by members of the</u>

<u>class to the settlement in terms of fees requested by counsel.</u>

FDIC in its exhibits submits two letters from one major shareholder,

C. Robert Suess, which disputes the Willner firm's fee petition. These

letters do not comply with Fed.R.Civ.P. 56(e) and are inadmissible

because they are not sworn statements. They are also impermissible

hearsay which speculates about the views of other unnamed persons.

Furthermore, Mr. Suess was not present at any of the discussions

between shareholder attorneys, FDIC, and the Department of Justice

9

(Willner Second Declaration). The Suess letters should be disregarded.

On the other hand, Mr. Suess' current attorney, Thomas Buchanan, has

testified under oath at his deposition this way:

> **Q    And in relation to your firm's work compared to Mr. Willner's contribution to the tax settlement do you think its fair he's asking for $800,000 and you're asking for a little bit under 600,000?**
>
> **A    I -- I think that we -- we have been paid more, I -- I think, than he has so far.  I mean, I -- I -- my view is is that Don deserves a multiple of a certain hourly rate and so I think that I would have no problem with him getting twice whatever hourly rate was legitimate for him.**
>
> **Q    Do you think, given Mr. Willner's involvement in this case and the geographic area where he normally practices, do you think an hourly rate of over $500 an hour is reasonable for him?**
>
> **A    No.  I -- I don't think 525 is -- is a reasonable rate, but I do think that -- the way I view it is I think that whether it's 250 or $300 an hour, and maybe more would be reasonable, but I think he deserves a multiple of that, like twice.**
> **So the way I view it is -- and my position would be that if Don were to say, okay, I want $250 an hour but I want a multiple so it comes out to 500, I'd say that's reasonable.**

(Ex. 18 to Willner firm Original Memorandum)

In accordance with D.C. Circuit law the Willner firm is now

seeking a percentage of the common fund, not an hourly rate and a

multiplier. In his deposition Mr. Buchanan says: "$250 or $300 an

hour, and <u>maybe more,</u>" would be reasonable" as a lodestar hourly rate

(emphasis added) and then that should be doubled. The Willner firm is

10

seeking $782,100.24, which is not out of line with the testimony of Mr. Buchanan, if the "maybe more" is $400 per hour.[1 and 2]

Exhibit 5 to this Reply Memorandum is a joint declaration of 14 former officers, directors, executives of Benj. Franklin or plaintiffs in this case owning 429,488 shares of stock of Benj. Franklin in support of the attorney fee sought by Willner firm.

c) <u>The skill and efficiency of the attorneys involved.</u>

FDIC does not challenge the skill and efficiency of the Willner firm. We have previously submitted Declarations or Affidavits of the former Chief Judge of the United States District Court for the District of Oregon, the former Chief Justice of the Oregon Supreme Court, the former Dean of the University of Oregon Law School, the former CEO of Benj. Franklin, and an Oregon attorney with expertise in evaluating attorneys fees in Oregon. This is competent, sworn evidence of Don Willner's high reputation and skill and there is no contrary evidence.

Former Chief Judge Burns of the Oregon Federal Court and former Chief Justice Lent of the Oregon Supreme Court testify to the

---

[1] Mr. Suess is a former client of Don Willner who in 2002 filed a complaint against Don Willner with the Oregon State Bar which was found to be without merit and was dismissed by the Bar. Mr. Suess within the last month has filed a second bar complaint against Don Willner which we hope will also soon be dismissed as without merit. (Willner Second Declaration, ex 8 of this Reply Memorandum)

[2] In the Willner firm fee petition to FDIC and the Opening Memorandum, Willner firm cites large contingent cases in which it has received $525 per hour or more. In consulting for another law firm in a similar savings and loan case 8 or 9 years ago, Don Willner received $375 per hour which translates to over $500 per hour now (Willner Second Declaration).

experience, reputation, skill and ability of Don Willner. (Exhibits 7 and 8 to Original Memorandum)

Former Dean Laird C. Kirkpatrick of the University of Oregon Law School is now a visiting professor at the University of Maryland Law School and last year was a visiting professor at George Washington Law School, both in the Washington, D.C. area. He testified that Don Willner **"is one of the most highly regarded trial lawyers in the state [of Oregon] particularly for complex litigation"** and that **"I have no doubt that his ability and skill match that of lawyers handling similar matters in Washington, D.C. or any other large urban area."** (Ex. 6 to Original Memorandum) (Emphasis supplied).

