00053
```
 1         (Discussion off the record.)
 2         BY MR. WILLNER:
 3    Q   When did you become involved in the
 4  United States v. FDIC tax case,
 5  approximately?
 6    A   The best of my recollection, I --
 7  I'm thinking it was either the first or
 8  second quarter of 2004.
 9    Q   All right.  And were your
10  predecessors Catherine Topping and Hugo Zia?
11    A   Yes.  They functioned as line
12  attorneys like I did.  Catherine got a
13  promotion and moved out.
14    Q   And when you came into the matter,
15  did you have discussions with them about what
16  had taken place before you became involved?
17    A   Yes, I did.
18    Q   Are you aware of the fact that I
19  filed the motion to intervene and along with
20  the motion to transfer to Oregon?
21    A   Yes.
22    Q   Are you aware of the fact that
```

EXHIBIT 1

Gill, Richard 01/17/2007                    Page 53

00061
1    A   I did not, but my colleagues before
2   me evidently -- when FIRREA was enacted in --
3   the federal -- federal insurance -- Financial
4   Institution Reform Recovery and Enforcement
5   Act of 1989, which we call FIRREA, when that
6   was enacted, I think the IRS shortly after
7   issued an IRS Notice 89102. I think the FDIC
8   folks had discussions with the IRS regarding
9   whether that notice, you know, was correct or
10  incorrect. And I think over the years, they
11  had discussions, but this was the first case
12  where it became real because, as I said
13  before, the other institutions were deep in
14  the hole, so --
15   Q   When you first approached the case
16  was it your opinion that the best outcome for
17  the shareholders was a settlement or a trial?
18   A   My -- when I came into the case,
19  what had actually happened is -- and the -- I
20  mean, victory has a thousand fathers and
21  defeat is an orphan. The attorney for the
22  DOJ had told me that in the process of

00062
1  settlement discussions or trying to resolve
2  this that he had agreed to propose like 12 --
3  I think it was 11 tax scenarios. And his
4  general impression was since the IRS had sued
5  for a billion 2 that they were going to take
6  the money either now or later.
7       And when the tax scenarios got run,
8  there were several tax scenarios that
9  produced a surplus, in other words, that the
10  shareholders would actually receive money
11  after the IRS was paid.
12       I came into the case at that point
13  and my genuine belief was that the
14  shareholders, you know, were entitled to
15  money here. The -- the -- there was a
16  position that if the shareholders won, they
17  would have gotten a little more. But my
18  genuine belief was that that scenario, if we
19  litigated, it would have taken probably taken
20  four years for them to get that money. And
21  if the shareholders lost -- and there was a
22  reasonable probability they would -- they'd