## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WINSTON & STRAWN LLP,

and

WILLNER & ASSOCIATES,

and

Civil Case No. 06-1120 (EGS)

BLACKWELL SANDERS PEPER MARTIN
and
ERNEST M. FLEISCHER,

[Consolidated with No. 06-1227
(EGS) and No. 06-1273 (EGS)]

    Consolidated Plaintiffs,

    v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
THE BENJ. FRANKLIN FS&LA,

    Defendant.

---

**PLAINTIFF WINSTON & STRAWN LLP'S REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT**

    FDIC-Receiver does not dispute that under *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261

(D.C. Cir. 1993), Winston & Strawn's request for a total attorney's fee of 2.8% of the $43

million common fund created on behalf of Benj. Franklin shareholders would be reasonable *if*

the law firm's efforts were responsible for that fund.  The sole question pertaining to Winston &

Strawn's motion for summary judgment, therefore, is whether the law firm was responsible for

creating the common fund.  The undisputed facts make it clear that the answer to this question is

"yes."

In fact, FDIC-Receiver concedes that Winston & Strawn is entitled to reasonable fees and expenses based on its effort "to reduce the $1.2 billion tax liability alleged by the IRS down to the $50 million settlement amount" – a settlement that created (or preserved) a receivership surplus for Benj. Franklin shareholders. FDIC Opp'n, Ex. 5 at 6-7. FDIC-Receiver further concedes that, in connection with the settlement negotiations, Winston & Strawn "reviewed the majority of the tax returns," performed "the most work associated with the . . . substantive responses" to the IRS's arguments, and, "issue by issue[,] . . . did the most to bring about a successful settlement of the IRS claim."[1] FDIC-Receiver states outright in its opposition brief that "[o]f all the Plaintiff Law Firms, Winston & Strawn probably has the most reasonable case" for the requested success fee. FDIC Opp'n at 6. These concessions by FDIC-Receiver end the inquiry.

FDIC-Receiver nonetheless argues that it would be unreasonable to honor Winston & Strawn's expectation, and the expectations of a majority of Benj. Franklin shareholders, that the law firm would receive a success fee of twice its normal hourly rates pertaining to the IRS claim. But FDIC-Receiver has it backwards – *its* fee proposal is unreasonable and, in fact, conflicts with pertinent precedent. FDIC-Receiver has failed to explain how or why it would be "reasonable" to expect an international law firm like Winston & Strawn to take on an engagement with greatly reduced rates – one-third of the firm's ordinary hourly rates, a discount that left the firm about $400,000 short in the aggregate – if the only potential "upside" is that the firm could recover merely its principle out-of-pocket losses, without interest, in the event of a successful settlement. To be clear, FDIC-Receiver's fee proposal *excludes* any payment to

---

[1] Winston & Strawn's Statement of Uncontested Material Facts ("W&S Facts") ¶ 19. FDIC-Receiver has contested none of the W&S Facts and, therefore, those facts should be deemed admitted. *See* Fed. R. Civ. P. 56(h) (providing that courts "may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion").

Winston & Strawn to compensate it for assuming the substantial and very real risk inherent in the representation (that is, recovery by the IRS of even 8% of its $1.2 billion claim would have wiped out the receivership surplus and left Winston & Strawn out-of-pocket by $400,000). FDIC-Receiver's proposal similarly *excludes* any payment to Winston & Strawn to compensate it for the multi-year delay in obtaining payment of its ordinary hourly fees. As a consequence, FDIC-Receiver has effectively concluded that "reasonable" fees in a successful, contingent fee representation is *less* than the amount the firm would have obtained in an ordinary, hourly representation. Not surprisingly, FDIC-Receiver cites no authority that supports this nonsensical position. Given that FDIC-Receiver's suggested outcome does not even make Winston & Strawn whole, much less compensate it for any risk assumed, FDIC-Receiver's proposed fee arrangement is deficient as a matter of law and thus should be rejected on summary judgment.

## ARGUMENT

## I.    THROUGH ITS EFFORTS, WINSTON & STRAWN CONTRIBUTED TO THE CREATION AND PRESERVATION OF A COMMON FUND

FDIC-Receiver does not, because it cannot, dispute that "a party who creates, preserves, or increases the value" of a common fund generally is entitled to a reasonable attorney's fee of 20-30% of that fund. *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993). Instead, FDIC-Receiver primarily argues that Winston & Strawn was not responsible for the creation of a common fund. It also makes a half-hearted argument that no fund even was created or preserved. Both arguments are meritless.

