AAGILL.txt

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------x
WINSTON & STRAWN, LLP, et al.,  :
                                :
        Plaintiffs,             :
                                :
        v.                      : No. 06-01120 (EGS)
                                :     06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE        :     06-01273 (EGS)
CORPORATION,                    :
                                :
        Defendant.              :
------------------------------x

                            Washington, D.C.

                    Wednesday, January 17, 2007

Deposition of

                    RICHARD GILL

a witness, called for examination by counsel for

Plaintiffs, pursuant to notice and agreement of

counsel, beginning at approximately 2:30 p.m., at

the law offices of Winston & Strawn, 1700 K Street,

NW., Washington, D.C., before Mary Ann Payonk of

Beta Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:

                                              2

1    APPEARANCES:

2        On behalf of Winston & Strawn, LLP:

                    Page 1

AAGILL.txt

18   whatever you want to call it, I've probably

19   handled hundreds.

20      Q   But just so we're clear, the only

21   other fee petitions you evaluated have been

22   those of contract attorneys who were doing

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

9

1   work for FDIC, is that correct?

2      A   That is correct.

3      Q   Does FDIC have any written or oral

4   guidelines for evaluation of attorney fee

5   petitions?

6      A   I am not aware of any.

7      Q   So we're clear, and no such

8   guidelines were utilized by you in reviewing

9   my fee petition?

10      A   No, I did not look at any -- any

11   FDIC policy on this matter.

12      Q   Were you given any oral

13   instructions by anyone in terms of how to

14   evaluate my fee petition?

15      A   Can -- that -- I'd have to say yes.

16      Q   All right.

17      A   I mean, but it -- as far as --

18      Q   Who gave you those instructions,

19   and what were they?

20      A   Robert Clark and Rick Aboussie.

Page 8

AAGILL.txt

21      Q    And what instructions were you

22  given in evaluating my fee petition?

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400       800-522-2382

10

1            MR. TAYLOR:  Let me stop the

2  witness here for a second.

3            MR. WILLNER:  Sure.

4            MR. TAYLOR:  I'm going to object

5  initially insofar as it calls for information

6  that's protected by the work product

7  privilege and instruct the witness not to

8  answer if it does.  Otherwise, if your

9  question calls for whether he was provided

10  with the standards of review, that's fine.

11            BY MR. WILLNER:

12      Q    Were you provided standards of

13  review by any superior in connection with my

14  fee petition?

15      A    No.

16      Q    All right.  Do not answer this

17  question, to give your attorney a chance to

18  object.  Were you provided any guidance in

19  writing or orally by any of your superiors in

20  dealing with my fee petition?

21            MR. TAYLOR:  Again, to the extent

22  it calls for information that's protected by

AAGILL.txt

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

⬚

11

1    the work product provision I object and I

2    instruct the witness not to answer.  If it's

3    just talking about policies, procedures,

4    specific instructions about how to go about

5    it, that's fine.

6            MR. WILLNER:  I think you're

7    premature.  I just asked him if he provided

8    any.

9        A    The answer is yes, but it's in

10   response to your November 2004 letter

11   agreement that you had with the FDIC.

12           BY MR. WILLNER:

13       Q    All right.  Well, what

14   instructions, guidelines, were you given in

15   connection with the letter agreement between

16   Bob Clark and myself?

17       A    The November agreement, the letter

18   agreement which Bob Clark memorialized with I

19   believe a one-sentence concurrence, says that

20   the FDIC will support reasonable attorneys'

21   fees and that the -- and that the fees, you

22   know, will be run through the receivership

AAGILL.txt

63

1    get nothing.  So my internal calculus was

2    that this was a case that was crying out for

3    settlement, so I firmly believe trial would

4    not have been good for this case.

5        Q    Did you share with that anyone,

6    that you thought settlement would be the

7    preferred avenue?

8        A    I believe I shared it with Don and

9    Tom Buchanan.  I can't remember.  I'm not

10   sure whether I shared it with Ernie or not,

11   but at that time, I thought Ernie was a

12   consultant to Don.

13       Q    Did you share that view with the

14   Court at any point?

15       A    No, because the -- the -- well,

16   yes, in the sense -- and not directly.  What

17   we had to file every six months was status --

18   status updates or status updates on the case.

