# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **WINSTON & STRAWN LLP,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **DON S. WILLNER & ASSOCIATES, P.C.** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **BLACKWELL SANDERS PEPER MARTIN** | ) | |
| and | ) | Civil Case No. 06-01120 (EGS) |
| **ERNEST M. FLEISCHER** | ) | |
| | ) | [Consolidated with No. 06-01227 |
| Consolidated Plaintiffs, | ) | (EGS) and No. 06-01273 (EGS)] |
| | ) | |
| v. | ) | |
| | ) | |
| **FEDERAL DEPOSIT INSURANCE** | ) | |
| **CORPORATION, AS RECEIVER FOR** | ) | |
| **THE BENJ. FRANKLIN FS&LA,** | ) | |
| **PORTLAND, OREGON** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FDIC'S REPLY TO PLAINTIFFS' OPPOSITIONS TO FDIC'S CROSS MOTION FOR SUMMARY JUDGMENT, INCLUDING MEMORANDUM OF POINTS AND AUTHORITIES AND CORRECTED AND SUPPLEMENTAL STATEMENT OF MATERIAL FACTS**

Bruce C. Taylor
Federal Deposit Insurance Corporation
550 17th Street, NW
Room VS-E7118
Washington, DC 20429
(703) 562-2436 (Telephone)
(703) 562-2478 (Facsimile)

Counsel for Federal Deposit Insurance Corporation,
as Receiver for The Benj. Franklin FS&LA

Date:   March 30, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FDIC'S REPLY TO
PLAINTIFFS' OPPOSITIONS TO FDIC'S CROSS MOTION FOR SUMMARY JUDGMENT 1

I.   The Atypical Nature Of This Case Does Not Justify Additional Fees ............................... 1

II.  The Plaintiff Law Firms Admit That The IRS Never Accepted Their Theories ............... 4

III. The Final Settlement and IRS Scenario # 10 Are Connected ............................................. 5

IV.  The FDIC-Receiver Is Entitled To Summary Judgment As A Matter Of Law ................. 8

IV.  Evidentiary Issues .................................................................................................. 8

     A. The Statements and Exhibits Referred to in the FDIC-Receiver's
        Declaration Are Admissible ......................................................................... 8

     B. Richard Gill's Corrected and Supplemental Declaration
        Satisfies Fed. R. Civ. Proc. 56(e) ............................................................... 10

V.   The Plaintiff Law Firms Are Not Entitled To Additional Fees
     Regardless of Whether the FDIC-Receiver Acted as an Advocate or Honest Broker...... 11

VI.  Willner & Associates Is Not Entitled To A Washington DC Hourly Rate...................... 14

VI.  The Additional Declarations Submitted by Willner & Associates Do Not Qualify as
     Admissible Expert Testimony............................................................................. 15

VII. The Decrease In the Surplus Is A Relevant Factor ......................................................... 15

CONCLUSION.................................................................................................. 15

CORRECTED AND SUPPLEMENTAL STATEMENT OF MATERIAL FACTS ................... 17

# TABLE OF AUTHORITIES

**Cases**

*Swedish Hospital Corp. v. Shalala*,
  1 F.3d 1261 (D.C. Cir. 1993) ............................................................................. 2, 4
*United States v. FDIC*,
  No. 02-1427 (D.D.C.) ...................................................................................... 18, 19
*Visser v. Packer Engineering Ass'n*,
  924 F2d 655 (7th Cir. 1991) ................................................................................ 11

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................ 1
Fed. R. Civ. Proc. 56(e) .................................................................................. 9, 10, 11
Fed. R. Evid. 408 ........................................................................................................ 9
Fed. R. Evid. 701 ...................................................................................................... 15
Fed. R. Evid. 702 ...................................................................................................... 15
Fed. R. Evid. 801 ........................................................................................................ 9
Fed. R. Evid. 801 (c) ................................................................................................ 10
Fed. R. Evid. 801-803 .............................................................................................. 10
Fed. R. Evid. 802 ........................................................................................................ 9
Fed. R. Evid. 803 ........................................................................................................ 9
Fed. R. Evid. 803 (3) ................................................................................................ 10
LCvR 56.1 .................................................................................................................... 1
LCvR 7(h) .................................................................................................................... 1
LCvR56.1 .................................................................................................................... 8
LCvR7(h) ..................................................................................................................... 8

**Treatises**

11 James Wm. Moore et al, *Moore's Federal Practice* § 56.14  (LEXIS 2006) .......................... 10

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FDIC'S
REPLY TO PLAINTIFFS' OPPOSITIONS TO FDIC'S CROSS MOTION FOR
SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, LCvR 56.1, and LCvR 7(h), the Federal Deposit Insurance

Corporation, as Receiver for The Benj. Franklin FS&LA ("FDIC-Receiver"), files this reply to

the oppositions filed in this consolidated action by the Plaintiff Law Firms on March 15, 2007.[1]

### I.     The Atypical Nature Of This Case Does Not Justify Additional Fees

The Plaintiff Law Firms would like the Court to believe that the Tax Case[2] was a typical

common fund case and that they are asking for much less than they are otherwise entitled to.  But

the Tax Case was not a typical common fund case.  And the Plaintiff Law Firms are asking for

additional fees that are not justified given the atypical nature of the Tax Case.

As discussed in the FDIC-Receiver's opening brief, the Tax Case shares little in common

with the typical common fund case.[3]  The Tax Case was initiated by the United States on behalf

of the IRS against the FDIC as receiver for the failed Benj. Franklin FS & LA.  The Plaintiff

Law Firms did not initiate the action on behalf of a class.  The receivership surplus – the

"common fund" – already existed, and the shareholders of Benj. Franklin already had a

contingent interest in the surplus under applicable law.

