# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WINSTON & STRAWN LLP,** ) <br><br> and ) <br><br> **DON S WILLNER & ASSOCIATES, P.C.** ) <br><br> and ) <br><br> **BLACKWELL SANDERS PEPER MARTIN** ) <br> and ) <br> **ERNEST M. FLEISCHER** ) <br><br> Consolidated Plaintiffs, ) <br><br> v. ) <br><br> **FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR THE BENJ. FRANKLIN FS&LA, PORTLAND, OREGON** ) <br><br> Defendant. ) | Civil Case No. 06-01120 (EGS) <br><br> [Consolidated with No. 06-01227 (EGS) and No. 06-01273 (EGS)] |

### MOTION FOR SUMMARY JUDGMENT OF DON S. WILLNER AND ASSOCIATES, P.C., INCLUDING A MEMORANDUM OF POINTS AND AUTHORITIES AND REQUEST FOR ORAL ARGUMENT

**A.     Introduction.**

This lawsuit is to obtain reasonable compensation for Don S. Willner and Associates, P.C. ("Willner") for its role in being lead counsel in reducing a $1.2 billion IRS claim to $50 million.

Benj. Franklin Federal and Loan Association of Portland, Oregon ("Benj. Franklin") was seized by the government on February 21, 1990.  It was founded in 1925, survived the Great Depression, became the largest savings and loan in Oregon, and was profitable for 16 consecutive calendar quarters before Congress breached the government contract with Benj. and hundreds of

other institutions by retroactively removing the huge capital asset of goodwill from their books when it enacted FIRREA, Pub. L. 10-73, 103 Stat. 183.

Claims Court Judge Loren Smith found that Benj. Franklin would have survived adverse economic conditions but for the government's breach of contract by passing FIRREA. Most of the assets of what FDIC in its earlier brief disparagingly calls a "failed thrift," were sold to Bank of America in 1990 for a record high premium. Benj. Franklin was profitable in the conservatorship and profitable in the receivership and has been one of the very few FDIC savings and receiverships with a surplus. The FDIC conservatorship had a balance of about $94 million after sale of the assets and accumulation of interest. Benj. Franklin is almost unique in the savings and loan debacle and the later litigation arising from the government seizures of savings and loans.

Don S. Willner and Associates, P.C. ("Willner") was lead counsel for the six thousand five hundred (6,500) Benj. Franklin Shareholders lawsuit in the United States Court of Federal Claims filed on September 14, 1990. In that lawsuit, Willner (a) argued in 1990 and won in 1995 the court order allowing shareholders derivative standing; (b) argued and won in 1997 Summary Judgment on liability; (c) handled the majority of the trial on damages in 1999 which resulted in a 2002 judgment in the amount of approximately $35 million; (d) filed the Motion for Reconsideration of the Claims Court judgment, did a portion of the briefing, and argued and won the portion of the motion which resulted in increasing the Claims Court judgment in 2006 to approximately $52 million.

Willner was lead counsel in the 2002 United States District Court for the District of Oregon resulting in FDIC not paying taxes to the IRS, which would have made the entire shareholder claim against the Government moot; and lead counsel for the Shareholder proposed intervenors in this Court which caused the three-way discussions between the Department of Justice ("DOJ") (on behalf of the IRS), the FDIC, and the Shareholders resulting in reducing a $1.2 billion IRS tax claim to $50 million, leaving a balance of $44 million in the FDIC receivership. (Willner Declaration, Ex. A)

**B.** **Procedural Context in This Court.**

This Court denied the previous Motion for Summary Judgment by Willner which was based upon the percentage of Common Fund theory, but has now allowed this Motion for Summary Judgment in order to analyze the Willner attorney fee claims based upon a Lodestar/Multiplier approach.

Co-Counsel Winston and Strawn, LLP was paid $1.1 million for its work as a result of an arbitration award approved by this Court. This resulted in a double multiplier of hourly rates, with over one thousand dollars ($1,000.00) paid per hour for their principal attorneys. (Based upon information and belief).

The claim of Blackwell, Sanders, Peper Martin and Ernest Fleischer (hired as a tax consultant by Willner) was not resolved in mediation and is pending before this Court. As near as we can calculate, that claim seeks $4,583.33 per hour plus a double multiplier.

Under a Lodestar multiplier approach, using the same double multiplier approved by this Court for Winston and Strawn, LLP, comes to a total of $1,059,870.00 for Willner or $525.00 per hour.

**C.** **Issues.**

The key legal issues before this Court are:

(1)    Should Willner be paid fair market value, at District of Columbia rates, for being the successful lead counsel in major complex litigation in the District of Columbia Federal Court?

(2)    Should Willner, as lead counsel, be paid at the same double multiplier success rates as paid to other capable attorneys working on the case who were not lead counsel, but who, unlike Willner, have offices in the District of Columbia?

(3)    As a distant fall back position, should Willner be paid at fair market value for lead counsel work in successful major complex litigation in the District of Columbia at Pacific Northwest rates?

(4)    Should FDIC's reduction of 186.35 hours in Willner's time records be rejected by this court?

In connection with FDIC reductions in Willner's hours and expenses, these matters can be resolved by this Court deciding certain legal issues, and the parties can then compute the dollar impact.  There should be no factual disputes.

(a)    Should lawyer time be compensable for preparing and examining an expert witness when this time cannot be separated from overall preparation and examination of the witness involving many issues?

(b)    Should time spent by lead counsel for keeping 6,500 shareholders informed of progress in the case in order to fulfill fiduciary duty and encourage contributions to the Litigation Fund be compensable?

(c)    Should time spent by lead counsel in organizing key portions of a litigation file be compensable?

(d)    Should time spent by lead counsel and associate counsel in preparing the FDIC administrative agency fee and expense petition required by FDIC be compensable?

(e)    Gill makes numerous errors in his computations of time to be deleted.

(f)    Should expenses incurred by lead counsel be compensable for bringing the former CEO and the former Executive Vice President of Benj. Franklin to Washington, D.C. to assist at the Fairness Hearing before this Court?

(5)    Is Willner's claim for $1,059,870.00 is justified by the Lodestar / Multiplier approach?

Although most of these issues have been discussed in the material previously submitted to the FDIC and this Court, it is appropriate to provide a new stand-alone motion with exhibits rather than expecting the Court to cross reference to the earlier material.

**D.    <u>Standard of Review</u>.**

Review by this Court of the FDIC Administrative Decision is de novo.  <u>Freeman v. FDIC</u> 56

F.3d 1394, 1400 (D.C. Cir., 1995). (See: H.R. Rep. No. 101-54(1), 101st cong., 1st Session, reprinted in 1989 Code cong. And Ad News 86, 214-215).

**E.      Statement of Facts.**

This lawsuit is to obtain reasonable compensation for Don S. Willner and Associates, P.C. ("Willner") for its role in being lead counsel in reducing a $1.2 billion IRS claim to $50 million.

