EXHIBIT A

# DECLARATION OF DON S. WILLNER

I, Don S. Willner, declare under penalty of perjury under the laws of the United States and the State of Washington that the following is true and correct to the best of my knowledge and belief.

1.    I am the principal of the law firm Don S. Willner and Associates, P.C. and also one of the attorneys in this case.

2.    The exhibits or excerpts from exhibits are true copies of the originals.

3.    After receiving Bruce Taylor's June 6, 2002 letter on June 11, 2002, I know that action had to be taken to protect the shareholders.  To prevent the FDIC from making tax payments, I filed on behalf of the shareholders, a suit on June 17, 2002 against the FDIC in the United States District Court for the District of Oregon (the "Oregon Action").  I was successful in obtaining a temporary restraining order ("TRO") prohibiting the FDIC, as Receiver of the Benj. Franklin, from making any tax payment to the IRS.  As a result, the FDIC then agreed not to make any such payment without advance notice to me.  If such payment had been made, all of the Benj. Franklin litigation would have become moot and the shareholders would have received nothing.  No taxes were paid by FDIC on behalf of Benj. Franklin Receivership until the current tax settlement was negotiated and approved.

The history of Benj. Franklin is based upon my seventeen (17) years of my knowledge about the litigation and should be undisputed.  Benj. Franklin Federal and Loan Association of Portland, Oregon ("Benj. Franklin") was seized by the government on February 21, 1990.  It was founded in 1925, survived the Great Depression, became the largest savings and loan in Oregon, and was profitable for 16 consecutive calendar quarters before Congress breached

the government contract with Benj. and hundreds of other institutions by retroactively removing the huge capital asset of goodwill from their books when it enacted FIRREA, Pub. L. 10-73, 103 Stat. 183.

Claims Court Judge Loren Smith found that Benj. Franklin would have survived adverse economic conditions but for the government's breach of contract by passing FIRREA. Most of the assets of what FDIC in its earlier brief disparagingly calls a "failed thrift," were sold to Bank of America in 1990 for a record high premium. Benj. Franklin was profitable in the conservatorship and profitable in the receivership and has been one of the very few FDIC savings and receiverships with a surplus. The FDIC conservatorship had a balance of about $94 million after sale of the assets and accumulation of interest. Benj. Franklin is almost unique in the savings and loan debacle and the later litigation arising from the government seizures of savings and loans.

4.    Based upon information and belief, co-counsel Winston and Strawn, LLP was paid $1.1 million for its work as a result of an arbitration award approved by this Court. This resulted in a double multiplier of hourly rates, with over one thousand dollars ($1000.00) paid per hour for their principal attorneys. The claim of Blackwell, Sanders, Peper Martin and Ernest Fleischer (hired as a tax consultant by me) was not resolved in mediation and is pending before this Court. That claim seeks, as far as we can tell, $4583.33 per hour.

5.    The 2002 Oregon breach of fiduciary duty suit was only dismissed by stipulation in 2006. I have been concerned that some FDIC officials have a long memory about this lawsuit which was so troubling, and this might have impacted the administrative decision.

6.    I had discussions with the government attorney who filed the suit in which the government said it would oppose any shareholder intervention since the FDIC was the

taxpayer.  I argued that the shareholders were the beneficial owners and were not being adequately represented by the FDIC.

7.      On September 16, 2002, I filed a Motion to Intervene in the tax case and transfer to the District of Oregon, with a Memorandum of Points and Authorities.  As a result of that Motion, the government and FDIC agreed on a three-way discussion with the Shareholders represented by me.

8.      I was lead counsel for the shareholders throughout the three-way discussions. Rosemary Stewart, Esq. of the Washington D.C. law firm of Spriggs and Hollingsworth, Kansas City attorney tax consultant Ernest Fleischer, Esq., and Delaware CPA Randi Cohn were retained by me to assist in early 2002.  Although I did much earlier work, the first discussion meeting did not take place until November 19, 2002.  At that time, attorneys Thomas Buchanan and Mitchell Moettel of Winston & Strawn joined the discussions on behalf of shareholder C. Robert Suess, but I remained lead counsel.

9.      In the settlement discussions, the FDIC did not advocate the lowest possible tax, stating that it was a "third party neutral" and an "honest broker".  The government argued that the $1.5 billion of federal financial assistance paid by corporate RTC to RTC – Receiver which was then paid to Bank of America to re-purchase a loan portfolio was taxable income to the Benj. Franklin receivership.  Tax attorneys Mitchell Moettel and Ernest Fleischer and I stressed that the transaction was called a loan; the re-purchased assets produced money for the receivership; the loan was fully re-paid plus $258 million of interest; and a loan cannot be taxed as income as part of the 16th Amendment to the United States Constitution.

