EXHIBIT B

# WILLNER U'REN & HOOTON, LLP

ATTORNEYS
Don S. Willner*
Matthew U'Ren*
Donald M. Hooton
Constance Wold
*Licensed in Oregon and Washington

ATTORNEYS AT LAW
SUITE 303
111 S.W. NAITO PARKWAY
PORTLAND, OREGON 97204-3509
TELEPHONE (503) 228-4000
FAX (503) 228-4201

PARALEGAL
Leslie Martinez-Munoz

STAFF
Misty Flock
Gloria Flores
Sarah Waltemate

Se habla español

May 3, 2002

**Via Facsimile Only**

Bruce Taylor
FDIC
202-942-3653

RE: *Suess et al v. United States*

Dear Bruce

John Thomas has instructed me to communicate with you rather than directly with him on the Suess case. I am enclosing a copy of an agreement between John Thomas and me dated January 25, 1999, and an agreement between Jim Igo and Tom Buchanan dated March 10, 1999.

I will phone you later today to discuss ways in which the FDIC can help.

Sincerely yours,

WILLNER U'REN & HOOTON, LLP

Don (sw)

Don S. Willner

DSW:sw
encl. 2

EXHIBIT NO.
Wit:
Date:
Rptr:

AATAYLOR[2].txt

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------x
WINSTON & STRAWN, LLP, et al., :
                               :
        Plaintiffs,            :
                               :
    v.                         : No. 06-01120 (EGS)
                               :     06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE      :     06-01273 (EGS)
CORPORATION,                   :
                               :
        Defendant.             :
------------------------------x

                                        Washington, D.C.

                                Wednesday, January 17, 2007

Deposition of

            BRUCE C. TAYLOR

a witness, called for examination by counsel for Plaintiffs, pursuant to notice and agreement of counsel, beginning at approximately 1:00 p.m., at the law offices of Winston & Strawn, 1700 K Street, NW., Washington, D.C., before Mary Ann Payonk of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

                                                        2

1   APPEARANCES:
2        On behalf of Winston & Strawn, LLP:

                    Page 1

```
                           AATAYLOR[2].txt
 3         SCOTT PLUTA, ESQUIRE
           THOMAS M. BUCHANAN, ESQUIRE
 4         Winston & Strawn, LLP
           1700 K Street, NW.
 5         Washington, D.C. 20006
           (202) 282-5100
 6
      On behalf of Willner & Associates, PC:
 7
           DON S. WILLNER, ESQUIRE
 8         Willner & Associates, PC
           630 Sunnyside Road
 9         Trout Lake, WA 98650
           (509) 395-2000
10
      On behalf of Blackwell Sanders Peper Martin, LLP
11         and Ernest Fleischer:

12         JAMES BORTHWICK, ESQUIRE
           Blackwell Sanders Peper Martin, LLP
13         4801 Main Street, Suite 100
           Kansas City, MO 64112
14         (816) 983-8000

15    On behalf of Federal Deposit Insurance
           Corporation:
16
           BRUCE C. TAYLOR, ESQUIRE
17         Federal Deposit Insurance Corporation
           550 17th Street, NW.  Room VS-E7118
18         Washington, D.C. 20429
           (703) 562-2436
19
           ROBERT J. DEHENZEL, ESQUIRE
20         RICHARD GILL, ESQUIRE
           Federal Deposit Insurance Corporation
21         3500 Fairfax Drive Virginia Square
           Arlington, Virginia 22226
22


                      BETA COURT REPORTING
                       www.betareporting.com
              (202) 464-2400      800-522-2382
0

                                                                3

 1                   C O N T E N T S

 2    EXAMINATION BY:                                     PAGE

 3      Counsel for Willner                                 4

 4    DEPOSITION EXHIBITS:

 5     No. 2 - May 3, 2002, Letter
                          Page 2
```

AATAYLOR[2].txt

6  No. 3 - May 10, 2002, Letter
7  No. 4 - Interagency Agreement
8  No. 5 - Letter
9  No. 6 - Letter
10 No. 7 - Letter to Willner
11
12
13
14                  *   *   *   *   *
15
16
17
18
19
20
21
22

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

0

                                                            4

1              P R O C E E D I N G S
2  Whereupon,
3              BRUCE C. TAYLOR
4  was called as a witness and, having been first
5  duly sworn, was examined and testified as follows:
6         EXAMINATION BY COUNSEL FOR WILLNER
7         & ASSOCIATES

