EXHIBIT N

AAGILL[2].txt

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------x
WINSTON & STRAWN, LLP, et al.,   :
                                 :
        Plaintiffs,              :
                                 :
    v.                           : No. 06-01120 (EGS)
                                 :     06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE        :     06-01273 (EGS)
CORPORATION,                     :
                                 :
        Defendant.               :
---------------------------------x

Washington, D.C.

Wednesday, January 17, 2007

Deposition of

RICHARD GILL

a witness, called for examination by counsel for Plaintiffs, pursuant to notice and agreement of counsel, beginning at approximately 2:30 p.m., at the law offices of Winston & Strawn, 1700 K Street, NW., Washington, D.C., before Mary Ann Payonk of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

2

1   APPEARANCES:

2       On behalf of Winston & Strawn, LLP:

Page 1

AAGILL[2].txt

11  we mean that in a good way. The goodwill
12  litigation on behalf of the FDIC.
13          And then from 2002, I think
14  approximately January-February 2002 to the
15  present, I've come back home and I now work
16  again for the professional liability group in
17  the FDIC.
18      Q    Have you ever been an attorney in
19  private practice?
20      A    No.
21      Q    Did you tell me or Kelly Fletcher
22  that a decision on my fee petition was being

6

1   made by FDIC in Texas?
2       A    No. I think I -- I mean, for
3   clarification, I think I told you that it was
4   being -- it -- that is the office that has to
5   send out the decisional material, but that --
6   and that's where the petition had to be
7   filed. But I never said that they were
8   making the decision.
9       Q    And you're confident of that?
10      A    Yes.
11      Q    Did you tell me or my attorney,
12  Kelly Fletcher, to send my fee petition and

AAGILL[2].txt

```
13   supplements to Glenn Glinsmann of FDIC in
14   Texas?
15        A    Yes.
16        Q    Had we previously been sending them
17   to you?
18        A    Before the claim was officially
19   filed, you were sending to the -- the actual
20   claims to me in draft form, and so that was
21   being sent to me.
22        Q    You have been present during the
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

7

```
1   telephone deposition of Glenn Glinsmann?
2        A    Yes.
3        Q    Is he correct that you made the
4   decision on my fee petition?
5        A    Point of clarification. I was
6   certainly involved in the decisional process
7   on your fee application. The decision -- and
8   for all intents and purposes, I proposed the
9   recommended decision that was approved by
10  other people in the FDIC.
11       Q    Who else in FDIC approved the
12  decision?
13       A    Specifically, Richard Aboussie,
14  who's an associate general counsel. I think
15  he is now an acting deputy general counsel
```

Page 6

AAGILL[2].txt

16  but at the time, he was an associate general
17  counsel. And the general counsel of the
18  FDIC, who I believe now is in private
19  practice, William Kroener.
20     Q  Did you have discussions with Mr.
21  Aboussie or Mr. Kroener about my fee
22  petition?

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

8

1     A  Yes.
2     Q  Before -- and did you also make
3  the, as you phrase it, effective
4  recommendations on the fee petitions of
5  Spriggs & Hollingsworth and Winston & Strawn?
6     A  Yes. The same process occurred.
7     Q  Before evaluating these three fee
8  petitions -- mine, Winston & Strawn and
9  Spriggs & Hollingsworth -- how many fee
10 petitions, attorney fee petitions have you
11 evaluated?
12    A  I've never evaluated attorneys fee
13 petitions like this before. But in my let's
14 say over ten years in the professional
15 liability section, we hire outside counsel to
16 handle cases, and I have probably -- if you
17 count each month's bill as a fee petition or

```
                    AAGILL[2].txt
18    whatever you want to call it, I've probably
19    handled hundreds.
20       Q    But just so we're clear, the only
21    other fee petitions you evaluated have been
22    those of contract attorneys who were doing
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

9

```
1     work for FDIC, is that correct?
2        A    That is correct.
3        Q    Does FDIC have any written or oral
4     guidelines for evaluation of attorney fee
5     petitions?
6        A    I am not aware of any.
7        Q    So we're clear, and no such
8     guidelines were utilized by you in reviewing
9     my fee petition?
10       A    No, I did not look at any -- any
11    FDIC policy on this matter.
12       Q    Were you given any oral
13    instructions by anyone in terms of how to
14    evaluate my fee petition?
15       A    Can -- that -- I'd have to say yes.
16       Q    All right.
17       A    I mean, but it -- as far as --
18       Q    Who gave you those instructions,
19    and what were they?
20       A    Robert Clark and Rick Aboussie.
```
Page 8

