AAGILL[2].txt

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------x
WINSTON & STRAWN, LLP, et al.,  :
                                :
        Plaintiffs,             :
                                :
   v.                           : No. 06-01120 (EGS)
                                :     06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE       :     06-01273 (EGS)
CORPORATION,                    :
                                :
        Defendant.              :
---------------------------------x

                              Washington, D.C.
                      Wednesday, January 17, 2007

Deposition of

              RICHARD GILL

a witness, called for examination by counsel for Plaintiffs, pursuant to notice and agreement of counsel, beginning at approximately 2:30 p.m., at the law offices of Winston & Strawn, 1700 K Street, NW., Washington, D.C., before Mary Ann Payonk of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

                                        2

1   APPEARANCES:
2       On behalf of Winston & Strawn, LLP:

                Page 1

AAGILL[2].txt

11    we mean that in a good way.  The goodwill
12    litigation on behalf of the FDIC.
13           And then from 2002, I think
14    approximately January-February 2002 to the
15    present, I've come back home and I now work
16    again for the professional liability group in
17    the FDIC.
18      Q    Have you ever been an attorney in
19    private practice?
20      A    No.
21      Q    Did you tell me or Kelly Fletcher
22    that a decision on my fee petition was being

6

1     made by FDIC in Texas?
2       A    No.  I think I -- I mean, for
3     clarification, I think I told you that it was
4     being -- it -- that is the office that has to
5     send out the decisional material, but that --
6     and that's where the petition had to be
7     filed.  But I never said that they were
8     making the decision.
9       Q    And you're confident of that?
10      A    Yes.
11      Q    Did you tell me or my attorney,
12    Kelly Fletcher, to send my fee petition and

Page 5

AAGILL[2].txt

13   supplements to Glenn Glinsmann of FDIC in
14   Texas?
15       A    Yes.
16       Q    Had we previously been sending them
17   to you?
18       A    Before the claim was officially
19   filed, you were sending to the -- the actual
20   claims to me in draft form, and so that was
21   being sent to me.
22       Q    You have been present during the

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

7

1    telephone deposition of Glenn Glinsmann?
2        A    Yes.
3        Q    Is he correct that you made the
4    decision on my fee petition?
5        A    Point of clarification. I was
6    certainly involved in the decisional process
7    on your fee application. The decision -- and
8    for all intents and purposes, I proposed the
9    recommended decision that was approved by
10   other people in the FDIC.
11       Q    Who else in FDIC approved the
12   decision?
13       A    Specifically, Richard Aboussie,
14   who's an associate general counsel. I think
15   he is now an acting deputy general counsel.

Page 6

AAGILL[2].txt

16  but at the time, he was an associate general
17  counsel. And the general counsel of the
18  FDIC, who I believe now is in private
19  practice, William Kroener.
20      Q   Did you have discussions with Mr.
21  Aboussie or Mr. Kroener about my fee
22  petition?

8

1       A   Yes.
2       Q   Before -- and did you also make
3   the, as you phrase it, effective
4   recommendations on the fee petitions of
5   Spriggs & Hollingsworth and Winston & Strawn?
6       A   Yes. The same process occurred.
7       Q   Before evaluating these three fee
8   petitions -- mine, Winston & Strawn and
9   Spriggs & Hollingsworth -- how many fee
10  petitions, attorney fee petitions have you
11  evaluated?
12      A   I've never evaluated attorneys fee
13  petitions like this before. But in my let's
14  say over ten years in the professional
15  liability section, we hire outside counsel to
16  handle cases, and I have probably -- if you
17  count each month's bill as a fee petition or

Page 7

```
                    AAGILL[2].txt
18    whatever you want to call it, I've probably
19    handled hundreds.
20        Q    But just so we're clear, the only
21    other fee petitions you evaluated have been
22    those of contract attorneys who were doing
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

9

