# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WINSTON & STRAWN LLP, <br><br> and <br><br> DON S WILLNER & ASSOCIATES, P.C. <br><br> and <br><br> BLACKWELL SANDERS PEPER MARTIN <br> and <br> ERNEST M. FLEISCHER <br><br>            Consolidated Plaintiffs, <br><br>       v. <br><br> FEDERAL DEPOSIT INSURANCE <br> CORPORATION, AS RECEIVER FOR <br> THE BENJ. FRANKLIN FS&LA, <br> PORTLAND, OREGON <br><br>           Defendant. | Civil Case No. 06-01120 (EGS) <br><br> [Consolidated with No. 06-01227 <br> (EGS) and No. 06-01273 (EGS)] |

## REPLY OF DON S. WILLNER AND ASSOCIATES, P.C.
## INCLUDING MEMORANDUM OF POINTS AND AUTHORITIES

Of Counsel:
KELBY D. FLETCHER
Peterson, Young, Putra,
2800 Century Square
1501 Fourth Avenue
Seattle, WA  98101-1609
Tel:     206-624-6800
Fax:     206-682-1415

DON S. WILLNER
Don S. Willner & Associates, P.C.
630 Sunnyside Road
Trout Lake, WA  98650
Tel:     509-395-2000
Fax:     509-395-2939

JEREMIAH A. COLLINS
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, N.W., Suite 1000
Washington, DC  20005
Tel:     202-842-2600
Fax:     202-842-1888

Counsel for Plaintiff

August 25, 2008

# TABLE OF CONTENTS

A.    Introduction………………………………………………………………1

B.    Argument………………………………………………………………2

    1.    FDIC ignores the Lodestar factors………………………………… 2

    2.    Because this is a District of Columbia case, the fair market
        value of Willner's work should be evaluated by District
        of Columbia standards……………………………………………5

    3.    FDIC's attempt to demean Willner's lead counsel work as
        "mostly routine" and "did not require exceptional skill or
        knowledge" is not supported by the evidence…………………………9

    4.    A double multiplier rate is appropriate for Willner's lead
        counsel role in reducing a $1.2 billion IRS claim to $50 million……..13

    5.    FDIC's new theory that it could have (but did not) cut all of
        Willner's time by an arbitrary fifty percent (50%) is speculative
        and would deny Willner due process…………………………………14

    6.    Responses to Certain Other FDIC Arguments not
        Previously Discussed…………………………………………………18

C.    Conclusion………………………………………………………………20

# TABLE OF AUTHORITIES

## Cases

***Blum v. Stenson***,
  465 U.S. 886, 106 S.Ct. 1542, 79 L.Ed. 2d 89 (1984)…………………..……………4

***BMW of North America, Inc. v. Gore***,
  517 U.S. 559, 116 S.Ct. 1589, 1598, 134 L. Ed. 2d 809 (1996)…………………15

***Buckkannon Board and Care Home, Inc. v. West Department of***

***Health and Human Resources***,
  532 U.S. 598, 128 S.Ct. 1835 (2001)…………………………………………..……..9

***City of West Coving v. Perkin***s
  525 U.S. 234, 525 U.S. 241, 119 S.Ct. 678, 681, 142 L. Ed, 2d 636 (1999)………15

***Davis County Solid Waste Management et al. v. U.S. Environmental***
***Protection Agency***,
  169 F.3d 755, 759-760 (D.C. Cir., 1999)………………………..……………………5

***Freeport Partners, LLC v. Albritton***,
  2006 U.S. Dist. Lexis (DDC, 2006)…………………………………..……...……2

***Gates v. Deukmejian***,
  987 F.3d 1392, 1397 (9th Cir. 1992)……………………………………………14

***Gates v. Rowland***,
  39 F.3d 1439, 1449 (9th Cir. 1994)……………………………………………14

***In re Baan Company Securities Litigation***,
  288 F.Supp. 2d 14 (DDC, 2003)…………………………………………………2

***In re New Commercial Paper***,
  826 F. Supp. 1448 (D.D.C., 1992)………………………………………………14

***Nat. Ass'n of Concerned Vets v. Sec. of Defense***,
  675 F.2d 1319, 1326 (D.C. 1982)………………………………………………14

***Pagan v. Calderon***,
  448 F.3d 6, 34 (1st Cir., 2006)……………………………………..……………15

## Statutes

U.S.C. § 54.155[2] ……………………………………………………………....15

## Other Authorities

***Moore's Federal Practice***, Vol. 10 (3d ed., Matthew Bender 2008)………………15

A.    **Introduction**.

This Reply Brief will focus on these issues:

(1) FDIC's Response ignores the Court's Order mandating an analysis of the seven Lodestar factors.  Instead, FDIC now switches from the rates which it paid its Oregon contract attorneys for local work (contained in the FDIC Notice of Partial Disallowance, Ex. M to Motion for Summary Judgment) to average rates in Oregon.  Both approaches are legally incorrect, and misread the available data.

(2)  District of Columbia law is clear that the hourly rates of the D.C. forum should apply because Willner's key work as lead counsel in D.C. was much more than "minimal", and a reasonable Oregon hourly rate is similar to that of this forum;

(3)  FDIC's attempts to demean Willner's lead counsel work as "mostly routine" and did not require "exceptional skill or knowledge" is not supported by the evidence;

(4)  A double multiplier rate is appropriate for Willner's lead counsel work in reducing a $1.2 billion IRS claim to $50 million;

(5)  FDIC's new theory that it could have (but did not) cut all of Willner's time by an arbitrary fifty percent (50%) is speculative;

(6) Responses to certain other FDIC arguments not previously discussed.

