# DECLARATION OF DON S. WILLNER

I, Don S. Willner, declare under penalty of perjury under the laws of the United States and the State of Washington that the following is true and correct to the best of my knowledge and belief.

1.     I am the principal of Don S. Willner & Associates, P.C. and the lead counsel for this plaintiff in this case.

2.     The excerpts from transcripts cited in the Reply Memorandum are true copies of the originals.

3.     I now have personally reviewed my original time records from 2003 through 2006 which were made contemporaneously and are accurate to the best of my knowledge and belief. This summary omits recorded time spent for other clients on these same days, including time spent in Washington, D.C. and during plane flights. For example, the time from June 16, 2000 to June 18, 2005 also involved a different case in Federal Court in Virginia which time is carefully excluded. The plane time was allocated two-thirds (2/3) to the Virginia case and one-third (1/3) to this case. On page 9 of the FDIC memorandum, FDIC comments that I recorded seven hours on either November 19, 2002 or November 21, 2002 and that there was a Court appearance in the Goodwill case on one of those days. I cannot now locate my November, 2002 time records, but have had a uniform practice of correctly allocating time to separate cases.

However, I have located my pocket calendar for 2002 which shows that I flew to Washington, D.C. on November 18, 2002 and prepared for a tax conference. There was then a tax conference with FDIC on November 19, 2002. On November 20, 2002 I worked in Washington, D.C. on oral argument and the oral argument in *Suess v. United States* (the

Goodwill case) took place on November 21, 2002 after which I flew to Seattle. The pocket calendar does not keep track of time, but the seven hours allocated in November, 2002 to the tax case in the four day period certainly appears reasonable.

4. Attorneys Catherine Topping and Hugo Zia represented FDIC in the tax settlement matter for two years before they were replaced by Richard Gill.

5. My time records on the tax matter start on May 2, 2002. Winston & Strawn joined the discussions on November 16, 2002, although I remained sole attorney of record in the motion to intervene.

6. Mike Duhl, CPA, has consistently taken the position that he did not believe any waiver from FDIC was required in order for him to talk to me about the Benj. Franklin federal financial assistance issue. I believe he also so testified in his Chicago deposition on June 28, 2002, but that transcript is not currently available to me.

7. I approach this subject with sadness. It is, however, one of the Lodestar factors and explanation is needed. Suess, as a large shareholder and the original Plaintiff, worked closely with me from 1990 to 2002. After the 2002 Claims Court decision on damages, Suess then wrote a highly critical letter to the trial Judge, Chief Judge Smith, about his Decision without telling me or the other Plaintiffs. Suess objected to my stipulation with the government that the offending letter should be withdrawn from the record. Here, Mr. Suess was acting in a way which could have prejudiced the interests of the other plaintiffs and the many absent shareholders.

Suess tried to instruct me not to file a motion for reconsideration of Judge Smith's decision, which later resulted in a $17 million increase. Suess' objections were contrary to the interests of the shareholders.

Suess also attempted to instruct me not to share our discussions with the other Plaintiffs, a violation of my ethical duties. At that point, the other Plaintiffs, after receiving independent legal counsel, took over management of the case and, although invited, Suess declined a further role in the management of the case until December 2006 and made no further financial contributions. The Declaration of plaintiff Richard A. Green summarizes in detail my role and that of Suess. (Ex. LL). Also see Ex. JJ.

In late December 2006, Chief Judge Smith, upon Suess' motion, appointed Thomas Buchanan as lead counsel for the appeal, with me as "of-counsel". I also continue to have other responsibilities in the litigation.

Starting in 2002, Suess filed two complaints against me with the Oregon State Bar, both of which were dismissed as without merit. Suess also wrote letters to the shareholders urging them not to contribute to the Litigation Fund, which was not helpful to the progress of the case or to the interests of the shareholders.

It should be noted that Suess' attorney, Buchanan, was asked the following leading question by FDIC during his deposition and answered as follows:

> "Q: Do you think, given Mr. Willner's involvement in this case <u>and the geographic area where he normally practices</u>, do you think an hourly rate of over $500 an hour is reasonable for him? (emphasis added)
>
> A: No. I – I don't think 525 is – is a reasonable rate, but I do think that – the way I view it is I think that whether it's 250 or $300 an hour, <u>and maybe more would be reasonable</u>, but I think he deserves a multiple of that, like twice. (Buchanan deposition, 1/17/07) (Ex. MM). (emphasis added)

I have continued to praise the work of the other members of the tax settlement team while being subjected to the unfair Suess criticism. Suess, Hindes and Siemens did not attend any of the settlement discussions, and their only knowledge of what occurred would come through

Buchanan. They are qualified to evaluate Winston & Strawn's work, but not to fairly evaluate my work.

Executed this 25th day of August, 2008 in Trout Lake, Washington.

_____
Don S. Willner