**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
**WINSTON & STRAWN LLP, _et al._,**          )
                                                        )
      **Plaintiffs,**                                )
                                                        )
      **v.**                                              )
                                                        )       **Civil No. 06-1120 (RCL)**
**FEDERAL DEPOSIT INSURANCE**               )
**CORPORATION, AS RECEIVER FOR**           )
**THE BENJ. FRANKLIN FS&LA,**               )
**PORTLAND, OREGON,**                         )
                                                        )
      **Defendant.**                               )
_____)

## MEMORANDUM OPINION

This attorney's fee dispute comes before the Court after a day and a half bench trial. At issue is the proper compensation owed to plaintiff Ernest M. Fleischer, an attorney hired as a consultant for litigation surrounding a tax claim against the Federal Deposit Insurance Corporation ("FDIC") receivership of the Benj. Franklin Federal Savings and Loan Association ("Benj. Franklin"). Mr. Fleischer has already been paid a total of $89,465.34 by the FDIC, including $1408.34 for expenses and $88,057 for approximately 250 hours of work at $340 to $390 per hour. Mr. Fleischer argues that he should instead be paid according to one of two alternative methods. First, he argues he is entitled to 2% of the $43.4 million surplus preserved after settlement of the tax claims. This would result in a judgment of $778,535 more than what he has been paid, or a total award of ten times his hourly fee. In the alternative, he requests a success fee of twice his hourly rate plus fees on fees, which would result in an award of $223,075 over what the FDIC has already paid him.

1

Having carefully reviewed the evidence presented and all representations made during trial, the record in this case, and the applicable law, the Court now finds that Mr. Fleischer has already been reasonably compensated by the FDIC and is not entitled to additional fees.

## I.  BACKGROUND

As one witness testified, nothing about this case is typical.  Stewart Test., Sept. 24, 2012. The matter involves a group of attorneys (the "shareholder attorneys") who sought compensation for their involvement in settlement discussions, and ultimately a settlement agreement, in a tax case to which their shareholder clients were not parties and in which the attorneys were not of record.  Mr. Fleischer did not directly represent *any* of the shareholders or the parties; he was hired, pursuant to an oral agreement with another shareholder attorney, as a consultant. Moreover, Mr. Fleischer does not seek compensation from a fund created by his efforts, but from surplus funds held in receivership by the FDIC (a receivership surplus being a rarity in itself) that remain after payment of the tax settlement.  Finally, because of the current stage of the litigation, fees for all other participating attorneys have already been determined through arbitration, mediation, and order of this Court.  Thus, some of the legal theories now advanced by Mr. Fleischer have been previously rejected during the litigation and the payments already determined for other shareholder attorneys necessarily shape the equities at play with respect to Mr. Fleischer.

### a.  Context of the Dispute

Because the facts of this case are unusual, and necessarily inform the outcome, they are discussed in some detail here.  In the midst of the savings and loans crisis of the 1980s and 1990s, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989.  The Act prevented federal regulators from, in most cases, counting

supervisory goodwill toward capitalization requirements.  This change rendered Benj. Franklin unable to satisfy minimum regulatory capitalization requirements, and federal regulators seized Benj. Franklin in February, 1990.  The Resolution Trust Corporation ("RTC") acted as Benj. Franklin's receiver from 1990 to 1995, after which the FDIC took over.

As receiver, the FDIC succeeds to "all rights, titles, and privileges of the insured depository institution" and may "take over the assets of and operate the insured depository institution with all the powers of the members or shareholders, the directors, and the officers . . . ."  12 U.S.C. §§ 1821(d)(2)(A)–(B)(i).  The FDIC may also "collect all obligations and money due the institution," and "preserve and conserve the assets and property of such institution."  12 U.S.C. § 1821(d)(2)(B)(ii), (iv).  Ultimately, the FDIC is tasked with liquidating the remaining assets of the institution.  After all depositors, creditors, other claimants, and administrative expenses are paid, the FDIC then distributes any surplus to the institution's shareholders.  12 U.S.C. § 1821(d)(2)(E); 12 C.F.R. § 360.3(a)(10).

The present attorney's fees litigation is shaped by several related developments regarding the receivership of Benj. Franklin.  First, the value of the assets in receivership exceeded liabilities, resulting in a surplus of over $90 million.  This is unusual in that most receiverships under RTC or FDIC supervision have resulted in deficits.  Darmstadter Test., Sept. 24, 2012.  Given the surplus, Benj. Franklin shareholders will receive pro rata distributions of any remaining liquidated assets.

Second, a nearly $1.2 billion claim by the Internal Revenue Service ("IRS") for unpaid taxes, penalties, and interest was lodged against the receivership in 1992 and remained until the settlement of tax litigation in 2006.  Tax claims against receiverships have typically been irrelevant given than most receiverships faced deficits rather than surpluses.  However, the Benj.

Franklin receivership had surplus funds with which to pay at least part of the taxes owed. Moreover, because the receiver and IRS expected the Benj. Franklin receivership to face a deficit, it appears that the receivership's early tax returns were not closely scrutinized by either the FDIC or IRS.  The impact this had on the tax liability and progress of the tax litigation is not entirely clear.

Third, in September 1990, a group of shareholders filed a shareholder derivative suit against the United States in the U.S. Court of Federal Claims, contending that the seizure of Benj. Franklin constituted, among other things, a breach of contract.  *See C. Robert Suess v. United States*, 52 Fed. Cl. 221 (2002) ("CFC suit").  The shareholders were represented by Oregon attorney Don Willner and by Tom Buchanan of Winston & Strawn.  The CFC suit remained pending until August 2012 when an appeal to the Federal Circuit was voluntarily dismissed pursuant to Fed. R. App. Proc. 42(b).  *See Suess v. United States*, Fed. Cir. Ct. App. 2011-5101.  However, until dismissal, the shareholders and attorneys involved in the CFC suit expected that a possible damages award might increase the surplus available for shareholders. The shareholders also knew that the pending tax claim could deplete the entire surplus and any damages won in the Court of Claims and thus sought to participate in discussions and litigation surrounding the tax claim.