David Markowitz, of Portland, Oregon, a fellow of the American College of Trial Lawyers, testifies that "for approximately 20 years I have worked on numerous matters involving attorney fee issues, often as an expert witness, mediator, or arbitrator. I have presented live testimony or supplied declarations on scores of occasions over the last 20 years." He commissioned a recent study of commercial litigation attorney fee rates in Portland, Oregon. Mr. Markowitz concludes, "**In my opinion, Don Willner should be considered with the very best commercial litigators in Portland when setting an appropriate billing rate**." (Ex. 10 to Original Memorandum) (Emphasis supplied.)

The above expert testimony should be helpful to this court under Fed.R.Ev. 702.

Dr. G. Dale Weight, former Chief Executive of Benj. Franklin was previously president of a billion dollar institution, Syracuse Savings Bank (New York), and held officer positions with the Federal Home Loan Bank of Pittsburgh, and the Federal Reserve Bank of Cleveland. After the seizure of Benj. Franklin he became Dean of the Atkinson Graduate School of Management at Willamette University in Salem, Oregon. (Ex. 9 of Original Memorandum)

He testified that "I had occasion to retain and/or work with attorneys on the East and West coasts, as well as in Washington, D.C. and other large cities. He concludes "**the legal work done by Mr. Willner as the Benj. Franklin attorney has been of the same high quality as other attorneys in national or super regional law firms with whom I have worked**." (Ex 9 to Original Memorandum) (Emphasis supplied.)

Dr. Weight is certainly qualified to give his opinion under Fed.R.Ev. 701.

There are excellent attorneys within "the Beltway," but also excellent attorneys, such as Don Willner, who was lead counsel for the shareholders in this Washington D.C. tax matter, outside of the Beltway.

In *Salazar v. District of Columbia*, 123 F.Supp 2d 8, 15 (D.C., 2000), the Court quoted with approval from an expert affidavit that "the market for legal services in complex federal litigation in Washington, D.C. is not a local market."

13

In addition, there is now in the Record the Declaration of tax attorney Ernest Fleischer who was involved in the entire settlement process. He says:

> The federal statutes forbid any restraining order against actions proposed to be taken by the Defendant. **Mr. Willner therefore did a remarkable job in obtaining the TRO and then persuading the Defendant to cooperate**." (Fleischer Declaration exhibit 1, paragraph 13 (b), an Exhibit to the Fleischer memorandum.) (Emphasis supplied.)

Then in the Fleischer Memorandum on page 15 it says:

> Plaintiffs [Fleischer and his law firm] suggest that because he was lead counsel, because of his insight in recognizing the danger of payment of the assets to the IRS and because he prevented such payment **Mr. Willner should be awarded 3.5% of the fund in the amount of $1.5 million…**" (Emphasis supplied.)

Although Willner firm greatly appreciated this kind suggestion, we are seeking the lesser amount of $782,110.24, plus actual expenses.

d)  The complexity and duration of the litigation.

FDIC raises no new facts or argument.

e)  The risk of non-payment.

FDIC raises no new facts or argument. The risk of non-payment would have greater impact for Don Willner than for the large law firms who are also involved in the tax matter.

f)  The amount of time devoted to the case by plaintiffs' counsel.

All members of the team of attorneys did good work. Here is the tabulation of hours devoted to the tax matter by the attorneys involved in the discussions with FDIC and Department of Justice.