### A.    Settlement Of The IRS Claim Created (Or Preserved) A Common Fund

To the extent FDIC-Receiver actually disputes that the IRS claim settlement created (or preserved) a common fund, that argument should be summarily disregarded. Near the end of its opposition brief, FDIC-Receiver appears to make this argument based on purportedly "objective"

mathematics: "When settlement negotiations began, the receivership surplus totaled about $92 million. When negotiations ended, [however,] the receivership surplus totaled about $42 million." FDIC Opp'n at 24. FDIC-Receiver then argues that, "viewed objectively," the efforts of Winston & Strawn and other counsel "actually resulted in a loss of $50 million to the receivership surplus." *Id.* FDIC-Receiver's math is correct, but its argument obviously ignores that the IRS $1.2 billion tax claim threatened to reduce the receivership surplus to zero.

Accordingly, FDIC-Receiver does not, because it cannot, seriously argue that Winston & Strawn's efforts in connection with the IRS claim actually resulted in a "loss." To the contrary, FDIC-Receiver admits, as it must, that "the tax settlement preserved a substantial amount for distribution to the shareholders." *Id.* This admission is consistent with the Notice to All Current Shareholders of Benj. Franklin Federal Savings & Loan Association ("Notice"), approved by the Court as well as the parties to the settlement (including FDIC-Receiver), which confirms that the receivership did owe income taxes, the IRS calculated the tax liability to be $1.2 billion, the parties negotiated that tax liability down to $50 million and, as a result, the settlement created (or preserved) a Benj. Franklin receivership surplus of tens of millions of dollars. FDIC Opp'n, Ex. 5 at 4-8.

### B.    Winston & Strawn Was Responsible, At Least In Substantial Part, For Creating (Or Preserving) The Common Fund

Because a fund was created or preserved, the *only* remaining legal issue presented by FDIC-Receiver's opposition brief is whether Winston & Strawn was responsible, at least in part, for that fund. As shown below, that question should be answered in the affirmative because the FDIC itself has time and again conceded that Winston & Strawn has played the primary role in achieving the successful result.

There is no dispute that, of all the plaintiffs in this case, Winston & Strawn rendered the most valuable services on behalf of Benj. Franklin in connection with the IRS claim settlement. In its opposition brief, FDIC-Receiver even singles out Winston & Strawn as the plaintiff "with the most reasonable case" for additional fees. FDIC Opp'n at 6. This concession is consistent with the testimony of FDIC-Receiver attorney Richard Gill who was primarily responsible for evaluating Winston & Strawn's fee petition in this case:

> Q.    In your opinion, of the law firms that worked on the tax settlement, who in your opinion or what firm in your opinion did the most heavy lifting?
>
> A.    I think with respect to the tax matters – I think Winston & Strawn.
>
> * * *
>
> Q.    [D]o you have knowledge of which firm, in your opinion, reviewed the majority of the tax returns?
>
> A.    Judging by the billing, it was clear that the Winston & Strawn firm reviewed the most tax firms [sic].
>
> * * *
>
> Q.    Which law firm did – the most work associated with the presentations that were given?
>
> A.    As far as the substantive responses, I would say Winston & Strawn.
>
> * * *
>
> Q.    In your opinion, if you would single out one single attorney who did the most to bring about a successful settlement of the IRS claim, who would that be?
>
> A.    I mean, I – certainly, I mean, if – you know, issue by issue I think Mitch Moetell [sic] [from Winston & Strawn] did.

W&S Facts ¶ 19, quoting Gill Dep. at 70:18-71:1, 72:6-11, 73:6-10, 74:18-75:10 (Ex. 1).

In addition to conceding that Mr. Moetell of Winston & Strawn "did the most [of all of the attorneys] . . . to bring about a successful settlement of the IRS claim," *id.* ¶¶ 13, 19, Mr. Gill of FDIC-Receiver also called Mr. Moetell "the key performer in terms of the negotiations," characterized him as "a walking encyclopedia of the IRS code," and opined that his "knowledge of the [Federal Financial Assistance] issue and tax code" had "an intimidating effect on the Department of Justice." FDIC Opp'n, Ex. 10 at 15, 16.[2] Given these concessions, the Court has no need to review the details of Winston & Strawn's involvement in the IRS claim settlement. Nevertheless, attached as Exhibit 1 is a declaration from Mr. Moetell, who explains in detail his and the firm's contributions to the IRS claim settlement and the scope of the engagement.