19   And, you know, what we -- each status

20   conference we'd file is we're making progress

21   towards settlement.  So I didn't say that,

22   you know, we wanted -- we didn't want to

64

Page 58

AAGILL.txt

```
 1    litigate, but certainly, you know, if you
 2    read the status conference reports, it
 3    certainly -- and then I think Judge Sullivan
 4    mentioned that in the fairness hearing that
 5    each status report, he could tell that we
 6    were making progress towards settlement.
 7        Q    Earlier you referenced the money,
 8    that the IRS either way felt that they were
 9    going to get the money.  When you refer to
10    the money, is that the -- the balance of the
11    surplus in the receivership?
12        A    Yes.  It was the surplus that
13    turned out to be around $94 million.
14        Q    So their general feeling was that
15    no matter how things ran, they were going to
16    end up getting the balance of the surplus?
17        A    Yes.  When they sued for a
18    million-2 or a billion 2, they felt that, you
19    know, no matter, it just would be gradations,
20    but no matter which scenario was run, it
21    would never push it down to a level where
22    you'd generate a surplus.
```

65

```
 1        Q    Uh-huh.  Now, you referred to 11 or
 2    12 scenarios that were to be run.  Do you
```

Page 59

AAGILL.txt
3     know who authored those?  Was that the IRS?

4         A    I believe, yes, yes, it was Susan

5     -- was it Susan?  It was -- it was -- and

6     this was before my time on the case, but the

7     -- the attorney for the DOJ, Henry

8     Darnstadter, D-A-R-N-S-T-A-D-T-E-R, but he

9     stated to me that somebody had suggested

10    that, and he went along with it.  And I guess

11    through discussions -- and I wasn't there --

12    they basically ran the tax scenarios

13    depending on a number of assumptions which

14    way federal financial assistance was taxed,

15    and there were a bunch of other assumptions

16    that kind of escaped me, whether penalties

17    were excluded.  And I think they produced 11

18    scenarios, and I believe two of which

19    produced actually a surplus.

20        Q    Do you happen to recall the amounts

21    of surpluses those two scenarios resulted in?

22    Approximate amount is fine.


BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382



                                                        66


1         A    I think -- I think that -- and the

2     documents will probably prove how accurate,

3     but one produced a tax liability of around 12

4     and a half million, which we believe I think

5     was scenario 10, which we believe was the --
                    Page 60

AAGILL.txt

11      A    I tried to.  I mean, I -- it was

12  tedious, but I went through them.

13      Q    What are some of the factors that

14  you used in evaluating granting Winston &

15  Strawn the standard hourly billing rate?

16      A    I accepted -- I looked to see that

17  the work that was done was legal and related

18  to the tax case.  And I accepted your

19  representations about your hourly rates,

20  which, you know, as law firms do, they

21  increased over time.  And so that -- that's

22  -- and I guess, you know, maybe it's

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

                                                    69

1   answering your question indirectly, but I

2   think it was 15.5 hours that I disallowed.  I

3   believed that those hours were spent -- you

4   know, in a big bill like that it's not

5   surprising those hours were spent on the

6   goodwill case, the related but unrelated

7   case.  So I thought that wasn't directly

8   related to the tax case.

9       Q    In evaluating Winston & Strawn's

10  claim for a success fee, which factors did

11  you use to evaluate that part of the proof of

12  claim?

Page 63

AAGILL.txt

13      A      Well, I guess -- backing up, I -- I

14    think we were not going to pay a success fee.

15    In other words, our understanding -- and

16    maybe Tom Buchanan and Winston got pulled in

17    -- is that according to our letter with Don

18    Willner, we believed that reasonable hourly

19    rates was the standard rate.  And I know that

20    Tom wasn't, you know, directly involved in

21    that letter, but I think the FDIC's feeling

22    was what was good for the goose is good for


BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382



70


1    the gander and that we were going to pay the

2    standard hourly rates.

3                  (Discussion off the record.)

4            BY MR. PLUTA:

5      Q      How familiar are you with the

6    involvement of various firms working on the

7    tax issue?  And by that I mean the amount of

8    work done by the various firms, the presence

9    of the various firms, the lawyers involved,

10    the resources allocated.