Winston & Strawn and Willner & Associates began representing the shareholders in 1990

in connection with the Goodwill Case.[4]  Winston & Strawn and Willner & Associates did not

take on any more risk than they already had, as they were already representing the interests of the

---

[1]  Consistent with the conventions used in the FDIC-Receiver's opening brief, the plaintiffs are collectively referred
to as the "Plaintiff Law Firms."  Plaintiff Winston & Strawn LLP is referred to as "Winston & Strawn."  Plaintiff
Don S. Willner & Associates P.C. is referred to as "Willner & Associates."  Plaintiffs Blackwell Sanders Peper
Martin and Ernest Fleischer are collectively referred to as the "Blackwell Plaintiffs."
[2]  As in the FDIC-Receiver's opening brief, "Tax Case" refers to *United States v. FDIC*, No. 02-1427 (D.D.C.)
[3]  FDIC Opp. 1-3.
[4]  As in the FDIC-Receiver's opening brief, "Goodwill Case" refers to *Suess v. United States*, No. 90-981C (Fed.
Cl.).

1

shareholders. The fact that Winston & Strawn set up a separate billing matter for the Tax Case does not negate its longstanding representation of the shareholders going back to 1990, which included 429 hours billed to tax issues in 1998-1999.[5] As shareholder Robert Suess states in his declaration in support of Winston & Strawn, the firm "spent a considerable amount of time doing this project in 1998 and 1999.[6] And it is not surprising that Winston & Strawn set up a separate billing matter for the Tax Case – after all they could not bill to the Tax Case until it was filed. But Winston & Strawn did not enter into a separate fee arrangement with Mr. Suess until May 9, 2003, nearly a year after the Tax Case was filed.[7]

In addition, because Winston & Strawn and Willner and Associates had been receiving payment – albeit at reduced rates – neither firm faced the risk of total non-payment. The Blackwell Plaintiffs, on the other hand, were hired as consultants by Willner & Associates, yet they are requesting as much additional compensation as the other two plaintiffs combined. This seems patently unreasonable.

The Plaintiff Law Firms agree that the general range of 20% to 30% for attorney's fees discussed in *Swedish Hospital* [8] is inappropriate to this case. The FDIC-Receiver contends, of course, that the firms have already received reasonable compensation and are not entitled to additional fees.

But the Plaintiff Law Firms cannot even agree on the proper measure of additional compensation. Winston & Strawn seeks twice what the FDIC-Receiver paid to the firm at its

---

[5] Like Winston & Strawn, the FDIC-Receiver does not see any reason to make Winston & Strawn's fee bills part of the record. *See* Winston & Strawn MSJ 17 n. 11. But the FDIC-Receiver joins in Winston & Strawn's offer to supplement the record at the Court's request. For reference, however, the pertinent invoice numbers for the period 1998-1999 are: 153332, 155139, 157268, 160185, 167932, 162413, 164793, 170394, 172010, 174018, 177319, 179964, 183348, and 201379.

[6] Winston & Strawn MSJ 13.

[7] *See* Winston & Strawn Facts 4 ¶ 16.

[8] *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993).

standard hourly rates.  Willner & Associates seeks roughly seven times what the FDIC-Receiver paid to the firm at the imputed hourly rate of $250.  The Blackwell Plaintiffs seek about 15 times what the FDIC-Receiver paid the firm at its standard hourly rates.  Winston & Strawn believes that it would be reasonable for Willner & Associates and the Blackwell Plaintiffs to receive double what the FDIC-Receiver paid them, which of course comports with Winston & Strawn's theory of the case.  On the other hand, Robert Suess, a major shareholder who has expressed support for Winston & Strawn's request for double fees, opposes any additional compensation to Willner & Associates.  Rosemary Stewart, a member of the only firm that did not sue for additional fees, believes that the Blackwell Plaintiffs have already received reasonable compensation and are not entitled to additional fees.  And the FDIC-Receiver, as custodian of the funds from which additional fees would be paid, opposes additional compensation for any of the Plaintiff Law Firms.

   In the Notice to Shareholders, the FDIC-Receiver agreed to pay "reasonable fees" to the attorneys for the shareholders "to compensate for the *time, expense, and expertise* that all shareholders' counsel and consultants brought to the Courtroom and to the settlement table in order to achieve a fair tax settlement."[9]  There is nothing to indicate that the FDIC-Receiver agreed to pay success or contingency fees to the Plaintiff Law Firms.  And the estimate of $1 million to $2 million for reasonable fees supports the FDIC-Receiver's position.  The Plaintiff Law firms were active participants in the preparation for the fairness hearing and did not object to the language used in the Notice to Shareholders.[10]  In fact, the Notice to Shareholders explicitly states "Mr. Willner and the other shareholders counsel now support the proposed tax

---

[9]  Notice to Shareholders 7 (FDIC Ex. 5).  (Emphasis added).

[10]  Gill Dec. II at 8-9 ¶ 25 and ¶ 26 (FDIC Ex. 21).

settlement *described herein* and will speak in favor of the proposed tax settlement at the Fairness Hearing."[11]

The FDIC-Receiver has paid over $4 million from the receivership surplus to cover legal fees under the terms of the settlement of the Tax Case. The FDIC-Receiver recently approved the payment of an additional $170,932 based on the $217,000 claim submitted by Winston & Strawn on behalf of shareholder Robert Suess.[12]  In all, payments for legal fees amount to about 10% of the gross surplus of $40+ million left over for distribution to the shareholders in the wake of the settlement.

This is not a typical common fund case.  And the Plaintiff Law Firms have already received reasonable compensation under the atypical facts of this case.