### *(1)      The seventeen (17) year Claims Court case.*

The only portion of the approximately ten thousand (10,000) hours spent by Willner as lead counsel in the Claims Court case claimed here are forty (40) hours preparing and presenting an expert witness dealing with the same tax matters that were later raised in this case.  Winston and Strawn, LLP has been paid here by the FDIC for its similar tax matter work in the Claims Court case.

In addition, Willner's unique knowledge of the Claims Court record was invaluable in the settlement discussions in this case and frequently came up in the discussion both in responding to government questions and in making the equitable argument.  No compensation is sought here for that earlier background work.

### *(2)      The breach of fiduciary duty suit in the Federal District Court in Oregon.*

The potential IRS tax claim concerning federal financial assistance was discussed in 1999 during the Claims Court damages trial and was the subject of a court approved stipulation.  Shortly after the Claims Court opinion in 2002, it became apparent that there was an imminent threat by FDIC to pay the tax.  If that were to occur, the FDIC receivership would have a zero balance and any payment to it as a result of success in the Claims Court case would be paid to the IRS for the balance of its tax claim instead of to shareholders.

April 22, 2002.  IRS filed its $1.2 billion tax claim with FDIC.  At that point the amount in the FDIC Benj. Franklin Receivership was about $94 million, with all other claims paid.

May 3, 2002.  Willner wrote Bruce Taylor, Esq., of FDIC, the letter attached as Exhibit B, suggesting that the shareholders and FDIC work together on the tax issue. Taylor did not respond.

(Taylor's lack of response to this and succeeding letters appears in his deposition, Ex. C to this Memorandum.)

May 10, 2002.  Willner again wrote to Taylor, referring, among other matters, to the two previous agreements between the shareholders and FDIC (Ex. D) and to the Inter-Agency Agreement between FDIC and the IRS (Ex. E). One of the agreements between the shareholders and FDIC "says, in part, that FDIC has duties to the shareholders and intends to make a good faith effort to minimize the IRS tax claim against the receivership" (Ex. F). The Inter-Agency Agreement between FDIC and IRS says in part, however:

> **The RTC will not challenge, in any forum, the amount [of tax] finally determined by the IRS**.  (Emphasis supplied).

The IRS had delayed collection of the tax pursuant to this Agreement and FDIC, as the successor to RTC, accepted the terms of the Inter-Agency Agreement. (See Willner's Declaration, Ex. A).

The Inter-Agency Agreement further provided that,

> **Each agreement will be specific in its findings and will not be made public by either party** except as required by IRS information sharing agreements with the various states, or other provisions of law.  (Emphasis supplied.)

In his May 10, 2002 letter, Willner argued that the Inter-Agency Agreement should not apply to the Benj.

Taylor never responded to the May 10, 2002 letter, although there was a telephone discussion.

May 20, 2002. Willner sent Taylor another follow-up letter, attached as Exhibit G. Taylor did not respond to this letter, either.

June 6, 2002. Willner sent a yet another follow-up letter to Taylor. (Ex. H)

June 6, 2002. Taylor finally writes Willner (Ex. I) which Willner date stamps as received on June 11, 2002. This letter includes the following language.

It appears unlikely that further efforts will be successful in lowering the IRS assessment of taxes, penalties, and interest below the projected assets of the receivership estate. In fact, the IRS has not given any indication that it will lower its assessments at all….

Finally, you expressed the hope that no payments would be made to the IRS without advance notice to you and without your consent. Although we agreed to keep you apprised of the status of negotiations with the IRS, **we did not agree to notify you or obtain your consent before the FDIC takes any action it deems necessary or appropriate and have no duty to do so. We can tell you, however, that a decision may be made soon on how to handle the IRS's claim, in light of the IRS's latest indication that it does not intend to abate any portion of the tax liability of the Ben Franklin receivership. Further, we will let you know if a payment is made to the IRS, so you can advise your clients accordingly.** (Emphasis supplied.)

In his deposition, Mr Taylor testified:

Q: Do you remember a clause in the interagency agreement which says that the FDIC under certain circumstances surrendered its right to protest any tax levied by the IRS?

A: I don't remember that provision specifically but I have no reason to doubt that it is in the agreement.

Q: But the decision was being made in light of the IRS's latest indication that it does not intend to abate any portion of the tax liability of the Benj. Franklin receivership, is that correct?

A: That's what my letter says, yes.

Q: And it's clear, isn't it, that **you meant you would give me that notification *after* you made the payment?**

A: T**hat is what my letter indicates, yes.**

Q: Were you authorized to write Exhibit 7? [The letter from Taylor received by Willner on June 11, 2002]

A: Yes.

Q: Before writing Exhibit 7, **did you research the impact of paying any portion of the tax upon the rights of the FDIC receiver or the shareholders of Benj. Franklin?**

A: **I did not.**  (Emphases supplied.)
(Taylor Deposition excerpt, Ex. C).

In **_United States v. Flora_**, 362 U.S. 145, 80 S.Ct. 630, 4L.Ed 2d. 623 (1960), the Court held that once any portion of the tax was paid, the taxpayer could not contest the tax without paying the entire amount claimed.  It is also an open question whether the shareholders would have standing to contest the tax.

June 17, 2002. Six days after receiving the Taylor response Willner, as sole counsel of record, filed the Oregon action and obtained the TRO against FDIC paying the tax to IRS in United States District Court for the District of Oregon.

During the argument before Judge Haggarty on the later preliminary injunction, FDIC's attorney for the first time promised advance notice to Willner before making any tax payment, and also said that FDIC believed its position to be that of a "stakeholder" between IRS and the shareholders.  The FDIC attorney also said for the first time that it was "honestly trying to seek a solution, which doesn't affect the interests of either—adversely effect either the shareholder plaintiffs or the IRS's" and was considering paying the money in the receivership into Court in an interpleader (Ex. J).

Judge Haggarty denied the preliminary injunction after concluding that it would not fit into any of the exceptions, including breach of contract, which allowed injunctions as set forth in **_Sharpe v. FDIC_** _126_ F.3d 1147 (9th Cir. 1997). Willner filed a precautionary Notice of Appeal but did not pursue it (See Willner Declaration, Ex. A)[1]. The TRO and the resulting FDIC open Court commitments by FDIC prevented the entire Benj. Franklin litigation from becoming moot.

---

[1] This 2002 Oregon breach of fiduciary duty suit was only dismissed by stipulation in 2006. (Willner Declaration, Ex. A) Willner has been concerned that some FDIC officials have a long memory about a suit which was so troubling, and this might have impacted the administrative decision.