FDIC, on the other hand, argued that the transaction was not a loan. FDIC had been co-counsel for the shareholders in the damages phase of the Claim's Court litigation, but did not continue to advocate the lowest possible tax.

FDIC was further handicapped because it earlier entered into a secret agreement with the IRS not to contest in court any tax determination made by IRS where IRS had previously refrained from collecting the tax. FDIC therefore, had a substantial incentive to settle on any basis rather than insisting on the highest possible settlement. In addition, FDIC's predecessor, RTC, incredibly failed to claim a tax deduction for the repayment of the $258 million loan interest, and on the tax returns made an $88 million overstatement of a repayment. In 2002, FDIC failed to research the legal impact of paying any tax to the IRS.

10.    I have now been practicing law for over fifty-six (56) years. After graduating from Harvard College *magna cum laude* and phi beta kappa, and then graduating from Harvard Law School, I worked for much of a year in Washington, D.C. as an associate in the prominent law firm now known as Arent Fox. I then returned to Oregon and have spent most of my working life in private practice in Oregon and Washington. My practice has emphasized complex litigation, including many class actions. I have argued and won cases in the U.S. Supreme Court, the Ninth and Tenth Circuit Courts of Appeal, and the Supreme Courts of Oregon and Washington. I was an adjunct Professor at Lewis and Clark Law School in Portland, Oregon for about ten (10) years, and president of the United States District Court for the District of Oregon Historical Society. I have served as a Circuit Judge Pro Tem (major trial court) in five (5) Oregon counties by appointment of the Chief Justice of Oregon.

Throughout my career I have emphasized "cause" cases, rather than focusing on the highest economic reward. I have done much pro bono work and represented non-profit groups and unions for low pay, such as the Oregon State Grange which I have represented for nearly thirty-four (34) years. My experience in complex federal litigation includes, among other examples:

A.  Representing, at low hourly rates, Colegio Cesar Chavez in obtaining a federal injunction against the U.S. Secretary of Health Education and Welfare preventing interference with the accreditation of a Chicano college.

B.  Representing, *pro bono* as co-counsel, the Japanese American Citizens League in federal court in a *coram nobis* proceeding revoking the World War II conviction of Minura Yasui for violation of the internment order (the Yasui conviction was one of three test cases initially affirmed by the Supreme Court during World War II).

C.  Representing, on a contingent basis, an early long-shot federal case, ultimately mostly unsuccessful, for a class of 2000 faculty women seeking equal pay, promotion, and tenure for women. This case was tried for nine (9) continuous months (minus court vacation) and is the longest trial in the history of the Oregon Federal Court (it is mentioned in the Chief Judge Burns' Affidavit, Ex. U).

D.  Representing, pro bono, the NAACP using 42 U.S.C. 1983 to obtain a federal injunction preventing a local water district from condemning for a well the land of the first African American seeking to build a house in eastern Multnomah County, Oregon.

E.  Representing, on a contingent basis, a group of older workers in a federal age discrimination case which was ultimately settled and a fee earned.

F.  Arguing and winning, a fishing rights case in the United States Supreme Court.

G.  Representing twenty-two thousand (22,000) west coast mill workers in state and federal courts in the largest successful revolt from undemocratic international labor unions in modern history.

H.  Representing, on a contingent basis as lead counsel, a large group of airport workers successfully suing a large government contractor in federal court (a recent eight (8) day jury trial).

11.    My work for labor unions has been at low rates over the years ($125 per hour in 1990, at the time I started the Benj. Franklin litigation), but has resulted in many contingent referrals, including a complex five million dollar ($5,000,000.00) settlement of a personal injury case in rural eastern Washington, which resulted from a win I argued in the Washington Supreme Court.   The hourly rate for 1783 hours worked out to about five hundred twenty-five dollars ($525.00) per hour.

12.    In consulting for another law firm in a similar savings and loan case about ten years ago, I was paid three hundred seventy-five dollars ($375.00) per hour which translates to over five hundred dollars ($500.00) per hour now.