Page 3

```
                         AATAYLOR[2].txt
 8           BY MR. WILLNER:
 9       Q   Mr. Taylor, what documents have you
10   reviewed in preparation for this deposition?
11       A   I reviewed my letter to you of June
12   2002 and your letter to me of May 2002, which
13   is the letter I responded to.
14       Q   All right.  In May and June 2002
15   were you the FDIC attorney in the Benj.
16   Franklin case in the U.S. Court of Federal
17   Claims?
18       A   To the best of my recollection, I
19   was at that time.
20                   (Deposition Exhibit No. 2 was
21                   marked for identification.)
22           MR. WILLNER:  Please review Exhibit
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

5

```
 1   2.
 2           MR. BUCHANAN:  You don't have any
 3   copies?
 4           MR. WILLNER:  I do not.  Do you
 5   want to take a moment to make copies?
 6           MR. BUCHANAN:  How many exhibits do
 7   you have?
 8           MR. WILLNER:  This many.
 9           MR. BUCHANAN:  This many?  What's
10   that?
```

AATAYLOR[2].txt

```
11           MR. WILLNER:  That's all I have for
12   this witness.  These all deal with --
13           MR. BUCHANAN:  We can go off the
14   record for this.
15           (Discussion off the record.)
16           BY MR. WILLNER:
17       Q   Did you receive Exhibit 2, which is
18   the letter of May 3, 2002?
19       A   When you say did I receive it, in
20   2002 at the time?
21       Q   Approximate time of the letter.
22       A   To the best of my recollection, I
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400       800-522-2382

6

```
1   received it.  I don't have any present
2   recollection of receiving it, but I probably
3   did, yes.
4       Q   All right.  Now, attached to the
5   letter are two agreements between the FDIC
6   and the Seuss plaintiffs.  Did you receive
7   those?
8       A   I'm assuming I did.
9       Q   What action did you take as a
10  result of receiving Exhibit 2, if any?
11      A   I don't recall taking any specific
12  action based on Exhibit 2.
```

Page 5

AATAYLOR[2].txt

13      Q    All right.
14           (Deposition Exhibit No. 3 was
15           marked for identification.)
16      BY MR. WILLNER:
17      Q    The court reporter's handed you
18 Exhibit 3, which is my letter to you of --
19 what's the date?
20      A    May 10th, 2002.
21      Q    Yes.  Did you receive that letter?
22      A    I must have, since I responded to

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

                                                    7

1  it.
2       Q    All right.  Did you respond to that
3  letter --
4       A    Yes.
5       Q    -- in writing?
6       A    Yes.
7       Q    Are you confusing that --
8       A    Oh, wait.  I'm sorry.  I am
9  confusing.  I'm confusing the -- a letter
10 probably on or about May 20th, 2002, as the
11 letter that I responded to.
12      Q    All right.
13      A    I do not have a recollection of
14 responding to this letter.
15      Q    Okay.  May I have it back for a
                    Page 6

AATAYLOR[2].txt

16  second? In this letter, I wrote to you: We
17  believe the tax liability is an open issue
18  under the interagency agreement which you
19  kindly sent to me.
20          Do you remember sending me the
21  interagency agreement?
22      A   Not specifically, but I assume that

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

8

1   I did, or that someone on our behalf sent it.
2       Q   Sure.
3           (Deposition Exhibit No. 4 was
4           marked for identification.)
5       BY MR. WILLNER:
6       Q   Is Exhibit 4 the interagency
7   agreement that you just referred to?
8       A   As far as I can tell, it appears to
9   be the document described in the last
10  exhibit.
11          MR. WILLNER: Can I have these
12  again? I'm sorry, the others.
13          MR. DeHENZEL: I think they're
14  being circulated.
15          MR. WILLNER: Okay.
16      BY MR. WILLNER:
17      Q   Okay, Mr. Taylor, I hand you back

AATAYLOR[2].txt
18    Exhibit 3. What action, if any, did you take
19 in connection with the receipt of Exhibit 3?
20    A    Again, I don't recall taking any
21 specific action in response to Exhibit 3.
22    Q    All right.

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

9

1    A    And when I say "I," I mean me
2 especially. I can't speak for anybody else
3 in the corporation.
4            (Deposition Exhibit No. 5 was
5            marked for identification.)
6        BY MR. WILLNER:
7    Q    Did you receive Exhibit 5?
8    A    I believe I did, yes.
9    Q    What action did you take in
10 connection with Exhibit 5?
11    A    To the best of my recollection, I
12 prepared a response letter addressing the
13 issues you raised in Exhibit 5.
14            (Deposition Exhibit No. 6 was
15            marked for identification.)
16        BY MR. WILLNER:
17    Q    What action, if any, did you take
18 in connection -- well, did you receive
19 Exhibit 6?
20    A    I assume that I did.