AAGILL[2].txt

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

11

```
 1    the work product provision I object and I
 2    instruct the witness not to answer.  If it's
 3    just talking about policies, procedures,
 4    specific instructions about how to go about
 5    it, that's fine.
 6              MR. WILLNER:  I think you're
 7    premature.  I just asked him if he provided
 8    any.
 9         A    The answer is yes, but it's in
10    response to your November 2004 letter
11    agreement that you had with the FDIC.
12              BY MR. WILLNER:
13         Q    All right.  Well, what
14    instructions, guidelines, were you given in
15    connection with the letter agreement between
16    Bob Clark and myself?
17         A    The November agreement, the letter
18    agreement which Bob Clark memorialized with I
19    believe a one-sentence concurrence, says that
20    the FDIC will support reasonable attorneys'
21    fees and that the -- and that the fees, you
22    know, will be run through the receivership
```

12

1   claims process. At the time, we all believed
2   that those fees were going to go through the
3   court process and then, after the Court
4   approved them, they would be run for payment
5   through the receivership claims process.
6              Subsequently, after Mr. Clark left
7   the FDIC, in discussions with Rick Aboussie,
8   it was determined that it might jeopardize
9   the underlying settlement by allowing both
10  the attorneys' fees and blessing the
11  settlement amount to be run through the
12  fairness hearing. So I believe it was
13  mutually agreed to that the attorneys' fees
14  would be run up through the receivership
15  claims process.
16             And at all times, both, you know,
17  on the reasonable attorneys' fees, it was the
18  FDIC's assumption that what we were to pay
19  was your reasonable hourly rates.
20             So to the extent that I was
21  provided guidance, it was to try to determine
22  what was fair as far as the reasonable -- the

AAGILL[2].txt

13

1   hourly rates of the law firms. And I was
2   given instructions I think both by Bob Clark,
3   who -- and Richard Aboussie on the -- that --
4   that's what, you know, the basic parameters
5   were as far as looking at these attorney's
6   fee petitions.
7       Q   Isn't it fair to say that Mr.
8   Aboussie was taking a position inconsistent
9   with the agreement that Bob Clark and I
10  reached?
11      A   It was different than the
12  agreement. I mean, it was -- in the sense
13  that Mr. Aboussie felt that the Court -- that
14  the Court may have a problem approving
15  attorneys' fees and so his position was that
16  they should come through the -- the
17  receivership claims process.
18      Q   Was the document of two pages
19  prepared by me and concurred in by Bob Clark
20  a binding agreement on the FDIC?
21      A   I think what it was was it was a
22  general outline of what the -- the broad

14

1   parameters of the settlement would be. In
Page 12

AAGILL[2].txt

5  specifically go out and -- and do any type of
6  statistical analysis saying, you know, a
7  partner with 20 or 30 or 40 or 50 years'
8  experience, what that partner would be worth.
9  What I looked at specifically was what the
10 high rate for a partner that the FDIC was
11 paying. And to the extent that that was
12 embedded in the data, that -- I picked it up.
13    Q   Are you aware of any Pacific
14 Northwest attorney other than me who was lead
15 counsel in a Washington, D.C. major complex
16 litigation in the group of attorneys that you
17 hired?
18    A   I'm not -- I'm not aware of any --
19 the case was filed in Washington, but I think
20 most of the work probably was performed in
21 the Pacific Northwest. But no, I'm not aware
22 of any other. In answer to your question,

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400       800-522-2382

29

1  no.
2     Q   All right. In evaluating a
3  reasonable fee in this case, did you consider
4  that the original suit of the IRS sought 1.2
5  billion and that through the efforts of the
6  attorneys, a $50 million settlement was made?
7     A   Yes, we certainly looked at the

Page 26

AAGILL[2].txt

8   amount of the original lawsuit. But, more
9   important, in the determination that
10  reasonable hourly rates should be the
11  standard hourly rates was the fact that this
12  was a combined effort by the FDIC, private
13  attorneys that we invited to participate on
14  behalf of the shareholders. And in all
15  fairness, I thought the attorney that we drew
16  from the Department of Justice was very
17  receptive to try to work that you to see if
18  we could resolve the case.
19       Q   Did you tell me in the course of
20  these discussions that the role of FDIC was
21  being a stakeholder?
22       A   I think that I -- I told you that

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

30

1   the role of the FDIC was to try to see what
2   we believed the correct tax should be and
3   that, you know, as far as -- as far as the --
4   the dollar flow, I mean, we were performing
5   more as a third-party neutral because the
6   dollars were going to flow either to you,
7   your shareholders, or to the Internal Revenue
8   Service.
9        Q   My question was: Did you tell me