```
1     work for FDIC, is that correct?
2         A    That is correct.
3         Q    Does FDIC have any written or oral
4     guidelines for evaluation of attorney fee
5     petitions?
6         A    I am not aware of any.
7         Q    So we're clear, and no such
8     guidelines were utilized by you in reviewing
9     my fee petition?
10        A    No, I did not look at any -- any
11    FDIC policy on this matter.
12        Q    Were you given any oral
13    instructions by anyone in terms of how to
14    evaluate my fee petition?
15        A    Can -- that -- I'd have to say yes.
16        Q    All right.
17        A    I mean, but it -- as far as --
18        Q    Who gave you those instructions,
19    and what were they?
20        A    Robert Clark and Rick Aboussie.
```
Page 8

AAGILL[2].txt

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

11

1   the work product provision I object and I
2   instruct the witness not to answer.  If it's
3   just talking about policies, procedures,
4   specific instructions about how to go about
5   it, that's fine.
6          MR. WILLNER:  I think you're
7   premature.  I just asked him if he provided
8   any.
9      A    The answer is yes, but it's in
10  response to your November 2004 letter
11  agreement that you had with the FDIC.
12         BY MR. WILLNER:
13     Q    All right.  Well, what
14  instructions, guidelines, were you given in
15  connection with the letter agreement between
16  Bob Clark and myself?
17     A    The November agreement, the letter
18  agreement which Bob Clark memorialized with I
19  believe a one-sentence concurrence, says that
20  the FDIC will support reasonable attorneys'
21  fees and that the -- and that the fees, you
22  know, will be run through the receivership

1   claims process. At the time, we all believed
2   that those fees were going to go through the
3   court process and then, after the Court
4   approved them, they would be run for payment
5   through the receivership claims process.
6        Subsequently, after Mr. Clark left
7   the FDIC, in discussions with Rick Aboussie,
8   it was determined that it might jeopardize
9   the underlying settlement by allowing both
10  the attorneys' fees and blessing the
11  settlement amount to be run through the
12  fairness hearing. So I believe it was
13  mutually agreed to that the attorneys' fees
14  would be run up through the receivership
15  claims process.
16       And at all times, both, you know,
17  on the reasonable attorneys' fees, it was the
18  FDIC's assumption that what we were to pay
19  was your reasonable hourly rates.
20       So to the extent that I was
21  provided guidance, it was to try to determine
22  what was fair as far as the reasonable -- the

AAGILL[2].txt

13

1    hourly rates of the law firms. And I was
2    given instructions I think both by Bob Clark,
3    who -- and Richard Aboussie on the -- that --
4    that's what, you know, the basic parameters
5    were as far as looking at these attorney's
6    fee petitions.
7        Q    Isn't it fair to say that Mr.
8    Aboussie was taking a position inconsistent
9    with the agreement that Bob Clark and I
10   reached?
11       A    It was different than the
12   agreement. I mean, it was -- in the sense
13   that Mr. Aboussie felt that the Court -- that
14   the Court may have a problem approving
15   attorneys' fees and so his position was that
16   they should come through the -- the
17   receivership claims process.
18       Q    Was the document of two pages
19   prepared by me and concurred in by Bob Clark
20   a binding agreement on the FDIC?
21       A    I think what it was was it was a
22   general outline of what the -- the broad

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

14

1    parameters of the settlement would be. In

Page 12

AAGILL[2].txt

5   specifically go out and -- and do any type of
6   statistical analysis saying, you know, a
7   partner with 20 or 30 or 40 or 50 years'
8   experience, what that partner would be worth.
9   What I looked at specifically was what the
10  high rate for a partner that the FDIC was
11  paying. And to the extent that that was
12  embedded in the data, that -- I picked it up.
13       Q    Are you aware of any Pacific
14  Northwest attorney other than me who was lead
15  counsel in a Washington, D.C. major complex
16  litigation in the group of attorneys that you
17  hired?
18       A    I'm not -- I'm not aware of any --
19  the case was filed in Washington, but I think
20  most of the work probably was performed in
21  the Pacific Northwest. But no, I'm not aware
22  of any other. In answer to your question,

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

29

1   no.
2        Q    All right. In evaluating a
3   reasonable fee in this case, did you consider
4   that the original suit of the IRS sought 1.2
5   billion and that through the efforts of the
6   attorneys, a $50 million settlement was made?
7        A    Yes, we certainly looked at the

Page 26

AAGILL[2].txt

8  amount of the original lawsuit. But, more
9  important, in the determination that
10 reasonable hourly rates should be the
11 standard hourly rates was the fact that this
12 was a combined effort by the FDIC, private
13 attorneys that we invited to participate on
14 behalf of the shareholders. And in all
15 fairness, I thought the attorney that we drew
16 from the Department of Justice was very
17 receptive to try to work that you to see if
18 we could resolve the case.
19     Q   Did you tell me in the course of
20 these discussions that the role of FDIC was
21 being a stakeholder?
22     A   I think that I -- I told you that

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

30

1  the role of the FDIC was to try to see what
2  we believed the correct tax should be and
3  that, you know, as far as -- as far as the --
4  the dollar flow, I mean, we were performing
5  more as a third-party neutral because the
6  dollars were going to flow either to you,
7  your shareholders, or to the Internal Revenue
8  Service.
9      Q   My question was: Did you tell me

Page 27

AAGILL[2].txt

13   that's why I just don't believe I used those
14   words.
15      Q   Do you know whether or not FDIC
16   used those words, called its position that of
17   a stakeholder in legal pleadings filed in the
18   Portland case?
19      A   No, I do not. I -- that was filed
20   in, I think, June of 2002, and I came into
21   this case in probably early to mid 2004.
22      Q   All right.

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

[]

32

1    A   I mean, the FDIC may have, but I
2   just specifically -- I mean, I don't remember
3   using those words.
4      Q   Do you recall using the -- telling
5   me that FDIC's role was that of an honest
6   broker --
7      A   Yes.
8      Q   -- between the IRS and the
9   shareholders?
10     A   Yes, I do remember that, saying
11   that to you on a number of occasions.
12     Q   During the discussions, were you
13   aware of the interagency agreement that had
14   been signed years before between first RTC

Page 29

AAGILL[2].txt

15  and then FDIC and the IRS?

16     A    Yes.  At some point during the

17  discussions, I was made aware of it.

18     Q    And were you aware that the

19  agreement provided that if certain

20  prerequisites are met that the FDIC would

21  accept the IRS's determination of the proper

22  tax?

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

33

1      A    Yes.

2      Q    In addition to the factors you

3   previously mentioned about --

4      A    Oh, can I clarify?  What I'm aware

5   of is that the FDIC -- if the IRS made a

6   final determination, I think the agreement

7   read we could -- we would not contest their

8   determination.

9      Q    Right.

10     A    Just a point of clarification.

11     Q    Sure.

12     A    If it was in court.

13     Q    You said something about court?

14  I'm sorry.

15     A    If the case went to court.

16     Q    Yes, all right.  In addition to the

17  matters you've mentioned -- well, have you

Page 30

AAGILL[2].txt

18  covered all matters that you considered in
19  fixing my fee?
20      A    I think that's reasonably
21  dispositive. We tried to canvass the
22  material out -- out there in the public

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

34

1   domain, which was interesting but not
2   particularly dispositive, because the rates
3   were all over the place, and so we fell back
4   to what we knew, which was what we paid our
5   outside counsel.
6           MR. WILLNER: All right. Off the
7   record.
8           (Discussion off the record.)
9           BY MR. WILLNER:
10      Q   You told us you've never been in
11  private practice. As an attorney in any
12  government agency, have you kept time
13  records?
14      A   Yes, I have. I mean, in the -- the
15  government isn't as time matter-sensitive as
16  the private practice but yes, we keep time
17  sheets. But it's much less specific. It's
18  just like how much time you've worked on a --
19  like, for example, in the FDIC, how much time

Page 31