The FDIC Response, in almost alternating paragraphs, cleverly mixes and confuses its arguments against Willner and Fleischer.  Fleischer seeks much more money for many fewer hours. Willner's Motion for Summary Judgment and Fleischer's Motion concerning trial evidence are entirely separate, and each should be judged on its own merits.  FDIC says:

> "…the Court may be able to resolve the disputed issues of fact based on the materials presented by the parties." (FDIC memorandum, pg. 21).

Willner believes that there are no <u>material</u> issues of fact in dispute and very much hopes that this case can be resolved on summary judgment in order to avoid a lengthy and expensive trial.[1]

**B.      Argument.**

**1.      FDIC ignores the Lodestar factors.**

The Court's Orders of May 22, 2008 (ECF system 5/22/08) and July 13, 2007 (Doc. 31) instructed the parties to analyze the reasonable value of the attorney claims through the use of the Lodestar factors (seven factors in this District, ***In re Baan Company Securities Litigation***, 288 F.Supp. 2d 14 (DDC, 2003); ***Freeport Partners, LLC v. Albritton***, 2006 U.S. Dist. Lexis (DDC, 2006)).  Willner provided its Lodestar analysis primarily on pages 27 to 32 of its opening Memorandum.  FDIC deals with only one of the seven (7) factors, and that one will be discussed later in this Reply.

In its Letter of Partial Disallowance, FDIC based its hourly rate for Willner on what it paid its contract attorneys for local work in Oregon, even though Willner was not hired by FDIC.  Possibly recognizing the weakness of this position, FDIC now entirely switches its position and bases its hourly rate for Willner on the average hourly rate for Oregon attorneys, which it says is Willner's "home jurisdiction".  Both approaches are legally incorrect and misread the available data.  As pointed out in the new Declaration of David Markowitz *supra*, the Bar Survey relied upon by FDIC is only a small sample, and the Morones Survey rejected by FDIC is broadly based and not limited to "top litigators at large firms" (Ex. DD).

FDIC does not mention six of the Lodestar factors of this District – "(1) the size of the fund created and the number of persons benefited; (2) the skill and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risk of non-payment; (5) the amount of time

---

[1] FDIC apparently believed it relevant to this proceeding that Willner could receive a thirty percent (30%) or more fee in the Claims Court case (FDIC Response, pg. 29), ignoring that at least twelve other attorneys worked on that case under Willner's direction.  But, if that comment was relevant, it is also now relevant that the Federal Circuit has recently reversed the Claims Court judgment on most issues.  Although a further appeal will be sought, it is probable that Willner's only reasonable award for eighteen years of work will come if justified in this case.

devoted to the case by Plaintiffs' counsel; and (6) the awards in similar cases." (**In re Baan**, and **Freeport Partners**, infra). In each of these categories the analysis favors Willner's requested fees and in some categories is more applicable to Willner than to the other members of the shareholder team. This is discussed in more detail in the original memorandum.

All of the evidence before this Court, which comes from Declarations of others, is that Willner is one of the best attorneys in Oregon for major complex litigation. The Declarations of Laird Kirkpatrick, former Dean of the University of Oregon Law School (Ex. W), David Markowitz (Ex. S), Dean Heiling (Ex. T) and Dr. G. Dale Weight, PhD, last CEO of Benj. Franklin (Ex. X) were filed with the opening memorandum. Two corroborative Declarations are now added. Angel Lopez, past president of the Oregon State Bar and experienced trial lawyer, says:

> "I had known of his legal reputation for years and jumped at the chance to try a case with one who has a statewide reputation as a "lawyer's lawyer".
> The energy, preparation, advocacy and skill with which Don approached and conducted the trial were to me incredible. Even though I considered myself an accomplished trial attorney, my experience with Don made me that much better.
> Don's particular strength is breaking down and effectively arguing complex and unique legal principles. He is as persuasive as he is persistent. I will forever hold Don up as one of the absolute best attorneys I have ever had the pleasure of working with. He is worthy of the trust of anyone with a complex legal matter." (Ex. EE)

Portland attorney N. Robert Stoll says in his Declaration:

> "Over the last 39 years I have tried in excess of 150 cases. I am also quite familiar with attorney Don Willner, and have known him since before I entered law school. He has a stellar reputation as a formidable and skillful litigator; certainly, in the instant litigation he has proven his reputation to be accurate."

> "Most of my cases are referred to me by other attorneys; other cases involved business clients who regularly retain lawyers: as a result, my billing rates are therefore reviewed by other attorneys and knowledgeable clients."

> "I would estimate that approximately 30 to 40% of the cases I handle are done on a strictly hourly fee basis, whereby my fees are paid regularly without regard to whether or not there is a favorable

outcome.  My current hourly rate in Portland Oregon is $480 per hour and is regularly paid by my hourly fee clients."

"I believe the hourly rate of Don Willner of $450 is reasonable in Portland Oregon for a lawyer with the skill and experience of Mr. Willner." (Ex. FF)

David Markowitz provides a new Declaration in reply to the FDIC Response.  Contrary to unsworn statements in the FDIC Response, Markowitz says in his latest Declaration that the Morones survey of litigation fees included law firms with five or more commercial litigators, and included

"…much more than a 'handful of Portland attorneys' and not just 'top litigators at large firms' as incorrectly stated by Bruce C. Taylor (see FDIC Opp. (7/23/08) 12".

Markowitz also points out that the Oregon State Bar Economic Survey relied upon in the FDIC Response was a sample of

"…19.4% of the total number of OSB members in the Portland and tri-county area…and did not include a specific category for commercial litigation..." (Ex. DD)

Markowitz, Heiling, Lopez and Stoll testified that the proper rate for Don Willner's legal services by Oregon standards would be four hundred fifty dollars ($450) per hour.