### b.   IRS Claim Against the Receivership

#### i.   *Initial Proof of Claim and Filing of Suit*

In September 1992, while the shareholder suit was pending, the IRS filed its first proof of claim for unpaid federal income taxes with the Benj. Franklin receivership in the amount of $862 million with $166 million in interest and $280 million in penalties accruing through November 5, 1992.  Complaint at 5–6, *United States v. FDIC-Receiver*, No. 02-1427 (D.D.C. July 17, 2002).

In 1998, Mr. Willner filed an action seeking appointment of an independent trustee but the action was dismissed after the FDIC-Receiver agreed to attempt to minimize the tax claim and keep the shareholders' attorneys informed about negotiations with the IRS.  *See* Blackwell Pls.' Statement Facts 4, ECF No. 120-1; FDIC's Partial Stipulation to Blackwell Pls.' Statement Facts 2, ECF No. 120-2.  For reasons that remain unclear, little progress was made between 1992 and 2002 to resolve the tax claim.

By 2002, Benj. Franklin had a surplus of more than $90 million.  *Id.*  After an April 2002 judgment of $34.7 million in favor of shareholders in the CFC suit, Mr. Willner sought renewed assurances from the FDIC-Receiver that it would "'make a good faith effort to minimize the IRS tax claim'" and would not make any payments to the IRS without first consulting with the shareholders.  Letter from Don Willner to Bruce Taylor, FDIC Legal Division (May 20, 2002), Pl.'s Ex. 6.  The FDIC responded that it had not agreed to consult with shareholders before paying and that a decision might be made shortly regarding the IRS claim.  Letter from Bruce Taylor, FDIC Legal Division, to Don Willner (June 6, 2002), Pl.'s Ex. 8.  Willner thus became concerned that the FDIC would pay the tax claim and exhaust the surplus.  Willner Dep. 9:18–12:8, Jan. 18, 2007, Pl.'s Ex. 60.

At some point in early- to mid-June 2002, Mr. Willner hired Ernest Fleischer, a tax attorney in Kansas City, Missouri who was Of Counsel to the firm then known as Blackwell Sanders Peper Martin, to serve as a tax consultant.  Fleischer Test., Sept. 21, 2012; Willner Dep. 39:11–20 (stating that Willner "would certainly have talked to Mr. Fleischer before [filing] for the TRO" on June 17, 2002).  Willner explained to Fleischer that he lacked funds to pay him and that Fleischer would have to work on the case on contingency.  Willner Dep. 22:14–20.  Specifically, Mr. Fleischer testified at trial that Willner had told him that, if they were successful,

a fee would be set by a federal district court judge based on Mr. Fleischer's contribution and benefit to his clients.  Mr. Fleischer stated that no specific contingency amount was discussed, but that he understood that something more than his hourly rates would be paid.  Fleischer Test., Sept. 21, 2012.

In June 2002, based in part on Fleischer's advice regarding the tax claim, Mr. Willner filed suit in the U.S. District Court for the District of Oregon to restrain the FDIC from paying the surplus to the IRS.  Fleischer Test., Sept. 21, 2012.  Willner obtained an ex parte TRO and, although this was rescinded just two weeks later for lack of jurisdiction, Willner testified that during the relevant preliminary injunction hearing, the FDIC agreed to advise him before making any payment to the IRS.  Thus, Willner "felt that [he] had the protection [he] needed."  Willner Dep. 42:7–21.

On July 17, 2002, the IRS sued the FDIC-Receiver in the U.S. District Court for the District of Columbia seeking a determination that approximately $1.2 billion in tax and related interest and penalties were due and owing.  Complaint, *United States v. FDIC-Receiver* ("Tax Case").  The tax case was assigned to Judge Emmet Sullivan.  The only attorneys to enter an appearance for the receivership were those for the FDIC-Receiver.  Although Mr. Willner filed a motion to intervene on behalf of the Benj. Franklin shareholders, the motion was denied without prejudice after the case was stayed.  At some point, the FDIC-Receiver and IRS agreed to permit the shareholders' attorneys to participate in negotiations with the IRS, despite the formal position of the IRS and DOJ that the FDIC was the taxpayer and only party in interest with standing to challenge the tax liability.  Darmstadter Test., Sept. 24, 2012.

### ii.  Settlement of Tax Case and Negotiation of Attorneys' Fees

Attorneys from at least four law firms participated in tax settlement discussions on behalf of the shareholders, including lawyers from Winston & Strawn and Spriggs & Hollingsworth, as well as Mr. Willner and Mr. Fleischer.  Mr. Willner was lead counsel for shareholders in these discussions and Mitch Moetell from Winston & Strawn was the lead tax counsel for shareholders.  Fleischer Test., Sept. 21, 2012; Buchanan Test., Sept. 21, 2012.  During at least parts of the settlement discussions, the shareholder clients paid reduced hourly fees to Willner, Winston & Strawn, and Spriggs & Hollingsworth with the understanding that these attorneys would seek a success fee if successful.  Mr. Fleischer does not appear to have been paid anything throughout the settlement discussions.

In November 2005, the parties reached a proposed agreement to settle the tax claim for $50 million.  Letter from Eileen J. O'Connor, Assistant Attorney Gen., Tax Div., U.S. Dep't of Justice, to Richard Aboussie, Assoc. Gen. Counsel, FDIC (Nov. 16, 2005), Def.'s Ex. 18.  This amount would preserve an estimated $44 million for distribution to the shareholders.  As discussed in more detail below, neither party to the current litigation can say exactly why the IRS agreed to settle for this amount.