14

- <u>Don Willner</u>            1031 hours

- <u>Mitch Moettel</u>          688.50 hours

- <u>Rosemary Stewart</u>       308.9 hours
  *(RS hours possibly exclude small supplemental additions)*
- <u>Tom Buchanan</u>          308.75 hours
  *(TB hours possibly exclude small supplemental additions)*
- <u>Ernest Fleischer</u>        240 hours

(Information from Fee Applications of the Parties)

<u>g)</u>  <u>Award in similar cases.</u>

FDIC does not challenge that *Swedish Hospital Corp. v. Slala*, 1 F.2d 3d 1261 (D.C. Cir 1998) established that a percentage of the common fund created through the efforts of the lawyers is the law of this Circuit. Nor does it challenge the percentages allowed in *Swedish Hospital*, 20%, or the percentages allowed in the previously cited cases in this District of 33%, 28%, and 22% (citations on p. 27 of Willner firm Opening Memorandum). Instead, FDIC fails to cite any awards in similar cases, as required by the D.C. District Court approved method of analysis.  Instead, it makes these arguments:

1) FDIC claims that it alone preserved the $44 million remaining in the receivership ,as  previously discussed in the introduction to this Memorandum on page one. This FDIC argument is frivolous. FDIC helped during the tax discussions, but most of the work was done by the shareholder attorneys and consultants. Since FDIC considered itself a third party neutral, by agreement, the final decision on all offers made by FDIC were  first approved by Don Willner in consultation with the other shareholder attorneys.

15

2)  FIDC also challenges the importance of the Oregon District Court
TRO.

All of the facts dealing with the TRO are contained in
written correspondence, sworn testimony, or Court documents
from the TRO case and are undisputed. Willner firm does not have
to prove that FDIC would have paid the tax, although that
inference is strong. Rather, there must by proof of imminent
danger of FDIC paying the tax, thereby losing all of the
shareholder money.  There is substantial proof of that.

Reviewing the material set out on pages 5 through 8
 of this Memorandum show the secret Inter-Agency Agreement
between IRS and FDIC that deferred payment of the tax to the IRS
by FDIC Receiver in return for an FDIC commitment not to
contest the IRS assessment in court. With this in mind, after
ignoring Willner's increasingly urgent letters, Taylor wrote that
because of IRS not changing its position about assessing the tax,
FDIC was about to act. Since FDIC earlier agreed in the Inter-
Agency Agreement with IRS  not to contest any  IRS claim in
Court, FDIC had no real choice. The danger was imminent, and
FDIC would not even tell Willner before any payment was made.
This was a secret Inter-Agency Agreement and imminent secret
payment of the tax

The materials presented to Oregon District Court Chief
Judge Haggarty on the breach of fiduciary duty law suit TRO

16

request included all of the correspondence between Taylor and Willner which is before this Court. See ex. 9. And the case of *U.S. v. Flora,* 362 U.S. 145, 80 S. Ct. 630 (1960) which showed the impossibility of filing suit for refund once any payment was made this court also has before it.  In addition, the Taylor deposition excerpts contain this question and answer.

> **"Q: Before Exhibit 7 [The June 6, 2002 letter], did you research the impact of paying any portion of the tax upon the rights of the FDIC receiver on the shareholders of Benj. Franklin?**
>
> **A: I did not."** [Emphasis supplied.]
>
> (Ex. 7 of this Reply Memorandum.)

This single question and answer sums up why the TRO was absolutely necessary to protect the shareholders from FDIC.

Willner firm is satisfied that Chief Judge Haggarty made the correct decision in granting the TRO. During the argument before Judge Haggarty on the later preliminary injunction, FDIC's attorney promised advance notice to Willner before making any tax payment, and also said that FDIC believed its position  to be that of a stakeholder between IRS and the shareholders.  The FDIC attorney also said that it was "honestly trying to seek a solution, which doesn't affect the interests of either—adversely effect either the shareholder plaintiffs or the IRS's" and was considering paying the money in the receivership into Court in an interpleader. See

17

page 6 and 7 excerpt from Fairness Hearing before Judge Haggarty. (Exhibit 9)

Judge Haggarty denied the preliminary injunction after concluding that it would not fit into any of the exceptions including breach of contract which allowed injunctions as set forth in *Sharpe v. FDIC 126* F.3d 1147 (9th Cir. 1997). Willner filed a precautionary Notice of Appeal but did not pursue it because it appeared clear that FDIC was not going to pay any tax money to IRS during the pendency of the Oregon case. (See Willner Second Declaration, ex. 8.) FDIC otherwise could have been subject to huge money damages for breach of fiduciary duty, and breach of contract damages if it broke its advance notice agreement.[3]

3) FDIC's argument that none of the plaintiff law firms can separately show they were solely responsible for a reduction of taxes is also frivolous. This was a team effort and there is no legal requirement which requires proof that any one individual or individual law firm separately achieved the result. If any of the law firms did not contribute substantially to the result FDIC should not have paid that firm anything.