Instead of addressing these undisputed facts, FDIC reads into *Swedish Hospital* a requirement that is not found there – namely, that Winston & Strawn must "point to [a] specific contribution it made that resulted in the reduction of taxes." FDIC Opp'n at 6. FDIC-Receiver overstates the causation requirement of the percentage-of-the-fund doctrine.

The D.C. Circuit in *Swedish Hospital* affirmed a decision holding that the plaintiffs' attorneys were entitled to 20% of the "part of the fund for which counsel was responsible" – *i.e.*, $10 million of the $28 million settlement. *Swedish Hosp.*, 1 F.3d at 1272. The fees in that case were limited to a portion of the fund because the attorneys "rode 'piggyback'" on a prior case (*Beverly Hospital v. Bowen*, 1872 F.2d 483 (D.C. Cir. 1989)) that established a settlement floor

---

[2] Winston & Strawn was part of an attorney team representing Benj. Franklin shareholders that collectively "participated actively" in the IRS claim negotiations "to achieve a fair settlement." The Notice sent to all Benj. Franklin shareholders and approved by FDIC-Receiver repeatedly emphasized the active role of all counsel for Benj. Franklin shareholders, including Winston & Strawn, in facilitating a favorable tax settlement: "The FDIC also has agreed to distribute an amount representing the reasonable fees and expenses of the shareholders' attorneys and consultants in connection with such persons' work to reduce the $1.2 billion tax liability alleged by the IRS down to the $50 million settlement amount. *This will compensate for the time, expense, and expertise that all shareholders' counsel and consultants brought to the Courtroom and to the settlement table in order to achieve a fair tax settlement.*" FDIC Opp'n, Ex. 5 at 7 (emphasis added); *see also id.* at 5 ("The $50 million compromise amount was the result of considerable negotiation and give-and-take by the U.S. Department of Justice's Tax Division, the IRS,

of $18 million.  As the trial court explained, due to the *Beverly* precedent, "plaintiffs and their attorneys never faced a risk of nonpayment" and, in fact, "plaintiffs' attorneys had exhibited no extraordinary legal skills in their representation" that resulted in an increase of the $18 million settlement floor to $28 million.  *Id.* at 1264-65 (characterizing trial court decision, which was affirmed).  Consequently, the plaintiffs' attorneys in *Swedish Hospital* were unable to show that their actions created a common fund of more than $10 million.

A similar showing of no causation as to part of the fund was made in *In re First Databank Antitrust Litigation*, 209 F. Supp. 2d 96 (D.D.C. 2002).  In that case, the Federal Trade Commission ("FTC") filed suit to dissolve a merger.  Over the previous 20-months, the FTC had pursued an exhaustive investigation into the defendant's activities, devoting in excess of 25,000 hours of investigator's time, reviewing more than 400 boxes of documents, issuing some 40 subpoenas, participating in 20 investigational hearings, and conducting over 60 interviews.  *Id.* at 97.  Barely a week after the FTC filed suit, the defendants informally offered to settle the action for $16 million.  *Id.*  A week later, eight plaintiff groups filed suit and "[f]rom that point forward, the private actions appear to have proceeded towards settlement in tandem with closure of the FTC's case."  *Id.*  The parties reached a global settlement of $24 million.  *Id.*

The FTC opposed counsel's fee request for a percentage of the fund, pointing out that the class action litigants had done almost no work, but instead effectively "piggyback[ed]" on the efforts of the FTC – "[t]heir task was simply to negotiate a supplemental recovery [from $16 to 24 million]."  *Id.* at 99.  Indeed, the Court defined class counsel's role as "devoted entirely to persuading defendants to increase their [settlement] offer."  *Id.* at 101.  Despite a very limited role in prosecuting the case, the Court in *First Databank* awarded class counsel a percentage of the

---

the FDIC, *and counsel to various Benj. Franklin shareholders*.") (emphasis added); *id* at 6 (stating that shareholders' counsel "participated actively in [the settlement] discussions over many months").

increase in the value of the fund that occurred after class counsel entered the case – 30% of $8 million, or $2.4 million. Of significance, this Court observed in *First Databank* that the FTC had little motivation to achieve the result sought by private counsel, noting that "it is unknown how aggressively the FTC would have pursued disgorgement" in the absence of a negotiated resolution. *Id.* at 99.