11      A      I mean, reasonably familiar, but I

12    don't want to say intimately familiar.  I

13    mean, I -- I learned a lot, I think, by

14    reviewing the bills, but --

15      Q      Okay.  And based on your

AAGILL.txt

16    familiarity and reviewing the bills, I think
17    you used the term earlier "heavy lifting."
18    In your opinion, of the law firms that worked
19    on the tax settlement, who in your opinion or
20    what firm in your opinion did the most heavy
21    lifting?
22          A    I think with respect to the tax

71

1    matters, the -- I think Winston & Strawn --
2    at least there was a memo written on the
3    federal financial assistance that -- that I
4    thought was very helpful in, you know,
5    advancing certain of the issues in the tax
6    settlement.  I mean, that -- that's what I
7    remember in particular.
8          Q    Was there anything else besides the
9    memo?
10          A    Well, in -- I -- I thought that
11    Mitchell Moetel, which I don't remember how
12    -- of the Winston & Strawn firm did, you
13    know, very effective jobs at the settlement
14    conference on advancing, you know, certain of
15    the tax positions.
16          Q    Are you familiar with the various
17    tasks that were performed by the different
                    Page 65

AAGILL.txt
18    law firms in regards to the IRS settlement

19    issue?

20        A    In general.  I -- I don't want to

21    say that I -- I -- I mean, it was more by

22    watching the people at the settlement that I


BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382



72


1    was gleaning what tasks were allocated, but I

2    truthfully don't think I knew in advance --

3    and maybe my perceptions were wrong -- as to

4    who was doing what.

5        Q    Okay.  Given that, given your

6    perceptions, do you have knowledge of which

7    firm, in your opinion, reviewed the majority

8    of the tax returns?

9        A    Judging by the billing, it was

10   clear that the Winston & Strawn firm reviewed

11   most of the tax firms -- I mean, the tax

12   forms.  Certainly, Ernie Fleischer's firm did

13   some work, but it looked like in particular

14   Mitchell Moetel was assigned because there

15   were lots of hours reviewing the various tax

16   returns and -- and tax matters.

17       Q    Which firm performed the most legal

18   analysis and research?

19       A    Just given -- given what -- given

20   what I saw, I'd say that on the -- that --
                Page 66

AAGILL.txt

21    that the Mitch -- Winston & Strawn performed

22    at least a significant part of the legal

73


1    research.  And I think Rosemary Stewart

2    provided some.  But I don't think that was --

3    I think that was not necessarily the tax

4    strategy.  And I -- Ernie, I would assume,

5    provided some, but I just don't remember.

6        Q    Which law firm did the -- the most

7    work associated with the presentations that

8    were given?

9        A    As far as the substantive

10   responses, I would say Winston & Strawn.  I

11   think, you know, Don Willner considers

12   himself the master of ceremonies and the

13   maestro, but I think the heavy substantive

14   work, at least as far as the -- was done by

15   Winston & Strawn.  And I remember Ernie did

16   some work on a -- on a goodwill issue that --

17   but I think that the main substantive work

18   was Winston & Strawn.

19       Q    Can you tell me which firm did the

20   majority of the substantive work in the

21   negotiations with the IRS directly?

22       A    You know, that -- in other words,

Page 67

AAGILL.txt

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

☐

74

1    the negotiation was a combination of the FDIC

2    and the law firms and the IRS.  I mean,

3    certainly -- trying to remember.  I know that

4    Winston & Strawn did a lot of the

5    substantive, you know, presentations at the

6    negotiations.  I think there was a lot of --

7    lot -- I would say at the actual settlement

8    discussions where the -- the IRS and all the

9    people were present, the Winston & Strawn

10   firm -- subsequently, there were a lot of

11   like telephonic conversations.  So I think

12   Don Willner played a part, I played a part

13   and --

14        Q    Okay.  In your opinion, if you

15   could single out one single attorney who did

16   the most to bring about a successful

17   settlement of the IRS claim, who would that

18   be?

19        A    Excluding me?

20        Q    Excluding -- excluding you.

21        A    You know, that -- in all honesty,

22   it's hard to answer that question because I

75

1    think the combined group performed the magic

2    of the settlement.  I mean, I -- certainly, I

3    mean, if -- you know, issue by issue, I think

4    Mitchell Moetel did -- well, I think Mike

5    Duhl, who was an FDIC consultant, and Richard

6    Peyster, who was at FDIC, had discussions

7    with IRS on the way FFA should be taxed.

8    Mitchell Moetel did a memo that was very

9    useful and I think very helpful in

10   facilitating settlement.

11         But there were a bunch of other tax

12   issues that I think lots -- I mean, it wasn't

13   -- my predecessors, Hugo and Catherine, there

14   was a big issue that would have pulled away

15   all the surplus.  There was approximately 260

16   million of the subrogated interests that the

17   FDIC wanted to deduct in 1990, and the IRS

18   said that it didn't meet the all events test

19   because it was accrued later and paid later.