## II.    The Plaintiff Law Firms Admit That The IRS Never Accepted Their Theories

The Plaintiff Law Firms take somewhat different tacks in their replies, but they express at least one overarching theme.  Each of the firms continues to insist that it is entitled to a success fee, because its efforts saved the remaining receivership surplus.  But the Plaintiff Law Firms ignore a significant problem for them:  they admit that the IRS *never* accepted any of the theories presented by the Plaintiff Law Firms.[13]  It is difficult to understand how the Plaintiff Law Firms can credibly argue that they were responsible for the settlement result when they admit that the IRS never accepted the Plaintiffs' theories.  Despite their protestations to the contrary, this is a significant problem for the Plaintiff Law Firms under *Swedish Hospital v. Shalala*.

The problem is highlighted by the course of settlement.  The FDIC-Receiver submitted a $47 million settlement proposal to the IRS in November 2004, based on Scenario # 10, without

---

[11]  Notice to Shareholders 6 (FDIC Ex. 5).  (Emphasis added).

[12]  Gill Dec. II at 5-6 ¶ 15 (FDIC Ex. 21); *See* FDIC Opp. 5.

[13]  Willner Dep. 19:17-22, 20:1-2 (Jan. 18, 2007) (FDIC Ex. 11).

penalties, with the $47 million divided between $11.75 million in taxes and $35.25 million in interest.[14]  In November 2005 the IRS agreed to settle for $50 million, $47 million plus an additional $3 million in interest.[15]  The Plaintiff Law Firms argue that the IRS did not settle on the basis of Scenario #10, but they cannot deny that Scenario #10 provided a tax result of $47 million, including interest but without penalties, and that an additional $3 million in interest, as required by the IRS, exactly matches the settlement amount of $50 million.  This is addressed in more detail herein.

Because the Plaintiff Law Firms admit that the IRS never accepted their theories, it is reasonable to conclude that the Plaintiff Law Firms cannot show that they were responsible for the remaining surplus, even if one discounts the similarity between IRS Scenario #10 and the $50 million the IRS agreed to accept in settlement.

## III.    The Final Settlement and IRS Scenario # 10 Are Connected

The Plaintiff Law Firms object to the FDIC-Receiver making a connection between the IRS Scenario #10 and the final settlement amount of $50 million.  The FDIC-Receiver merely pointed out that the final settlement amount of $50 million corresponded to the $47 million tax result presented by IRS Scenario #10, plus an additional $3 million in interest, which the IRS required before agreeing to settle.

---

[14]  Gill Dec. II at 6-7 ¶ 18 and ¶ 19 (FDIC Ex. 21).
[15]  Gill Dec. II at 7-8 ¶ 21 and ¶ 22 (FDIC Ex. 21).

The connection between the first $47 million of the final $50 million settlement amount and Scenario #10 is evident by adding the net taxes due, *without penalties*, and interest from Scenario #10 (actually titled Schedule #10).[16]  Those calculations are shown below.

| Tax Year | Net Tax Due | Interest |
|---|---|---|
| 1990 | 1,094,031 | 25,082,433 |
| 1991 | 2,998,795 | 4,461,743 |
| 1992 | 431,076 | 3,833,868 |
| 1994 | 113,081 | 409,337 |
| 1998 | 1,542,238 | 615,286 |
| 1999 | 1,837,226 | 536,014 |
| 2000 | 1,394,941 | 252,949 |
| 2001 | 1,741,192 | 174,115 |
| 2002 | 481,025 | 18,301 |
| Total | 11,633,605 | 35,384,046 |

The totals of $11,633,605 and $35,384,046 equal $47,017,651.  This is not an amazing coincidence.  The parties discussed Scenario #10 at length in several meetings.[17]  The FDIC-Receiver based its settlement proposal on Scenario #10.[18]

By letter dated December 2, 2004, the Tax Division for the Department of Justice responded to the FDIC-Receiver's settlement offer of November 19, 2004.  The letter repeated the terms of the FDIC's offer, which in substance provided that the FDIC-Receiver agreed to pay the United States $47 million, with 25% ($11.75 million) treated as constituting the payment of tax and the remaining 75% ($35.25 million) treated as constituting the payment of interest.[19]

By letter dated November 16, 2005, the Tax Division for the Department of Justice accepted the FDIC-Receiver's amended offer dated July 22, 2005.  The United States accepted the FDIC-Receiver's amended offer, which in substance provided that the FDIC-Receiver would pay $50 million to the United States, with 75% of the first $47 million treated as a payment of

---

[16]  Scenario #10 (Schedule #10) is in the record as Doc. 20-9 at p. 31 of 33.

[17]  Gill Dec. II at 6 ¶ 17 (FDIC Ex. 21).

[18]  Gill Dec. II at 6-7 ¶ 18 (FDIC Ex. 21).

[19]  Gill Dec. II at 7 ¶ 19 (FDIC Ex. 21).  *See* FDIC Ex. 15.

interest and the remaining 25% of the first $47 million treated as payment of federal income taxes (both of which terms were identical to the FDIC-Receiver's initial offer) and the remaining $3 million treated solely as a payment of interest for purposes of determining the effect of the payment on tax years after 2002. This is borne out in the Notice to Shareholders, which provided:

> [T]he FDIC as receiver of Benj. Franklin would pay $50 million for the taxes allegedly owed by the receivership for calendar years 1990 through 2002, which will resolve and close each of those disputed tax years. Seventy-Five percent of *the first $47 million* of the settlement payment will be treated as a payment of interest on the alleged tax liability and the remaining 25% of that amount will be treated as payment of federal income taxes for purposes of determining the effect of the payment on tax years after 2002. The *remaining $3 million* of the settlement payment will be treated solely as a payment of interest for purposes of determining the effect of the payment on tax years after 2002.[20]

It is not too difficult to see a connection between the first $47 million and the result of Scenario #10 and to conclude that the IRS required the FDIC-Receiver to sweeten the pot by an additional $3 million in interest to compensate for the delay between the initial offer and final acceptance. The parties may have agreed not to specify the basis for the settlement, but the connection between Scenario #10 and the final settlement terms is unavoidable.