*(3)*     **_The Shareholder Motion for Intervention in this Court_.**

On April 22, 2002, IRS filed its proof of claim with FDIC for $1.2 billion.  Then, on July 17, 2002, the IRS sued the FDIC in this Court.  There followed discussions between Willner and the government attorney who filed the suit in which the government said it would oppose any shareholder intervention since the FDIC was the taxpayer.  Willner argued that the shareholders were the beneficial owners and were not being adequately represented by the FDIC.  (Willner Declaration, Ex. A)

Willner, on September 16, 2002, then filed a Motion to Intervene in the tax case and transfer to the District of Oregon, with a Memorandum of Points and Authorities.  As a result of that Motion, the government and FDIC agreed on a three-way discussion with the Shareholders represented by Willner.  The Willner Motion to Intervene was stayed by this Court during that period and was later dismissed with leave to re-file.  The proposed intervenors were given the effective role of an intervenor without the government having to prepare and argue the risky opposition to the Motion. Three years later, these three-way discussions resulted in a favorable settlement which was approved by this Court. (Ex. A)

*(4)*     **_The Settlement discussions_.**

Willner was lead counsel for the shareholders throughout the three-way discussions. Rosemary Stewart, Esq. of the Washington D.C. law firm of Spriggs and Hollingsworth, Kansas City attorney tax consultant Ernest Fleischer, Esq., and Delaware CPA Randi Cohn were retained by Willner to assist him in early 2002.  Although Willner did much earlier work, starting in May, 2002, the first discussion meeting did not take place until November 19, 2002.  At that time, attorneys Thomas Buchanan and Mitchell Moettel of Winston & Strawn, LLP joined the discussions on behalf of shareholder C. Robert Suess, but Willner remained lead counsel. (Ex. A)

In the settlement discussions, the FDIC did not advocate the lowest possible tax, stating that it was a "third party neutral" and an "honest broker".  The government argued that the $1.5 billion of

federal financial assistance paid by corporate RTC to RTC – Receiver which was then paid to Bank of America to re-purchase a loan portfolio was taxable income to the Benj. Franklin receivership. Willner and tax attorneys Mitchell Moettel and Ernest Fleischer stressed that the transaction was called a loan; the re-purchased assets produced money for the receivership; the loan was fully re-paid plus $258 million of interest; and a loan cannot be taxed as income because of the 16th Amendment to the United States Constitution. (Ex. A)

FDIC, on the other hand, argued that the transaction was not a loan.  FDIC had been co-counsel for the shareholders in the damages phase of the Claim's Court litigation, but did not continue to advocate the lowest possible tax. (Ex. A)

FDIC was further handicapped because it earlier entered into a secret agreement with the IRS not to contest in court any tax determination made by IRS where IRS had previously refrained from collecting the tax. See p. 6, *supra*. FDIC therefore, had a substantial incentive to settle on any basis rather than insisting on the highest possible settlement.  In addition, FDIC's predecessor, RTC, failed to claim a tax deduction for the repayment of the $258 million loan interest, and on the tax returns made an $88 million overstatement of a repayment (Ex. K, FDIC letter of November 1, 2002).  In 2002, as previously discussed, FDIC failed to research the legal impact of paying any tax to the IRS. (Ex. A and Taylor Deposition, Ex. C)

All members of the shareholder team participated fully in obtaining the final settlement. FDIC was also helpful as an intermediary, but the laboring oar in obtaining the final settlement was carried by shareholder attorneys with Willner as lead counsel.

The best way of demonstrating Willner's work as lead counsel in the complex settlement process is through the 3 ½ years of correspondence between Willner on behalf of the shareholder team, the Department of Justice and the FDIC (Ex. L, the 43 letters between November 1, 2002 and January 30, 2006, and a more readable summary (Ex. M) are in the Appendix).

### (5) *The FDIC administrative processing of Willner's claim.*

FDIC in its Notice of Partial Allowance of Willner's Claim (Ex. N) paid lead counsel Willner

at a lower rate than any of the attorneys who were members of the shareholders team.

The Notice of Partial Disallowance of Claim for Reasonable Attorney's Fees is signed by

Glenn Glinsmann of the Claims Department, but apparently he did not make the decision.

Richard Gill, FDIC attorney, testified in his deposition (Ex. O):

Q: Have you ever been an attorney in private practice?

A: No.

…

Q: Is he [Glinsmann] correct that you made the decision on my fee petition?

A: Point of clarification. I was certainly involved in the decisional process on your fee application. The decision – and for all intents and purposes, I proposed the recommended decision that was approved by other people in the FDIC.

Q: Who else in the FDIC approved the decision?

A: Specifically, Richard Aboussie, who's an associate general counsel…And the general counsel of the FDIC, who I believe now is in private practice, William Kroener.

…

Q: Before evaluating these three fee petitions – mine, Winston & Strawn and Spriggs & Hollingsworth – how many fee petitions, attorney fee petitions have you evaluated?

A: I've never evaluated attorneys fee petitions like this before.

…

Q: Does FDIC have any written or oral guidelines for evaluation of attorney fee petitions?

A: I am not aware of any.

Q: So we're clear, and no such guidelines were utilized by you in reviewing my fee petition?

A: No, I did not look at any – any FDIC policy on this matter.

…

Q: Were you provided standards of review by any superior in connection with my
fee petition?

A: No.

…

A: And at all times, both, you know, on the reasonable attorneys' fees, it was the FDIC's assumption that what we were to pay was your reasonable hourly rates.

…

Q: Are you aware of any Pacific Northwest attorney other than me who was lead counsel in a Washington, D.C. major complex litigation in the group of attorneys that you hired?

A: I'm not – I'm not aware of any – the case was filed in Washington but I think most of the work probably was performed in the Pacific Northwest. But no, I'm not aware of any other. In answer to your question.

…

A: We tried to canvass the material out – out there in the public domain, which was interesting but not particularly dispositive, because the rates were all over the place, so we fell back to what we knew, which was what we paid our outside counsel. (emphasis added).

*[The Gill Deposition is Ex. O]*

Gill also testified:

Q: Are you aware of the fact that I filed the motion to intervene and along with the motion to transfer to Oregon?

A: Yes.

Q: Are you aware of the fact that starting way before you came in and continuing until not too long ago there was an enormous amount of correspondence between Henry Darmstadter on behalf of the government, Catherine or Hugo or yourself on behalf of the FDIC, and myself as lead counsel for the shareholders?

A: Yes.

Q: That just saved you going through chunks of paper. Isn't it a fact that there were numerous discussions between you and me concerning what settlement would be acceptable to the shareholders?

A: Yes, yes.

Q: Isn't it true that at the meetings held in Washington, D.C. around that long table that I chaired the shareholders' side of those meetings?

A: Yes. As best I can recall, I think that you were the – you were the counsel for the shareholders that – yes.

Q: And that I would – during the discussions, I would call on others in our group to respond to questions?

A: Yes.

…

A: Yes, you were lead counsel at the time of the Fairness Hearing.

**F.    Argument.**

**(1)    Willner should be paid fair market value at District of Columbia rates for being the successful lead counsel in major complex litigation in the District of Columbia Federal Court.**

The appropriate starting measure in determining a reasonable fee is a fair market hourly rate, which does not have to be a regular hourly rate. *Missouri v. Jenkins* 491 U.S. 274, 109 S.Ct. 2463, 2476, 105 L.Ed 2d 225 (1989); *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 78 L.Ed 2d 891 (1984); *Covington v. District of Columbia,* 27 F.3d 1101 (D.C. Cir., 1995).