13.    I coordinated the work of all team members, chaired the shareholder side of the three-way discussions, handled almost all of the contact with government attorneys, primarily negotiated and signed the important agreement with FDIC (Ex. F) which among other matters provided for FDIC return of all money paid by shareholders to the Litigation Fund,

most of which was contributed before the tax case started, and held the discussions with Richard Gill of FDIC concerning the actual settlement proposals. At the Fairness Hearing before this Court, I had the major role of describing and defending the settlement. In addition, my sixteen (16) years of knowledge of the case became important when FDIC or the Department of Justice requested documents or information from Benj. Franklin. This knowledge gained from sixteen (16) years of litigation in the Claims Court case was not billed for in this petition fee.  Replication of this knowledge by other counsel would have required untold hours of effort.

14.    I called meetings, assigned tasks, managed the litigation on an almost daily basis, and worked with FDIC closely on the successful settlement process, including making the major explanation and defense of the settlement before this Court at the Fairness Hearing.

15.    All of the multiple, lengthy discussions over a three year period with the IRS through the Department of Justice, and the defendant, the Federal Deposit Insurance Corporation as Receiver of Benj. Franklin, took place in person within the District of Columbia with me as lead counsel.  There were also preparation meetings all of which took place in D.C. with the FDIC and also with co-counsel, as well as the Fairness Hearing with this Court, in which I had the major role in defending the settlement.

16.    This Court, by Order dated November 28, 2007, has approved a double success multiplier for the attorneys from the Winston and Strawn, LLP law firm.  This means that Mitchell Moettel, to the best of my belief, has been paid one thousand fifty dollars ($1,050.00) per hour and Thomas Buchanan, to the best of my belief, has been paid one thousand ten dollars ($1,010.00) per hour based upon a double multiplier.  Buchanan is in the

Washington, D.C. office and Moettel, I believe, spends more of his time in the New York office, but did much of his work on this case in the D.C. office.

17.    I also have substantial District of Columbia experience.  I have been a member of the bar of this Court since 1951 and have tried cases in this Court.  I have argued and won a case in the United States Supreme Court, and have worked on briefs in other cases in the Supreme Court.  A significant portion of the Benj. Franklin Claims Court litigation was tried in the District of Columbia.  I have also worked on briefs submitted to the United States Court of Appeals for the Federal Circuit.

18.    FDIC never hired me as a contract attorney at an agreed upon rate.

19.    These sophisticated declarants who signed Ex. Y are familiar with my work in the Benj. Franklin cases.  Those who were plaintiffs received regular reports from me.  Mr. Suess was not present at any of the discussions between shareholder attorneys, FDIC, and the Department of Justice.

20.    Mr. Suess is a former client of mine who in recent years has filed two bar complaints against me with the Oregon State Bar, both of which have been dismissed as without merit. Mr. Suess did not attend the recent oral argument in the Federal Circuit appealing the $52 million Claims Court Judgment.

21.    The Department of Justice also had its problems. It was apparent during the negotiations that its client, the IRS, wanted to take a less compromising position. At one three-way meeting, there were over a half a dozen IRS people present who strongly disagreed with all of the shareholder arguments. It is also frequently hard to negotiate with a government agency which often has difficulty in getting someone to commit to a decision, plus the layers of government review.

Then the whole compromise almost unraveled by the Department of Justice Review Board wanting a last minute additional $3 million after its trial department had recommended the $47 million settlement. Ultimately, the shareholder clients agreed, but it was not easy.

The IRS sought $1.2 billion and settled for $50 million, of which 75% was allocated to interest and 25% was allocated to the tax. This 75% could later be used to offset any taxes owed for recovery in the Claims Court litigation.

22.    I was paid one hundred twenty-five dollars ($125.00) per hour by the shareholders for my work as lead counsel, with lesser amounts for associate and paralegal work. These amounts are woefully inadequate. The understanding with my clients was that I would apply for additional compensation from the Court or FDIC if success was attained.

23.    All members of the team of attorneys did good work. Here is the tabulation of hours devoted to the tax matter by the attorneys involved in the discussions with FDIC and Department of Justice.

- Don Willner             1033 hours

- Mitchell Moettel        688.50 hours

- Rosemary Stewart      308.9 hours
  *(RS hours possibly exclude small supplemental additions)*
- Tom Buchanan          308.75 hours
  *(most of which took place in the earlier Claims Court case.)*
  *(TB hours possibly exclude small supplemental additions)*
- Ernest Fleischer        240 hours

(Information from Fee Applications of the Parties).

24.    I keep time records daily by one tenth (.10) of an hour of work. Although many attorneys record at least one fourth (.25) of an hour for all telephone calls, I record at least one tenth (.10) of an hour for all telephone calls. The tabulations in my time records have

been done under my supervision by experienced legal staff. They are accurate to the best of my knowledge and belief.

Executed this 23rd day of June, 2008 in Trout Lake, Washington.

_____

Don S. Willner