Page 8

AATAYLOR[2].txt

21    Q    And what action, if any, did you
22    take in connection with Exhibit 6?

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

10

1     A    I don't recall taking any specific
2     action based on Exhibit 6 unless it prompted
3     me to expedite the preparation and mailing of
4     my response letter to you of I think the same
5     date. But I'm not sure about the sequence of
6     events.
7          (Deposition Exhibit No. 7 was
8          marked for identification.)
9          BY MR. WILLNER:
10    Q    I've handed you Exhibit 7. Is this
11    the letter that you wrote to me in response
12    to one of the previous exhibits?
13    A    It appears to be, yes.
14         (Discussion off the record.)
15         BY MR. WILLNER:
16    Q    Did anyone else in FDIC participate
17    in the preparation -- is that 7, Exhibit 7?
18    A    To the best of my recollection, no
19    one else participated in the preparation of
20    the letter.
21    Q    All right. If your counsel has a
22    copy, could you look on with your counsel's

Page 9

11

1    copy?
2        A    Sure.
3        Q    All right.  On page 1 of Exhibit 7
4    at the bottom of the second full paragraph,
5    you wrote:  It appears unlikely that further
6    efforts will be successful in lowering the
7    IRS assessment of taxes, penalties and
8    interest below the projected assets of the
9    receivership assets.  What research or
10   inquiry, if any, did you make before writing
11   that sentence?
12       A    I -- if I recall correctly, I
13   discussed it with some of my colleagues who
14   were more knowledgeable of the efforts being
15   made by the FDIC to meet and discuss the tax
16   with the IRS.
17       Q    Who did you talk to?
18       A    I'm not sure whether my memory's
19   accurate, but I must have spoken with Jim
20   Eigo, who was either a colleague at the time
21   or maybe had been involved earlier.  Can't be
22   sure about that because Jim may have

1   separated from the agency by that date.
2           I probably -- again, I don't know
3   this for a fact, but I probably discussed it
4   with John Thomas, who was my supervisor. And
5   other than Mr. Thomas, I don't recall
6   discussing it with anyone else, although I
7   may have.
8       Q   The next sentence says: In fact,
9   the IRS has not given any indication that it
10  will lower its assessments at all. What
11  research or inquiry did you make before
12  writing that sentence?
13      A   My answer to that question would be
14  the same as my answer to the last question.
15      Q   All right. Now turn the page,
16  please. Last paragraph, second sentence:
17  Although we agreed to keep -- well, let's
18  read the whole thing. Finally, you expressed
19  the hope that no -- writing to me. Finally,
20  you expressed the hope that no payments would
21  be made to the IRS without advance notice to
22  you and without your consent. Although we

AATAYLOR[2].txt

13

```
 1   agreed to keep you apprised of the status of
 2   negotiations with the IRS, we did not agree
 3   to notify you or obtain your consent before
 4   the FDIC takes any action it deems necessary
 5   or appropriate and have no duty to do so.
 6              What research or inquiry did you
 7   make within the agency before writing that
 8   sentence?
 9       A    Well, this sentence -- if I recall
10   correctly, I reviewed the agreement, which is
11   one of the exhibits that you presented to me
12   earlier, that being the 1999 agreement signed
13   by Jim Eigo on behalf of John Thomas and
14   signed by you on behalf of the shareholders.
15              I reviewed the agreement.  I looked
16   at the terms of the agreement, and then I'm
17   sure I discussed what those terms were with
18   certainly Mr. Thomas and perhaps other
19   members of my group.
20       Q    In connection with any of these,
21   these questions relating to sentences in this
22   letter, did you read the interagency
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

14

```
 1   agreement?
```

...

AATAYLOR[2].txt

2    A    I don't recall whether I read the
3    interagency agreement for these purposes. I
4    know I've read the interagency agreement
5    before as part of other duties, but never
6    specifically for the purpose of responding to
7    anybody in particular. And I'm almost
8    certain I did not review it for purposes of
9    responding to this, although, you know, I may
10   have.
11   Q    All right.
12   A    But --
13   Q    Do you remember a clause in the
14   interagency agreement which says that the
15   FDIC under certain circumstances surrendered
16   its right to protest any tax levied by the
17   IRS?
18   A    I don't remember that provision
19   specifically but I have no reason to doubt
20   that it is in the agreement.
21   Q    Next sentence says: We can tell
22   you, however, that a decision may be made

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

U

15

1    soon on how to handle the IRS's claim in
2    light of the IRS's latest indication that it
3    does not intend to abate any portion of the