```
                         AAGILL[2].txt
 2    policy.
 3         Q    I understand.  Are those policies
 4    for contract attorneys in written form?
 5         A    Yes.  I mean, there's a manual.
 6    There's a legal services manual that is
 7    publicly available.
 8              MR. WILLNER:  All right.  Could I
 9    either get -- at the end of the day get
10    either a copy of it or a citation where I can
11    find it?
12              MR. TAYLOR:  Actually, I think it's
13    available on line.  I think I can provide
14    that now at our public website, which is --
15              MR. WILLNER:  Just a minute.  Is it
16    long?  I'm not very good at this.
17              MR. TAYLOR:  I can write it down.
18    It's www.fdic.gov.  Then you'll see a series
19    of links and subheadings.  If you need
20    assistance with it, please call me and I'll
21    walk you through it.
22              MR. WILLNER:  Off the record.
```

u

53

```
 1              (Discussion off the record.)
 2              BY MR. WILLNER:
 3         Q    When did you become involved in the
 4    United States v. FDIC tax case,
```
Page 48

AAGILL[2].txt

5   approximately?

6   A   The best of my recollection, I --
7   I'm thinking it was either the first or
8   second quarter of 2004.

9   Q   All right. And were your
10  predecessors Catherine Topping and Hugo Zia?

11  A   Yes. They functioned as line
12  attorneys like I did. Catherine got a
13  promotion and moved out.

14  Q   And when you came into the matter,
15  did you have discussions with them about what
16  had taken place before you became involved?

17  A   Yes, I did.

18  Q   Are you aware of the fact that I
19  filed the motion to intervene and along with
20  the motion to transfer to Oregon?

21  A   Yes.

22  Q   Are you aware of the fact that

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

54

1   starting way before you came in and
2   continuing until not too long ago there was
3   an enormous amount of correspondence between
4   Henry Darmstadter on behalf of the
5   government, Catherine or Hugo or yourself on
6   behalf of the FDIC, and myself as lead

Page 49