Fair market value of an attorney's work is based upon the U.S. Supreme Court case of **Blum v. Stenson**, 465 U.S. 886, 106 S.Ct. 1542, 79 L.Ed. 2d 89 (1984) which provides for prevailing market rates regardless of the pay the attorney actually receives.  Willner, like the plaintiffs' attorneys in **Blum**, does a large amount of *pro bono* work in major litigation.  Willner's skill and experience is discussed in the foregoing Declarations, and his reputation is discussed in the Affidavits of Federal District Chief Judge Burns and Oregon Chief Justice Lent.

It is striking that FDIC offers <u>no</u> evidence that refutes this evidence of Willner's skill and experience as a litigator.  However, while trying to justify a low rate the FDIC states: "Further, Willner is over 60 years old" (FDIC Response, pg. 7).  But, so are most of the Justices of the Supreme Court.  We are not favored with any explanation of the relevance of Willner's age.  Certainly,

experience, judgment and skill are enhanced by time spent as a continuing practicing lawyer with an emphasis in litigation and trial of cases.

Since FDIC does not deal with the Lodestar factors mandated by this Court, its argument on other matters should be disregarded.

**2.      Because this is a District of Columbia case, the fair market value of Willner's work should be evaluated by District of Columbia standards.**

Willner discusses in its opening brief, on pages 14 and 15, the case of ***Davis County Solid Waste Management et al. v. U.S. Environmental Protection Agency***, 169 F.3d 755, 759-760 (D.C. Cir., 1999), the controlling case in this Circuit.  This case holds that D.C. rates apply "unless the work done here is minimal and the difference [with Home Jurisdiction rates] is substantial."

Willner's tally of his District of Columbia time working on this case differs substantially from the tally of FDIC.  Both tallies are derived from the same Willner fee petition and supplements.

Because of this great discrepancy, Don Willner has now personally reviewed his original time records from 2003 through 2006 which were made contemporaneously and are accurate to the best of his knowledge and belief.  This summary omits recorded time spent for other clients on these same days, including time spent in Washington, D.C. and during plane flights.  For example, the time from June 16, 2000 to June 18, 2005 also involved a different case in Federal Court in Virginia which time is carefully excluded.  The plane time was allocated two-thirds (2/3) to the Virginia case and one-third (1/3) to this case.  On page 9 of the FDIC memorandum, FDIC comments that Willner recorded seven hours on either November 19, 2002 or November 21, 2002 and that there was a Court appearance in the Goodwill case on one of those days.  Willner cannot now locate his November, 2002 time records, but has had a uniform practice of correctly allocating time to separate cases.

Willner, however, has located his pocket calendar for 2002 which shows that Willner flew to Washington, D.C. on November 18, 2002 and prepared for a tax conference.  There was then a tax conference with FDIC on November 19, 2002.  On November 20, 2002 Willner worked in

Washington, D.C. on oral argument and the oral argument in **Suess v. United States** (the Goodwill case) took place on November 21, 2002 after which Willner flew to Seattle.  The pocket calendar does not keep track of time, but the seven hours allocated in November, 2002 to the tax case in the four day period certainly appears reasonable.

Willner made six trips to D.C. in connection with his lead counsel negotiations with the government and FDIC, including twenty days in D.C.  The total amount of professional services time involved in these trips is 159.0 hours.  In addition, another 26.8 hours and over four days were spent in Chicago interviewing and deposing Mike Duhl, CPA, an expert on Federal finance assistance, in connection with the Portland case against FDIC where FDIC was threatening to pay the tax.

<u>Table of Time Spent by Willner Working on the Tax Matter<br>in the District of Columbia (and also in Chicago)</u>

a. <u>Washington, D.C. Trips.</u>                                                                                           Time

| | |
|---|---|
| November 21, 2002 – (see discussion above) | 7.0 |
| Tuesday, April 8, 2003 – re taxes; Review filed documents and prepare agenda for tax group meeting. | 2.5 |
| To hotel from WA, D.C. airport | 0.5 |
| (The rest of the plane trip from Portland, Oregon to Washington, D.C. was not listed, but should be added). | 5.0 |
| Wednesday, April 9, 2003 – Phone Richard Green re pending matters. | 0.4 |
| Conference w/ Rosemary. | 0.4 |
| Taxes – conference w/ Ernie and Rosemary | 1.0 |
| Conference with tax group and then Rosemary Stewart | 2.0 |
| Thursday, April 10, 2003 – Conference with FDIC. | 4.0 |
| Conference w/ Ernie and Rosemary. | 1.0 |
| Friday, April 11, 2003 – To Airport; Fly to Portland; Work on motion; Letter to Zia, clients. | 8.0 |
| May 17, 2004 – To Airport for trip to WA, D.C.; Conference w/ tax group; Reviewing file on trip.<br>(Also worked on another client's case on trip) | 10.5 |
| May 18, 2004 – Conference with DOJ and FDIC. | 6.5 |
| May 19, 2004 – Meeting with Gill; To airport for trip to Portland, OR; Long call to Hank from Chicago. | 9.5 |
| August 17, 2004 – Work on plane on preparation for meeting; Airport to Stewart's office; Dinner conference w/ Stewart; To hotel. | 9.3 |