The FDIC and shareholders' attorneys also agreed to a mechanism by which the attorneys could collect their fees through the FDIC claims process.[1]  The tax case was not a class action or derivative suit which would have required notice of the settlement to class members or shareholders.  However, because of the "unusual facts and somewhat unique situation presented by [the] receivership," the FDIC argued that its responsibility to distribute surplus funds to shareholders raised considerations analogous to those in class or derivate suits.  *See* Unopposed Motion for Fairness Hearing, *United States v. FDIC-Receiver*, No. 02-1427 (D.D.C. July 17,

---

[1] The parties do not claim that this was a "fee agreement," but the FDIC does not dispute that the attorneys are owed reasonable fees through this process.

2002).  Thus, on February 3, 2006, the FDIC-Receiver requested that the Court approve a Notice to Shareholders describing the proposed settlement.  *Id.*  According to the Notice, which the Court approved, the FDIC-Receiver agreed that the shareholders' attorneys would be paid "reasonable fees and expenses . . . in connection with [their] work to reduce the $1.2 billion tax liability alleged by the IRS down to the $50 million settlement amount."  Notice of Proposed Settlement 8, Def.'s Ex. 19.  The Notice further stated that "[w]hile the FDIC has not yet determined the total amount of legal fees and expenses it will approve pursuant to its receivership claims procedures, the amount will likely be between $1 and $2 million."  *Id.* at 8–9.  The Notice was sent to shareholders and on May 2, 2006, the Court held a fairness hearing and approved the settlement.

One of the attorneys involved in settlement discussions, Rosemary Stewart of the firm then known as Spriggs & Hollingsworth, testified that she drafted the Notice to Shareholders and provided it to FDIC counsel who made a few edits before filing it.  Ms. Stewart acknowledged that the attorneys were to be paid "reasonable" fees and would have to file claims through the FDIC's receivership process.  Her testimony, along with correspondence in the record, suggests that she and Don Willner negotiated this agreement with the FDIC one and a half to two years prior to approval of the settlement agreement.

It is unclear the extent to which attorneys from other law firms participated in the negotiation of this attorneys' fee provision.  However, the other attorneys, including Mr. Fleischer, appear to have had notice of the agreement as early as November 2004.[2]  *See* Letter

---

[2] Mr. Fleischer's Proposed Findings of Fact state that he "did not see the Notice [to Shareholders containing the attorney's fees agreement] before it was filed, was not consulted regarding its contents, and did not take part in its preparation."  Pl.'s Proposed Findings of Fact 16, ECF No. 124.  While the Court has no reason to doubt Mr. Fleischer's credibility, and while he may not have been consulted about the Notice, it does appear that he had notice of Willner and Stewart's agreement with the FDIC that it would distribute "reasonable fees and expenses of shareholders' counsel and consultants as approved by the Court and as determined through the receivership process."  This language is nearly identical to that ultimately used in the Notice.

from Don Willner to Robert Clark, FDIC (Nov. 8, 2004), Def.'s Ex. 11; *see also* E-mail from Rosemary Stewart to Tom Buchanan, Michael Moetell, Ernest Fleischer, and Don Willner (Nov. 22, 2004, 2:14 PM), Pl's Ex. 43 (attaching the "side-agreement with FDIC"); E-mail from Rosemary Stewart to Tom Buchanan, Michael Moetell, Ernest Fleischer, and Don Willner (Nov. 22, 2004, 3:26 PM), Pl's Ex. 43 ("As to attorneys' fees, Par.5(c) allows us to seek only the reasonable fees and expenses related to the tax work.").

Ms. Stewart testified that it was the attorneys, not the FDIC, who calculated the estimated $1 to $2 million range in legal fees. Ms. Stewart, Don Willner, and an attorney with Winston & Strawn determined that compensation calculated at their hourly rates would amount to approximately $1 million. Because they planned to seek a multiplier of two in their fee petitions to the FDIC, the outer range was set at $2 million.[3] Ms. Stewart's testimony is bolstered by the November 8, 2004 letter from Don Willner to Robert Clark of the FDIC in which Mr. Willner stated that he understood "reasonable" attorney's fees "as approved by the Court and as determined through the receivership process" would be distributed by the receivership "pursuant to FDIC receivership and administrative procedures." Def.'s Ex. 11. It is unclear what role, if any, Mr. Fleischer played in the discussions about the range of possible attorney's fees and the multiplier that would be sought.

### iii. Post-Settlement Claims for Attorneys' Fees

The shareholder attorneys filed fee petitions through the FDIC process. According to Ms. Stewart, the FDIC granted payment for most of the hours submitted by Spriggs & Hollingsworth and Winston & Strawn but denied their request for a multiplier of two. Mr. Willner sought compensation for approximately 1000 hours based on prevailing hourly rates for

---

[3] In fact, Winston & Strawn's fee agreement with their shareholder client provided that, if successful, they would be paid a success-contingent fee of twice their hourly rates.

complex litigation in Washington, D.C., as well as for a "substantial contingent fee . . . no less than the same contingent fee percentage awarded to the other attorneys." *See* Def.'s Ex. 16 at 3, 14. He also sought payment for expenses and the work his consultants, including $93,600 for 240 hours of work by Mr. Fleischer and $2,200 for Fleischer's expenses. Mr. Willner did *not* seek a multiplier for Mr. Fleischer's fees. Mr. Fleischer was subsequently asked to provide more detail about his hours and expenses and he submitted billing records for 253.6 hours and $1408.34 in expenses. Facsimile from Ernest Fleischer to Richard Gill, FDIC (Mar. 3, 2006), Pl.'s Ex. 48. Mr. Fleischer never directly requested a multiplier but instead described his oral agreement with Willner to be compensated "fairly" and that his understanding that a "'fair' contingent fee amount would be determined by a Federal judge.'" *Id.* The FDIC disallowed payment for 188.75 of Mr. Willner's hours and rejected Willner's request for $525 per hour plus an enhancement, instead paying him $250 per hour, an amount lower than the Laffey rates. Def.'s Ex. 21. The FDIC also disallowed 4.5 hours of Mr. Fleischer's time and ultimately paid him a total of $89,465.34. Def.'s Ex. 22.