4) The FDIC's companion argument that preserving the $44 million "was a loss to the balance in the Receivership" is also frivolous. If

---

[3] This 2002 Oregon breach of fiduciary duty suit was only dismissed by stipulation in 2006. (Willner 2nd Declaration.) Willner firm has been concerned that FDIC would have a long memory about a suit which was so troubling.

it was a loss FDIC should have paid nothing, instead of making partial payments.

5) FDIC argues that since the $50 million final settlement was similar to "scenario 10" proposed by the Department of Justice there was no gain resulting from the efforts of the shareholder law firms. This argument is incorrect both factually and legally. First, if it were correct, why did FDIC pay any legal fees to counsel for shareholders? Second, Scenario 10 provided for a tax payment of $47 million while the final settlement was for payment of a tax of $12.5 million and an interest payment of $37.5 million. Interest payments to IRS, however, can be offset against corporate income so the allocation to interest was of enormous importance to the shareholders. (Notice to Shareholders, FDIC ex. 5, p.3) Actually, there were many discussions between shareholders attorneys, the Department of Justice, and the FDIC that a settlement could best be achieved by agreement on an arbitrary number which was unrelated to any of the technical arguments made by the parties. (Willner Second Declaration)

The Claims Court judgment is for approximately $52 million and has recently been appealed by Department of Justice. If this amount is affirmed (or increased) the resulting judgment amount will be paid by the U.S. Treasury to the FDIC as Receiver of Benj. Franklin. This might have resulted in a corporate tax on that amount of approximately one third or about $17 million. But

19

the allocation to interest in the settlement could increase the amount which FDIC would distribute to the shareholders by that that amount. Furthermore, the eleven tax scenarios presented by the government came only after over a year of difficult discussions between the Department of Justice, the FDIC, and the shareholder attorneys during which where were several memoranda submitted by the shareholders in opposition to federal financial assistance being taxed <u>at all</u> in the unusual factual circumstances of this case. (Discussed at length in Willner firm's Opening Memorandum.)

The strength of the equities in favor of the Benj. Franklin shareholders which made this a poor test case for the Department of Justice, plus the strength of the memoranda and arguments made on behalf of the shareholders, were the proximate cause of the tax settlement.

Every attorney and Judge knows that a settlement is a compromise in which the participants start at very different positions in the spectrum and work toward a common result. During settlement negotiations in this case the participants talked about reaching a mutually acceptable number, rather than tying it to any particular technical analysis. This made compromise easier. (Willner 2nd Declaration.)

FDIC's argument that it alone saved the $258 million deduction (which it had negligently failed to claim earlier and that the absence of this deduction would wipe out the shareholders' claim is wrong for two reasons. In fact, shareholder attorneys had been discussing the failure of RTC to claim the $258 million deduction. (Willner Second Declaration) Then, on April 14, 2004 Willner sent the Department of Justice a detailed memorandum making persuasive arguments in support of FDIC being allowed to claim the old deduction. (Ex. 11 of this Reply Memorandum.)

We come now to the FDIC's argument that the total of all the fee claims amounts to "$2.6 million to nearly $4 million" and that this is too much.

FDIC first says this is more than the $1 million to $2 million which is FDIC's own estimate provided to the shareholders of the amount that FDIC would pay. However, FDIC did not consult with the shareholder attorneys before providing this estimate.

Furthermore, since this is a *de novo* determination by this Court; there is no deference owed to the agency determination.

Willner firm agrees that this Court should consider as one factor the total of the claims against the common fund, with one exception. In its responding memorandum; however, FDIC first disclosed a $217,000 claim by major shareholder Suess. Since this new claim became part of the record and the FDIC's argument, Willner firm has requested that FDIC provide a copy of the Suess claim, but FDIC has refused (Ex. 6 to this Reply Memorandum). It is axiomatic in American jurisprudence that in a fair trial (or fair summary judgment proceeding) one party cannot rely upon evidence which it fails to disclose to another party. This Court should ignore the new Suess claim.