Both *Swedish Hospital* and *First Databank* thus stand for the proposition that fees of 20% to 30% of a common fund are reasonable, and that such a determination can be made in the absence of an evidentiary hearing. Although these cases addressed issues of causation in connection with the fee award, they merely held that an attorney who rides "piggyback" on a prior case that sets a settlement floor can recover a percentage-of-the-fund as its fee based only on that portion of the fund that exceeds the settlement floor.

Here, of course, there was no prior case on which Winston & Strawn could ride "piggyback." Nor was there any settlement floor. To the contrary, Winston & Strawn faced the very real possibility that the IRS claim would wipe-out the entire receivership surplus and thus leave the firm with a fee of only one-third its normal hourly rate. Moreover, as in *First Databank*, there is no basis to conclude that FDIC-Receiver would have resisted the IRS's call for FDIC-Receiver to pay over to the IRS the entire $92 million fund – in fact, the evidence is to the contrary.[3] Had the shareholders' counsel not stepped-in, the entire receivership surplus could have been subsumed by the IRS claim. Winston & Strawn, along with other attorneys for the

---

[3] On June 6, 2002, FDIC-Receiver informed counsel for the shareholder plaintiffs that FDIC-Receiver believed it was "unlikely that further efforts will be successful in lowering the IRS assessment of taxes, penalties, and interest below the project assets of the receivership estate," it did not require the shareholder plaintiffs' "consent before taking any action it deem[ed] necessary or appropriate," and "a decision may be made soon on how to handle the IRS's claim, in light of the IRS's latest indication that it doesn't not [sic] intend to abate any portion of the tax liability of the Benj. Franklin receivership." June 6, 2002 letter from FDIC to Don. Willner (Ex. 2); *see* FDIC/IRS Interagency Agreement (Ex. 3); Deposition Transcript of FDIC lawyer Bruce Taylor (Ex. 4); *see also* Willner & Assoc. Mot. for Summ. Judg. at 4-6 (Docket Item No. 13).

Benj. Franklin shareholders, thus took necessary steps to ensure that a common fund would be created (or preserved) for the shareholders. They were successful, and a $42 million common fund was created.

A percentage-of-the-fund award is particularly warranted here given that all parties agree that the IRS claim raised "novel and complex tax issues." W&S Facts ¶ 12. Accordingly, this is not a situation where an attorney seeks a large fee award based on a cookie-cutter settlement that required minimal effort. *Compare Swedish Hosp.*, 1 F.3d at 1264-65 (finding that "plaintiffs' attorneys had exhibited no extraordinary legal skills in their representation"); *see also First Databank*, 209 F. Supp. 2d at 101 (finding that case did not require "heavy lifting"). To the contrary, FDIC-Receiver admits that: (1) "[Winston & Strawn] rendered valuable services to Benj. Franklin's shareholders and the Benj. Franklin receivership," W&S Facts ¶ 31; (2) Winston & Strawn should be compensated for more than 1400 hours of attorney time for, *inter alia*, conducting depositions, preparing memoranda analyzing complex and novel tax issues, and reviewing thousands of pages of tax returns and other tax-related documents[4]; (3) Winston & Strawn did most of the "heavy lifting"; and (4) Mr. Moetell of the firm was the attorney most responsible for the successful conclusion of the tax dispute. *Id.* ¶ 19. In light of these admissions, FDIC-Receiver cannot plausibly put its head in the sand now and complain that Winston & Strawn has failed to show that its contributions to the IRS claim negotiations contributed to the common fund.

Under these circumstances, Winston & Strawn is undoubtedly entitled to much more than 2.8% of the fund it created or preserved, as it is doubtful that the requested fee is even enough to

---

[4] FDIC-Receiver approved all but 15.5 of 1,457 hours devoted by Winston & Strawn attorneys to the Tax Case as reasonable and allowed Winston & Strawn's "claim for recovery of attorney's fees in the amount of $400,812.75," an amount sufficient to compensate the firm at its "standard hourly billing rates, less any reimbursements from" Benj. Franklin shareholders. W&S Facts ¶¶ 31, 32; Ex. 4 (FDIC Letter).

cover lost interest on its greatly-reduced fee. What is not in doubt is that Winston & Strawn's request is most modest, and most assuredly reasonable as a matter of law.