20   The FDIC, my predecessors, carried the ball

21   on that.

22         So I don't mean not to answer the

AAGILL.txt

12    hour.  And I assumed that that was the rate

13    that -- that Winston & Strawn was getting.

14        Q    Did you understand that rate to be

15    a discount to what Winston & Strawn typically

16    charges for legal services?

17        A    Yes, and that -- that's why we felt

18    like, you know, the standard hourly rate was

19    appropriate because it was significantly

20    more.  I mean, I think Tom Buchanan's rate

21    when we left the case was like 505 an hour.

22    It's probably higher now, but --


BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382



82

1        Q    In your assessment of the situation

2    do you believe that Winston & Strawn assumed

3    a measure of risk in prosecuting the

4    shareholders' case?

5        A    Now that requires facts that I'm

6    not fully aware of.  I don't know what

7    Winston & Strawn's total wall was, but -- but

8    certainly if a firm takes a case on

9    contingency, you obviously do assume some

10    risk.  I guess the -- to mitigate that risk a

11    little bit, you at least were getting paid

12    something.  It wasn't a pure contingency, but

13    -- but there obviously is risk when you take

Page 75

AAGILL.txt
14    on a case if you're not being compensated

15    straight up at your normal hourly rate.

16         Q    If Winston & Strawn -- strike that.

17    If the case had been lost, would the FDIC

18    have approved Winston & Strawn's standard

19    billing rates?

20         A    Oh, absolutely not, because I think

21    in the letter to Don Willner it was made

22    clear that this was contingent on the


BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

83

1    successful settlement.

2         Q    So if Winston & Strawn would not be

3    compensated if the case was lost, if the case

4    was won, they would merely be compensated to

5    the level of their standard billing rates?

6         A    Well, that's a question I don't

7    know the answer to is if this case had

8    actually been litigated to judgment.  And,

9    one, I think the FDIC wouldn't be directly

10    involved in it.  You would be going to the

11    Court to get, you know, some type of -- but

12    this was part of a -- of a settlement

13    process.  And the specific deal was if the

14    settlement was effectuated, the attorneys

15    that, you know, added to the settlement would

16    be compensated.
Page 76

AAGILL.txt

17      Q    In the discussions you had

18   regarding the awarding or not to award the

19   success fee to Winston & Strawn, do you

20   recall any legal basis that was discussed or

21   that you relied on to deny the success fee?

22      A    We -- we believed that it was -- it

84

1    was based -- I mean, it wasn't as much a

2    legal basis as what the -- the letter

3    agreement said.

4       Q    So the letter agreement was both a

5    factual and a legal basis to deny the awards?

6       A    Well, it was clearly the factual

7    basis.  I don't think we ever -- I don't

8    think we ever got into -- I mean, we

9    certainly -- we certainly looked at the cases

10   and, you know, we didn't believe that -- I

11   mean, obviously, you're having a de novo

12   proceeding in district court.  And Judge

13   Sullivan will be the final arbiter, but just

14   on our read of the cases, if one law firm had

15   taken on a case and provided through trial

16   and successfully run it, then a success fee

17   in many cases was appropriate.

18              This was a novel animal.  It was

Page 77

AAGILL.txt

19    effectuating a settlement, and so I think the

20    primary basis was the fact that the FDIC

21    believed it had -- its position was we were

22    going to pay the normal hourly rates.


BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

〔


85


 1        Q    Do you happen to know if Winston &

 2    Strawn was a party to the agreement that you

 3    refer to?

 4        A    No.  Winston & Strawn wasn't at

 5    that time.  Should I say it diplomatically?

 6    I think Bob Seuss, who was Winston & Strawn

 7    client, and Don Willner, was on the outs, so

 8    to speak.  So Winston & Strawn was not a

 9    direct party to that agreement.

10        Q    Do you know if that letter or

11    agreement were referenced in any way in the

12    disallowance letter you sent Winston & Strawn

13    regarding that claim?

14        A    I don't think it was.  I don't

15    think it was.

16        Q    Did you cite any or rely on any

17    case law in deciding whether or not to grant

18    a success fee?

19        A    Not in the disallowance letter, no.

20        Q    When you were going through the

21    process of deciding whether or not to grant

Page 78