But it is not necessary for the Court to find that the IRS essentially agreed to settle based on its own Scenario #10 to find that the Plaintiff Law Firms cannot show that they are responsible for the remaining surplus, because, as noted, they admit that the IRS never accepted their theories.

---

[20]  Notice to Shareholders 3 (FDIC Ex. 5).

**IV.     The FDIC-Receiver Is Entitled To Summary Judgment As A Matter Of Law**

The Plaintiff Law Firms argue in their replies that the FDIC-Receiver agrees that they are entitled to summary judgment because the FDIC-Receiver does not explicitly dispute any of the material facts set out in their motions for summary judgment.  The Plaintiff Law Firms point out that the FDIC-Receiver did not submit a separate statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, as required by LCvR7(h) and LCvR56.1.  The FDIC-Receiver did not do so, because it does not contend that there are material facts that require litigation.  The FDIC-Receiver clearly differs with the Plaintiff Law Firms on the legal effect of the facts in this case and supports its arguments with no less than 65 citations to the record, belying the Blackwell Plaintiffs' allegation that the FDIC-Receiver's arguments are not supported by the factual record and place the Court in the inappropriate position of searching the record for support for the FDIC-Receiver's arguments.[21]  As noted, because the FDIC-Receiver does not dispute the material *facts* – as opposed to legal conclusions or argument – a statement of disputed facts is neither required nor necessary.  The Plaintiff Law Firms must still show that they are entitled to summary judgment *as a matter of law*.  The Court can decide whether the Plaintiff Law Firms are entitled to additional fees as a matter of law based on the submissions of the parties.

**IV.     Evidentiary Issues**

**A.     The Statements and Exhibits Referred to in the FDIC-Receiver's Declaration Are Admissible**

Willner & Associates objects to the admissibility of several statements made in the FDIC-Receiver's original statement of material facts, alleging that the statements are barred by

---

[21]  Blackwell Plaintiffs' Reply 1-2. (Doc. 19).

Fed. R. Civ. Proc. 56(e), Fed. R. Evid. 408, Fed. R. Evid. 801, Fed. R. Evid. 802, or Fed. R. Evid. 803. The objections are unfounded.

Willner & Associates alleges that the statements made in paragraph 4 of the FDIC-Receiver's statement of facts (based on FDIC Ex. 4) are inadmissible either because they are barred by Fed. R. Evid. 408.[22]

Fed. R. Evid. 408 does not apply to the statement made in paragraph 4 or to FDIC Ex. 4. Paragraph 4 and FDIC Ex. 4 recount a statement made by FDIC attorney Richard Gill to shareholder counsel Rosemary Stewart and Don Willner indicating that the FDIC-Receiver probably would not pay more than standard hourly rates to the attorneys who participated in the settlement discussions in the Tax Case. First, the statement has nothing do to with a compromise. Thus, Rule 408 is inapplicable. Second, the statement was submitted to show that counsel for the shareholders knew or should have known that the references to "reasonable fees" "estimated at between $1 million and $2 million" meant standard hourly rates. Rule 408 is "inapplicable when evidence of the compromise is offered to prove notice."[23] Thus, even if Rule 408 were otherwise applicable, it would not operate to bar the statements made in paragraph 4 or FDIC Ex. 4.

Moreover, Willner & Associates submitted a letter clearly marked as subject to Rule 408 in support of its opposition.[24] Willner & Associates is estopped from objecting to the statements made in paragraph 4 or to FDIC Ex. 4. Winston & Strawn also submitted Rule 408 documents with its opposition and reply and did not raise any objections to the use of such documents.

---

[22] Willner Resp. to FDIC Facts 2 ¶ 4 (Doc. 17-2).

[23] Fed. R. Evid. 408 advisory committee's note to 2006 amendment.

[24] Willner Ex. 11 (Doc. 17-14).

Willner & Associates admits the content of the statements made in paragraph 11 of the FDIC-Receiver's statement of facts (based on FDIC Ex. 8 and FDIC Ex. 9) but alleges that they are inadmissible under Fed. R. Civ. Proc. 56(e).[25]

FDIC Exs. 8 and 9 are letters to the FDIC-Receiver from Robert Suess, a major shareholder whose statements abound in the record.  Willner & Associates does not question the authenticity or trustworthiness of the letters.  And FDIC attorney Richard Gill has certified that FDIC Exs. 8 and 9 are true and exact copies of letters sent to him by Mr. Suess.[26]  Mr. Suess clearly could testify to the contents of the letters, which could then be introduced as exhibits at trial.  Even unauthenticated documents may be considered if they can be reduced to admissible evidence at trial.[27]  The Court may consider FDIC Exs. 8 and 9.

Willner & Associates also objects to the comments reflected in paragraph 12 of the FDIC's statement of facts, alleging that they are hearsay and inadmissible under Fed. R. Evid. 801-803 and Fed. R. Civ. Proc. 56(e).[28]  But the statement is admissible under Fed. R. Evid. 803 (3) as a statement of Mr. Suess's existing state of mind that the FDIC-Receiver was trying to do the right thing by controlling attorney's fees.  In addition, the statement is admissible under Fed. R. Evid. 801 (c) to prove that the statement was made rather than "to prove the truth of the matter asserted."[29]

**B.     Richard Gill's Corrected and Supplemental Declaration Satisfies Fed. R. Civ. Proc. 56(e)**

Willner & Associates and the Blackwell Plaintiffs object to portions of Richard Gill's Declaration because it does not technically comply with the "personal knowledge" requirement

---

[25]  Willner Resp. to FDIC Facts 4 ¶ 11 (Doc. 17-2).