Once a fair market hourly rate is determined, then the seven Lodestar factors apply. *In re Baan Company Securities Litigation 2*88 F Supp. 2d (D.C., 2003); *Freeport Partners, LLC v. Allbritton* 2006 U.S. Dist., Lexis (D.C. 2006).  The other attorneys who are seeking fees in the companion case rely upon their normal billing rates in the large cities of Washington D.C., New York and Kansas City with information provided year by year.  Because Willner has no normal billing

rates, but relies upon fair market value for complex Federal litigation, there is no such year by year

data.  An attorney may use a different reasonable rate than co-counsel.  ***Czarniewy v. District of***

***Columbia,*** No. Civ.A. 02-1496 (HHK), 2005 WL 692081, D.D.C., March 25, 2005.  The

Declarations of prominent Washington, D.C. attorneys Charles Cooper (Ex. P), Melvin Garbow (Ex.

Q), and John Millian (Ex. R) say that five hundred twenty-five dollars ($525.00) per hour is a

reasonable rate for being lead counsel in complex federal litigation in the District of Columbia.[2]

In ***Donnell v. United States,*** 682 F.2d 240, 251-52 (D.C. Cir. 1982) the Court held that the

proper rule is that the relevant community for determining legal fees is the one in which the District

Court sits.  Then ***Davis County Solid Waste Management et al. v. U.S. Environmental Protection***

***Agency,*** 169 F.3d 755, 759-760 (D.C. Cir. 1999) created a "limited" exception:

> "We think the neutrality rationale in <u>Donnell</u> is still sufficient to justify
> forum rates in all but the extreme situation we face here.  We will
> presume that Washington rates will apply so long as the judicial forum
> is here, <u>unless the work done here is minimal and the difference in
> rates substantial</u>.  Like basing awards on the situs of the work
> performed, the use of Washington rates is neutral in that it does not
> afford an automatic advantage to either prevailing or losing parties."
> (emphasis added)."
>
> …
>
> "Our decision today is confined to the situation before us and effects a
> limited exception to <u>Donnell</u>.  In this case, as far as we can tell from
> the record, virtually all of the work was performed in Utah, the less
> expensive legal market.  The only time spent in Washington, D.C. by
> Davis County lawyers as far as the record reflects was for the purpose
> of examining the administrative record and participating in a short oral
> argument."

The "limited" exception does not apply here for both reasons set forth in <u>Davis</u>.  The work

done in the District of Columbia was not "minimal".  All of the multiple, lengthy discussions over a

three and a half year period with the IRS through the Department of Justice, and the defendant, the

Federal Deposit Insurance Corporation as Receiver of Benj. Franklin, took place in person within the

---

[2] This is not a fee shifting case so <u>Laffey v. Northwest Airlines, Inc.</u>, 682 F.2d 240, 251-252 (D.C. Cir., 1982) does not apply.

District of Columbia with Willner as lead counsel. There were also preparation meetings all of which took place in D.C. with the FDIC and also with co-counsel, as well as the Fairness Hearing with this Court, in which Willner had a major role (Exhibit A). Secondly, the difference between Oregon fair market rates ($450.00) and D.C. rates ($525.00) is not substantial (Markowitz (Ex. S) and Heiling (Ex. T) Declarations). In **_Salazar v. District of Columbia_** 123 F.Supp. 2d 8 (D.C.D., 2000) the Court quoted with approval from an expert affidavit that "the market for legal services in complex Federal litigation in Washington D.C. is not a local market."[3]

The **_Blum_** group of cases require supporting information of fair market value where there is no regular hourly rate.

**(2)    Fair market value rate must be justified by reputation, skill and experience.**

At no place in its administrative decision or in any of the hundreds of pages of material submitted to this Court, has FDIC ever challenged the reputation, skill or experience of Willner. Any attempt to do so now would be ex post facto.

Reputation, skill and experience are best proven by the affidavits and declarations of distinguished citizens who know Willner best.

**(a) Reputation**.

Honorable James M. Burns, former Chief Judge of the United States District Court for the District of Oregon says in his affidavit (Ex. U).

> "Don Willner is an attorney of excellent experience, reputation, and ability…He is well known for his willingness to take on complex, difficult 'cause cases' where he represents small plaintiffs against large, well-financed opponents and handles these cases with great diligence and skill. I am proud that Don Willner is an Oregon attorney."

Honorable Berkeley Lent, former Chief Justice of the Supreme Court of Oregon, says

---

[3] Willner also has substantial District of Columbia experience. He has been a member of the bar of this Court since 1951 and has tried cases in this Court. He has argued and won a case in the United States Supreme Court, and has worked on briefs in other cases in the Supreme Court. A significant portion of the Benj. Franklin Claims Court litigation was tried in the District of Columbia. Willner has also worked on briefs submitted to the United States Court of Appeals for the Federal Circuit.

in his affidavit (Ex. V).

> "Don Willner was well known and highly regarded by both bench and bar for his skills and integrity…I agree with the sentiment of my friend, Senior United States District Judge M. Burns, that I am proud that Don Willner is an Oregon attorney."

**(b) Skill.**

Laird Kirkpatrick, former Dean of the University of Oregon Law School and currently a Professor at the George Washington Law School in Washington, D.C.,[4] has said in his Declaration (Ex. W) that Willner,

> "is one of the most highly regarded trial lawyers in the state [of Oregon], particularly for complex litigation"

and that

> "[Willner's] ability and skill match that of lawyers handling similar legal matters in Washington, D.C. or any other large urban area."

G. Dale Weight, PhD, was the CEO of Benj. Franklin at the time of its seizure. Before moving to Portland, Oregon, he was President of the billion dollar Syracuse, N.Y. Savings Bank and worked with the Federal Home Loan Bank of Pittsburgh and the Federal Bank of Cleveland. After his service with Benj., he was Dean of the Atkinson Graduate School of Management at Willamette University in Salem, Oregon. In his declaration (Ex. X) he says:

> "In all these positions I had occasion to retain and/or work with attorneys on the east and west coasts, as well as in Washington."
> …
> "The legal work done by Mr. Willner as the Benj. Franklin attorney has been of the same high quality as other attorneys in national or super regional law firms with whom I have worked."
> …
> "Don Willner has the highest reputation in Oregon and Southwest Washington as an excellent attorney, and has done skillful work on behalf of the shareholders of Benj. Franklin. In my judgment, attorneys should be evaluated by the quality of their work. Their residency is a secondary matter. It would be grossly unfair for the FDIC to pay Mr. Willner, as lead counsel, a lower hourly rate than the attorneys who assisted him in the successful activities on behalf o [of] the Benj. Franklin."

---

[4] Laird Kirkpatrick was a visiting Professor at George Washington Law School at the date of his declaration.

In addition, there is now in the Record the Declaration of tax attorney Ernest Fleischer who was involved in the entire settlement process. He says:

> The federal statutes forbid any restraining order against actions proposed to be taken by the Defendant. **Mr. Willner therefore did a remarkable job in obtaining the TRO and then persuading the Defendant to cooperate.**" (Fleischer Declaration Ex 1, paragraph 13 (b), an Exhibit to the Fleischer earlier Summary Judgment Memorandum.) (Emphasis supplied.)