```
                      AATAYLOR[2].txt
   4    tax liability of the Ben Franklin
   5    receivership.
   6            Same question: what research or
   7    inquiry did you make before writing that
   8    sentence?
   9       A    I believe for this sentence I
  10    relied on, again, conversations with
  11    colleagues who were more intimately involved
  12    with the IRS negotiations and who were more
  13    likely to have information necessary to
  14    evaluate what the IRS was likely to do, what
  15    we were -- what we were likely to do going
  16    forward and what our strategies and various
  17    positions might be.
  18       Q    Were you told of any recent
  19    negotiations between the FDIC and IRS
  20    concerning the -- the so-called FFA, federal
  21    financial assistance?
  22       A    If I was, I don't recall the
```

                                                              16

```
   1    specifics of any discussion along those
   2    lines.
   3       Q    Isn't it a fact that -- I'm sorry,
   4    did I interrupt you?
   5       A    Just looking at what I wrote, it
   6    appears that someone advised me of what had
```
                            Page 14

AATAYLOR[2].txt

7   been happening with the IRS. Now, whether it
8   was a -- a meeting that happened immediately
9   before I wrote this letter, I don't know.
10  But obviously, I didn't -- I did not have
11  personal knowledge of the negotiations
12  because I didn't participate in the
13  negotiations, so I had to refer and rely on
14  my colleagues.
15      Q   Are you aware of any meetings
16  between IRS and FDIC concerning the IRS tax
17  claim on or about the meeting at which Mr.
18  Duhl attended?
19      A   I recall having discussions with
20  some of my colleagues that indicated there
21  had been more than one contact with the IRS.
22  Now, whether they advised me there'd been

17

1   more than one meeting, including the meeting
2   that Mr. Duhl attended, I don't recall.
3       Q   All right. Now, you say in this
4   sentence that a decision may be made soon on
5   how to handle the IRS's claim. Specifically,
6   who told you that a decision was coming soon?
7       A   I'm not sure that anyone told me
8   expressly that a decision was coming soon.

```
                          AATAYLOR[2].txt
 9      If -- someone may have.  I don't recall.  I
10      believe I wrote that because I knew that
11      there were discussions ongoing within the
12      corporation as to how to handle IRS's claim.
13         Q    And by "the corporation," you mean
14      FDIC?
15         A    Correct.
16         Q    And there were discussions about a
17      early decision on the possibility of paying
18      the tax?
19         A    My letter seems to indicate that
20      there -- that the discussions were perhaps
21      coming to a head and -- and that whoever's
22      responsible for making the final decision was
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

                                                     18

```
 1      in the process of making a final decision.
 2      What that decision would have been, I -- I
 3      don't know.
 4         Q    But the decision was being made in
 5      light of the IRS's latest indication that it
 6      does not intend to abate any portion of the
 7      tax liability of the Benj. Franklin
 8      receivership, is that correct?
 9         A    That's what my letter says, yes.
10         Q    In the next sentence, you say:
11      Further, we will let you know if a payment is
```
Page 16

AATAYLOR[2].txt

```
12   made to the IRS so you can advise your
13   clients accordingly.
14              And it's clear, isn't it, that you
15   meant you would give me that notification
16   after you made the payment?
17        A    That is what my letter indicates,
18   yes.
19        Q    Before writing Exhibit 7 -- pardon
20   me. Was Exhibit 7 as a letter approved by
21   anybody else in the FDIC before you sent it?
22        A    Is Exhibit 7 my June 6th letter?
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382


                                            19

```
1         Q    Yes.
2         A    Okay.
3              (The reporter read the record as
4              requested.)
5         A    I'm not sure if I can give you a
6    precise answer to the question as worded.  I
7    know that John Thomas reviewed the letter,
8    which I assume for purposes of your question
9    means he approved the letter.  But there was
10   no process where I vetted the letter and had
11   people signing off and giving written
12   concurrence on that.
13        Q    Were you authorized to write
```

Page 17

```
                          AATAYLOR[2].txt
14    Exhibit 7?
15         A     Yes.
16         Q     Before writing Exhibit 7, did you
17    research the impact of paying any portion of
18    the tax upon the rights of FDIC receiver or
19    the shareholders of Benj. Franklin?
20         A     I did not.
21              MR. WILLNER:  No further questions.
22              (Discussion off the record.)



                   BETA COURT REPORTING
                    www.betareporting.com
               (202) 464-2400      800-522-2382
```

                                                              20

```
1               MR. BUCHANAN:  I don't have any
2     questions.
3               MR. WILLNER:  Do you have any
4     questions?
5               MR. PLUTA:  No questions.
6               MR. WILLNER:  You have no
7     questions?
8               MR. BORTHWICK:  No.
9               MR. DeHENZEL:  We will read and
10    sign.
11              (Whereupon, at 1:54 p.m., the
12              deposition of BRUCE C. TAYLOR was
13              adjourned.)
14                   *   *   *   *   *
15
16
```

Page 18