```
                             AAGILL[2].txt
 7    counsel for the shareholders?
 8         A    Yes.
 9         Q    That just saved you going through
10    chunks of paper.
11              Isn't it a fact that there were
12    numerous discussions between you and me
13    concerning what settlement would be
14    acceptable to the shareholders?
15         A    Yes, yes...
16         Q    Isn't it true that at the meetings
17    held in Washington, D.C., around that long
18    table that I chaired the shareholders' side
19    of those meetings?
20         A    Yes.  As best I can recall, I think
21    that you were the -- you were the counsel for
22    the shareholders that -- yes.
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400        800-522-2382

                                                      55

```
 1         Q    And that I would -- during the
 2    discussions, I would call on others in our
 3    group to respond to questions?
 4         A    Yes.  I mean, you know, I remember
 5    that Winston & Strawn was at the meetings.  I
 6    think Tom Buchanan and Rosemary Stewart,
 7    which was from Spriggs & Hollingsworth, was
 8    also counsel at the meeting.
 9         Q    Yeah.
```

                         Page 50

AAGILL[2].txt

10   A   But I think you were the lead
11 counsel for the shareholders at that time.
12   Q   When you say "at that time," wasn't
13 I lead counsel for the shareholders through
14 the time of the fairness hearing?
15   A   Yes. And I just was -- I didn't
16 know if you were still lead counsel. That
17 was the only -- I -- that's --
18   Q   I'm not lead counsel for the
19 appeal.
20   A   Yeah, that's -- I didn't mean to --
21   Q   I'm of counsel for the appeal.
22   A   I was trying to be complete in my

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

56

1  answer. Yes, you were lead counsel at the
2  time of the fairness hearing.
3   Q   Right. And was I the only attorney
4  of the shareholders who participated in the
5  fairness hearing?
6   A   Well, in -- I think Mr. Buchanan --
7  in other words, Bob Seuss had a group of
8  shareholders -- I mean, you were representing
9  -- I can't be -- I don't know the full
10 answer. You know more than I do. But you
11 were representing some of the shareholders,

Page 51

AAGILL[2].txt

12  Winston & Strawn was representing some of the
13  shareholders. Bob Seuss and some others, I
14  think Gary Hines and Abe Siemens, so --
15     Q    Let me ask another question. Isn't
16  it true that I was the only attorney for the
17  shareholders that addressed the Court and was
18  extensively involved in the presentation of
19  the argument in favor of the fairness
20  hearing?
21     A    Well, you -- you certainly
22  addressed the Court as I remember, but I

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

57

1   remember that Tom Buchanan, I thought, did,
2   as well. But I think primarily, he presented
3   Bob Seuss, so I -- in the interest --
4   interest of completeness, you certainly did
5   --
6      Q    Yeah.
7      A    -- make -- make arguments to the
8   Court.
9      Q    Isn't it true that Tom introduced
10  Bob Seuss but basically, I was presenting the
11  argument for the shareholders in favor of the
12  settlement?
13     A    I -- I think so. I mean, I just --
14  I can't totally recall. I mean, the record

Page 52

AAGILL[2].txt

```
15   is what it is on that, but --
16        Q    Sure.  Do you recall that at the
17   end of the -- I guess after the fairness
18   hearing that the -- Judge Sullivan entered a
19   minute order instructing the Court to mail
20   the original shareholders letters to me for
21   safekeeping?
22        A    Yes.
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

58

```
1              MR. WILLNER:  I have no further
2    questions.
3              MR. PLUTA:  I have some questions.
4    Off the record.
5              (Discussion off the record.)
6         EXAMINATION BY COUNSEL FOR WINSTON
7         & STRAWN
8         BY MR. PLUTA:
9         Q    Mr. Gill, my name is Scott Pluta.
10   I'm counsel for Winston & Strawn in this
11   matter.  I just have a couple questions for
12   you.
13             We'll start generally.  In regards
14   to the issue at stake, the -- the matter
15   brought by the IRS, as far as the 1.2 billion
16   dollar claim they had against the
```

Page 53