| | |
|---|---|
| August 18, 2004 –<br>7:15 – Prep for meeting, to Stewart's office;<br>8:00 – Meeting with tax group;<br>10:00 – Meeting w/ DOJ and FDIC;<br>2:30 – Meeting w/ tax group;<br>5:15 – Dinner conference w/ Stewart and Fleischer;<br>6:30 – Phone conference w/ clients;<br>7:30 – Phone conference w/ Fleischer and Jim Walker. | 12.5 |
| August 19, 2004 – Prep for FDIC meeting; To Stewart's office; Tax group conference; Working lunch w/ Ernie and Rosemary; Attempts to reach Gary Hindes; Conference w/ Rosemary; To airport; Flight to Portland working on case during trip. | 13.5 |
| November 5, 2004 – Travel to WA, D.C. for meetings with co-counsel to FDIC. | 5.9 |
| November 8, 2004 – Conference w/ Rosemary. | 0.2 |
| To FDIC for conference w/ Gill; Lunch DSW and Rosemary; Revisiting letter to Gill; Conference with Rosemary re claim form and amendments to agreement. | 6.3 |
| Tuesday, November 9, 2004 – To Rosemary's office; Conference re FDIC meeting; To FDIC for meeting with Clark, Gill, and Rosemary; Call Peter, McIntyre, and Green; Preparation of website; Conference w/ Rosemary. | 4.3 |
| To airport, to Portland; Prep of first draft of application for reimbursement of contributions while on plane. | 8.5 |
| June 16, 2005 – Flight to WA, D.C. for meeting with FDIC.<br>(Also 7.0 billed to another client for a Virginia Federal Court hearing) | 4.0 |
| June 17, 2005 – BF  - Conference w/ Rosemary; Then to FDIC for conference with Gill re tax case. | 2.7 |
| June 18, 2005 – BF – Flight to Portland.<br>(7.0 was billed to another client) | 3.5 |
| May 1, 2006 – To airport; Flight to Chicago and Baltimore; Taxi to WA, D.C. (arrive at 6:45); Dinner conference 8:30; Work on BF case on plane with clients. | 12.0 |
| May 2, 2006 – 8:00 – Prep for hearing; To FDIC for conference w/ John Thomas, Andrew Gilbert, and Rosemary; Back to hotel for client conference; Client conference. | 3.5 |
| 1:00 – To Courthouse for Fairness Hearing – 4:15 | 3.3 |
| May 3, 2006 – Fly from WA, D.C. to Portland – Benj. Franklin | 11.2 |
| **TOTAL** | **159 hours** |

b.    Chicago Trips.                                                                         Time

| | |
|---|---|
| April 28, 2002 – To airport for trip to Chicago; Prepare memo to Mike Duhl during flight. | 6.5 |
| Prepare for Duhl meeting. | 0.7 |
| April 29, 2002 – To Prudential Building for meeting with Mike Duhl; Duhl meeting. | 2.0 |
| Memo of conversation with Mike Duhl. | 0.8 |

| | |
|---|---|
| June 27, 2002 – FDIC case flight to Chicago; Review and edit Buchanan affidavit.<br>Preparation of supplemental brief – FDIC case; Preparing for Chicago. | 2.3<br><br>1.5 |
| June 28, 2002 – FDIC case – Preparation of Duhl deposition; Complete supplemental brief; Phone call with Tom Buchanan re affidavit; Editing affidavit; Phone calls with Sarah re preparation of material for Court. | 3.5 |
| FDIC case – Duhl deposition; Phone call with Tom Buchanan; Review final Buchanan affidavit; Final edit of supplemental brief. | 2.5 |
| To airport – travel home; Phone calls with Dean Hooten re case; Work on cost bill and attorney fee petition. | 7.0 |
| **TOTAL** | **26.8 hours** |

FDIC's tally in connection with Willner's D.C. time appears on page 9 of the FDIC's Response and totals only 40.9 hours.

FDIC argues that Willner should not be charging for travel time.  Willner's records very carefully separate out time spent on the plane working on this case and time spent on other matters.  For example, in the only trip which Willner took to D.C. with clients, there is independent evidence that the entire flight was spent working on the case (McIntyre Declaration, Ex. GG)

FDIC has not challenged Fleischer's travel time, and Fleischer does not say whether he worked during that time (Ex. HH), nor does the FDIC challenge the Siegfried Group's travel time (Ex. II).  FDIC should be estopped from taking inconsistent positions in the same litigation.

Since Willner's key work in this case took place in Washington, D.C., it is not by any measure "minimal".

*Donnell* requires that both factors – less than minimal contact with this forum and a great difference in fees between the forum and the attorney's home - must apply to avoid using the D.C. hourly rate.  Here, the requested D.C. rate is five hundred twenty-five dollars ($525.00) per hour and the reasonable Oregon rate is four hundred fifty dollars ($450.00), which is not a substantial difference, and Willner's lead counsel work was far more than minimal.  For the D.C. rate, see the affidavits of Cooper, Garbow and Milian (Ex. P, Q, and R).

**3.      FDIC's attempt to demean Willner's lead counsel work as "mostly routine" and "did not require exceptional skill or knowledge" is not supported by the evidence**.

FDIC's witness, Richard Gill, testified in his deposition, in response to Willner questions:

> "Q:  Isn't it true that at the meetings held in Washington, D.C. around that long table, that I chaired the shareholders side of those meetings?
> A:  Yes, as best I can recall, I think you were the counsel for the shareholders that – yes.
> …
> Yes, you were lead counsel at the time of the fairness hearing." (Ex. N).

Willner's unique contribution as lead counsel included in chronological order:  (1) Filed the case against FDIC in Oregon Federal District Court and obtained the open court commitment which prevented FDIC from paying any tax, which would have lost <u>all</u> money for the shareholders.  This issue is discussed at length in the FDIC Response and will therefore be discussed now.  FDIC says on page 31 of its Response that Willner is arguing the "catalyst" theory and then proceeds to reject it.