After being denied a multiplier, Ms. Stewart decided not to pursue the matter further. Mr. Willner, Mr. Fleischer, and attorneys from Winston & Strawn filed suit in this Court and the cases were consolidated in October 2006. Winston & Strawn sought the same amount it had requested through the FDIC administrative claims process, invoking the Court's authority under 12 U.S.C. § 1821(d)(6) to review FDIC claims or under a quantum meruit theory. Complaint, *Winston & Strawn LLP v. Fed. Deposit Ins. Corp.*, No. 06-1120 (D.D.C. June 20, 2006). Don Willner invoked the same theories to request $880,000 which represented his total hours at $525 per hour plus an approximately 63% success enhancement. *See* Complaint, *Don S. Willner & Associates v. Fed. Deposit Ins. Corp.*, No. 06-1227 (D.D.C. July 7, 2006). Mr. Fleischer

requested 5% of the remaining surplus minus what had been paid to him through the FDIC process.  Complaint, *Blackwell Sanders Peper Martin, LLP v. FDIC*, No. 06-1273 (D.D.C. July 18, 2006).  Winston & Strawn's and Willner's claims amounted to about 2.6% and 2% of the $44 million remaining surplus, respectively, but their claims appear to have been based on their hours worked times a multiplier.

In early 2007, plaintiffs in the consolidated case moved for summary judgment, and FDIC cross-moved.  Plaintiffs appear to have modified their legal arguments to some degree in their motions for summary judgment.  While requesting the same dollar amounts, plaintiffs argued that the common fund doctrine, and specifically the percentage-of-the-fund method, governed their fee request.  However, except for Mr. Fleischer, the plaintiffs merely requested percentages that matched or approximated the amounts they had originally requested from the FDIC based on the hours worked.

Judge Sullivan denied the motions for summary judgment.  As described in more detail below, he rejected plaintiffs' argument that they should be compensated under the "common fund doctrine" based on a percentage of the remaining surplus.  *Winston & Strawn LLP v. Fed. Deposit Ins. Corp.*, No. 06-1120, 2007 WL 2059769, at *4–5 (D.D.C. July 13, 2007) (Mem. Op. 8, ECF No. 31).   Judge Sullivan also found the record insufficient to fully evaluate the fees awarded by the FDIC.  The Court noted that a multiplier "*may* be appropriate to account for additional factors such as the contingent nature of the case." *Id.* at 13 (emphasis added).  Judge Sullivan then referred the dispute to mediation.

The Winston & Strawn plaintiffs ultimately obtained judgment as a result of arbitration in which the mediator recommended they receive their fees plus a multiplier of two.  The Court entered final judgment for Winston & Strawn in that amount and ordered Winston & Strawn to

bear its own costs with respect to litigation over the fees.  Order, Nov. 28, 2007, ECF No. 39; Final J., Nov. 28, 2007. ECF No. 40.

Mr. Willner obtained judgment pursuant to this Court's approval of a Report and Recommendation by Magistrate Judge Facciola.  Judge Facciola's Report recommended that Willner be paid Laffey rates for an attorney with twenty or more years of experience, thus increasing his hourly rates to between $350/hour and $425/hour depending on the years the work was done.  Judge Facciola did not recommend a multiplier and Willner did not receive one.

Mr. Fleischer and the Blackwell firm failed to reach agreement with the FDIC through the first round of mediation and their motion to participate in additional mediation with Mr. Willner was denied.  On August 13, 2012, this Court dismissed Fleischer's firm without prejudice.  Mr. Fleischer himself is thus the only remaining plaintiff.

## II.    LEGAL STANDARD

### a.  Court's Jurisdiction

This court has jurisdiction to review *de novo* claims filed with, and processed by, the FDIC under its administrative claims process.  12 U.S.C. § 1821(d)(5)–(d)(6); *Freeman v. FDIC*, 56 F.3d 1394, 1400 (D.C. Cir. 1995).

### b.  Court's Discretion

Trial courts "enjoy[] substantial discretion in making reasonable fee determinations." *Swedish Hospital v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).  Trial court decisions on attorney fee determinations are reviewable only for an abuse of discretion.  *Id.* (citing *Pierce v. Underwood*, 487 U.S. 552, 563 (1988)).

### c.  Attorney's Fees

The general rule in the American legal system is that each party bears its own attorney fees and expenses. *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1671, (2010) (citing *Hensley*, 461 U.S. at 429); *see also Swedish Hosp.*, 1 F.3d at 1265. Exceptions to this rule are supplied by various fee-shifting statutes and equitable doctrines. *Swedish Hosp.*, 1 F.3d at 1265.

The most common equitable exception is the "common fund" doctrine, which is typically applied in class actions. This doctrine "allows a party who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees." *Id.* The D.C. Circuit has acknowledged that courts historically enjoyed great discretion to calculate a common fund award based on the particular circumstances of the case. A percentage-of-the-fund calculation was the most common method; however, in the wake of large fee awards, a number of courts began to move toward the lodestar method of paying attorneys a product of the reasonable hours expended and the reasonable hourly rate. *Id.* at 1265–66. In *Swedish Hospital v. Shalala*, the D.C. Circuit held that, a percentage-of-the-fund method, and not the lodestar method, "is the appropriate mechanism for determining the attorney fee awards in common fund cases."[4] *Id.* at 1271.