Willner firm has consistently taken the position that all of the attorneys did good work and should be reasonably compensated, without our making any attempt to place a dollar amount on the other claims. During the Fairness Hearing, this Court applauded the efforts of all of the attorneys. Fairness Hearing Tr. At 20: 7-13 (May 2, 2006).

As discussed in both of the Willner firm Memoranda, Don Willner filed the Motion to Intervene and was lead counsel. (See especially the excerpts from the Gill Deposition in the Opening Memorandum, p. 19, the Declaration of Ernest Fleischer excerpted in this Memorandum, and the tacit admission by FDIC of this role set forth in Willner Statement of Material Facts.) It is recognized that the lead counsel rule gives relative weight to law firms or

21

lawyers in setting attorneys fees. In the *In re: Vitamin Anti-Trust Litigation case,* 398 F.Supp.2d 209 (D.D.C., 2005, Magistrate Judge Facciula, at page 4, gave weight in fixing fees to the lead counsel role saying:

> a) Organize and run the case: This was the responsibility of Co-Lead Counsel. Co-Lead Counsel called meetings, assigned tasks, managed the litigation on a daily basis, and oversaw the successful settlement process. In addition CMHT had the specific task of organizing the group of law firms that had not filed lawsuits with Boies Schiller.

Don Willner called meetings, assigned tasks, managed the litigation on an almost daily basis, and worked with FDIC closely on the successful settlement process, including making the major explanation and defense of the settlement before this Court at the Fairness Hearing.

Both FDIC and Willner firm agree that there are no material facts in dispute in this claim, and both have moved for Summary Judgment. Willner firm's work on this tax matter started in 1999 and was completed seven years later in 2006, with the Fairness Hearing before this court. This is a long time to wait for reasonable compensation.

The amount to be awarded to Willner firm should now be decided upon Summary Judgment. [4]

As discussed, at length, in Willner firm's Opening Memorandum, the 20% awarded in the D.C. Circuit or the 22%, 28%, and 33% awarded in the D.C. District are too high under the

---

[4] Mr. Fleischer in his summary judgment motion requests an evidentiary hearing for his claim. Willner firm has no objection so long as it does not delay resolution by Summary Judgment of our claim.

circumstances of this case. The 1.78% that Willner firm as lead counsel is seeking is reasonable compensation, and this court should also fix reasonable compensation for the other attorneys. [5]

## E. CONCLUSION

Willner firm should be granted judgment in the amount of $782,110.24 reasonable attorney fees plus reasonable expenses in the amount of $1,264.14, plus costs and disbursement incurred herein.

March 15, 2007                          Respectfully submitted,

Of Counsel:                             __/s/Don Willner_____
KELBY D. FLETCHER                       DON S. WILLNER
Peterson, Young, Putra, Fletcher,       Don S. Willner & Associates, P.C.
  Knopp & Wampold, P.S.                 630 Sunnyside Road
2800 Century Square                     Trout Lake, WA  98650
1501 Fourth Avenue                      Tel:    509-395-2000
Seattle, WA  98101-1609                 Fax:    509-395-2939
Tel:    206-624-6800
Fax:    206-682-1415                    __/s/Jeremiah Collins_____
                                        JEREMIAH A. COLLINS
                                        Bredhoff & Kaiser, P.L.L.C.
                                        805 15th Street, N.W., Suite 1000
                                        Washington, DC  20005
                                        Tel:    202-842-2600
                                        Fax:    202-842-1888

                                        Counsel for Plaintiff

---

[5] Willner firm trusts that FDIC in its forthcoming Reply Brief will be limited to its cross-appeal, and not further respond to Willner firm's motion. (*GLF Advantage Fund C&D v. Colkitt,*, 216 F.R.D. 189, 197 (D.D.C. 2003); *Public Citizen Health Research Group v. National Institute of Health*, 209 F. Supp 2d 37, 43-44 (D.D.C 2002); *Charter Oil Co. v. Am Employers' Ins Co.*, 69 F.3d 1160, 1170-71, D.C. Cir, 1995)