## II. FDIC-RECEIVER'S REMAINING ARGUMENTS FAIL TO DEFEAT WINSTON & STRAWN'S CLAIM FOR FEES

FDIC-Receiver raises several additional arguments, though not one of them, even if true, would defeat Winston & Strawn's claim.

### A. FDIC-Receiver Cannot Identify A Specific Contribution It Made To The Preservation Of The Fund

FDIC-Receiver posits that "[a]ssuming any one participant can lay claim to playing a crucial role, it is the FDIC-Receiver's contribution that ensured that there would be a receivership surplus available for distribution to the shareholders." FDIC Opp'n at 17-18. The supposition of its role as a savior is curious indeed.

The Resolution Trust Corporation ("RTC") covered about $2.6 billion in insured deposit liabilities when the Office of Thrift Supervision appointed the RTC as receiver for Benj. Franklin. Interest expense payments were made on that debt from the balance of the Benj. Franklin receivership (and not from FDIC funds as it suggests). The RTC as receiver, and subsequently FDIC-Receiver, should have deducted the interest expense payments totaling $258 million on Benj. Franklin annual tax returns. Those deductions were never made. When the mistake was discovered, "the FDIC-Receiver, without assistance from counsel for the shareholders, convinced the IRS's Tax Division to permit the receivership to reopen the tax returns and receive full credit for the post-insolvency payments." FDIC Opp'n at 17. What FDIC-Receiver so delicately fails to highlight is that it was *FDIC-Receiver* (and before it, the RTC) that failed to complete properly and file Benj. Franklin's tax returns. *See* Moetell Decl. at ¶

5 (Ex. 5). FDIC-Receiver's belated discovery of its own failings hardly constitutes "credit" deserving payment.[5]

### B.    A Majority Of Benj. Franklin's Shareholders Support Winston & Strawn's Request for a Success Fee

In its Opposition, FDIC-Receiver concedes that several of the largest Benj. Franklin shareholders have approved Winston & Strawn's request, and, equally important, not one shareholder has voiced objection.  Although FDIC-Receiver argues that the "'will' of the entire shareholder class is not being asserted by the Plaintiff Law Firms," FDIC Opp'n at 21, this is of FDIC-Receiver's own doing.    Winston & Strawn has proposed that all Benj. Franklin shareholders be asked to approve the requested success fee, but FDIC-Receiver repeatedly has declined that proposal.  *See* Thomas M. Buchanan Supp. Decl. at ¶ 2 (Ex. 6).  As a practical matter, however, such a classwide vote is unnecessary because there is no dispute that a majority of Benj. Franklin shareholders already have expressed support for Winston & Strawn's requested success fee. W&S Facts ¶ 38.  As Mr. Suess declared under oath:

> I have discussed my fee arrangement with Winston & Strawn LLP with many large shareholders … and hundreds of other smaller individual shareholders.  *I can attest with certainty that I have spoken with individuals who hold over half of the shares of Benj. Franklin stock, and that they fully support Winston & Strawn LLP's fee petition.*

*Id.*, Ex. 6 at 3 (emphasis added).  Given that FDIC-Receiver has refused to submit the issue formally to the shareholders, Mr. Suess's representations (which carry special weight given his duties to his fellow shareholders as Lead Plaintiff in the Court of Federal Claims litigation) –

---

[5] Nor, as it turns out, were FDIC's tax errors so limited.  *See* Moetell Decl. at ¶¶ 5, 14 (Ex. 5).

together with the declarations of support from Mr. Hindes and Mr. Seimens – constitutes the totality of the evidence regarding shareholder will.[6]

FDIC-Receiver quibbles only at the margins, noting, for example, that C. Robert Suess and Gary Hindes are clients of Winston & Strawn. This argument is irrelevant, especially since Winston & Strawn's request for payment affects them every bit as much as the other shareholders. To be sure, these shareholders are merely honoring their agreement – entered into with Winston & Strawn by C. Robert Suess on behalf of the shareholders – to pay the firm a success fee in the event of a successful resolution of the IRS claim. W&S Facts ¶¶ 13-20, 38 & Exs. 6-8. In the face of such overwhelming and unanimous support for Winston & Strawn's request, FDIC-Receiver adduces *no evidence at all* that even one shareholder objects to Winston & Strawn's fee petition. In short, the "will" of the shareholders is clear – Winston & Strawn should receive its requested success fee. *See Swedish Hosp.*, 1 F.3d at 1271 (finding significant "that a large number of hospitals, in contravention of their economic interests, took the trouble to affirmatively support the proposed fee settlement").