[26]  Gill Dec. II at 9 ¶ 29 and ¶ 30 (FDIC Ex. 21).

[27]  11 James Wm. Moore et al, *Moore's Federal Practice* § 56.14  (LEXIS 2006).

[28]  Willner Resp. to FDIC Facts 4 ¶ 12 (Doc. 17-2).

[29]  Fed. R. Evid. 801 advisory committee's note to subsection (c).

of Fed. R. Civ. Proc. 56(e).  The FDIC-Receiver has submitted the Second Declaration of

Richard Gill to correct any real or perceived deficiency.  For convenience, paragraphs 1 through

15 of the Second Declaration restate paragraphs 1 through 15 of the original Gill Declaration,

except where specifically noted.  Thus, citations to the original Gill Declaration in the FDIC-

Receiver's opening brief correspond to the same numbered paragraphs in the Second Gill

Declaration.  Paragraphs 16 through 31 of the Second Gill Declaration provide additional

information in reply to the oppositions filed by the Plaintiff Law Firms.

　　　Personal knowledge includes inferences and opinions based on observation or

comparison.[30]  The Court may consider Mr. Gill's conclusion that the IRS settlement amount of

$50 million and the tax result obtained under IRS Scenario #10 are materially the same,

particularly in light of the settlement figures proposed by the FDIC-Receiver.[31]  This is

addressed in more detail herein.

　　　Mr. Gill's statement that the FDIC-Receiver invited counsel for the shareholders to

participate simply reflects a fact that is supported by the record in the Tax Case, as discussed

herein.  In addition, Mr. Gill personally invited shareholder counsel to participate in numerous

meetings after he became involved in the Tax Case.[32]

## V.　The Plaintiff Law Firms Are Not Entitled To Additional Fees Regardless of Whether the FDIC-Receiver Acted as an Advocate or Honest Broker

　　　The Plaintiff Law Firms criticize the FDIC-Receiver for taking on the role of a third-

party neutral in the settlement discussions.  The criticism is surprising in light of the Court's

remarks at the fairness hearing on May 2, 2006, that it was extraordinary for a case to settle

---

[30]  *Cf. Visser v. Packer Engineering Ass'n*, 924 F2d 655, 660 (7th Cir. 1991).

[31]  *See* Section III herein and FDIC Ex. 15, FDIC Ex. 16, and FDIC Ex. 17.

[32]  Gill Dec. II at 9 ¶ 27 (FDIC Ex. 21).

without the intervention of a mediator or third-party neutral.[33]  Obviously, the Court thinks more highly of the role of a mediator or third-party neutral than the Plaintiff Law Firms.  To the extent the FDIC-Receiver filled the role of a third-party neutral, it is reasonable to assume that the FDIC-Receiver facilitated the settlement.  And aside from filling the role of an honest broker in the settlement discussions, the FDIC-Receiver also acted as an advocate.

As previously noted, the FDIC-Receiver lead the way in convincing the IRS to allow the receiver to reopen the receivership's tax returns and receive full credit for the payment of $258 million in post-insolvency interest.[34]  In its opening brief, the FDIC-Receiver overlooked a letter dated April 14, 2004, submitted by counsel for the shareholders in support of the FDIC-Receiver's position with respect to the post-insolvency interest deduction, but that oversight has been corrected.[35]  But as Willner & Associates states, the letter was in *support* of the FDIC-Receiver's position with respect to the deduction of $258 million in post-insolvency interest.[36] The letter states "As you see, we agree with the FDIC" and "The shareholders believe the FDIC's analysis of this issue is correct and strongly support the analysis and conclusions set out in the FDIC's March 17, 2004 letter."[37]

In addition, the Plaintiff Law Firms' accuse the FDIC-Receiver of attempting to take credit for correcting mistakes made by the receiver on its tax forms.  The Plaintiff Law Firms are superficially correct that the receiver failed initially to claim the $258 million of post-insolvency interest as a deduction.  But the Plaintiff Law Firms are substantially wrong in their conclusion that the FDIC-Receiver is attempting to take credit for cleaning up its own mess.  What the

---

[33]  Winston & Strawn Facts 7 (Doc. 14).

[34]  FDIC Opp. 17-18.

[35]  *See* Gill Dec. II at 5 ¶ 12 and FDIC-Receiver's Corrected and Supplemental Statement of Material Facts herein at 17 ¶ 3..

[36]  Willner Resp. to FDIC Facts 1 ¶ 3 (Doc. 17-2).

[37]  Doc. 17-14 at 1 and 3.

Plaintiff Law Firms fail to tell the Court is that the deduction had no benefit to the receivership unless it was taken in the early years of the receivership, when the deduction could be offset against substantial income.[38]

The Plaintiff Law Firms' accusation that the receiver failed to assert the deduction from the beginning of the receivership is unfounded, because the deduction did not exist until the receiver began making post-insolvency interest payments in 1995-1996. While it is true that the receiver belatedly asserted the deduction, it did convince the IRS to allow the receivership to apply the deduction to 1990. The $258 million deduction did not provide a benefit to the receivership until the FDIC-Receiver convinced the IRS to allow the deduction to be applied to the receivership's 1990 taxes.[39] Failing that, the deduction could have been carried forward on the receivership's books, but it would have been of little or no practical benefit.