Then in the earlier Fleischer Memorandum on page 15 it says:

> Plaintiffs [Fleischer and his law firm] suggest that because he was lead counsel, because of his insight in recognizing the danger of payment of the assets to the IRS and because he prevented such payment **Mr. Willner should be awarded 3.5% of the fund in the amount of $1.5 million…**" (Emphasis supplied.)

**(c) Experience.**

Don Willner has now been practicing law for over fifty-six (56) years. After graduating from Harvard College *magna cum laude* and phi beta kappa, and then graduating from Harvard Law School, he worked for much of a year in Washington, D.C. as an associate in the prominent law firm now known as Arent Fox. He then returned to Oregon and has spent most of his working life in private practice in Oregon and Washington. His practice has emphasized complex litigation, including many class actions. He has argued and won cases in the U.S. Supreme Court, the Ninth and Tenth Circuit Courts of Appeal, and the Supreme Courts of Oregon and Washington. He was an adjunct Professor at Lewis and Clark Law School in Portland, Oregon for about ten (10) years, and president of the United States District Court for the District of Oregon Historical Society. He has served as a Circuit Judge Pro Tem (major trial court) in five (5) Oregon counties by appointment of the Chief Justice of Oregon.

In that lawsuit, Willner (a) argued in 1990 and won in 1995 the court order allowing shareholders derivative standing; (b) argued and won in 1997 Summary Judgment on liability; (c) handled the majority of the trial on damages in 1999 which resulted in a 2002 judgment in the

amount of approximately $35 million; (d) filed the Motion for Reconsideration of the Claims Court judgment, did a portion of the briefing, and argued and won the portion of the motion which resulted in increasing the Claims Court judgment in 2006 to approximately $52 million.

Throughout his over fifty-six (56) years of law practice, Don Willner has emphasized "cause" cases, rather than focusing on the highest economic reward.  He has done much pro bono work and represented non-profit groups and unions at low hourly rates, such as the Oregon State Grange which he has represented for thirty-four (34) years.  His experience in complex federal litigation includes, among other examples:

1.      Representing, at low hourly rates, Colegio Cesar Chavez in obtaining a federal injunction against the U.S. Secretary of Health Education and Welfare preventing interference with the accreditation of a Chicano college.

2.      Representing, *pro bono* as co-counsel, the Japanese American Citizens League in federal court in a *coram nobis* proceeding revoking the World War II conviction of Minura Yasui for violation of the internment order (the Yasui conviction was one of three test cases initially affirmed by the Supreme Court during World War II).

3.      Representing, on a contingent basis, an early long-shot federal case, ultimately mostly unsuccessful, for a class of 2000 faculty women seeking equal pay, promotion, and tenure for women.  This case was tried for nine (9) continuous months (minus court vacation) and is the longest trial in the history of the Oregon Federal Court (it is mentioned in the Chief Judge Burns' Affidavit, Ex. U).

4.      Representing, pro bono, the NAACP using 42 U.S.C. 1983 to obtain a federal injunction preventing a local water district from condemning for a well the land of the first African American seeking to build a house in eastern Multnomah County, Oregon.

5.      Representing, on a contingent basis, a group of older workers in a federal age discrimination case which was ultimately settled and a fee earned.

6.     Arguing and winning, a fishing rights case in the United States Supreme Court.

7.     Representing twenty-two thousand (22,000) west coast mill workers in state and federal courts in the largest successful revolt from undemocratic international labor unions in modern history.

8.     Representing, on a contingent basis as lead counsel, a large group of airport workers successfully suing a big government contractor in federal court (a recent eight (8) day jury trial).

Willner's work for labor unions has been at low rates over the years ($125 per hour in 1990, at the time he started the Benj. Franklin litigation), but has caused many contingent referrals, including a complex five million dollar ($5,000,000.00) settlement of a personal injury case in rural eastern Washington, which resulted from a win argued by Willner in the Washington Supreme Court. The hourly rate for 1783 hours worked out to about five hundred twenty-five dollars ($525.00) per hour.

In consulting for another law firm in a similar savings and loan case about ten years ago, Willner was paid three hundred seventy-five dollars ($375.00) per hour which translates to over five hundred dollars ($500.00) per hour now (Willner Declaration, Ex. A)

**(d) <u>The compensation of lead counsel should compare favorably with skilled attorneys who worked on this matter who were not lead counsel.</u>**

Don Willner had the responsibility, as lead counsel, of coordinating the work of four (4) law firms who often had different views of how to proceed.  Willner chaired the shareholder side of the three-way discussions, handled almost all of the contact with government attorneys, primarily negotiated and signed the important agreement with FDIC **(Ex. U)** which among other matters provided for FDIC return of all money paid by shareholders to the Litigation Fund, even though most of which was contributed before the tax case started, and held the discussions with Richard Gill of FDIC concerning the actual settlement proposals. At the Fairness Hearing before this Court, Willner had the major role of describing and defending the settlement (Ex. O). In addition, Willner's 16 years

of knowledge of the case became important when FDIC or the Department of Justice requested documents or information from Benj. Franklin. This knowledge gained from sixteen years of litigation in the Claims Court case was not billed for in this fee petition (Ex. A).  Replication of this knowledge by other counsel would have required untold hours of effort.  Willner's memory was, perhaps, the only true efficiency in the tax matter settlement.

In the ***In re: Vitamin Anti-Trust Litigation case,*** 398 F.Supp.2d 209 (D.D.C., 2005)*,* Magistrate Judge Facciula, at page 4, gave weight in fixing fees to the lead counsel role saying:

> a) Organize and run the case: This was the responsibility of Co-Lead Counsel. Co-Lead Counsel called meetings, assigned tasks, managed the litigation on a daily basis, and oversaw the successful settlement process. In addition CMHT had the specific task of organizing the group of law firms that had not filed lawsuits with Boies Schiller.

Comparing Willner's work to this quotation, he called meetings, assigned tasks, managed the litigation on an almost daily basis, and worked with FDIC closely on the successful settlement process, including making the major explanation and defense of the settlement before this Court at the Fairness Hearing.

Here, the other attorneys, especially tax attorneys Mitchell Moettel and Ernest Fleischer, had important roles, but Willner, as lead counsel for sixteen (16) years of Benj. Franklin litigation, best knew the sympathetic Benj. Franklin history which was the basis of the argument to the government that this was not the case for IRS to use as its test case. (Ex. A)

**(3)    Willner, as lead counsel, should be paid at the same double multiplier success rates as other capable attorneys working on the case who were not lead counsel, but unlike Willner, have offices in the District of Columbia.**

This Court, by Order dated November 28, 2007, has approved a double success multiplier for the attorneys from the Winston and Strawn, LLP law firm.  This means to the best of our information and belief that Mitchell Moettel has been paid one thousand fifty dollars ($1,050.00) per hour and Thomas Buchanan has been paid one thousand twenty dollars ($1,020.00) per hour based upon a

double multiplier.  Buchanan is in the Washington, D.C. office and Moettel, we believe, spends more of his time in the New York office, but did much of his work on this case in the D.C. office.