The decision in ***Buckkannon Board and Care Home, Inc. v. West Department of Health and Human Resources***, 532 U.S. 598, 128 S.Ct. 1835 (2001) is cited by FDIC as preventing the awarding of attorneys fees for Willner's work in causing the FDIC to change its position and promise not to harm the shareholders until the tax matter was resolved.  FDIC's argument is not persuasive for several reasons.

a. ***Buckhannon*** establishes,

> "Given the clear meaning of 'prevailing party' <u>in the fee shifting statutes</u>, we need not determine which way these various policy arguments cut." 128 S.Ct. at 1243. (emphasis added)

The basis of attorneys fees in this case is not a fee shifting statute but a written agreement between FDIC and <u>Willner</u> for the payment of reasonable fees to all Plaintiffs' attorneys for their role in achieving the tax settlement (Ex. Y). (emphasis added).

b.      FDIC has already paid fees to Willner for work in the Portland case, so the only

remaining issue is the reasonableness of the fees paid.

c.      FDIC was the opponent in that Portland case, so the Court should not give great

weight in a situation where FDIC is trying to be both administrative judge of what is an appropriate

fee and opponent, all in the same matter.

| What FDIC said before Willner filed in the Federal Court in Portland | What FDIC said in open court in Portland after Willner obtained the TRO |
|---|---|
| "We did not agree to notify you or obtain your consent before the FDIC takes any action it deems necessary or appropriate and have no duty to do so. We can tell you, however, that a decision may be made soon on how to handle the IRS's claim in light of the IRS's latest indication that it does not intend to abate any portion of the tax liability of the Ben Franklin Receivership. Further, we will let you know if a payment is made to the IRS, so you can advise your clients accordingly…"<br>Q: Before writing Exhibit 7, did you research the impact of paying any portion of the tax upon the rights of the FDIC Receiver or the shareholders of Benj. Franklin?<br>A: I did not.<br>(cited in Opening Memorandum) | "Well your Honor, as a stakeholder in this case, which is how we perceive ourselves being, since we have no interest ourselves in that $87 million which is sitting in receivership, we're honestly trying to seek a solution which doesn't affect the interest of either – adversely affect either the shareholder plaintiffs or the IRS… but since we don't have authority to, at this point to request interpleader, we thought we do have authority, as represented, to at least provide two days notice."<br>(from Ex. J to Opening Memorandum) |

Willner was the <u>cause</u> not a "<u>catalyst</u>" for saving the opportunity to preserve all of the shareholders'

money in the tax matter.  Furthermore, FDIC did not previously disallow any of Willner's time

working on the Portland case (Ex. BB), and its new criticism is not persuasive.

The other Willner contributions have been discussed in the earlier memorandum, but should

be summarized here;

1)  Filing the motion for intervention and transfer to Oregon which caused the

shareholder participation in the settlement discussions;

2)  Negotiating with the help of Rosemary Stewart, the agreement for a fairness hearing

on the tax settlement before this Court and providing that FDIC would pay the money to reimburse

all the shareholder contributions to the shareholder litigation fund;

3)  Coordinating the work of all of the professionals in the settlement discussions with the government and FDIC;

4)  Handling the shareholder negotiations with government attorney Henry Darnstadter and FDIC attorneys Catherine Topping, Hugo Zia and later Richard Gill (Gill only became involved in April 2004).  This was a team effort in preparing some documents, but the correspondence in Exhibit K shows Willner functioned as lead counsel.  FDIC has submitted no Declarations from Topping or Zia, who represented FDIC in the first two years of the discussions (Ex. JJ);

5)  Bringing to the settlement discussions unique knowledge of the history of Benj. Franklin and the progress of the Claims Court goodwill case which was vital in persuading the government to agree to a reasonable settlement (this was not the best test case for the government to litigate federal financial assistance);

6)  Taking the major role in presenting the tax settlement package to this Court which resulted in high praise from this Court.  Here is an excerpt from the Fairness Hearing which praised the work of all of the attorneys:[2]

---

[2] This footnote includes a dialogue between Court and counsel during the presentation which is a fond memory.

"MR. WILLNER: Thank you.  I would like to welcome all the people from Oregon and Washington who are sitting in the courtroom out there listening to us.  I should also tell the court that I became a member of the bar of this court in 1951.  The court may remember the Joe Nacrelli Bar Review course.

THE COURT: Absolutely.  Absolutely.

MR. WILLNER: I'm a happy graduate of that.

THE COURT: Absolutely.  That's the mark of a true Washingtonian that you remember the Joe Nacrelli Bar Review.

MR. WILLNER: If I may take 30 more seconds of random comment that you and I remember, sir.  Joe Nacrelli for $30 in my day, at least that is what I paid for the bar review and I paid for three things.

One, for the course.  Two, he spotted about 50 percent of the questions.

THE COURT: That's right.  He was an amazing spotter, wasn't he?

MR. WILLNER: Yes.  And the third was he moved our admission to the United States Court of Appeals for the District of Columbia Circuit.

He would stand there with about 50 of us there, and the court may remember this, and read off our names, and one at a time say, I vouch for his character.  I always wondered what would happen if the judges would have asked him what does he know about the character of each of these.

THE COURT: And of course, he was never asked.

MR. WILLNER: He was never asked.  All he knew was our $30 check had not bounced.  He knew that."