The basis of the common fund doctrine is often said to be the free rider problem that results when fund claimants do not contribute to the fees of the parties and attorneys who fought to create or protect the fund. *See Consol. Edison Co. of New York, Inc. v. Bodman*, 445 F.3d

---

[4] The Circuit noted that the appeal in that case raised "important questions about the reasonable calculation of contingent counsel fees *in class actions* resulting in the creation of a common fund payable to plaintiffs." *Swedish Hosp.*, 1 F.3d at 1263 (emphasis added). However, the court did not specify whether its holding was limited to the class action context. The common fund doctrine itself is not limited to class actions. *See Sprague v. Ticonic National Bank*, 307 U.S. 161, 167 (1939) (recognizing the equitable power of courts to award attorney's fees where equity demands, regardless of the "formalities of the litigation [or] the absence of an avowed class suit or the creation of a fund"). However, this does not answer the question of whether a percentage-of-the-fund method must be applied to non-class action suits as well. For the sake of argument, this Court assumes that the Circuit's holding that the percentage-of-the-fund method applies is not limited to the class action context. The Circuit seems to have implicitly assumed this in *Consolidated Edison*, where the court reversed a district court's refusal to grant fees pursuant to a percentage-of-the-fund calculation to an attorney who did not represent a certified class. 445 F.3d at 442. Moreover, the same concerns that motivated the decision in the class action context will often apply to other common fund cases.

438, 442 (D.C. Cir. 2006) ("[T]he common fund theory conventionally rests on a theory that beneficiaries of the lawsuit would be unjustly enriched if not compelled to pay a share of the fees that made success possible.") (citing *Swedish Hosp.*, 1 F.3d at 1265). "Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The rule provides an incentive for lawyers to take on cases for which the expected value of the litigation for claimants willing to fund the case will not support adequate compensation for counsel. However, the D.C. Circuit has also noted that "[i]n some cases, of course, a subset of potential beneficiaries will have stakes large enough to call forth ample litigation effort; if so, the free-rider concern declines, possibly to nil. This last point would be pertinent, if at all, in calculation of fees." *See Consol. Edison*, 445 F.3d at 443.

The free rider problem explains why fees should be paid from the entire fund, rather than by a few litigants, but does not explain why a percentage of the fund is the appropriate measure of those fees. The D.C. Circuit has explained that the latter practice: (1) promotes efficiency by basing the attorney award on the amount won; (2) more closely resembles the market practice of contingent fee litigation; (3) conserves scarce judicial resources by not requiring district judges to review attorney billing information in detail; and (4) requires less subjectivity than a lodestar analysis.

## III. DISCUSSION

### a. Fleischer Entitled to Reasonable Attorney's Fees

The parties agree that Mr. Fleischer is entitled to compensation for the services he provided during the tax settlement discussions. However, the FDIC argues he has been paid

"reasonable" fees based on the hours he worked and his hourly rate.  Mr. Fleischer argues that he is due either a percentage of the surplus or a success fee.

### b.  Settlement Agreement Governs Attorney's Fees Owed

As already noted, Judge Sullivan previously rejected the common fund theory now advanced by the plaintiff.  The parties dispute whether the law of the case doctrine mandates the same result in the present opinion.  However, the applicability of the law-of-the-case doctrine is irrelevant because the Court agrees with Judge Sullivan's reasoning and conclusions.  As a preliminary matter, Judge Sullivan presided over the tax litigation that led to settlement and the agreement to pay attorneys' fees.  When he denied summary judgment in the present litigation, he thus brought to the bench an understanding not only of the present dispute but of the agreement underlying that dispute.

Moreover, as explained more fully below, the Court agrees with Judge Sullivan's analysis that this case deals not with a typical attorneys' fee award at the close of litigation, but with review of the FDIC's administrative determination of reasonable fees as provided for in the Notice to Shareholders.  As Judge Sullivan noted, "[p]laintiffs are not seeking attorney fees in the Tax Case itself.  Nor were plaintiffs' clients . . . even parties to the Tax Case. . . .  Nor are plaintiffs seeking an award from the opposing party in interest in the Tax Case, the United States."  *Winston & Strawn*, 2007 WL 2059769, at *4 (Mem. Op. 8, ECF No. 31).  Instead, Judge Sullivan noted that plaintiffs had sought payment from the FDIC through its administrative claims process and that the Court's "only purpose is to review the FDIC's payment decisions . . . [which were] part of an overall agreement reached amongst the parties to settle the Tax Case. . . .  [That] agreement stated that the FDIC would pay plaintiffs 'an amount representing the reasonable fees and expenses.'"  *Id.*

15

Although the agreement did not define what constituted "reasonable" fees, Judge Sullivan concluded that the term should be interpreted in light of prevailing law governing reasonable attorneys' fees in other contexts. *Id.* at 5. Although the percentage-of-the-fund method is used to determine "reasonable" fees in the common fund context, Judge Sullivan found that this was not appropriate here. *Id.* Specifically, provision in the agreement of an estimated $1 to $2 million for attorneys' fees demonstrated that the parties did not expect that a standard percentage-of-the-fund method would be used. *Id.* That method would normally result in an award of twenty to thirty percent of the remaining fund, which in this case would have required the agreement to provide for fees of roughly $8 to $12 million. *Id.*

As discussed below, given the fact that the parties appear to have contemplated use of the lodestar method, with or without a multiplier, what constitutes "reasonable" fees should not be determined based on the percentage-of-the-fund method but on the lodestar method.