**C.    Receivership Principles Do Not Preclude Granting Winston & Strawn's Request of a Success Fee**

FDIC-Receiver insists that "receivership principles" dictate that it "refrain from being overly generous in awarding fees in circumstances involving protected funds." FDIC Opp'n at 24. Significantly, however, FDIC-Receiver does not reveal the origins of these lofty principles – it offers no statutory, regulatory, nor agency policy that precludes awarding attorney's fees above

---

[6] On May 2, 2006, this Court held a Fairness Hearing to hear arguments related to the proposed settlement for the Tax Case. After substantial notice was given to the shareholders of Benj. Franklin, 3 million votes were cast, of which 99.3% voted in favor of the Settlement. FDIC Opp'n at 23 ("the FDIC-Receiver sought the input of *all the shareholders* given the substantial overall stakes involved") (emphasis added). The three individuals who have provided declarations of support on behalf of Winston & Strawn constitute over half of the votes cast at the May 2, 2006 hearing (Gary Hindes has 800,000 shares, Hindes Decl. at ¶ 1 (Ex. 7), Abe Siemens has 346,000 shares, Siemens Decl. at ¶ 1 (Ex. 8), and C. Robert Suess has 371,000 shares, Suess Decl. at ¶ 2 (Ex. 9)).

and beyond "standard hourly rates."[7]  The only support FDIC-Receiver offers is *Veeder v. Public Service Holdings Corp.*, 51 A.2d 321, 325 (Del. 1947), a state-court decision from Delaware dating back to 1947.  To be sure, *Veeder* carries no weight whatsoever, and certainly cannot overcome the binding precedent set in *Swedish Hospital*.[8]

### D.    FDIC-Receiver Did Not Notify Winston & Strawn During The Course Of The Settlement Negotiations That It Would Not Receive A Success Fee

FDIC-Receiver repeatedly references an email that purportedly put Winston & Strawn on notice that it would not receive a success fee.  FDIC Opp'n, Ex. 4.  Significantly, however, this email is dated September 28, 2005, well after Winston & Strawn devoted virtually all of its time to resolving the IRS claim.  This email, therefore, is completely irrelevant to the firm's expectations, as reflected in its written and oral agreements with Mr. Suess, that it would recover a success fee if the IRS claim were settled on terms favorable to the Benj. Franklin shareholders. *See* W&S Facts at ¶¶ 13-20.

### E.    The Tax Case Was Not A Mere "Continuation" Of Winston & Strawn's Work In The Court Of Federal Claims Case

FDIC-Receiver argues that a success fee is not warranted because Winston & Strawn's efforts in resolving the IRS claim merely was "a continuation of [the firm's] longstanding representation in the Goodwill Case going back to 1990."  FDIC Opp'n at 8.  But neither the United States (the defendant in the "Goodwill Case" before the Court of Federal Claims) nor Winston & Strawn's own client has ever suggested that the firm's representation in that case required Winston & Strawn to participate in resolving the IRS claim.  The two proceedings

---

[7] FDIC-Receiver has admitted that it does not have any policies or guidelines for evaluating attorney fee petitions, nor were any polices or guidelines employed in the evaluation of Winston & Strawn's request. Gill Dep. Tr. at 10:3-11 (Ex. 1).

[8] After holding that a common fund was created, the court in *Veeder* adopted a lodestar type analysis in order to determine "reasonable compensation," an approach this Circuit has expressly rejected. See *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1266-71 (D.C. Cir. 1993).

constitute two different actions implicating two different sets of operative facts involving different parties and different courts. Indeed, FDIC-Receiver fails to reconcile its argument with its decision to pay Winston & Strawn for its efforts in connection with the IRS claim settlement.