In addition, the FDIC-Receiver convinced the IRS to waive penalties against the receivership. In March 2005 the FDIC-Receiver sent two emails to the IRS advocating for the waiver of penalties.[40] The IRS did waive penalties. The receivership surplus would have been wiped out if the IRS had not waived penalties.

In sum, the Plaintiff Law Firms' fail to appreciate the importance of the FDIC-Receiver's role as facilitator to the success of settlement discussions and fail to recognize the FDIC-Receiver's role as an advocate with respect to the $258 million interest deduction and the waiver of penalties, both of which were critical to saving funds for distribution to the shareholders.

In any event, the FDIC-Receiver did not cite its efforts to show that it was solely responsible for the settlement. After all, unlike the Plaintiff Law Firms, the FDIC-Receiver is

---

[38]  Gill Dec. II at 5 ¶ 12 (FDIC Ex. 21).

[39]  Gill Dec. II at 5 ¶ 12 (FDIC Ex. 21).

[40]  Gill Dec. II at 8 ¶ 23 (FDIC Ex. 21).  *See* FDIC Ex.18 and FDIC Ex. 19.

not asking for additional compensation. Rather, the point is that the FDIC-Receiver can identify a significant specific contribution it made to saving part of the receivership surplus while the Plaintiff Law Firms can not. More importantly, despite the services provided by the Plaintiff Law Firms – which did not go uncompensated – Mr. Willner admitted in depositions that the IRS never accepted the theories presented by the Plaintiff Law Firms. Thus, it is reasonable to ask why the Plaintiff Law Firms are entitled to additional compensation.

## VI.     Willner & Associates Is Not Entitled To A Washington DC Hourly Rate

Willner & Associates continues to argue that it is entitled to the same rate as Washington DC counsel. But Willner & Associates does not adequately explain why it is entitled to a higher Washington DC rate when it maintained an office in or around Portland, Oregon, and a great deal of his work was performed in Oregon and through correspondence and phone calls.[41]  In fact, Mr. Willner emphasized that "The best way of demonstrating [my] work as lead counsel in the complex settlement process is through the 3 ½ years of correspondence between [me] on behalf of the shareholder team, the Department of Justice and the FDIC."[42]  In addition, in 1990 when Mr. Willner began representing shareholders in the U.S. States Court of Federal Claims, he charged a reduced rate based on a regular hourly rate of about $125.[43]  There is nothing to indicate that Mr. Willner ever charged a Washington DC rate related to his representation of the shareholders. Likewise, there is nothing to indicate that the consultants hired by Willner & Associates to work on the Tax Case billed at higher rates because the Tax Case was pending in this district.

---

[41]  *See* FDIC Opp. 8-9; Willner MSJ 19-24.

[42]  Willner MSJ 19-20.

[43]  FDIC Opp. 14.

Willner & Associates is not entitled to use an enhanced regular rate to boost his request for additional compensation.

**VI.    The Additional Declarations Submitted by Willner & Associates Do Not Qualify as Admissible Expert Testimony**

The additional "expert" reports submitted by Mr. Willner suffer from the same deficiencies as those submitted with the motion for summary judgment filed by Willner & Associates.  In essence, they are testimonials that are not based on any facts related to Mr. Willner's work in the Tax Case.  This is not a libel suit.  The FDIC-Receiver is not attacking the character, reputation, or competence of Mr. Willner or any of the other plaintiff attorneys.  The FDIC-Receiver is opposing the Plaintiff Law Firm's requests for additional fees.  The declarations in support of Willner & Associates' request for additional fees simply fail to qualify as admissible expert testimony under either Fed. R. Evid. 701 or Fed. R. Evid. 702.

**VII.    The Decrease In the Surplus Is A Relevant Factor**

The Plaintiff Law Firms disdainfully dismiss the FDIC-Receiver's suggestion that the decrease in the surplus from $92 million to $40+ million is relevant.  But the FDIC-Receiver asks how the *decrease* in the existing fund could not be relevant in deciding whether it is reasonable to *increase* the fees that the Plaintiff Law Firms have already received.

In this regard, it is certainly worth noting that none of the common fund cases cited by the Plaintiff Law Firms involved a fund that consisted of less money at the end of the case than at the beginning of the case.

**CONCLUSION**

If the Tax Case were a typical common fund case and the Plaintiff Law Firms could show that they were responsible for the remaining surplus, the Plaintiff Law Firms could make a case that they are entitled to additional fees.  But the Tax Case was not a typical common fund case;

the Plaintiff Law Firms cannot show that they were responsible for the remaining surplus, and they are not entitled to additional fees.

As a matter of law, the motions for summary judgment filed by the Plaintiff Law Firms should be dismissed and the cross motion filed by the FDIC-Receiver should be granted.

Respectfully submitted,

Date: March 30, 2007

/s/ Bruce C. Taylor
Bruce C. Taylor
Federal Deposit Insurance Corporation
550 17th Street, NW
Room VS-E7118
Washington, DC 20429
(703) 562-2436 (Telephone)
(703) 562-2478 (Facsimile)

Counsel for Federal Deposit Insurance Corporation,
as Receiver for The Benj. Franklin FS&LA

## CORRECTED AND SUPPLEMENTAL STATEMENT OF MATERIAL FACTS

The FDIC-Receiver submits the following corrected and supplemental statement of material facts to accompany its reply to the oppositions filed by the Plaintiff Law Firms.  As with Richard Gill's Second Declaration, for convenience and to retain the original citing references, paragraphs 1 through 13 repeat paragraphs 1 through 13 of the original statement of facts submitted with the FDIC-Receiver's opening brief on February 22, 2007, except where noted by underling (added text) or strikethrough (deleted text).  Paragraphs 14 through 27 provide supplemental facts in support of the FDIC-Receiver's reply.