Willner, as lead counsel, should receive the same double multiplier previously approved by this Court for Winston and Strawn, LLP.  This Court, in its July 13, 2007 decision, said that a double multiplier could be "fair and reasonable" (page 13 of Decision).

Winston and Strawn, LLP, did good work.   But, Willner obtained the TRO and subsequent FDIC commitments in Federal Court in Portland, Oregon which prevented this entire litigation from becoming moot.  Willner filed the Motion to Intervene and transfer to Oregon, which caused the three-way settlement discussions.  Winston and Strawn, LLP only came into this case later, at the start of the actual settlement discussions.  Willner remained lead counsel throughout the settlement discussions and had the major role of presenting the settlement to this Court at the Fairness Hearing.

The ultimate result of reducing a $1.2 billion IRS claim to $50 million with a favorable allocation of interest and tax is an incredible result, which preserved $44 million for the shareholders (minus as yet undetermined FDIC expenses).

Although not residing or having an office within "the Beltway", Willner should receive the same double multiplier for success as received by Winston and Strawn, LLP.

**(4)      As a distant fall back position, Willner should be paid at fair market value for lead counsel work in successful major complex litigation in the District of Columbia at the Pacific Northwest rates.**

FDIC attorney Richard Gill testified in his deposition:

> "A:  We tried to canvas the material out there in the public domain, which was interesting but not particularly dispositive because the rates were all over the place, so we fell back on what we knew, which was what we paid our outside counsel [in the Pacific Northwest]" (emphasis added).

This is not the correct legal standard for setting reasonable attorneys fees in this case.  Now there is a *de novo* review, but this quotation was the reason given for the FDIC decision on Willner's fee entitlement.  Any new reasons that may be developed in FDIC's forthcoming Response are *ex post facto*.  The Gill rationalization omits to mention these important differences:

        (a)     FDIC never hired Willner as a contract attorney at an agreed upon rate.

        (b)     FDIC made no evaluation of Willner's reputation, skill and experience as required by law**.**

        (c)     FDIC did not analyze the Lodestar factors.

        (d)     There is no showing that any FDIC Pacific Northwest contract attorney was handling major complex litigation at all comparable to reducing a $1.2 billion claim to $50 million.

        (e)     There is no showing that any of the FDIC Pacific Northwest contract attorneys performed their key work in the District of Columbia.

        (f)     There is no showing that any of the FDIC Pacific Northwest contract attorneys had anything comparable to the fifty-six (56) years of legal experience of Willner in handling major complex federal and state litigation.

Richard Gill, Esq. has never been in private practice and never analyzed an attorney fee petition similar to this one.  Large law firms, such as co-counsel in this case and the Litigation Division of FDIC, have paralegal staff that can do some of the work.  Gill, in his reductions from Willner's hours, has been hyper-technical and did not give proper weight to the discretionary decisions of Willner as an experienced and successful trial lawyer of major complex cases.

    **(5)**       **<u>This Court should reject FDIC's disallowance of 186.35 hours of time</u>**.

In the Notice, FDIC only gives "illustrative purposes" for rejection of time.

(a)    Lawyer time should be compensable for preparing and examining an expert witness when this time cannot be separated from overall preparation and examination of the witness involving many issues.

Gill agrees in his deposition testimony that in his time records he has never differentiated separate issues in related cases in preparation and examination of an expert witness. **(Ex. N & P).**  It would have been an impossible task to stop and enter time allocations by subject, especially in open court.  These forty (40) hours should be allowed.

(b)    Time spent by lead counsel for keeping 6,500 shareholders informed of progress in the case in order to fulfill fiduciary duty and encourage contributions to the Litigation Fund should be compensable.

Gill, in his deposition, essentially conceded that keeping six thousand five hundred (6500) shareholders informed of progress in the case is necessary in order to fulfill fiduciary duty and encourage contributions to the litigation fund.  These 24.3 hours should be allowed.

(c)    Time spent by lead counsel in organizing key portions of a litigation file should be compensable.

Gill testifies that paralegals can organize a litigation file.  The documents necessary for this huge, complex settlement discussion covered thousands of pages.  Willner is only seeking payment for his organizing key documents.  This is a judgment an experienced litigator should be able to make.  These 13.4 hours should be allowed.

(d)    Time spent by lead counsel and associate counsel in preparing the FDIC administrative agency fee and expense petition required by FDIC should be compensable.

The issue of whether time spent by lead counsel and associate counsel in preparing the FDIC administrative agency fee and expense petition required by FDIC is compensable is an issue upon which courts have split.  Favorable cases are:

General Federation of Women's Clubs v. Iron Gate, Inc., 530 A.3d. 1123, 1129 (D.C. Court of Appeals, 1988); Copeland v. Marshall, 641 F.2d 880, 893 (D.C. Cir., 1980); and Clark v. City of Los Angeles, 803 F.3d 987, 992 (9th Cir., 1986).  There are unique circumstances present on this issue before this Court.  Exhibit Y is a written agreement between Willner and FDIC which says that the attorneys' fees would be initially determined by this Court.  This agreement was unilaterally revoked by FDIC (See Gill deposition, Ex. O, P. 14).  If FDIC insisted that the fee petition initially go to FDIC, it should pay reasonable fees for this work.  No compensation is sought for attorney time in the fee litigation in this Court.  These 64.2 hours of Willner should be allowed, plus the 12.95 hours of Sarah Dressler at $150.00 per hour and the 7 hours of experienced bookkeeper Kathy Kelley at $30.00 per hour.  Willner should be able to decide whether the expense of bringing two former Benj. Franklin top executives to the Fairness Hearing to assist in factual questions that might arise should be compensable.  The expense involved was one thousand four hundred eight dollars and thirty-four cents ($1,408.34).

    (e)     Gill makes numerous errors in his computations of time to be deleted.

    (f)     Expenses incurred by lead counsel should be compensable for bringing the former CEO and the former Executive Vice President of Benj. Franklin to Washington, D.C. to assist at the Fairness Hearing before this Court.

There are unique circumstances present on this issue before this Court.  Exhibit Y is a written agreement between Willner and FDIC which says that the attorneys' fees would be initially determined by this Court.  This agreement was unilaterally revoked by FDIC (See Gill deposition, Ex. O, P. 14).  If FDIC insisted that the fee petition initially go to FDIC, it should pay reasonable fees for this work.  No compensation is sought for attorney time in the fee litigation in this Court.  These 64.2 hours of Willner should be allowed, plus the 12.95 hours of Sarah Dressler at $150.00 per hour and the 7 hours of experienced bookkeeper Kathy Kelley at $100.00 per hour.Willner should be able to decide whether the expense of bringing two former Benj. Franklin top executives to the Fairness

Hearing to assist in factual questions that might arise should be compensable.  The expense involved was one thousand four hundred eight dollars and thirty-four cents ($1,408.34).

Willner records time spent on a telephone call at a minimum of one tenth (.10) of an hour. Many law firms record every telephone call at a minimum of one fourth (.25) of an hour.  Gill rejected one tenth (.10) of an hour calls which, for example, said "attempt to reach Gill", "attempts to reach RC, fax to RC".  This is hyper-technical and depends solely upon what Willner wrote in his time records during a busy time.  Willner suggests as a fair solution dividing the total of 17.5 hours in half, thereby reducing the claim by 8.7 hours.