"MR. WILLNER: May it please the court, I am Don Willner from
     Portland, Oregon.
THE COURT: Good afternoon, counsel.  Welcome to the court.
…
MR. WILLNER: As the court possibly knows from the papers that have
     been filed, I have been working on this case for 16 years and I have
     thousands of hours and I am lead counsel in all of the three cases.  The
     three cases being first the Claims Court case where I represent the
     shareholders derivative action pending there which is I represented in
     that way all of the shareholders.
        Then in the case in Portland, Oregon, the breach of fiduciary
     duty case.  And when this tax claim was filed, on behalf of the
     shareholders I filed a motion to intervene and transfer to Oregon, to
     the District of Oregon.
        The result of this, I believe, this may have had some impact on
     getting some of the discussions going and FDIC graciously allowed us
     to participate and the government thought that was all right.  The
     government strongly opposing our right to intervene, but allowing us
     to participate in the matter.
        We had many many many discussions and negotiations.  One
     of the issues before this court was was this arms length, were the
     parties well represented, and were issues raised and discussed; and the
     answer is very much so.  This went on for three and a half years.
     There were many meetings that I recall coming to Washington and
     being lead counsel for the shareholders.  One we had, I think over 20
     people present including IRS folks, Department of Justice people.
THE COURT: You do this without the benefit of a third party, of neutral
     evaluator or arbitrator or mediator, didn't you?
MR. WILLNER: Of course, we had no neutral there.  I thought we did
     very well.
THE COURT: I did.  I applaud your efforts, I mean when I say you, I
     applaud the efforts of everyone who participated in this, but it just
     struck me as quite unusual that this was accomplished without the
     assistance of a mediator or a retired judge or an arbitrator.  The parties
     literally rolled their sleeves up and made this thing happen.  It took a
     lot of time.
MR. WILLNER: In retrospect that might have been a good idea but I
     thought we worked well together.
THE COURT: I'm sure, because of that working relationship, no one
     thought about upsetting the apple cart at that point and asking for the
     involvement of a third party mediator which sometimes will alter the
     chemistry that exists among the participants.  I applaud your efforts.  It
     is quite unusual that a settlement of this magnitude is achievable
     without the intervention or the assistance of someone who is
     completely detached from the proceedings.  I really applaud the efforts
     of everyone who worked so hard over the years. (Doc. 12)[3]

---

[3] We have corrected spelling errors in the text.

**4.      A double multiplier rate is appropriate for Willner's lead counsel role in reducing a $1.2 billion IRS claim to $50 million.**

Once the proper hourly rate is determined, then a multiplier should be applied to that rate. Winston & Strawn, LLP., one of the Plaintiffs in this fee litigation, received a double multiplier for all of its work which was the full amount requested.  This Court approved adding $574,937.99 as a multiplier to the same amount previously approved by FDIC without a multiplier (Doc. 39).  This resulted in tax attorney Mitchell Moettel and trial attorney Thomas Buchanan receiving over one thousand dollars ($1,000.00) per hour for their time, plus unknown amounts for other Winston & Strawn attorneys (Doc. 39, Nov. 28, 2007).

The Lodestar matrix looks to comparable payments, and the Winston & Strawn payment is the only comparable.  Willner does not have access to the Winston & Strawn time records, except those pages included in FDIC's Response.

FDIC applies a double standard to the work of Winston & Strawn and the other fee petitioners compared to Willner.

FDIC praises the work of Winston & Strawn's tax attorney Mitchell Moettel, who did fine work.  Willner, as lead counsel, would call on Moettel to answer certain questions raised during the three-way discussions (Ex. N).  But tax attorney consultant Ernest Fleischer worked with Moettel on the various tax memos (Ex. HH).  FDIC also totally ignores the 113.8 hours put in by The Siegfried Group, LLP, a Delaware CPA tax firm, even though FDIC accepted all of that firm's hours.  Ms. Cohn of that CPA firm attended many of the Washington, D.C. meetings and billed for travel time without FDIC disallowance (Ex. II).

Moettel put in 688.5 hours out of Winston & Strawn's total hours.  Buchanan's role was less significant and most of his work was before these tax settlement discussions started.  FDIC did not discount for conferences between various Winston & Strawn attorneys which resulted in additional fees.

Willner has earned the same double multiplier as Winston & Strawn for Willner's own lead counsel work, not for the work of Winston and Strawn. This settlement was a team effort, but Willner was lead counsel throughout, and starting on May 2, 2002, before Winston & Strawn joined the discussions on November 19, 2002 (Ex. JJ). Willner filed the Motion to Intervene on behalf of all of the plaintiffs, including Suess, on September 16, 2002, and continued to be the sole attorney of record.

**5.    FDIC's new theory that it could have (but did not) cut all of Willner's time by an arbitrary fifty percent (50%) is speculative and would deny Willner due process.**

FDIC's new theory does not specify which items are part of the speculative and arbitrary fifty percent (50%) cut it contends it 'could' have made but did not. If FDIC can add an additional *de novo* legal theory under the ***In re New Commercial Paper***, 826 F. Supp. 1448 (D.D.C., 1992) case which it cites for allowing new legal theories, then Willner should have the same opportunity. But, the proposed arbitrary fifty percent (50%) cut is not a new legal theory as defined in ***New Commercial Paper***. Furthermore, the proposed arbitrary fifty percent (50%) cut prevents Willner from a defense since there is no way of knowing which items FDIC would now cut. This should be seen as a *post hoc* rationale for FDIC's earlier action and, perhaps, a violation of due process and equal protection.

An applicant bears the burden of providing support for the reasonableness and accuracy of the fees charged on a fee application. ***Nat. Ass'n of Concerned Vets v. Sec. of Defense***, 675 F.2d 1319, 1326 (D.C. 1982). Once this burden has been met, the burden shifts to the opposing party to provide evidence that challenges the hours charged for the facts presented on the fee petition or supporting affidavits. ***Gates v. Rowland***, 39 F.3d 1439, 1449 (9th Cir. 1994).