### c.  Common Fund Doctrine Not Applicable

Even if the Notice to Shareholders had not seemed to provide for a lodestar calculation, the percentage-of-the-fund method would nevertheless be inappropriate.

Neither Mr. Fleischer nor any of the other shareholder attorneys represented parties to the litigation. In fact, Mr. Fleischer did not represent any shareholder client directly, but was hired as a consultant by Mr. Willner. The only parties to the Tax Case were the FDIC and the IRS. Common fund cases routinely discuss application of the doctrine to "parties" or "litigants" who create, preserve, or increase the value of a fund. *See Swedish Hosp.*, 1 F.3d at 1265, 1268–69. The plaintiff cites no law to show that the *Swedish Hospital* holding should apply to attorneys such as himself who are not of record or who were hired as consultants. The Court has been able to find only one case, not binding in this Circuit, suggesting that attorneys not of record might

16

qualify for attorney's fees under the common fund doctrine.  *See Gottlieb v. Barry*, 43 F.3d 474

(10th Cir. 1994) (holding, in settlement of securities class action, that nondesignated class

counsel and class members whose arguments led to reduction of fees to be awarded to various

counsel were entitled to attorneys' fees).  However, this approach has been rejected in at least

one circuit, which noted that "simply doing work on behalf of the class does not create a right to

compensation; the focus is on whether that work provided a benefit to the class. . . .  Non-lead

counsel will have to demonstrate that their work conferred a benefit on the class beyond that

conferred by lead counsel."  *In re Cendant Corp. Securities Litigation*, 404 F.3d 173 (3d Cir.

2005).  However, even if the common fund doctrine and percentage-of-the-fund method can be

applied to non-party attorneys, other concerns militate against application of this method.

The concerns of the D.C. Circuit supporting application of the common fund doctrine and

the percentage-of-the fund calculation are not as applicable in this case as they may be in cases

in which the attorneys brought the case or represented parties to the underlying litigation.  First,

here there is less of a free rider problem.  In this case, shareholders holding a large percentage of

the outstanding shares funded much of the litigation effort leading up to and including the Tax

Case.  The D.C. Circuit has noted that where a subset of potential beneficiaries have stakes large

enough to fund litigation, the free-rider concern declines "possibly to nil" and that this would be

pertinent in calculation of fees.  *Consol. Edison*, 445 F.3d at 443; *see also C. Robert Suess v.*

*Fed. Deposit Ins. Corp.*, 770 F. Supp. 2d 32, 40 (D.D.C. 2011) (rejecting claim for common fund

attorney's fees by largest shareholder in part because of lack of free rider concern).  Moreover,

although the record does not contain much detail on the topic, it appears that the FDIC has

already distributed over $3 million to reimburse 4200 shareholders for contributions to a

litigation fund to pay Willner and attorneys from Winston & Strawn and Spriggs &

17

Hollingsworth.  This further alleviates concerns that other claimants will be able to free ride off of a few shareholders' efforts.  Finally, any payments by the FDIC to shareholders' attorneys, whether based on a lodestar or a percent of the fund, will be made from the fund as a whole and thus will thus affect all shareholders' distributions.

The concerns driving *Swedish Hospital*'s percentage-of-the-fund holding are also less applicable where, as here, the attorney requesting compensation was a consultant.  In adopting the percentage of the fund calculation, the D.C. Circuit noted that such a method more closely resembles market contingent fee practices.  However, that concern is less relevant for attorneys, like consultants, who are often paid on an hourly, rather than a contingent basis.  *See* Willner Dep. 23:3–10 (stating that he had hired a variety of expert witnesses and experts during his career and that they were normally paid hourly rates).

Third, the percentage of the fund theory would appear more difficult to administer in this case than a lodestar-type approach because of the participation of various parties and the inability to tease out what portion of the fund the shareholder lawyers were responsible for.  Here, the funds available after settlement of the tax claim necessarily depended on the surplus that existed before settlement, any successes obtained by the FDIC attorneys, and the reasons why the IRS agreed to settle for $50 million (which no witness was able to fully explain).

Finally, the Supreme Court has noted that "[a]s in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility."  *Sprague*, 307 U.S. at 167.  The facts of this case are highly unusual and do not readily fit the typical percentage-of-the-fund mold.  The parties have not succeeded in convincing this Court to apply a broadly outlined doctrine to a case in which the doctrine would clearly not produce equitable results.

**d.  Even if Common Fund Doctrine Applied, Mr. Fleischer Has Not Met His Burden**

"'[T]he unarticulated threshold requirement for application of the common-benefit doctrine is that the claimant must enjoy some form of success on the merits of the litigation.'" *Consol. Edison*, 445 F.3d at 457 (quoting I Alba Conte, *Attorney Fee Awards* § 2.1, at 41 (3d ed. 2005)).  Further the "claiming parties' litigation [must] have played a causal role in achieving the benefits for which they seek reimbursement."  *Id.* at 451 (citing cases and a secondary source suggesting that the attorney's actions must be a "substantial cause," a "cause-in-fact," or a "but for" cause of the benefit); *see also Consol. Edison*, 445 F.3d at 460 ("[P]ayment should be allowed 'only as a reasonable proportion of the amount actually collected . . . for which petitioners' attorneys were responsible,' i.e., proportional to the degree to which the civil litigation enhanced the probability of pay-out to the beneficiaries in question and the amount distributed.") (citing *Democratic Central Committee of D.C. v. WMATC*, 38 F.3d 603, 606 (D.C. Cir. 1994)).