Three additional facts belie FDIC-Receiver's proposition that representation in the Tax Case was "a continuation of [Winston & Strawn's] longstanding representation" in the Goodwill Case. First, while Winston & Strawn's earliest work on the tax issues (1998 and 1999) was billed under the client's original billing number per the client's request, Winston & Strawn did create a separate billing number once the United States filed suit in July 2002. See Buchanan Supp. Decl. at ¶ 3 (Ex. 6). And while Winston & Strawn sought and was granted attorney's fees from the first period of work, the vast majority of the work on the Tax Case was accomplished after the government filed suit. *Id*. at ¶ 4.

Second, as FDIC-Receiver concedes, Mr. Moetell of Winston & Strawn played the primary role in defending and negotiating the IRS claim. *See, e.g.,* W&S Facts ¶ 19. Yet, he has had no role in connection with the Court of Federal Claims matter. Moetell Decl. ¶ 17 (Ex. 5).

Third, FDIC-Receiver itself admits that Winston & Strawn would not have been compensated beyond the greatly reduced rate of $125 an hour for its services in the absence of a successful resolution of the Tax Case. *See* Gill Dep. Trans. 83:17-84:1 (Ex. 1). This puts to rest FDIC-Receiver's claim that Winston & Strawn did not take on any "additional risk" by taking on the Tax Case on a reduced hourly rate. FDIC Opp'n at 8.

In the end, FDIC-Receiver utterly fails to address why a law firm would accept one-third of its customary billing rates without an expectation of a contingent award. That is because they cannot. No law firm would enter into such an arrangement. The simple fact remains that Winston & Strawn accepted greatly reduced hourly billing rates contingent upon the promise of a

success fee if the Tax Case were settled to the satisfaction of the shareholders. It is altogether reasonable as a matter of law that a law firm that incurs contingent risk is entitled to be compensated. *Blum v. Stenson*, 465 U.S. 886, 903 (1984) (Brennan, J., concurring) ("Lawyers operating in the marketplace can be expected to charge a higher hourly rate when their compensation is contingent on success than when they will be promptly paid, irrespective of whether they win or lose").

## **CONCLUSION**

For the foregoing reasons, Winston & Strawn respectfully requests that the Court grant Winston & Strawn's motion for summary judgment in its entirety and likewise deny FDIC's cross motion in its entirety.

Dated: March 15, 2007

Respectfully submitted,

By: _____
Thomas M. Buchanan
Eric W. Bloom
Charles B. Klein
Scott D. Pluta
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20001
(202) 282-5100

*Counsel for Winston & Strawn LLP*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2007, a copy of the foregoing document was served by first class mail, postage prepaid, and email upon the following:

William F. Demarest (D.C. Bar No. 266312)
Blackwell Sanders Peper Martin LLP
750 17th Street N.W., Suite 1000
Washington, D.C. 20006-3901
Phone: (202) 378-2300
Facsimile: (202) 378-2319
*Attorney for Blackwell Sanders Peper*
*Martin, LLP and Ernest Fleischer*

James Borthwick  (MO #19722)
Nancy S. Jochens  (MO #49022)
Blackwell Sanders Peper Martin LLP
4801 Main Street, Suite 1000
Kansas City, MO. 64112
Phone: (816) 983-8000
Facsimile: (816) 983-8080
*Attorneys for Blackwell Sanders Peper*
*Martin, LLP and Ernest Fleischer*

Don S. Willner
DON S. WILLNER AND ASSOCIATES
630 Sunnyside Road
Trout Lake, Washington 98650
(509) 395-2939 (Facsimile)

Bruce C. Taylor
FEDERAL DEPOSIT INSURANCE
CORPORATION
55017th Street, NW
Room VS-E7118
Washington, DC 20429
(703) 562-2478 (Facsimile)
Counsel for Federal Deposit Insurance
Corporations,
as Receiver far The Benj. Franklin FS&LA

Kelby Fletcher
Attorney at Law
1501 4th Avenue, Suite 2800
Seattle, WA 98101
(206) 682-1415 (Facsimile)

Jeremiah A. Collins
13REDHOFF &. KAISER, PLLC
805 15th Street, NW
Washington, D.C. 20005-2207
(202) 842-1885 (Facsimile)
Counsel for Willner & Associates

Charles B. Klein

DC:506317.5

16