1.  The IRS prepared 11 tax scenarios for use in the settlement discussions in the Tax Case that resulted in a cumulative tax liability, without interest and penalties, ranging from approximately $11 million to $97 million.  Later the IRS provided interest calculations for 12 alternate tax scenarios.  Gill Dec. 2 ¶ 3 (FDIC Ex. 14); Gill Dec. II at 2 ¶ 3 (FDIC Ex. 21).

2.  The IRS ultimately agreed to settle the Tax Case on terms nearly matching the results of its Scenario #10, which included a tax liability of approximately $12 million and interest of approximately $38 $35 million, if run to the date of settlement.  Gill Dec. 2 ¶ 6 (FDIC Ex. 14); Gill Dec. II at 3 ¶ 6 (FDIC Ex. 21).

3.  The FDIC-Receiver, without assistance from counsel for the shareholders, took the lead in convincing the IRS's Tax Division to permit the receivership to reopen the tax returns and receive full credit for the post-insolvency interest payments.  If this $258 million deduction had not been allowed, the entire receivership surplus would have been consumed.  Gill Dec. 4 ¶ 12 (FDIC Ex. 14); Gill Dec. II at 5 ¶ 12 (FDIC Ex. 21).

17

4. On September 29, 2005, Don Willner and Rosemary Stewart, an attorney for Spriggs & Hollingsworth met with Richard Gill, an attorney for the FDIC-Receiver, and discussed, among other things, the issue of attorney's fees.  Mr. Gill advised Mr. Willner and Ms. Stewart that the FDIC's receivership claims division had been very negative regarding paying fees beyond regular hourly rates.  The same day, Ms. Stewart sent an email to Tom Buchanan, counsel for Winston & Strawn, that recounted the meeting and specifically said that "it was clear that [Richard] is trying to prepare us for not getting the full amount of the claims as we filed them."  Email to Tom Buchanan from Rosemary Stewart (9/28/2005).  FDIC Ex. 4.  *See* Gill Dec. 4-5 ¶ 13 (FDIC Ex. 14).

5. The Notice to Shareholders in *United States v. FDIC*, No. 02-1427 (D.D.C.) provided that after payment of $50 million to the IRS, the remaining receivership surplus funds of about $42 million would be distribution *pro rata* to all Benj. Franklin shareholders who could demonstrate their ownership of Benj. Franklin common stock, after other claims and expenses are paid.  Notice to Shareholders 8.  FDIC Ex.  5.

6. The Notice to Shareholders also provided for the creation of a reserve for future years' receivership and administrative expenses and other legal contingencies.  At the time the FDIC-Receiver estimated that this reserve would be about $1 million.  Notice to Shareholders 6.  FDIC Ex. 5.

7. The Notice to Shareholders also provided for the distribution of approximately $3 million to the Benj. Franklin Shareholders Litigation Fund to reimburse contributing shareholders for legal the fund paid to counsel for the shareholders.  Notice to Shareholders 7.  FDIC Ex. 5.

8.  The Notice to Shareholders also stated that the FDIC-Receiver agreed to distribute an amount representing the reasonable fees and expenses of the shareholders' attorneys and consultants in connection with such persons' work to reduce the $1.2 billion tax liability alleged by the IRS down to the $50 million settlement amount.  The FDIC-Receiver estimated that the amount of reasonable fees and expenses would be between $1 million and $2 million.  Notice to Shareholders 7-8.  FDIC Ex. 5.

9.  The Notice to Shareholders elicited a response from about 446 of Benj. Franklin's estimated 6500 shareholders.  The respondents represented about 3,000,000 shares of Benj. Franklin stock, 99.3% of which agreed with the proposed settlement.  Order at 2, *United States v. FDIC*, No. 02-1427 (D.D.C.) (5/2/2006). FDIC Ex. 6.

10. Rosemary Stewart testified that she believed that the FDIC-Receiver's payment of about $89,000 to Ernest Fleischer was reasonable compensation for his contribution to the settlement process.  Stewart Dep. 26:6-12.  FDIC Ex. 13.

11. C. Robert Suess, a major shareholder and organizer of the Goodwill Litigation, has stated that the FDIC-Receiver was generous to Willner & Associates by paying that firm $250 per hour and urged the FDIC-Receiver not to pay Willner & Associates any more.  Undated letter to FDIC, FDIC Ex. 8;  Letter to Richard Gill (1/4/2007), FDIC Ex. 9.

12. During a telephone conversation in October 2006, Robert Suess told FDIC attorney Richard Gill that he knew the FDIC-Receiver was trying to do the right

thing by trying to keep control of the legal fees in this case.  Gill Dec. 5 ¶ 14
(FDIC Ex. 14); Gill Dec. II at 5 ¶ 14 (FDIC Ex. 21).

13. ~~The FDIC-Receiver currently is reviewing an additional claim submitted by~~
~~Winston & Strawn on behalf of Robert Suess for $217,000 that was not included~~
~~in earlier submissions.  Gill Dec. 5 ¶ 15.  FDIC Ex. 14; Gill Dec. II at 5 ¶ 15.~~

14. On March 19, 2007, the FDIC-Receiver approved $170,931.66 of the $217,000 claim
submitted by Winston & Strawn on behalf of Robert Suess.  Gill Dec. II at 6 ¶ 15 (FDIC
Ex. 21).

15. Beginning in April 2004, Richard Gill was the FDIC-Receiver's lead attorney in the Tax
Case.  His involvement included review of documents, legal analysis, preparation of
correspondence, memoranda, and pleadings, and meetings and discussions with attorneys
from the Department of Justice, the IRS, Winston & Strawn, Willner & Associates,
Blackwell Sanders Peper Martin, Spriggs & Hollingsworth, and FDIC in-house attorneys
and business representatives.  Gill Dec. II at 6 ¶ 16 (FDIC Ex. 21).