In addition, a review of the records show 11.4 hours of time in the Claims Court case, and 12.2 hours working on the tax settlement which was entered by mistake and this 23.6 hours should be deducted from the claim.  There is suggested a 50/50 compromise on the 17.05 telephone hours or 8.52 hours.

Willner is at the top of his profession in Oregon.  The Declarations of former Chief Judge James Burns of the United States District Court for the District of Oregon and former Chief Justice of the Oregon Supreme Court Berkeley Lent testify to Willner's excellent legal reputation in Oregon.

David Markowitz, of Portland, Oregon, a Fellow of the American College of Trial Lawyers, says in his Declaration:

> "for approximately 20 years I have worked on numerous matters
> involving attorney fee issues, often as an expert witness, mediator, or
> arbitrator. I have presented live testimony or supplied declarations on
> scores of occasions over the last 20 years."

He commissioned a recent study of commercial litigation attorney fee rates in Portland, Oregon.  Markowitz concludes,

> **"I referred the class representation in this case to Mr. Willner
> because of my belief that he was the most qualified Plaintiff's class
> action litigator in the City of Portland who would be willing to
> undertake the Benjamin Franklin Savings and Loan**

**Litigation[5]...In my opinion, Don Willner should be considered
with the very best commercial litigators in Portland when setting
an appropriate billing rate**." (Ex. S)

He testified that the appropriate rate for Don Willner's work in Oregon was

four hundred fifty dollars ($450.00) per hour.

Dean Heiling, prominent Portland, Oregon attorney, says in his Declaration:

> "I am a frequent lecturer at Continuing Legal Education seminars in
> Oregon on trial litigation, including attorney fees. I am familiar with
> billing rates – highs, lows, and averages – of attorneys in Oregon and
> in various states throughout the country. I have testified as an expert
> witness in attorney fee disputes from time to time since the early
> 1980s, submitted many affidavits in support of fee petitions for other
> attorneys and for myself, and I have served as arbiter in attorney fee
> claims in Oregon. I know Don Willner....One of the cases we co-
> counseled involved a personal injury suit against a U-Haul company.
> Mr. Willner argued and won in the Ninth Circuit, persuading that court
> to establish a favorable interpretation of the Commercial Code of
> Tennessee, which was later discussed in a Tennessee law review. I
> consider myself an accomplished attorney, but I do not have Mr.
> Willner's expertise in complex litigation. Mr. Willner is highly
> intelligent, highly experienced, and an excellent legal strategist. The
> usual hourly rates in Oregon for attorneys of Mr. Willner's experience
> and professional standing in litigation are between $375 and $500. In
> my opinion, a basic rate of $450 per hour would be completely fair for
> Mr. Willner."

Willner believes, however, that the appropriate community for determining attorney fees is

the District of Columbia, where the reasonable rate is higher than in Oregon, but not much higher.

**(6)    Willner's claim for $1,059,870.00 is justified by the Lodestar/Multiplier approach
used in this District.**

In its Notice to Shareholders prepared by FDIC, it says:

> "The FDIC <u>has not yet determined</u> the total amount of legal fees and
> expenses it will approve pursuant to its receivership claim procedures,
> <u>the amount will likely be between $1 and $2 million</u>. (emphasis added)

This is a prediction of a "likely" range for a "not yet determined" fee. Willner's requested fee

is consistent with this indefinite statement of the FDIC.

---

[5] Markowitz is not participating in the fee in this tax matter (Willner Declaration, Ex. A).

**(a)** ___The size of the fund created and the numbers of persons benefited.___

There were about 6500 shareholders of Benj. Franklin at the time of seizure in 1990. There has been no stock transfer agent since 1990 but there has been a substantial over-the-counter market. No one knows how many shareholders will benefit from the 2006 settlement because most of the money was distributed through stockbrokers who keep confidential records.  However, the number of shareholders is probably still in the thousands (Willner Declaration, Ex A). $44 million is a very substantial fund.

**(b)** ___The presence or absence of substantial objections by members of the class to the settlement in terms of fees requested by counsel.___

Ex. Z is a joint declaration of fourteen (14) former officers, directors, or executives of Benj. Franklin, and plaintiffs in the case owning a total of 429,488 shares of stock of Benj., in support of the attorney fee sought by Willner.  These sophisticated declarants are familiar with the work of Willner in the Benj. Franklin cases.  Those who were plaintiffs received regular reports from Willner. FDIC has, however, previously submitted two letters from one major shareholder, C. Robert Suess, which objects to the Willner fee petition.  Mr. Suess was not present at any of the discussions between shareholder attorneys, FDIC, and the Department of Justice.[6]

**(c)** ___The skill and efficiency of the attorneys involved.___

This has been previously discussed in this Motion.  At no time in its administrative decision, or in any of the hundreds of pages of material submitted to this Court, has FDIC ever challenged the skill or efficiency of Willner.  Any attempt to do so now would be ex post facto.

Indeed, in its Notice to Shareholders approved by this Court, FDIC relied heavily on Willner's recommendation to approve the settlement.

---

[6] Mr. Suess is a former client of Don S. Willner who in recent years has filed two bar complaints against Willner with the Oregon State Bar, both of which have been dismissed as without merit.  Mr. Suess did not attend the recent oral argument in the Federal Circuit appealing the $52 million Claims Court Judgment. (Willner Declaration, Ex. A)

"**Don S. Willner is the Portland, Oregon attorney who represents shareholders of Benj. Franklin in the above-described CFC [Court of Federal Claims] litigation, which is a shareholders' derivative action. Mr. Willner also filed a motion to intervene in the tax litigation pending before Judge Sullivan in the U.S. District Court (D.C.) in order to argue that the Benj. Franklin shareholders were the real parties in interest because the claimed tax would have eliminated any hope of the shareholders' receiving a cash distribution from the Benj. Franklin receivership estate. Mr. Willner also filed a still-pending suit against the FDIC-Receiver in the U.S. District Court in Portland, Oregon, seeking to enjoin FDIC from making the disputed tax payment to the IRS. After these actions were filed by Mr. Willner and recognizing the interest of the Benj. Franklin shareholders, the FDIC invited Mr. Willner and other attorneys representing Benj. Franklin shareholders to meet with the FDIC and representatives of the IRS and the Department of Justice Tax Division to discuss the possible compromise or settlement of the tax dispute. Mr. Willner and the other shareholders' counsel and consultants participated actively in these discussions over many months, and Mr. Willner and other shareholders counsel now support the proposed tax settlement described herein and will speak in favor of the proposed tax settlement at the Fairness Hearing....**

**For all the reasons discussed above, the FDIC as receiver of Benj. Franklin and shareholders' counsel, including Mr. Willner, recommend that the proposed tax settlement be found to be fair, adequate, and reasonable**." (emphasis added)

As previously said in this Motion, Fleischer, who was present from the beginning of this case, highly praised Willner's efforts and suggested that Willner receive more than Willner has requested.