When providing support for a fee application, an applicant must provide specific evidence of the hours and costs expended on the litigation, and why those fees are appropriate and reasonable. ***Gates v. Deukmejian***, 987 F.3d 1392, 1397 (9th Cir. 1992). When the opposing party is attempting to

challenge the requested rate or hours charged, it must do so by providing "equally specific

countervailing evidence." *Nat. Ass'n of Concerned Vets*, *supra*, 675 F.2d at 1326.  The opposing

party must "point with specificity" to any fee requested that is duplicative, unnecessary, unwarranted,

or unreasonable. *Rowland*, 39 F.3d at 1449.  Specific factual allegations must challenge specific rates

charged or challenge specific claimed hours.  James WM. Moore, *Moore's Federal Practice*, Vol. 10

§ 54.155[2] (3d ed., Matthew Bender 2008).  Mere conclusory statements that the fees requested by

the applicant are "too high" will not provide a sufficient basis on which a court may reduce a fee. *Id.*

  FDIC's general statements that the fees awarded should be reduced by 50% because, "they

could have" challenged time records included with the fee petition but did not, should not be a

sufficiently specific basis on which the Court can reduce the amount of fees awarded.

  Although this alternative argument need not be reached, FDIC is a quasi-governmental

agency, which exercises governmental authority and is held to constitutional standards in its dealing

with citizens:

> "Elementary notions of fairness enshrined in our constitutional
> jurisprudence dictate that a person receive fair notice not only of the
> conduct that will subject him to punishment…" *BMW of North
> America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 1598, 134 L. Ed.
> 2d 809 (1996);

> "A primary purpose of the notice required by the due process clause is
> to ensure that the opportunity for a hearing is meaningful" *City of
> West Coving v. Perkins* 525 U.S. 234, 525 U.S. 241, 119 S.Ct. 678,
> 681, 142 L. Ed, 2d 636 (1999);

> "With reference to governmental action, this language [equal
> protection] has been interpreted to mean that 'all persons similarly
> situated should be treated alike'. *Pagan v. Calderon*, 448 F.3d 6, 34
> (1st Cir., 2006).

  The Court should examine FDIC Document 51-60, "<u>Summary of Willner Hours that were

allowed and paid by FDIC as Receiver but could have been Disallowed (Excluding calls)</u>".

  Here are examples of unusual items:

a.   FDIC provides its own annotations to many of the items without a supporting Declaration, and the annotations should therefore be disregarded.  Examples include FDIC's claim that Duhl and Willner needed waivers from FDIC, the opposing party in the Portland lawsuit, while failing to mention that Duhl did not believe any waiver was required (see Ex. JJ);

b.   Willner, in its opening brief, already removed hours relating to the Goodwill case;

c.   The necessity of the website and reporting to clients has been discussed previously. FDIC is fortunate that it avoids dealing with these important tools for fundraising since it receives its money from the government and financial institutions, not 6500 shareholders.

d.   There is no basis for FDIC reducing Willner's time by estimates of working time that FDIC by hindsight only, believes not to be helpful.  An experienced trial lawyer is entitled to make honest judgment calls.

e.   Some of FDIC's possible cuts have no basis whatsoever.  For example, the third and fourth items on page 4 - "Edit letter to Gill – 0.1" and "e-mail tax group – 0.2", or the item on the top of page 5 – "Review spreadsheet (block billing – time estimated)" – The time provided is 0.2 of an hour (12 minutes).  Many other examples could be provided.  FDIC is proposing that a lawyer ought not charge for time reviewing papers pertaining to a matter.

Incidentally, Willner lists time by one tenth (0.1) of an hour, while Winston & Strawn never lists anything under one-quarter (.25) of an hour.  FDIC has paid Winston & Strawn for these quarter of an hour (.25) items, but criticizes Willner for only billing one tenth (0.1) of an hour even though that was the time actually incurred in the professional service.  Willner's time keeping in tenths of an hour increments allows for greater accuracy and therefore favors the shareholders.  This is another example of the double standard used by FDIC.

A similar list of examples could be prepared for FDIC document 51-59, pages 1 to 28 – "Willner call and fax entries".  All of the entries list the name of the person called.  Some list subject

matter, some do not.  Compare the few time record sheets of Winston & Strawn where FDIC made

no disallowances, other than for some work on fee petition.

Buchanan has many items which say "Review correspondence" or "Telephone call to M.

Moetell", without listing the subject (Ex. KK).  Willner is criticized for identical entries.  Also

consider FDIC not making disallowances for "block time for this Moettel time keeping entry:

> "3.50 [hours] – Conference with E. Fleischer regarding settlement
> offer; review previous spreadsheets; telephone conference with new
> FDIC attorney; consider ramifications of IRS scenario number 10
> applying section 597 regulations." (Ex. KK)

One may only imagine how FDIC would treat this entry if Willner had been the time keeper.

Entries by Fleischer of the large Kansas City law firm of Blackwell Sanders Peper Martin,

LLP deserve examination in the same manner.  At least Fleischer breaks down his time by tenths

(0.1) of an hour.  Fleischer has been paid by FDIC without challenge for all of his travel time,

regardless of whether Fleischer reports working on the case during the trip (Ex. HH).  There have

been essentially no disallowances from his fee petition.  But, in terms of block time, look at this

Fleischer time item on 11/08/02:

> "7.3 [hours] – Review and analysis of RC's spreadsheet comparing
> various tax positions, call from DSW re BF tax matter; related
> research."

Once again, what would FDIC have done if this item was entered by Willner?  FDIC should

be estopped from treating the fee petitions of the various applicants differently in the same case.

This Court should ignore the proposed fifty percent (50%) speculative and arbitrary tax cut,

and evaluate the respective positions of Willner and FDIC on the 188.75 hours that FDIC actually

disallowed.  This can be done on the motion papers submitted by the parties.