Here, it is reasonable to assume that Mr. Fleischer and the other attorneys may have assisted in obtaining a successful outcome for the shareholders.  However, it is not clear that Mr. Fleischer's actions were a "substantial cause" or a "but for" cause of that success.  Fleischer cites several primary contributions to the settlement agreement and preservation of the remaining $44 million surplus.  First, he argues that he provided the legal theory that supported Mr. Willner's request for a TRO restraining the FDIC from making any payment to the IRS.  However, the TRO only restrained the FDIC for approximately two weeks before it was rescinded for lack of jurisdiction.  Mr. Willner in a deposition, and Mr. Fleischer in trial testimony, stated that the TRO was instrumental in convincing the FDIC not to pay the IRS without first notifying

shareholders.   However, it appears that Mr. Willner, rather than Mr. Fleischer, was more instrumental in obtaining authorization for the shareholders' attorneys to participate in settlement discussions.   Willner Dep. 12:15–14:5.   Mr. Fleischer also points to tax advice, informed by his unique experience in the taxation of another savings association, provided during settlement discussions.   However, several witnesses testified that the IRS was not receptive to the theories proposed by Mr. Fleischer.   Buchanan Test., Sept. 21, 2012; Stewart Test., Sept. 24, 2012; Willner Dep. 19:17–20:2.

Mr. Fleischer also acknowledges that other attorneys, including FDIC attorneys, contributed to the parties' ability to reach a settlement that preserved a surplus.   In addition to participating in settlement discussions generally, the FDIC prepared a memorandum regarding the tax treatment of $258 million in post-insolvency interest, which apparently was one of the few theories the IRS accepted.   Fleischer Test., Sept. 21, 2012.   Mr. Fleischer acknowledged that if the IRS had not accepted the FDIC's position on that issue, the surplus also would have been wiped out.   *Id.*   Moreover, the IRS was responsible for preparing the scenario upon which the FDIC's final settlement offer was based.

As a result, Mr. Fleischer has not shown the benefit conferred by him beyond that conferred by other shareholder attorneys or by the FDIC.   *Cf. In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 333 (3d Cir. 1998) (rejecting a fee award to class counsel in a case in which state government lawyers also performed much of the investigation and negotiation and criticizing the district court for "not attempt[ing] to distinguish between those benefits created by the [state attorneys] and those created by class counsel").

In fact, none of the witnesses could say exactly why the IRS chose to settle for $50 million and various witnesses advanced very different theories for the basis for the settlement.

Ms. Stewart suggested the IRS was swayed by the equities at play in the situation, namely, the rarity of a receivership with a surplus and the human story of many elderly shareholder investors who stood to gain from a distribution of the remaining surplus.  She believed that the IRS never intended to hold fast to their claim for $1.2 billion; if this were the case, she testified, there would have been no reason to involve the shareholders in settlement negotiations.   Mr. Buchanan's testimony implied that the IRS, although unwilling to reduce the tax liability to zero, was trying to find a way to settle for some amount that would preserve a surplus.  He stated that the shareholders had equities on their side.  He emphasized that the settlement was a compromise and agreed that it was fair to characterize it as a "black box settlement" that produced a fair result but the legal basis of which was never entirely clear.  Mr. Fleischer also acknowledged that he does not know what legal theories the IRS did or did not accept, and that he does not know the basis upon which the IRS reduced its claim from $1.2 billion to $50 million.

Even if Mr. Fleischer succeeded in showing that he contributed to some degree to the settlement, courts are within their discretion to apply a percentage of the fund calculation to only that portion of the fund for which counsel was responsible." *Swedish Hosp.*, 1 F.3d at 1272.  Mr. Fleischer has not demonstrated that he was responsible for a settlement amount that preserved all $44 million of the remaining surplus and the Court would be unable to calculate what portion, if any, Mr. Fleischer was responsible for.

Finally, given that the common fund doctrine is an equitable exception to the general attorney's fee rule, it is important to note that equity does not favor Mr. Fleischer's request for a percentage of the fund.  None of the other attorneys in this case have been compensated based on the common fund doctrine.  It would inequitable to compensate Mr. Fleischer under a common fund theory when no other attorney has been paid on that basis.  This is particularly true given

that Mr. Fleischer, while he may have contributed creative legal theories, appears to have performed the least amount of work of the four shareholder firms.[5]  Although it is true that the other attorneys could, like Mr. Fleischer, have insisted on a trial, they made decisions regarding their fees based in part on Judge Sullivan's rejection of the common fund theory at the summary judgment stage.

### e.    FDIC Acted Reasonably in Denying Success Multiplier

Mr. Fleischer argues that, if not based on a percentage of the fund, his "reasonable" attorney's fees should nevertheless be twice his hourly rates.  Again this argument hinges on what constitutes "reasonable" fees as provided for in the Notice to Shareholders.

The Court has already outlined why a percentage of the fund would not be "reasonable" in this context.  However, Courts have determined "reasonable" fees through a number of other methods.  In the context of fee-shifting statutes, courts have relied on a lodestar approach, a twelve-factor test, and a combination of the two to determine reasonable fees.  The lodestar approach is simply the product of the reasonable hours expended and the reasonable hourly rate. *Swedish Hosp.*, 1 F.3d at 1266.  The amount calculated could historically be adjusted up or down based on the risk involved or contingent nature of the work and the quality of the attorney's contributions.  *Id.*  The twelve-factor approach bases fees on factors such as the time and labor required, the novelty of the questions, time limitations imposed by the client, etc.[6]  In some

---

[5] Mr. Fleischer submitted billing records for approximately 250 hours of work, significantly less than that submitted by Ms. Stewart (376 hours), Winston & Strawn (1457 hours), and Mr. Willner (approximately 1000 hours). However, Mr. Fleischer did not keep contemporaneous time records and he believes that he may have worked more than 250 hours but still less than 500 hours.  Fleischer Test., Sept. 21, 2012.