16. During several settlement meetings the parties extensively discussed IRS Scenario #10,
which included a total net tax, without penalties, of about $12 million and interest of
about $35 million.  Gill Dec. II at 6 ¶ 17 (FDIC Ex. 21).

17. Mr. Gill considered IRS Scenario #10 as an acceptable compromise between the position
taken by counsel for the shareholders, who argued for little or no tax liability (a non-
starter for the IRS, as noted above, and which was never accepted by the United States, as
admitted by Mr. Willner at his deposition), and the position taken by the United States,
which argued for significantly higher tax liability.  Thus, the FDIC-Receiver prepared a

settlement proposal based on Scenario #10 and presented it to counsel for the United States.  Gill Dec. II at 6 ¶ 18 (FDIC Ex. 21).

18. By letter dated December 2, 2004, the Tax Division for the Department of Justice responded to the FDIC-Receiver's settlement offer of November 19, 2004.  The letter repeated the terms of the FDIC's offer, which in substance provided that the FDIC-Receiver agreed to pay the United States $47 million, with 25% ($11.75 million) treated as constituting the payment of tax and the remaining 75% ($35.25 million) treated as constituting the payment of interest.  Gill Dec. II at 7 ¶ 19 (FDIC Ex. 21) .

19. By letter dated July 13, 2005, the FDIC-Receiver offered an additional $1 million to be treated as interest and again provided that 75% of the first $47 million would be treated as interest and the remaining 25% of the first $47 million would be treated as a payment of taxes.  FDIC Ex. 16 is a true and exact copy of the FDIC's July 13, 2005 letter maintained in the FDIC's files.  Gill Dec. II at 7 ¶ 20 (FDIC Ex. 21).

20. The IRS ultimately required an additional $3 million in interest to settle the Tax Case, so on July 22, 2005, the FDIC-Receiver amended the offer accordingly.  Gill Dec. II at 7 ¶ 21 (FDIC Ex. 21).

21. By letter dated November 16, 2005, the Tax Division for the Department of Justice accepted the FDIC-Receiver's amended offer dated July 22, 2005.  The United States accepted the FDIC-Receiver's amended offer, which in substance provided that the FDIC-Receiver would pay $50 million to the United States, with 75% of the first $47 million treated as a payment of interest and the remaining 25% of the first $47 million treated as payment of federal income taxes (both of which terms were identical to the FDIC-Receiver's initial offer) and the remaining $3 million treated solely as a payment of

interest for purposes of determining the effect of the payment on tax years after 2002. Gill Dec. II at 7-8 ¶ 22 (FDIC Ex. 21).

22. On March 1, 2005, and March 4, 2005, Mr. Gill sent requests to the IRS by email asking the IRS to waive penalties against the Benj. Franklin receivership and supplied supporting authority.  Following Mr. Gill's requests, the IRS waived the penalties.  If the IRS had not waived the penalties, the receivership surplus would have been eliminated, leaving nothing for distribution to the shareholders. Gill Dec. II at 8 ¶ 23 (FDIC Ex. 21). *See* FDIC Ex. 18 and FDIC Ex. 19.

23. Mr. Gill assisted in preparing the Notice to Shareholders submitted to this Court on February 2, 2006, in the Tax Case and sent to the shareholders of Benj. Franklin FS&LA. Gill Dec. II at 8 ¶ 24 (FDIC Ex. 21).

24. The Motion for Fairness Hearing and Notice to Shareholders were circulated among counsel for the FDIC-Receiver and counsel for the shareholders.  No one expressed any disagreement with the terms or language of those documents.  Gill Dec. II at 8 ¶ 25 (FDIC Ex. 21).

25. Mr. Gill represented the FDIC-Receiver at the fairness hearing conducted before this Court on May 2, 2007.  Counsel for the shareholders appeared at the hearing, including Tom Buchanan and Don Willner, and expressed their support for the terms of the settlement in the Tax Case as reflected in the Notice to Shareholders.  The Notice to Shareholders stated that the FDIC "has agreed to distribute an amount representing the reasonable fees and expenses of the shareholders' attorneys and consultants."  The Notice to Shareholders estimated that the amount "will likely be between $1 million and $2

million."  None of the attorneys for the shareholders objected to this fee estimate.  Gill Dec. II at 8-9 ¶ 26 (FDIC Ex. 21). *See* FDIC Ex. 5 at 5 and 6.

26.  The Notice to Shareholders explicitly stated that "the FDIC invited Mr. Willner and other attorneys representing Benj. Franklin shareholders to meet with FDIC and representatives of the IRS and the Department of Justice Tax Division to discuss the possible compromise or settlement of the tax dispute."  None of the attorneys for the shareholders objected to this statement.  In addition, after Mr. Gill after became lead attorney for the FDIC-Receiver, he personally invited counsel for the shareholders to attend meetings with representatives from the Department of Justice and the IRS.  Gill Dec. II at 9 ¶ 27 (FDIC Ex. 21). *See* FDIC Ex. 5 at 6.

27. As reflected in FDIC Ex. 4, on or about September 28, 2005, Mr. Gill met with Don Willner and Rosemary Stewart to discuss several issues.  During the meeting Mr. Gill told Mr. Willner and Ms. Stewart that it was unlikely that the FDIC-Receiver would agree to pay more than standard hourly rates to the attorneys who participated in the settlement discussions related to the Tax Case. Gill Dec. II at 5 ¶ 13 (FDIC Ex. 21).