### *(d)* *The Complexity and duration of the litigation.*

Dealing with the Department of Justice and FDIC was difficult.

As previously discussed, FDIC had its own problems and was not in position to be a vigorous advocate for the best possible settlement, so shareholder participation was vital. In ***Donnell v. United States,*** *supra* the D.C. Circuit observed:

"This inquiry primarily entails determining whether the government litigant adequately represented the intervenors interests by diligently defending the suit. It also entails considering both whether the intervenors proposed different theories and arguments for the Court's consideration and whether the work it performed was of important value to the Court" (Donnell at p. 249).[7]

---

[7] Even objectors can receive Court awarded fees if they improved the settlement. Gottlieb v. Barry, 43 F.3d 474, 491 (10th Cir., 1994); White v. Auerbach, 500 F.2d 822, 828 (2d Cir., 1974).

Since this was a successful settlement rather than a court trial, the important primary different theory argued by the shareholders was that the $1.5 billion financial assistance should not be taxed, while FDIC argued that it should be taxed. The shareholder attorneys carried the argument on this and many other points while FDIC was often an intermediary with the Department of Justice.

The Department of Justice also had its problems. It was apparent during the negotiations that its client, the IRS, wanted to take a less compromising position. At one three-way meeting, there were over a half a dozen IRS people present who strongly disagreed with all of the shareholder arguments. It is also frequently hard to negotiate with a government agency which often has difficulty in getting someone to commit to a decision, plus the layers of government review.

Then the whole compromise almost unraveled by the Department of Justice Review Board wanting a last minute additional $3 million after its trial department had recommended the $47 million settlement. Ultimately, the shareholder clients agreed, but it was not easy. (Willner Declaration, Ex. A)

The IRS sought $1.2 billion and settled for $50 million, of which 75% was allocated to interest and 25% was allocated to the tax. This 75% could later be used to offset any taxes owed for recovery in the Claims Court litigation.

The issue presented by the IRS claim of income tax was whether federal financial assistance provided to a receivership after the institution has been seized can be taxable income on transactions that are called loans (and in this case, repaid plus interest) has never been decided by any court. In almost all other receiverships, the federal financial assistance is provided with no real expectation of repayment, even though it is called a loan. The Internal Revenue Service regulations were written considering the usual scenario of no repayment. But Benj. Franklin Receivership is one of a very few which has a surplus, and therefore can and did repay the $1.5 billion loan with interest.

This case would have been one of first impression if it was not settled. There were also other important tax issues unresolved which also contributed to the settlement. They included

"how the Alternate Minimum Tax should have been applied, how the 1990 taxes should have been calculated, whether the bad debt reserve was handled correctly, which statute of limitations would apply, and whether interest and penalties would be appropriate. Any one of these legal issues might have formed the basis of a lengthy lawsuit, but in this case, all of these issues are present in the one pending suit." *Quoted from page 4 of FDIC's Motion for a Fairness Hearing.*

### (e)    *The risk of non-payment.*

Willner was paid one hundred twenty-five dollars ($125.00) per hour by the shareholders for his work as lead counsel, with lesser amounts for associate and paralegal work. These amounts are woefully inadequate.  The understanding with its clients was that he would apply for additional compensation from the Court or FDIC if success was attained.

If the settlement had not been successful, there would have been no money for additional reasonable fees.  Furthermore, intervenor status for the shareholders was not resolved by the Court, and the government was opposed to such status.  If intervenor status had been denied, there would have been no additional fees.  If, on the other hand, intervenor status was granted and no settlement reached, litigation would follow in this Court, and probably on appeal, because of the importance of the issue to the government, and this would have been lengthy, expensive, and risky for all parties including the shareholders.  The risk of non-payment would have greater impact for Willner than for the large law firms also involved in this tax matter who can spread the risk over hundreds of attorneys.

### (f)    *The amount of time devoted to the case by plaintiffs' counsel.*

All members of the team of attorneys did good work.  Here is the tabulation of hours devoted to the tax matter by the attorneys involved in the discussions with FDIC and Department of Justice.

- Don Willner                1033 hours

- Mitchell Moettel        688.50 hours

- Rosemary Stewart      308.9 hours
  *(RS hours possibly exclude small supplemental additions)*
- Tom Buchanan           308.75 hours
  *(most of which took place in the earlier Claims Court case.)*
  *(TB hours possibly exclude small supplemental additions)*
- Ernest Fleischer          240 hours

(Information from Fee Applications of the Parties)

The material previously totaled in the earlier submission showed 1031 hours for Willner, and the correct amount is 1033 hours. It also omitted 12.95 hours for attorney Sarah Dressler at $150.00 per hour and 7 hours for experienced bookkeeper Katherine Kelley at $30.00 per hour which was work done on the fee petition, but this time was included in the earlier submission, and should be allowed.

Adding two (2) hours to Willner's total (addition mistake), and omitting the 23.6 hours previously conceded comes to 1009.4 hours for Willner. If Willner's lead counsel time of five hundred twenty-five dollars ($525.00) per hour, plus a double multiplier, is approved, the total we are seeking for fees is $1,059,870.00 plus $1,408.34 in expenses. If the Court chooses to reject any categories of time, the number of hours to be deducted is previously set forth. If the Court determines that Willner's lead counsel time should not be calculated at District of Columbia rates, appropriate information has previously been provided. We strongly believe that District of Columbia rates are appropriate for lead counsel work in a District of Columbia case.

### *(g)*      ***The awards in similar cases.***

As previously discussed, the only similar case is the companion claim of Winston & Strawn, LLP where this Court approved an arbitrator's award giving that firm the same fair market value rate and the same double multiplier which Willner is now seeking.

Willner's work on this tax matter started in 1999 and was completed seven years later in 2006, with the Fairness Hearing before this Court, and the fee matter is still not resolved.  This is a long time to wait for reasonable compensation.

In **_Donnell,_** supra the D.C. Circuit said,

> "An additional factor which the district court could have considered, but did not, was the delay in payment of the fees."

## Conclusion

Summary Judgment should be granted in the amount of $1,059,870.00 for attorneys fees minus $101,793.90 already paid by the shareholders, so the total amount requested from this Court is $958,076.10 and $1,408.34 for additional costs.

Dated this 23rd day of June, 2008.

Respectfully submitted,

Of Counsel:

   /s/ Don S. Willner 06/23/08

KELBY D. FLETCHER

DON S. WILLNER

Peterson, Young, Putra, Fletcher,

Don S. Willner & Associates, P.C.

  Knopp & Wampold, P.S.

630 Sunnyside Road

2800 Century Square

Trout Lake, WA  98650

1501 Fourth Avenue

Tel:    509-395-2000

Seattle, WA  98101-1609

Fax:    509-395-2939

Tel:    206-624-6800

Fax:    206-682-1415

JEREMIAH A. COLLINS

Bredhoff & Kaiser, P.L.L.C.

805 15th Street, N.W., Suite 1000

Washington, DC  20005

Tel:    202-842-2600

Fax:    202-842-1888

Counsel for Plaintiff