In Willner's opening brief there is an extensive discussion of the subjective and often

confusing choices FDIC makes in its earlier analysis disallowing some of Willner's time.  It is not a

criticism of Richard Gill that he had no comparable experience before analyzing the fee petitions in

this enormous complex case.  It is no wonder that FDIC again switches position and now argues for the speculative arbitrary fifty percent (50%) across the board cut.

      6.    **Responses to Certain Other FDIC Arguments not Previously Discussed**.

      a.    **The criticism of Mr. Suess and two of his close friends**.

       Willner approaches this subject with sadness.  It is, however, one of the Lodestar factors and explanation is needed.  Suess, as a large shareholder and the original Plaintiff, worked closely with Willner from 1990 to 2002.  After the 2002 Claims Court decision on damages, Suess then wrote a highly critical letter to the trial Judge, Chief Judge Smith, about his Decision without telling the other Plaintiffs or Willner.  Suess objected to Willner's stipulation with the government that the offending letter should be withdrawn from the record.  Here, Mr. Suess was acting in a way which could have prejudiced the interests of the other plaintiffs and the many absent shareholders.

       Suess tried to instruct Willner not to file a motion for reconsideration of Judge Smith's decision, which later resulted in a $17 million increase.  Suess' objections were contrary to the interests of the shareholders.

       Suess also attempted to instruct Willner not to share their discussions with the other Plaintiffs, a violation of Willner's ethical duties.  At that point, the other Plaintiffs, after receiving independent legal counsel, took over management of the case and, although invited, Suess declined a further role in the management of the case until December 2006 and made no further financial contributions.  The Declaration of plaintiff Richard A. Green summarizes in detail the roles of Willner and Suess. (Ex. LL).  Also see Ex. JJ.

       In late December 2006, Chief Judge Smith, upon Suess' motion, appointed Thomas Buchanan as lead counsel for the appeal, with Willner as "of-counsel".  Willner also continues to have other responsibilities in the litigation.

       Starting in 2002, Suess filed two complaints against Willner with the Oregon State Bar, both of which were dismissed as without merit.  Suess also wrote letters to the shareholders urging them

not to contribute to the Litigation Fund, which was not helpful to the progress of the case or to the interests of the shareholders. Compare the Suess Declaration written by Suess himself with the lengthy Declaration he signed, presumably written by his attorneys (FDIC exhibit 59, pages 7 and 8).

It should be noted that Suess' attorney, Buchanan, was asked the following leading question by FDIC during his deposition and answered as follows:

> "Q: Do you think, given Mr. Willner's involvement in this case <u>and the geographic area where he normally practices</u>, do you think an hourly rate of over $500 an hour is reasonable for him? (emphasis added)
>
> A: No. I – I don't think 525 is – is a reasonable rate, but I do think that – the way I view it is I think that whether it's 250 or $300 an hour, <u>and maybe more would be reasonable</u>, but I think he deserves a multiple of that, like twice. (Buchanan deposition, 1/17/07) (Ex. MM). (emphasis added)

Willner has continued to praise the work of the other members of the tax settlement team while being subjected to the unfair Suess criticism. Suess, Hindes and Siemens did not attend any of the settlement discussions, and their only knowledge of what occurred would come through Buchanan. They are qualified to evaluate Winston & Strawn's work, but not to fairly evaluate the work of Willner.

Exhibit Z to the original memorandum is the Joint Declaration of the key officials of Benj. Franklin when the institution was seized in 1990. Most of them have substantial knowledge of the entire litigation. In this Joint Declaration, they praise Willner's work and ask this Court to grant Willner's fee requests. Their knowledgeable opinions should be given great weight.

FDIC raises a cloud of objections in its Response. We will comment on some of them. FDIC points out in its Response that Willner now seeks more by the Lodestar approach then previously sought by the percentage of the common fund preserved approach. This Court has mandated the Lodestar approach.

On page 32 of its Response, FDIC says "There is nothing in the record showing that the Interagency agreement was secret." As pointed out in our opening brief, the Interagency agreement

between RTC and FDIC says:

> "Each agreement will be specific in its findings **and will not be made public by either party**, except as required by IRS information sharing agreements with the various states, or other provisions of law." (Ex. E) (emphasis added)

We read this language as calling for a secret agreement. The shareholders are neither the IRS nor a state government. There is also no question that FDIC and its predecessor agreed in the Interagency Agreement that:

> "The RTC will not challenge in any forum the amount (of tax) finally determined by the IRS." (Ex. E) (emphasis added)

**C.    Conclusion**

The amounts claimed in this Summary Judgment Motion are supported by the law and the facts, and are reasonable and deserving for Willner's lead counsel role in reducing the $1.2 billion IRS claim to $50 million.

This Court should enter judgment for Don S. Willner and Associates, P.C. in the amount of $958,076.10 for additional fees and $1,408.34 for additional costs, plus expenses and costs incurred herein.

Dated this 25th day of August, 2008.

Respectfully submitted,

Of Counsel:
KELBY D. FLETCHER
Peterson, Young, Putra,
2800 Century Square
1501 Fourth Avenue
Seattle, WA  98101-1609
Tel:    206-624-6800
Fax:    206-682-1415

____s/Don S. Willner 08/25/08_____
DON S. WILLNER
Don S. Willner & Associates, P.C.
630 Sunnyside Road
Trout Lake, WA  98650
Tel:    509-395-2000
Fax:    509-395-2939

JEREMIAH A. COLLINS
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, N.W., Suite 1000
Washington, DC  20005
Tel:    202-842-2600
Fax:    202-842-1888
Counsel for Plaintiff