[6]  The following twelve factors inform the determination of a reasonable fee:  "1) the time and labor required; 2) novelty and difficulty of the questions involved; 3) the skill requisite to perform the legal services properly; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee; 6) whether the fee is contingent or fixed; 7) time limitations imposed by the client or other circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation, and ability of the attorneys; 10) the 'undesirability' of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases." *Swedish Hosp.*, 1 F.3d at 1266 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

cases, a combination of these approaches has been used.  Recently, however, the lodestar approach, without enhancement by the twelve factors, has emerged as the prevailing method for calculating attorneys' fees.  *Id.* (citing *City of Burlington v. Dague*, 505 U.S. 557 (1992); *King v. Palmer*, 950 F.2d 771 (D.C. Cir. 1991) (en banc)).

Multipliers are now disfavored and fee enhancements are rare.  The Laffey rates are presumed to be the highest reasonable rates in the context of statutory attorney's fees.  *See Swedish Hosp.*, 1 F.3d at 1267 n.3 ("[W]e have generally disavowed the use of enhancement, in recognizing that enhancing factors are reflected in the original lodestar."); *cf. Rooths v. District of Columbia*, Civil No. 09-492, 2011 U.S. Dist. LEXIS 87659, *12 (D.D.C. Aug. 9, 2011).  Indeed, the Supreme Court has stated that enhancements under the lodestar approach for superior results and performance are permitted only "in extraordinary circumstances" and that there is a "strong presumption that the lodestar is sufficient."  *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1669 (2010).  The "party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified."  *Id.*

Mr. Fleischer has already been compensated at his own rates which are comparable to the Laffey matrix.  As with the percentage-of-the-fund calculation, Mr. Fleischer has not met his burden to show, with specificity, that factors not included in the lodestar would justify an enhanced fee.

Mr. Fleischer testified that he was uniquely qualified and had particular experience that allowed him to quickly provide sophisticated legal advice.  Fleischer Test., Sept. 21, 2012.  He stated that, without his prior experience in the taxation of another savings plan, he would have had to spend five to ten times the number of hours on the case.  *Id.*  Moreover, he suggested that

the risk of his not collecting any fee also supports his request for a multiplier. Finally, Mr. Fleischer again points to his contributions to the tax settlement.

However, attorney experience is already reflected in the Laffey rates. Moreover, the Supreme Court has said that the "quality of an attorney's performance generally should not be used to adjust the lodestar." *Perdue*, 130 S.Ct. at 1673. More importantly, Mr. Fleischer, while he may be a highly capable tax attorney, simply has not met his burden of showing that his efforts were extraordinary or that he is uniquely responsible for the settlement obtained. As already discussed, the IRS was not receptive to his legal theories and may have been more persuaded by the equities at play in the case than by any tax arguments advanced by Mr. Fleischer. The FDIC attorneys and other attorneys working on the case also appear to have contributed to the settlement agreement reached. Finally, no other attorney has been awarded a success fee by this Court. It is true that Winston & Strawn obtained twice their fees; however, this was negotiated in arbitration and was due in part to admissions by the FDIC that Winston & Strawn had done significant work. The results of an arbitration process are not binding on this Court.

Mr. Fleischer argues that the holding of *Perdue* with respect to fee enhancements is not applicable here because that case was based on interpretation of a federal fee-shifting statute and because it was decided after Fleischer decided to provide services on a contingent basis. Pl.'s Proposed Conclusions Law 15, ECF No. 125. However, these arguments are without merit. *Perdue* is instructive not only for its holding, but for its discussions of lodestar calculations more generally. This Court relies on *Perdue* to better inform its review of whether the FDIC's determinations were "reasonable" in comparison with other attorney fee calculations. Finally,

the language of *Perdue* confirms a trend that had been taking place long before that decision in 2010.

>       **f.   Mr. Fleischer Is Not Due Fees on Fees**

Mr. Fleischer has not succeeded in showing that a fee enhancement was wrongfully withheld by the FDIC.  As such, he cannot succeed on his claim for fees on fees.  Moreover, even if he had successfully demonstrated his entitlement to a multiplier, he would not be owed fees on fees for the expenses associated with the current litigation.

This Court permitted Mr. Willner to recover the costs for preparing his fee petition. However, neither Mr. Willner nor Winston & Strawn were granted costs for litigating their attorneys' fees claims in this Court.

## IV.   CONCLUSION

Mr. Fleischer has already been reasonably compensated by the FDIC for his work on the tax settlement.  Of the approximately 250 hours he reported working, he was compensated at his hourly rates for all but 4.5 hours.

Mr. Fleischer is not entitled to a percentage-of-the-fund award.  In this case, the FDIC agreement to pay "reasonable" attorney's fees governs the determination of what fees are owed to Mr. Fleischer.  The parties clearly did not contemplate that "reasonable" fees would be calculated based on a percentage of the fund, which would likely have entailed payment of fees in the range of $8 to $13 million, rather than the $1 to $2 million requested by the parties. Moreover, other shareholder attorneys stated that they planned to ask for a success modifier of twice their hourly rates, and not a percentage of the remaining surplus funds.  The percentage-of-the-fund doctrine is simply not applicable in this case.  Even if that method were found to be

governing, Mr. Fleischer would not have met his burden to show that his efforts caused the preservation of the surplus.

Mr. Fleischer is not due a success fee.  Success enhancements are now rare and fees calculated by the lodestar method are presumed adequate.  Mr. Fleischer would need to produce specific evidence that a factor not included in the lodestar would mandate a fee enhancement. He has not done so.

Finally, Mr. Fleischer is not due fees on fees, both because he did not prevail on his request for a fee enhancement and because fees on fees would nevertheless be inappropriate.  An appropriate Order and Judgment accompanies this Memorandum Opinion.


Signed by Royce C. Lamberth, Chief Judge, on October 2, 2012.